# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

No. 23-3247

THE SATANIC TEMPLE, INC.

      Plaintiff-Appellant

          v.

TODD ROKITA and
RYAN MEYERS

      Defendants-Appellees

Appeal from the United States
District Court for the Southern
District of Indiana, Indianapolis
Division.


No. 1:22-cv-01859-JMS-MG

Jane Magnus-Stinson, *Judge*


## PLAINTIFF-APPELLANT'S BRIEF

W. James Mac Naughton, Esq.
7 Fredon Marksboro Road
Newton, NJ 07860
wjm@wjmesq.com
732-213-8180
Attorney for Plaintiff-Appellant
The Satanic Temple, Inc.

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>23-3247</u>

Short Caption: <u>The Satanic Temple, Inc. v. Todd Rokita and Ryan Meyers</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>The Satanic Temple, Inc.</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>W. James Mac Naughton</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

      <u>None</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      <u>None</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: _____     Date: <u>January 29, 2024</u>

Attorney's Printed Name: <u>W. James Mac Naughton</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑   No ☐

Address: <u>7 Fredon Marksboro Road</u>

    <u>Newton, NJ 07860</u>

Phone Number: <u>732-213-8180</u>      Fax Number: <u>732-875-1250</u>

E-Mail Address: <u>wjm@wjmesq.com</u>

rev. 12/19 AK

# TABLE OF CONTENTS

I. JURISDICTIONAL STATEMENT ....................................... 1

II. STATEMENT OF ISSUES ................................................ 1

III. STATEMENT OF THE CASE ............................................ 2

    A. Facts ................................................................................ 2

    B. Procedural History .......................................................... 9

        1. The District Court Held TST Does Not Have Standing As an Abortion Provider Because TST Does Not Intend to Establish a Licensed "Abortion Clinic" in Indiana. ..................... 12

        2. The District Court Held TST Does Not Have Standing as a Religious Organization Because TST Does Not Intend to Establish a Licensed "Abortion Clinic" in Indiana. ..................... 18

        3. The District Court Held TST Does Not Have Associational Standing Because TST Refuses to Identify its Members by Name. .......................................... 19

IV. SUMMARY OF ARGUMENT ........................................... 23

V. ARGUMENT ................................................................. 24

    A. The District Court's Finding That TST Does Not Have Standing Is Reviewed *De Novo.* ........................................ 24

    B. TST Has Standing Because it Will Commit a Felony if it Provides a Medical Abortion by Telemedicine to an Indiana Member. ................................................................. 26

C.  TST Has Standing as a Religious Organization Because TST Has and Will Continue to Divert Its Resources to Promote the Satanic Abortion Ritual in Indiana. ......................... 31

D.  TST Members Do Not Have to Be Identified by Name to Establish TST's Standing. ............................................. 35

1.  Individual TST Members Have a Constitutional Right to Privacy. ........................................................................ 35

2. The Application of Local Rule 10-1 to TST in This Case Is Unconstitutional. ................................................... 41

3.  An Anonymous Party Can Have Article III Standing. ... 41

4.  *Summers* Does Not Bar the Use of Statistical Analysis Admissible Pursuant to Fed. R. Evid. 702 to Identify an Individual Member. ....................................................... 44

5.  Expert Testimony Can Establish the Existence of an Anonymous Individual With Sufficient Specificity to Establish Standing. ...................................................................... 46

6. Dr. J.D.'s Opinion Proves There are Ninety-four (94) TST Members in Indiana Each Year Who Are Involuntarily Pregnant Women. ........................................................ 50

7. The District Court Erred by Ignoring Dr. J.D.'s Opinion ......................................................... 53

8.  All TST Indiana Members Have Standing Due to Stigmatic Injury. .......................................................... 54

E.  The District Court Erred By Dismissing Without Leave to Amend. ............................................................................ 58

VI.   Conclusion ............................................................. 58

VII. Certificate of Compliance With Type-Volume Limit
Typeface Requirements, and Type-Style Requirements ........... 61

TABLE OF CONTENTS FOR APPENDIX TO THE BRIEF..... 63

# TABLE OF AUTHORITIES

## CASES

*520 Michigan Ave. Associates v. Devine*, 433 F.3d 961 (7th Cir. 2006).. 47

*Alliance For Hippocratic Medicine v. U.S. Food & Drug Admin.*, 78 F. 4th 210 (5th Cir. 2023), *cert granted* __ U.S. ___ ................................. 46

*Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) ................................................................................................ 47

*American Bottom Conservancy v. U.S. Army Corps*, 650 F.3d 652 (7th Cir. 2011). ..................................................................................... 47

*Ams. for Prosperity Found. v. Bonta*, 594 U.S. __, 141 S. Ct. 2373 (2021) ...................................................................................... 43

*Anonymous Plaintiff #1 et al v. The Individual Members of The Medical Licensing Board of Indiana, et al.*, Dkt. No. 49D01-2209-PL-031056 56

*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) ...................................... 59

*Baker v. State*, 569 N.E.2d 369 (Ind. Ct. App. 1991).............................. 54

*Bates v. Little Rock*, 361 U.S. 516 (1960)................................................ 37

*Bauer v. Shepard*, 620 F.3d 704 (7th Cir. 2010) ..................................... 28

*Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014)..................................... 55

*Buckley v. Valeo*, 424 U.S. 1 (1976)................................................. 40, 43

*Catholic League v. City of San Francisco*, 624 F.3d 1043 (9th Cir. 2010)............................................................................ 55

*Coates v. Johnson Johnson*, 756 F.2d 524, 538 (7th Cir. 1985).............. 49

*Common Cause Ind. v. Lawson*, 937 F.3d 944 (7ᵗʰ Cir. 2019) .... 33, 34, 35

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)... 22, 49, 53

*Disability Rights Wisconsin, Inc. v. Walworth County Board of Supervisors*, 522 F.3d 796 (7ᵗʰ Cir. 2008) ........................................... 42

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. __, 142 S. Ct. 2288 (2022) ..................................................................................... passim

*Doe v. Bolton*, 410 U.S. 179 (1973) ......................................................... 27

*Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840 (7th Cir. 2012)..................... 57

*Doe v. Parson*, 960 F.3d 1115 (8ᵗʰ Cir. 2020) ........................................ 48

*Doe v. Stincer*, 175 F.3d 879 (11ᵗʰ Cir. 1999) ........................................ 22

*Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058 (9ᵗʰ Cir. 2000) ........................................................................... 38, 41, 43

*Elk Grove Village v. Evans*, 997 F.2d 328 (7th Cir. 1993) .............. 47, 53

*Ezell v. City of Chicago*, 651 F.3d 684 (7ᵗʰ Cir. 2021)............................ 28

*Gastineau v. Wright*, 592 F.3d 747 (7ᵗʰ Cir.2010).................................. 26

*GenBioPro, Inc. v. Sorsaia*, Civil Action 3:23-0058 (S.D.W.Va. Aug. 24, 2023) .......................................................... 4, 12, 16, 18, 29

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) .................. passim

*Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333 (1977). 19

*June Med. Servs. LLC v. Russo* , ⸺ U.S. ⸺, 140 S. Ct. 2103 (2020) ................................................................................................. 27

*Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, 782 F.3d 353 (7th Cir. 2015) ................................................................. 49

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .............................. passim

*Lukaszczyk v. Cook Cnty.*, 47 F.4th 587 (7th Cir. 2022) ...................... 34

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ......................................... 47

*McCormack v. Hiedeman*, 900 F. Supp. 2d 1128 (D. Idaho 2013), *aff'd sub nom*, *McCormack v. Herzog*, 788 F.3d 1017 (9th Cir. 2015) ......... 27

*NAACP v. Alabama*, 357 U.S. 449 (1958) ...................................... passim

*Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015) ................................................................... 21, 42

*Perry v. Village of Arlington Heights*, 186 F.3d 826 (7th Cir. 1999) ...... 24

*Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908 (7th Cir. 2015) ................................................................. 27

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002 (7th Cir. 2021 ............................................... 21, 22, 42

*Roe v. Wade*, 410 U.S. 113 (1973) ......................................... 52

*Singleton v. Wulff*, 428 U.S. 106 (1976) ............................... 35, 52

*Snell v. Cleveland, Inc.*, 316 F.3d 822 (9th Cir. 2002) ............... 58

*Southern Methodist Univ Ass'n v. Wynne & Jaffe*, 599 F.2d 707 (5th Cir. 1979 .................................................. 36

*Spokeo, Inc. v. Robins*, 538 U.S. 330, 136 S.Ct. 1540 (2016) ................ 55

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ................... passsim

*Talley v. California*, 362 U.S. 60 (1960) ................................................. 37

*Thornburgh v. American College of Obstetricians & Gynecologists*, 476 U.S. 747 (1986), *overruled in part on other grounds, Planned Parenthood v. Casey,* 505 U.S. 833 (1992) .......................................... 36

*United Church v. Chicago*, 502 F.3d 616 (7th Cir. 2007) ....................... 43

*United States ex rel. Health v. Wis. Bell, Inc.*, 75 F.4th 778 (7th Cir. 2023) ............................................................................................. 49

*United States v. Hall*, 165 F.3d 1095 (7th Cir.), *cert. denied*, 119 S.Ct. 2381 (1999). .......................................................................................... 53

*Village of Elk Grove Village v. Evans*, 997 F.2d 328 (7th Cir. 1993) ..... 47

*Walker v. Soo Line Railroad*, 208 F.3d 581 (7th Cir. 2000), ................... 53

*Williams v. Standard Oil Co.*, 278 U.S. 235 (1929) ................................. 41

*Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 418 (7th Cir. 2005) .................................................................................... 49

## STATUTES

18 U.S.C. § 1461 ............................................................... passim

21 U.S.C. § 355-1(f)(3)(C) ............................................... 16, 18, 29

28 U.S.C. § 1331 ................................................................. 1

28 U.S.C. §1291 ................................................................. 1

42 U.S.C. § 1983 ................................................................. 9

Indiana Code § 16-18-2-128.7. ........................................... 54

Indiana Code § 16-21-2-2.5 ............................................................ passim

Indiana Code § 16-34-2-1 ............................................................. passim

Indiana Code § 16-34-2-1(d) .................................................................. 32

Indiana Code § 16-34-2-7(a) ...................................................... passim

Indiana Code § 34-13-9-1 et seq. .......................................................... 10

Indiana Code § 35-42-1-4 ...................................................................... 54

Indiana Code § 35-50-2-6(b) .................................................................... 8

## RULES

Fed. R. Civ. Pro. 12(b)(1) ...................................................................... 11

Fed. R. Civ. Pro. 12(b)(6) ...................................................................... 11

Fed. R. Civ. Pro. 15(a)(1)(B) ................................................................. 11

Fed. R. Evid. 702 ................................................................... 44, 46, 49

S.D. Ind. L.R. 10-1 ................................................................... passim

## CONSTITUTIONAL PROVISIONS

First Amendment ....................................................................... passim

# I. JURISDICTIONAL STATEMENT

The District Court had jurisdiction over the action being appealed pursuant to 28 U.S.C. § 1331 because it was a civil action arising under the Constitution and laws of the United States. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because an appeal was timely taken on November 22, 2023, from a final order dismissing the action entered on October 25, 2023. Brief Appendix ("Br.App.") 1 to 3.

# II. STATEMENT OF ISSUES

Does an abortion clinic that provides medical abortions by telemedicine have standing to challenge an Indiana statute that makes providing such an abortion in Indiana a crime?

Does a religious organization that has and will continue to spend money to promote its religious beliefs by establishing an abortion clinic in response an abortion ban have standing to challenge that ban?

Does a religious association have to identify its members by name to have standing to challenge an abortion ban that infringes on the exercise of their religious beliefs?

# III. STATEMENT OF THE CASE

## A. Facts

Plaintiff-Appellant The Satanic Temple, Inc. ("TST") is a Massachusetts non-profit corporation organized as a religious institution. Its mission is to promote the beliefs, ideals, and tenets of TST, provide mutual support for TST members, hold religious services and do community outreach. TST venerates, but does not worship, the allegorical Satan described in Milton's epic poem Paradise Lost - the defender of personal sovereignty against the dictates of religious authority. First Amended Complaint ("Complaint") ECF No. 21 at ¶¶1 to 8.

TST members adhere to seven tenets (the "TST Tenets") commonly associated with secular humanism including the belief that one's body is inviolable, subject to one's own will alone. TST members do not believe a human being comes into existence at conception and oppose government regulation of abortion antithetical to the TST Tenets. Complaint ¶13.

TST promotes the TST Tenets with a variety of programs, including, but not limited to, education and protecting the exercise of TST Tenets from government intrusion. One of those programs is

promoting the Satanic Abortion Ritual, a meditation that alleviates guilt and shame that may be experienced by a woman who gets a medically safe and legal abortion. Complaint Ex. A.

Within months of the U.S. Supreme Court decision in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. __, 142 S. Ct. 2288 (2022) ("*Dobbs*"), Indiana effectively banned abortion based on the belief that a human being comes into existence at conception and abortion is homicide.[1]  In response, TST spent over $75,000 to create a clinic that provides medical abortions by telemedicine (the "Clinic").[2]  TST decided that the effective promotion of the TST Tenets in general and the Satanic Abortion Ritual in particular requires making the abortifacients mifeprestone and misoprostol available at minimum expense.  A-4.

---

[1] Defendant Rokita has argued to the Indiana Supreme Court that "[A]bortion terminates the existence of what science shows to be a distinct living human being with the capacity to think, feel, hear, move, and direct its own development." [citations and internal quotations omitted]. A-13.

[2] The Clinic provides free abortions to anyone who participates in the Satanic Abortion Ritual.  Patients pay only for the abortifacients – about $90.  TST offers help in paying for travel expenses and medicines. https://www.tsthealth.org/about, last visited January 22, 2024.

Creating the Clinic was the first step in that effort. The Clinic currently serves New Mexico residents and is provocatively named "Samuel Alito's Mom's Satanic Abortion Clinic." A-6.

Prior to opening the Clinic, TST's programs were focused on education and advocacy, not the practice of medicine. The creation of the Clinic diverted TST resources from TST's other educational and advocacy programs. A-7.

The Clinic was designed to make abortifacients readily available throughout the country to the fullest extent possible permitted by the Risk Evaluation and Mitigation Strategy ("REMS") Program established by the U.S. Food and Drug Administration ("FDA") for abortifacients.[3] The Clinic was designed to be scalable, meaning it can expand its services into any state with the minimal expenditure of time and money. A-5.

The Clinic uses the following procedure to prescribe and deliver abortifacients (the "Telemedicine Model"):

---

[3] REMS was established pursuant to the FDA's statutory authority in 21 U.S.C. § 355-1(f)(3)(C). See *GenBioPro, Inc. v. Sorsaia*, Civil Action 3:23-0058 at *4 (S.D.W.Va. Aug. 24, 2023) ("*GenBioPro*"). A-276.

- The Clinic maintains a website for purposes of describing its services and providing a means of scheduling an abortion.  The website is at www.tsthealth.org.

- The patient contacts the Clinic through the website or by phone or email.

- Personnel from the Clinic contact the patient by phone or email and collect the information necessary to determine whether abortifacients can be safely prescribed to the patient in accordance with REMS.

- The patient consults with an Advanced Practice Registered Nurse ("APRN") by video link, such as Zoom.[4]

- The APRN must comply with REMS in prescribing abortifacients.

- The APRN determines during the course of the consultation whether writing the patient a prescription for abortifacients complies with REMS.

---

[4] APRN's are "healthcare providers" authorized by REMS to prescribe abortifacients using telemedicine.

- If so, the APRN writes the prescription for abortifacients during the consultation which is filled by a third-party pharmacy authorized by the FDA to dispense abortifacients.

- The abortifacients are sent to the patient by U.S. Mail.

- Mailed delivery typically takes three to five days. Overnight delivery is available at the patient's expense.

- The patient takes the abortifacients at home and can consult with the Clinic at any time if necessary.

A-5 to 6

The Clinic currently employs APRN's licensed in New Mexico to prescribe abortifacients to patients who provide a New Mexico address for the delivery of the abortifacients. A-6. New Mexico is a party to the Nurse Licensure Compact and thus the Clinic can readily have its APRN's licensed in any state that is also a party to the Nurse Licensure Compact. See https://www.nursecompact.com last visited January 13, 2024.

Indiana is a party to the Nurse Licensure Compact. See https://www.in.gov/pla/professions/nursing-home/nursing-licensing-information, last visited January 13, 2024. APRN's employed by the

Clinic can be licensed in Indiana for a filing fee of $50. An APRN

employed by the Clinic and licensed in Indiana can safely prescribe

abortifacients to Indiana residents using telemedicine in accordance

with REMS. A-6. However, that APRN would go to jail because

prescribing abortifacients to Indiana residents using telemedicine in

accordance with REMS and delivering the drugs by U.S. Mail is a Level

5 felony. Indiana Code § 16-34-2-7(a).[5] The Clinic chooses to not require

its APRN's to be licensed in Indiana or otherwise prescribe

abortifacients to Indiana patients due to the threat of criminal

prosecution. A-6.

Indiana Code § 16-34-2-1 permits an abortion only in the following

limited circumstances:

- The abortion is necessary to prevent any serious health risk to

  the pregnant woman or to save the pregnant woman's life.

- The fetus is diagnosed with a lethal fetal anomaly.

---

[5] The statute provides, in pertinent part, "a person who knowingly or
intentionally performs an abortion prohibited by [Indiana Code § 16-34-
2-1] commits a Level 5 felony."

- No abortions are allowed after viability of the fetus or twenty weeks post fertilization.

- The abortion must be performed by a physician.

- The abortion must be performed in a hospital or out-patient surgical center owned by a hospital.

- Only a physician can dispense an abortifacient.

- Abortifacients must be consumed in the presence of the physician.

- "In person" does not include the use of telehealth or telemedicine services.

Failure to comply with any one of these requirements is punishable by a prison term of one to six years and a $10,000 fine. Indiana Code § 35-50-2-6(b).

Indiana Code § 16-34-2-7(a), by incorporating and enforcing Indiana Code § 16-34-2-1 in its entirety (collectively the "Indiana Abortion Ban") prevents the Clinic from providing its services in Indiana using the Telemedicine Model, even in the limited cases of a "serious health risk to the pregnant woman or to save the pregnant woman's life" or a "lethal fetal anomaly." The Clinic does not employ

physicians and has no "hospital" or "surgical center." The cost of complying with these requirements would dramatically increase the cost for the Clinic to fulfill its mission of providing abortifacients by telemedicine and U.S. Mail. A-6.

These requirements also significantly increase the costs for TST members to get an abortion in Indiana. The travel time and waiting periods for an in-person appointment with a physician in a hospital or surgical center means a TST member has to wait longer to get an abortion in Indiana than if she used the Telemedicine Model. A-12.

## B. Procedural History

TST filed its complaint on September 21, 2022, naming the Governor and Attorney General of Indiana as Defendants in an action pursuant to 42 U.S.C. § 1983. The complaint alleges the Indiana Abortion Ban is unconstitutional because 1) a TST member who is pregnant with an "unborn child" due to the failure of her birth control (an "Involuntarily Pregnant Woman") is deprived of her property right to exclude that "unborn child" from her uterus without just

compensation;[6] 2) the statute compels an Involuntarily Pregnant Woman to provide her labor and services to incubate and deliver an "unborn child" in violation of the Thirteenth Amendment prohibition on involuntarily servitude; and 3) a woman who is pregnant due to rape can abort her "unborn child" while an Involuntarily Pregnant Woman cannot in violation of the Equal Protection clause of the Fourteenth Amendment.[7]

The Complaint does not seek to invalidate the Indiana abortion scheme in its entirety. Rather, TST seeks to enjoin the enforcement of the Indiana Abortion Ban against 1) anyone who provides an abortion to an Involuntarily Pregnant Woman; and 2) the Clinic if it prescribes and delivers abortifacients using the Telemedicine Model to TST members in Indiana. Complaint at pp. 15-16.

---

[6] The Complaint alleged "[t]he property right to exclude or remove an [unborn child] from a woman's uterus has substantial commercial value as established by over twenty-five years of experience with gestational surrogacy in Indiana." Complaint at ¶74.

[7] The Complaint also alleged the Indiana Abortion Ban violates Indiana Code § 34-13-9-1 et seq. (the "Religious Freedom Restoration Act" or "RFRA"). Complaint at Counts Four and Five. TST asked for leave to replead these counts as violations of the Free Exercise Clause. App.Br. 24.

On March 23, 2023, TST filed an amended complaint pursuant to Fed. R. Civ. Pro. 15(a)(1)(B) which removed the Governor as a Defendant and added Defendant Ryan Mears in his capacity as Marion County prosecutor. Defendants served discovery on TST to determine the identity of the TST members in Indiana who are Involuntarily Pregnant Women and the nature and scope of services provided by the Clinic. A-264-268.

Defendants then moved to dismiss the Complaint pursuant to Fed. R. Civ. Pro. 12(b)(1) and 12(b)(6), arguing TST failed to state a claim and did not have standing to challenge the constitutionality of "S.B. 1."[8] While the motion was pending, the District Court ordered further briefing on recent U.S. Supreme Court decisions regarding standing.

---

[8] "S.B.1" refers to Senate Bill 1, a copy of which is annexed at Br.App. 27. S.B.1 changed the regulation of abortions in Indiana in response to *Dobbs*. S.B.1 amended Indiana Code § 16-34-2-1 effective September 15, 2022, by, *inter alia*, limiting abortion to cases where pregnancy put the mother's life at risk or there is a lethal fetal abnormality. Br.App.38 to 41. S.B.1 made the Level 5 felony provisions of Indiana Code § 16-34-2-7(a) applicable to Indiana Code § 16-34-2-1 in its entirety. Br.App. 58. S.B.1 eliminated "abortion clinic" as a place where abortions could be performed. See Brief Appendix B at pp. 27, 32 to 37, 44, 51 to 54, and 58 to 61. The District Court mistakenly identified S.B.1 as "Indiana Code § 16-34-2-1(a)." Br.App. 4.

ECF No. 35. TST's brief was filed as required on August 21, 2023. ECF No. 57.

The *GenProBio* decision was handed down three (3) days later on August 24, 2023, and TST brought it to the District Court's attention by a letter filed August 28, 2023 (the "*GenProBio* Letter"). A-274.

### 1. The District Court Held TST Does Not Have Standing As an Abortion Provider Because TST Does Not Intend to Establish a Licensed "Abortion Clinic" in Indiana.

Defendants argued the Clinic did not "exist" nor was it "likely to exist" because TST made only "generic allegations of an intention to provide abortions to unidentified women at some unspecified time." Defendants relied on the admitted facts that the Clinic employs only APRN's, has no physical facilities and does not currently provide abortions to Indiana residents.

TST submitted the declaration of Erin Helian, its Executive Director who described the Telemedicine Model and stated under oath:

- The APRN's employed by the Clinic could safely prescribe abortifacients in accordance with REMS to TST members in Indiana for inducing abortions at home. The cost for an APRN to become registered in the State of Indiana is about $300.

- The Clinic chooses to not prescribe abortifacients to TST members in Indiana due to the threat of criminal prosecution and jeopardy to the professional licenses of its staff.

- Complying with Indiana's requirements that abortions be provided only by a physician in a hospital or surgical center would dramatically increase the costs for TST to fulfill its mission of efficiently providing abortifacients to Indiana members.

- TST spent over $75,000 to establish and operate the Clinic.

- The Clinic was established in response to *Dobbs* and Indiana's ban on abortions.

- The Clinic was established to promote the Satanic Abortion Ritual.

- Funding the Clinic has diverted resources from other programs to promote the TST Tenets based on education and advocacy.

A-5 to 6

TST also submitted the declaration of Dr. J.D., who holds a Doctorate in Osteopathy and is a Fellow in The American Congress of Obstetricians and Gynecologists. Dr. J.D. is licensed to practice

medicine in four states and has fifteen (15) years' experience as a specialist in obstetrics and gynecology.[9] A-8. Dr. J.D. opined that, to a reasonable degree of medical certainty:

- Ninety-four (94) TST members in Indiana are Involuntarily Pregnant Women during the course of a year and at least one (1) of them is pregnant at any given point in time.

- Due to the travel time and waiting period required by the Indiana procedure, the delivery of an abortion using abortifacients takes longer following the Indiana procedure than using the Telemedicine Model.

- Due to the requirement in Indiana that only a physician with hospital privileges can prescribe abortifacients, the cost of an abortion using abortifacients is more expensive in Indiana than using the Telemedicine Model.

A-10, 12

---

[9] The identity of Dr. J.D. is subject to a protective order due to "the risk of violent retribution from domestic terrorists motivated by animosity to proponents of abortion and non-Christian religious beliefs." A-262.

Based on these facts, TST argued it has standing to invoke the Court's jurisdiction to enjoin the Indiana Abortion Ban, both as a provider of abortions by telemedicine and as a religious organization whose mission is to promote the Satanic Abortion Ritual.

Defendants argued TST did not have standing because "telehealth abortions were already illegal in Indiana prior to the passage of Senate Bill 1." Defendants relied on the 2013 version of Indiana Code § 16-21-2-2.5 which required abortions be performed in licensed "abortion clinics." Defendants failed to tell the District Court "abortion clinics" had been completely removed from Article 16 of the Indiana Code by S.B.1.

Defendants also relied on the Comstock Act of 1873, 18 U.S.C. § 1461 (the "Comstock Act"), which bans the interstate distribution of "every article or thing designed, adapted, or intended for producing abortion." Defendants argued TST "would still be unable to ship mail-order abortions into Indiana from its virtual clinic outside the State" even if enforcement of "S.B. 1" was enjoined.

Defendants did not identify any state laws - other than Indiana Code § 16-21-2-2.5 (2013) or Indiana Code § 16-34-2-1 (2022) that made

abortions illegal in Indiana after the passage of S.B. 1. Even if they had, those laws have been preempted by the FDA pursuant to 21 U.S.C. § 355-1(f)(3)(C) to the extent it is impossible for TST to comply with both those state laws and REMS. See *GenBioPro* at *25 (REMS alone "dictates the manner in which mifepristone may be prescribed.").

TST submitted the opinion of the General Counsel of the United States Postal Service that the mailed delivery of abortifacients is not illegal under the Comstock Act when "the sender lacks the intent that the recipient of the drugs will use them unlawfully." A-197. As the General Counsel said, "there are manifold ways in which recipients in every state may use these drugs, including to produce an abortion, without violating state law." TST repeatedly stated it intended to prescribe and distribute abortifacients in Indiana only if it could do so lawfully.

Citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ("*Lujan*"), the District Court said "[t]he intent to engage in possibly unlawful conduct must exceed some-day intentions —those without any description of concrete plans or any specification of when the some-day will be. [internal quotations omitted]." Br. App. 19. The District Court said

TST's intention to provide abortions to Indiana residents was a fact question. Br. App. 20.

The District Court correctly noted TST was not challenging the validity of Indiana Code § 16-21-2-2.5.  The District Court correctly noted TST "does not presently intend" to start an in-person abortion clinic in Indiana, and it "does not presently intend" to seek a license for an abortion clinic in Indiana.  The District Court ruled, in error, that the 2013 version of Indiana Code § 16-21-2-2.5 "remain[s] the law today." Br. App. 7.

The District Court applied the (non-existent) "abortion clinic" requirement to TST's admission it has no plan to construct a licensed "abortion clinic" in Indiana and held that TST did not have injury in fact for purposes of standing because TST "fail[ed] to meet its burden to make clear it intends to engage in conduct that is unlawful under S.B. 1."  Br.App. 20 to 21.

The District Court further said TST had not met the causation and redressability prongs of standing because "other unchallenged federal law and Indiana laws would each independently prohibit the Satanic Temple from operating its mail-order abortion service."  Br.App.

23.   The District Court said the Comstock Act presents a "sharply contested" question of law on whether the Telemedicine Model is lawful. Br.App. 23. The District Court did not mention REMS, the FDA or 21 U.S.C. § 355-1(f)(3)(C).  The District Court struck the *GenBioPro* Letter saying TST "already benefitted from a chance to submit supplemental briefing, and was warned that extraneous materials may be struck."[10] Br. App. 19.

### 2. The District Court Held TST Does Not Have Standing as a Religious Organization Because TST Does Not Intend to Establish a Licensed "Abortion Clinic" in Indiana.

TST submitted uncontroverted evidence it had spent $75,000 to create the Clinic in response to S.B.1's ban on abortions. This money was diverted from TST's other educational programs that promoted the Satanic Abortion Ritual. Citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ("*Havens*"), TST argued this drain on its resources gives

---

[10] That "warning" was directed to the briefing requested by the District Court for recent U.S. Supreme Court decisions on standing. ECF No. 53. That order states "[n]o issues outside the scope of this Order may be raised, and any extraneous material may be struck." It was entered a month before the *GenBioPro* decision was handed down.

it standing as an organization to invoke the Court' jurisdiction to enjoin enforcement of the Indiana Abortion Ban.

The District Court held TST "faces no imminent harm from the enforcement of S.B. 1" due to its "own lack of intent" and "even if the Satanic Temple had diverted its resources, it has fallen short of proving injury in fact." Br. App. 21. The District Court relied on its finding that the Clinic entertained less than "some-day" intentions to expand into Indiana because it did not have a licensed abortion clinic in Indiana. The District Court did not address TST's contention that under *Havens*, the diversion of its resources from other programs to promote the TST Tenets was the requisite "injury in fact" regardless of any risk of criminal prosecution for the Clinic providing telemedicine abortions in Indiana.

### 3. The District Court Held TST Does Not Have Associational Standing Because TST Refuses to Identify its Members by Name.

Defendant argued the standing requirements established by *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333 (1977) ("*Hunt*") and *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ("*Summers*") require an association to identify at least one (1) member by name who

has standing. Defendants argued TST did not have "associational standing" because it did not identify any member by name.

TST argued the identity of its members is protected from disclosure by the Free Exercise Clause of the First Amendment. TST told the District Court that its office was attacked by an arsonist and proponents of its educational programs have received death threats. TST takes these attacks seriously and refuses to "divulge the names of any TST members in these proceedings, even anonymously." A- 15.

TST advised the District Court it does not trust the limited protections provided by S.D. Ind. L.R. 10-1 ("Local Rule 10-1") for a litigant using a pseudonym.[11]  TST pointed out that the passions stirred by the abortion debate have clouded the judgment of even high government officials with access to confidential information to the point that Defendant-Appellee Rokita has been criticized by a state court for publicly announcing a confidential investigation of a physician who

_____

[11] Local Rule 10-1 (a) states "If a litigant seeks to proceed under a pseudonym, at the time of filing his or her initial pleading, the party must file under seal a Notice of intention to seek leave to proceed under such pseudonym and disclose the litigant's true name."  The only other District Court in this Circuit with this disclosure requirement is Local Civil Rule 10(c) in the Eastern District of Wisconsin.

provides abortions and unknown person(s) at the U.S. Supreme Court publicly disclosed a draft of the *Dobbs* decision. A-15.

TST presented expert testimony that, to a reasonable degree of medical certainty, there are ninety-four (94) Involuntarily Pregnant Women in Indiana who are TST members during the course of a year and at least one (1) of them is pregnant at any given point in time ("Dr. J.D.'s Opinion"). A-8 to 12. TST argued this evidence meets the requirements for associational standing in *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1011 (7th Cir. 2021) ("*Prairie River Networks*") ("[T]he requirement for an individual member to have standing still allows for the member on whose behalf the suit is filed to remain unnamed by the organization." [internal citations and quotations omitted]) and *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015) ("*Cegavske*") ("Where it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's

claim of injury, we see no purpose to be served by requiring an organization to identify by name the member or members injured.").

TST also argued TST has approximately 11,300 members in Indiana who suffer stigmatic injury by a statute that criminalizes their belief one's body is inviolable, subject to one's own will alone and a human being does not come into existence at conception.

The District Court questioned the continued efficacy of *Prairie River Networks* in light of *Summers*.[12]  Br.App. 14.  The District Court denigrated Dr. J.D.'s Opinion as a "paradox of inferences" and "speculation through statistics" but failed to analyze its admissibility as evidence under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert*"). Br.App. 15 to 16.

The District Court dismissed TST's Free Exercise claims on the grounds that not all TST members in Indiana are Involuntarily Pregnant Women.  Br.App. 12.  The District Court dismissed the

---

[12] Citing *Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999), *Prairie River Networks* said, "the requirement for an individual member to have standing still allows for the member on whose behalf the suit is filed to remain unnamed by the organization. We reserve for another day whether that statement survives *Summers*.") 522 F.3d at 802.

stigmatic injury suffered by 11,500 TST members as a mere "setback to the organization's abstract social interests."  Br.App. 21.  The Court ruled "[u]tilizing the organization itself as a functional pseudonym is no replacement for abiding by the requirements imposed by [Local Rule 10-1] within the guidelines of the Seventh Circuit." Br.App. 13.

On October 25, 2023, the Court ruled TST does not have standing to assert the claims made in the Complaint and dismissed it for lack of jurisdiction.  The dismissal was without leave to amend because TST "had an opportunity to submit evidence. It had notice of its standing defects. And it was given the opportunity to cure them. It has failed on all fronts."  Br.App. 25.  This appeal timely followed. Br.App. 1

## IV.  SUMMARY OF ARGUMENT

The District Court erred when it required TST to be licensed as an "abortion clinic" pursuant to a repealed statute in order to show TST faces imminent and redressable injury from the enforcement of the Indiana Abortion Ban.

The District Court erred when it held the Comstock Act precluded TST's standing to challenge the enforcement of the Indiana Abortion Ban.

The District Court erred when it failed to analyze TST's standing as a religious organization to challenge enforcement of the Indiana Abortion Ban due to the diversion of its resources.

The District Court erred when it required TST to identify its members by name to show TST has associational standing.

## V. ARGUMENT

### A. The District Court's Finding That TST Does Not Have Standing Is Reviewed *De Novo*.

"A party seeking to invoke a federal court's jurisdiction must demonstrate three things; 1) an 'injury in fact,' which is an invasion of a legally protected interest that is '(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;' (2) a causal relationship between the injury and the challenged conduct, such that the injury can be fairly traced to the challenged action of the defendant and not from the independent action of some third party not before the court, and (3) a likelihood that the injury will be redressed by a favorable decision. [internal citations omitted]" *Perry v. Village of Arlington Heights*, 186 F.3d 826, 828 (7th Cir. 1999) ("*Perry*"). "'[S]ome day' intentions — without any description of concrete plans, or indeed even any specification of *when* the some day will be — do not support a

finding of the actual or imminent injury that our cases require. [emphasis in original]" *Lujan,* 504 U.S. at 564.

Whether a plaintiff meets that standard is typically a question of law reviewed by the Circuit Court *de novo. Perry* at 828. In this case, the District Court found TST does not even have "some-day" intentions of providing abortions in Indiana because it does not have an abortion clinic licensed in Indiana and therefore has not shown "actual or imminent" injury. Ordinarily, intent is a fact question. However, in this case, there is no dispute the Clinic uses the Telemedicine Model to serve New Mexico residents and intends to provide its services to Indiana residents using only the Telemedicine Model but does not because it would be committing a felony by operation the Indiana Abortion Ban.

The District Court found that notwithstanding these undisputed facts, TST would be barred by the 2013 version of Indiana Code § 16-21-2-2.5 and the Comstock Act from providing "mail-order" abortions in Indiana regardless of whether Indiana Code § 16-34-2-7(a) is enforced. The District Court concluded that TST's intentions were therefore not sufficiently concrete and "imminent" to confer standing.

This conclusion was based on an error of law, not a finding of disputed fact. Indiana Code § 16-21-2-2.5 has been amended by S.B.1 to apply only to "birthing centers" and no longer applies to "abortion clinics." As set forth in more detail below in Section V. B., the Comstock Act does not apply to the lawful extension of the Telemedicine Model into Indiana sought by TST.

The District Court's finding regarding TST's intention to bring the Telemedicine Model into Indiana applied an erroneous legal conclusion about Indiana Code § 16-21-2-2.5 (2013) and the Comstock Act to undisputed facts. It is therefore reviewed under the abuse of discretion standard. *Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir.2010) ("An abuse of discretion occurs if the district court reaches erroneous conclusions of law or premises its holding on a clearly erroneous assessment of the evidence." [internal quotations omitted]).

### B. TST Has Standing Because it Will Commit a Felony if it Provides a Medical Abortion by Telemedicine to an Indiana Member.

The U.S. Supreme Court held over fifty years ago that a medical professional subject to criminal penalties for providing an abortion has a "sufficiently direct threat of personal detriment" to show "injury in

fact" and does not have "to await and undergo a criminal prosecution as the sole means of seeking relief." *Doe v. Bolton*, 410 U.S. 179, 188 (1973) ("*Doe*"). *Doe* has been followed in the Seventh Circuit, *Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908, 911 (7th Cir. 2015) ("[A]bortion doctors . . . have first-party standing to challenge laws limiting abortion when, as in *Doe* and the present case as well, penalties for violation of the laws are visited on the doctors.") and in other Circuits. See, *McCormack v. Hiedeman*, 900 F. Supp. 2d 1128, 1140-1142 (D. Idaho 2013), *aff'd sub nom*, *McCormack v. Herzog*, 788 F.3d 1017 (9th Cir. 2015) ("Given that [the physician] faces the threat of prosecution for performing medical abortions, it makes little sense to suggest that [he] must first comply with those laws before he has standing to challenge them.").

*Doe* was recently reaffirmed in *June Med. Servs. LLC v. Russo* , –– U.S. ——, 140 S. Ct. 2103, 2118–19 (2020) (plurality opinion), overruled on other grounds by *Dobbs v Jackson Women's Health Org*, 597 U.S. ___, 142 S.Ct. 2228 (2022) (The Supreme Court has "long permitted abortion providers to invoke the rights of their actual or potential patients in challenges to abortion-related regulations" and has

"generally permitted plaintiffs to assert third-party rights in cases [like this one] where the enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights."[13]  The very existence of Indiana Code § 16-34-7(a) presents an inherent threat of enforcement sufficient to establish standing.  *Ezell v. City of Chicago*, 651 F.3d 684, 695-696 (7th Cir. 2021) ("The very existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper, because a probability of future injury counts as injury for the purpose of standing." [internal citations and quotations omitted]); *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010) (same).

Neither Defendants nor the District Court contest that TST has a liberty interest threatened by the enforcement of Indiana Code § 16-34-2-7(a). Rather, the District Court held there was no actual or imminent threat of injury because "other unchallenged federal law and Indiana laws would each independently prohibit the Satanic Temple from operating its mail-order abortion service."  Br.App. 23. The District

---

[13] TST has shown, to a reasonable degree of medical certainty, there are ninety-four (94) potential patients for the Clinic in Indiana each year. TST does not have to identify any of those potential patients by name to have standing pursuant to *Doe*.

Court relied on those same "unchallenged" laws to find lack of causation and redressability.  The only laws identified by the District Court were the 2013 version of Indiana Code § 16-21-2-2.5 and the Comstock Act.[14]

The District Court erred because the current version of Indiana Code § 16-21-2-2.5 does not apply to TST.  TST does not intend to get licensed as an abortion clinic in Indiana because it is not required to.

The District Court further erred because the Comstock Act will not be enforced against TST if it obtains its requested relief.  The Court in *GenProBio* addressed the application of the Comstock Act:[15]

> [The] Comstock Act is currently understood to apply only to use of the mails in an illegal manner. Courts have held this consistently since 1915. See *Bours v. United States*, 229 F. 960 (7th Cir. 1915); *Davis v. United States*, 62 F.2d 473 (6th Cir. 1933); *United States v. One Package*, 86 F.2d 737 (2nd Cir. 1936); *Consumers Union of United States, Inc. v. Walker*, 145 F.2d 33 (D.C. Cir. 1944). The Department of Justice's current enforcement interpretation concurs. Dept. of Justice, Application of the Comstock Act to the Mailing of Prescription Drugs that Can Be Used for Abortions, Mem.

---

[14] If and to the extent there are any other unidentified and unchallenged Indiana laws that render the Telemedicine Model illegal, they have been pre-empted by the FDA pursuant to 21 U.S.C. § 355-1(f)(3)(C) to the extent it is impossible for TST to comply with both those state laws and REMS.  *GenBioPro* at *25 (REMS alone "dictates the manner in which mifepristone may be prescribed.").

[15] The District Court compounded its error by striking TST's attempt to bring *GenProBio* to its attention.

Op. for the Gen. Couns. USPS (Dec. 23, 2022). [The Attorney General for West Virginia] has obliquely threatened legal action against pharmacies willing to distribute mifepristone in West Virginia, he does not have the authority to enforce federal law. To reiterate, the entity with that enforcement authority-the Department of Justice - has stated that it will not enforce the Comstock Act against legal vendors of mifepristone. Accordingly, this Court declines to find that a widely abrogated century statute which the federal government will not enforce bars redressability here.

<em>Id.</em> at **14-15

The District Court in this case said the interpretation of the Comstock Act is "sharply contested." That is irrelevant. Neither Defendant has any authority to enforce the Comstock Act regardless of its scope. The U.S. Department of Justice will not enforce the Comstock Act against legal vendors of mifeprestone or the U.S. Postal Service. The Comstock Act is not an impediment to the delivery of abortifacients into Indiana by TST using the Telemedicine Model so long as enforcement of the Indiana Abortion Ban is enjoined.

## C. TST Has Standing as a Religious Organization Because TST Has and Will Continue to Divert Its Resources to Promote the Satanic Abortion Ritual in Indiana.

The primary mission of TST is to promote the Satanic Tenets, including the Satanic Abortion Ritual. Prior to the enactment of S.B.1, TST pursued its mission in Indiana by education and advocacy. But S.B.1 has effectively eliminated the exercise of the Satanic Abortion Ritual in Indiana by closing down Indiana abortion clinics.[16]

In response to *Dobbs* and S.B.1, TST got into the business of running an abortion clinic. TST has spent over $75,000 thus far to create the Clinic for the purpose of making the exercise of the Satanic Abortion ritual simple and easy nationwide. TST would have to spend even more money to expand the Clinic into Indiana.

So long as the Indiana Abortion Ban remains fully enforceable, that cost could run into the tens of thousands of dollars to hire physicians who would have to deliver abortifacients in person at a

---

[16] Planned Parenthood stopped providing abortions in Indiana when S.B.1 went into effect. https://www.indystar.com/story/news/health/2023/08/01/indiana-abortion-ban-begins-planned-parenthood-iu-health-eskenazi-where-to-go/70486870007/, last visited January 22, 2024

hospital or surgical center. Indiana Code § 16-34-2-1(a)(1)(B). The Clinic could not use the Telemedicine Model. Indiana Code § 16-34-2-1(d). Any clinic in Indiana staffed by physicians confined to the in-person delivery of abortifacients and other constraints of Indiana Code § 16-34-2-1 would inevitably operate at a loss and have to be subsidized on an ongoing basis.

If the application of the Indiana Abortion Ban is enjoined, then existing Indiana based providers could lawfully provide abortifacients to Involuntarily Pregnant Women without the constraints of Indiana Code § 16-34-2-1. There would be no need for TST to spend its own money to provide abortifacients to TST members in Indiana for use in the Satanic Abortion Ritual. TST could return to education and advocacy to promote the Satanic Abortion Ritual in Indiana. The cost savings to TST would, at a minimum, be the $300 it would not have to spend to get one its APRN's licensed in Indiana.

*Havens* held that an organization has standing in its own right to invoke the Court's jurisdiction to enjoin an illegal action if there has been a "drain on the organization's resources" caused by the illegal action. If the requested relief ameliorates the drain, the three prongs of

standing established by *Lujan* – injury in fact, causation and redress – are met.

This Court said in *Common Cause Ind. v. Lawson*, 937 F.3d 944, 955-56 (7th Cir. 2019) ("*Common Cause*"):

> *Havens* teaches that courts must focus on those drains in resources that arise from the organization's need to counteract the defendants' allegedly illegal practices, making that drain simply another manifestation of the injury to the organization's noneconomic goals. What matters is whether the organizations' activities were undertaken because of the challenged law, not whether they are voluntarily incurred or not. By way of analogy, when there is an outbreak of the flu, doctors will predictably order more flu vaccines, work longer hours, and educate the public about the danger. The additional work is certainly done willingly or voluntarily but it is not self-inflicted—it is caused by the outbreak. In our setting, *Havens* recognizes standing only for a *consequent* drain on resources. [emphasis in original, internal quotations and citations omitted]

TST voluntarily incurred the costs of creating the Clinic. It did so as a consequence of and in response to the adoption of S.B.1. Enjoining the enforcement of the Indiana Abortion Ban will permit existing Indiana abortion providers to serve the ninety-four (94) TST members who are involuntarily pregnant each year. This is turn relieves TST of the need to spend any money to expand the Clinic to deliver its own abortifacients into Indiana to those members. TST has therefore shown

injury in fact, caused by the challenged statute that will be redressed by enjoining enforcement of The Indiana Abortion Ban. *Lukaszczyk v. Cook Cnty.*, 47 F.4th 587, 597 (7th Cir. 2022) ("[P]laintiffs' injuries by enjoining the vaccination mandate [are redressed by] eliminating the extra costs imposed on the defendants."); *Common Cause*, 937 F.3d at 956 ("[T]he Organizations have shown that Act 442 will likely create more work for them. This is sufficient not only for causation but for the redressability element of standing, since without Act 442 there will be less drain on their resources.").

The District Court erred by applying the same analysis for redressability to two separate and discrete injuries – threat of prosecution and diversion of resources. The timing of the threat of prosecution of TST, relied on by the District Court to dismiss this case, is completely irrelevant to whether the Indiana Abortion Ban has caused a diversion of TST's resource. That money was spent regardless of whether the Clinic could lawfully operate in Indiana after the Indiana Abortion Ban is lifted.

If the requested relief is granted, other providers of abortions in Indiana with the requisite physicians, hospitals and surgical centers

will be able to legally deliver abortifacients to Involuntarily Pregnant TST members. TST will not need to spend more money to expand the Clinic into Indiana. TST can return to promoting the Satanic Tenets by education and advocacy. This saves TST money and gives it standing under *Havens*, *Lujan* and *Common Cause*.

### D. TST Members Do Not Have to Be Identified by Name to Establish TST's Standing.

#### 1. Individual TST Members Have a Constitutional Right to Privacy.

This country has a long and honorable history of granting anonymity to pregnant women who petition the Courts to strike down abortion laws. It includes granting abortion providers standing to challenge abortion laws because a pregnant woman "may be chilled from such assertion by a desire to protect the very privacy of her decision from the publicity of a court suit." *Singleton v. Wulff*, 428 U.S. 106, 117 (1976) ("*Singleton*"). Indeed, a pregnant woman has a constitutional right keep her decision to get an abortion wholly private, even from "the contrary opinion of the sovereign or other third parties." *Bellotti v. Baird*, 443 U.S. 622, 655 (Stevens, J, concurring). "The decision to terminate a pregnancy is an intensely private one that must

be protected in a way that assures anonymity." *Thornburgh v. American College of Obstetricians & Gynecologists*, 476 U.S. 747, 766 (1986), *overruled in part on other grounds, Planned Parenthood v. Casey,* 505 U.S. 833 (1992).  See also *Southern Methodist Univ Ass'n v. Wynne & Jaffe*, 599 F.2d 707, 712-13 (5th Cir. 1979) ("Where the issues involved are matters of a sensitive and highly personal nature, such as birth control, abortion, homosexuality or the welfare rights of illegitimate children or abandoned families, the normal practice of disclosing the parties' identities yields to a policy of protecting privacy in a very private matter.")

The privacy accorded a pregnant woman's decision to abort becomes even more compelling when, as in this case, it is intertwined with the exercise of religious beliefs.  The Satanic Abortion Ritual "includes the abortion itself [and] spans the entirety of the pregnancy termination." The Satanic Abortion Ritual is a religious ritual that affirms the integrity of the participant's body and assuages any concern homicide is being committed. Complaint at Exhibit A.

The very essence of TST is to give believers in the TST Tenets a public voice while protecting their right to practice their religious

beliefs in private. *NAACP v. Alabama*, 357 U.S. 449, 460 (1958) ("*NAACP*") ("Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association."). The U.S. Supreme Court has recognized the right of an association to keep the names of its members private is guaranteed by the First Amendment. *Bates v. Little Rock*, 361 U.S. 516, 523 (1960) ("*Bates*") (Anonymity "may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs."); *NAACP*, 357 U.S. at 462 (same). The U.S. Supreme Court stressed in *NAACP* that:

> [The] threat of physical coercion, and other manifestations of public hostility [ ] is likely to affect adversely the ability of petitioner and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure.

357 U.S. at 462-63

Citing *Bates* and *NAACP*, the U.S. Supreme Court reiterated in *Talley v. California*, 362 U.S. 60, 65 (1960) "there are times and circumstances when States may not compel members of groups engaged in the dissemination of ideas to be publicly identified. The reason for

those holdings was that identification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance." [17]

*NAACP* held the "rank and file" of the NAACP, as a group, has the First Amendment right to withhold their names and addresses from the Attorney General of Alabama and the NAACP has standing to represent its rank and file as a group in asserting that right.

The Attorney General of Alabama had sought the names of all NAACP members in Alabama, not just some of them. *NAACP* therefore did not address whether or to what extent an organization has to name some of its members individually to have standing.

The District Court rejected TST's reliance on *NAACP* saying:

> [A]nonymity is permitted only where all the members of the organization are affected by the challenged activity. Here, the challenged abortion law allegedly affects only some, but not all, of the Satanic Temple's Indiana membership, only ninety-four out of over 11,000 members. [citation omitted].

---

[17] The District Court did not deny TST members are at risk of harassment and worse for their beliefs. TST's offices were attacked by an arsonist and proponents of its after-school program received death threats.  A-14 to 15.  The District Court's failure to takes these threats into account is reversible error. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1070 (9th Cir. 2000) ("*Advanced Textile*")("[T]he district court erred as a matter of law by refusing to take into account evidence of threatened retaliation.").

The District Court erred because the Constitutional right of privacy is enjoyed by each member of an association individually as well as collectively.

The District Court also erred when it said:

[NAACP] was willing to divulge the identity of its members who held official positions. Here, the Satanic Temple is not willing to divulge any such identity. Its Executive Director [Erin Helian] hides [his/her] real name for fear of domestic terrorists." [internal quotations and citations omitted].

The District Court did not explain why Erin Helian's true name is relevant to TST's standing. Neither Defendants nor the District Court ever asked for Erin Helian's identity. If they had, it would have been disclosed pursuant to the same protective order covering Dr. J.D.'s name.

The District Court relied on a statement in *Summers* (citing *NAACP*) for the proposition that the "requirement of naming the affected members has never been dispensed with in light of statistical probabilities, but only where *all* the members of the organization are affected by the challenged activity." [emphasis in original]. 555 U.S. at

498-99. The U.S. Supreme Court was not presented in *Summers* or *NAACP* with the right of an organization to protect the identity of some of its individual members under the First Amendment.

The U.S. Supreme Court did not say in *NAACP* the right of an organization's members to remain anonymous was absolute. Rather it held the Attorney General of Alabama failed to show an "overriding valid interest of the State" that justified the disclosure of NAACP members' names. 357 U.S. at 460. An individual association member can be required to disclose his or her identity, but only if disclosure serves a compelling state interest. *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) ("*Buckley*") (The "interests of the State must survive exacting scrutiny [and] there [must] be a relevant correlation or substantial relation between the governmental interest and the information required to be disclosed." [internal citations and quotations omitted].).

However, the District Court did not apply a strict scrutiny analysis to TST's First Amendment claim. Instead, it held "[u]tilizing the organization itself as a functional pseudonym is no replacement for abiding by the requirements imposed by [Local Rule 10-1] and within the guidelines of the Seventh Circuit." Br.App. 13. This was an error.

## 2. The Application of Local Rule 10-1 to TST in This Case Is Unconstitutional.

Local Rule 10-1 is an outlier in this Circuit. It is unconstitutional as applied to TST because the District Court cannot condition TST's access to the Courts by surrendering the Constitutional rights of its members to privacy. [18] *Williams v. Standard Oil Co.*, 278 U.S. 235, 241 (1929) ("[T]he state may not impose conditions which require the relinquishment of rights guaranteed by the Federal Constitution.").

## 3. An Anonymous Party Can Have Article III Standing.

Article III standing does not require the identification of an individual plaintiff by name. *Advanced Textile Corp.*, 214 F.3d at 1070.[19] Article III therefore does not require an organization to identify any of its individual members by name to have standing.

As this Court held in *Prairie Rivers Network,* "the requirement for an individual member to have standing still allows for the member on whose behalf the suit is filed to remain unnamed by the organization."

---

[18] Local Rule 10-1 requires disclosure of a party's true name to the District Court and other parties.

[19] The identification of litigants by name is a common law practice, not a Constitutional requirement to establish standing. *Id.* at 1067.

[internal citations and quotations omitted]. Citing *Disability Rights Wisconsin, Inc. v. Walworth County Board of Supervisors*, 522 F.3d 796, 802 (7th Cir. 2008), *Prairie Rivers Networks* noted that the requirement for an individual member to have standing "still allows for the member on whose behalf the suit is filed to remain unnamed by the organization." The Court said, "[w]e reserve for another day whether that statement survives *Summers*." 2 F.4th at 1011.

The identification of an association member by name is not required "[w]here it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury." *Cegavske*, 800 F.3d at 1041. Neither Defendants nor the District Court explained why Defendants needed to know the actual names of any TST members in Indiana.[20]

---

[20] None of the Circuit Court decisions relied on by the District Court "expressly require[s] names for associational standing on the pleadings." Br.App. 14. Like *Summers*, those cases did not involve a claim by an association that the First Amendment protects the anonymity of its members.

In a case such as this where anonymity is required to protect the exercise of religious rights, the burden is on the proponent of disclosure to meet the strict scrutiny standard established by *Buckley*. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. __, 141 S. Ct. 2373, 2390 (2021) ("[O]ur precedents require application of strict scrutiny to laws that compel disclosure of protected First Amendment association." [internal citations and quotations omitted].). "Under strict scrutiny review, the Government bears the burden of proving both that the act in question advances a compelling state interest and that the means chosen to pursue that interest are narrowly tailored to that end." *United Church v. Chicago*, 502 F.3d 616, 646 (7th Cir. 2007).

There is no compelling state interest served by requiring TST to identify by name any of its Indiana members, including those who are Involuntarily Pregnant Women. The disclosure of the names of an association's individual members to the Court or the public is certainly not required to establish Article III standing.

Defendants did not show why they, the District Court or the public need to know the identity of TST members. See *Advanced Textile*, 214 F.3d at 1069-70 ("[D]efendants suffer no prejudice by not

knowing the identities of named plaintiffs [and] [t]he public's interest in this case can be satisfied without revealing the plaintiffs' identities.").

The District Court erred in failing to require Defendants to show the need – under the strict scrutiny standard - for disclosure of the identity of any of TST members in Indiana, including the ninety-four (94) Involuntarily Pregnant Women.

### 4. *Summers* Does Not Bar the Use of Statistical Analysis Admissible Pursuant to Fed. R. Evid. 702 to Identify an Individual Member.

Citing *Summers*, the District Court said "[t]he Supreme Court has unequivocally prohibited statistical standing." Br.App. 15. *Summers* said no such thing.

The issue before the U.S. Supreme Court in *Summers* was whether the Sierra Club has standing to challenge "regulations in the absence of a live dispute over a concrete application of those regulations." *Id.,* 555 U.S. at 490. The regulations at issue affected tracts of 250 acres or less in national forests after a fire. Those tracts were exempt from an environmental impact statement for salvage timber sales and other remediation (the "Exemption").

The Sierra Club argued there was a "statistical probability" the "recreational interests' of the "thousands" of its California members who visited Sequoia National Forest each year would be injured by the Exemption. However, the Sierra Club provided no data or analysis to show the likelihood any one of its members would actually visit a tract of land in the Sequoia National Forest subject to the Exemption nor did it explain how that member would be adversely affected by the Exemption.

The U.S. Supreme Court said it was "conjecture" that any one member of the Sierra Club would "stumble" onto a site of 250 acres or less that had suffered a forest fire and have his or her recreational interest injured because of the Exemption.  The U.S. Supreme Court went on to say "[t]his novel approach to the law of organizational standing would make a mockery of our prior cases, which have required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm" Id., 555 U.S. at 498.

Citing *NAACP*, the U.S. Supreme Court said ""Th[e] requirement of naming the affected members has never been dispensed with in light

of statistical probabilities, but only where *all* the members of the organization are affected by the challenged activity" *Id.,* 555 U.S. at 498-99.  When read in context, the U.S. Supreme Court was saying an injury that affects all members of an organization does not require the identification of specific individual member but if the injury affects only some members, then those members need to be identified with something more than conjecture.  The U.S. Supreme Court did not say that individual members must be identified name. Nor did it say a statistical analysis admissible under the Fed. R. Evid. 702 cannot be used to identify individual members for standing purposes.  See also *Alliance For Hippocratic Medicine v. U.S. Food & Drug Admin.*, 78 F. 4th 210, 235 (5th Cir. 2023), *cert granted* December 23, 2023 ("*Summers* does not stand for the proposition that courts must categorically reject standing when a plaintiff alleges that a defendant's action puts hundreds of association members at risk of future injury. It stands for the proposition that courts must treat such assertions with caution.")

    5.  **Expert Testimony Can Establish the Existence of an Anonymous Individual With Sufficient Specificity to Establish Standing.**

Article III standing requires TST to identify at least one of its

members in Indiana to enable the Court to determine whether there is a "small probability of injury" to that individual from the enforcement of the Indiana Abortion Ban. V*illage of Elk Grove Village v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993) ("*Elk Grove*") ("[E]ven a small probability of injury is sufficient to create a case or controversy — to take a suit out of the category of the hypothetical — provided of course that the relief sought would, if granted, reduce the probability.") quoted approvingly in *Massachusetts v. EPA*, 549 U.S. 497, 525 n. 23 (2007) and *American Bottom Conservancy v. U.S. Army Corps*, 650 F.3d 652, 685 (7th Cir. 2011). There is no question that an Involuntarily Pregnant Woman, who is a TST member residing in Indiana, will be injured by the enforcement of the Indiana Abortion Ban. Thus, TST needs to show a "small probability" that individual actually exists either now or in the foreseeable future to have standing. *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 594 (7th Cir. 2012) (Pre-enforcement standing "depends on the probability of harm, not its temporal proximity."); *520 Michigan Ave. Associates v. Devine*, 433 F.3d 961, 962 (7th Cir. 2006)

(same).[21]

The existence of a "small probability" there is or will be an actual Involuntarily Pregnant Woman who is a TST member in Indiana is a question of fact.  The traditional way of establishing that fact is to have someone who meets the requisite standing criteria appear by a pseudonym, such as Judy Doe.[22]   But that would require Judy Doe to surrender her First Amendment right to keep her membership in the TST private.  An alternative to the waiver of that First Amendment right is a statistical analysis that establishes the "small probability" an individual with standing is or will exist.

Statistical analysis is simply a tool an expert witness can use to opine on the truth of the facts.[23]   See, *United States ex rel. Health v.*

_____

[21] The District Court erred by requiring a "guarantee" that an individual TST member with standing exists.  The District Court said that level of certainty cannot be achieved so long as "it is statistically possible" no such individual exists. Br.App. 14 to 15.

[22] TST did precisely that in *Doe v. Parson*, 960 F.3d 1115 (8th Cir. 2020).  That case originated in the Eastern District of Missouri, which does not require disclosing Judy Doe's true name to the Court or adverse parties.

[23] The District Court said the U.S. Supreme Court "forbids" identifying members "statistically". Br.App. 16.  The Supreme Court never said any such thing.

*Wis. Bell, Inc.*, 75 F.4th 778, 785 n.2 (7th Cir. 2023) ("[S]tatistical analyses may be used to support False Claims Act cases."); *Coates v. Johnson Johnson*, 756 F.2d 524, 538 n.14 (7th Cir. 1985) ("[S]tatistical analysis has been used in countless Title VII cases").

The admissibility of an expert opinion based on a statistical analysis to prove a "small probability" of injury to an actual person is determined by applying the principles described in *Daubert.* The Court determines whether the methodology is sufficiently reliable to admit the opinion into evidence under Fed. R. Evid. 702. *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 418 (7th Cir. 2005). The fact finder determines whether the facts put into evidence pursuant to Fed. R. Evid. 702 are true. *Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, 782 F.3d 353, 360 (7th Cir. 2015) ("In a bench trial, once the court has fulfilled its gatekeeping function, it becomes a trier of fact that needs to assess the evidence itself—not just the methodology underlying that evidence."). The District Court erred in not following this well-established procedure to determine the "small probability" there is or will be an Involuntarily Pregnant Woman in Indiana who is a TST member.

### 6. Dr. J.D.'s Opinion Proves There are Ninety-four (94) TST Members in Indiana Each Year Who Are Involuntarily Pregnant Women.

TST submitted Dr. J.D.'s Opinion which established to a reasonable degree of medical certainty the existence of ninety-four (94) TST members each year who have standing in their capacity as individuals to bring this action because they are or imminently will be Involuntarily Pregnant Women injured by the enforcement of the Indiana Abortion Ban. The District Court erred by rejecting that evidence.

Dr. J.D. holds a Doctorate in Osteopathy. Dr. J.D. is a Fellow in The American Congress of Obstetricians and Gynecologists, licensed to practice medicine in four states and has engaged in the practice of medicine as an obstetrics and gynecological specialist for over fifteen (15) years. The District Court's only critique of Dr. J.D.'s credentials was Dr. J.D. was not employed as a physician by the Clinic. Br.App. 14. The District Court did not explain why that fact is relevant.[24]

---

[24] The District Court also commented on the fact Dr. J.D. is "not identified to the public." Br.App. 14. The District Court did not explain why that fact is relevant.

Dr. J.D. started with the assumption that there are five thousand six hundred fifty (5,650) female members of TST of child-bearing age in Indiana. That assumption is based on the undisputed declaration of Erin Helian there are 11,300 TST members in Indiana who are generally between 16 and 40 years old.

Relying on the annual fertility rate in Indiana of 63.5 per 1,000 women ages 15 to 44 and the annual induced abortion rate in Indiana of 6.0 per 1,000 women ages 15 to 44, as reported by the State of Indiana, Dr. J.D. concluded that in any given year, three hundred ninety-two (392) Indiana members of TST get pregnant. A-9.

Dr. J.D. then applied the statistic reported by the Centers for Disease Control and Prevention that fifty percent (50%) of all pregnancies in the U.S. are unintended and concluded that half of those TST Indiana members who got pregnant in any given year had unintended pregnancies. A-10.

Dr. J.D then applied the statistic reported by The National Institute of Health that 48% of unintended pregnancies in the U.S. are due to a failure in the use of birth control. Based on that statistical analysis, Dr. J.D. opined that to a reasonable degree of medical

certainty, ninety-four (94) Indiana members of TST are Involuntarily Pregnant Women in any given year and that at least one of them is pregnant at any given point in time. A-10.

An individual woman who is not pregnant does not have standing to challenge an abortion restriction due to the uncertainties of becoming pregnant. *Roe v. Wade*, 410 U.S. 113, 128 (1973) ("*Roe*") (She has no standing because "possible future contraceptive failure . . . may not take place."). However, once she becomes pregnant, she retains her standing to challenge an abortion restriction after having an abortion or giving birth because pregnancy is a condition that is "capable of repetition yet evading review." *Id.* at 125. Thus, as the U.S. Supreme Court held in *Singleton*, "a class could be assembled, whose fluid membership always included some women with live claims." 428 U.S. at 117.

It is a biological certainty that a large enough group of women of child-bearing age will, over the course of a year, produce pregnant women. It is a biological certainty that some subset of that group will become pregnant unintentionally due to the failure their birth control. That group of women eliminates the uncertainties inherent in any one

individual woman being involuntarily pregnant, regardless of when their pregnancies start or end.

The question then becomes how large a group of women is necessary to establish a class whose members always include at least one (1) live claim by an involuntarily pregnant woman that she is injured by the Indiana Abortion Ban.  In Dr. J.D.'s Opinion, 5,650 women of child-bearing age is sufficient to show there are 94 women who are Involuntarily Pregnant Women and thus, by definition, injured by the Indiana Abortion Ban.  That meets the "small probability of injury" required by *Elk Grove* to establish an Article III case or controversy.

### 7. The District Court Erred by Ignoring Dr. J.D.'s Opinion Without a *Daubert* Hearing.

This Court reviews *de novo* "whether the district court properly followed the framework set forth in Daubert." *Walker v. Soo Line Railroad*, 208 F.3d 581, 590 (7th Cir. 2000), citing *United States v. Hall*, 165 F.3d 1095, 1101 (7th Cir.), *cert. denied*, 119 S.Ct. 2381 (1999).  The District Court simply ignored the Dr. J.D. Opinion for reasons unrelated to *Daubert* and thus committed reversible error.

### 8. All TST Indiana Members Have Standing Due to Stigmatic Injury.

Indiana Code § 16-34-2-7(a) makes it a crime punishable as a Level 5 felony to abort an "unborn child, irrespective of gestational age or the duration of the pregnancy." Indiana Code § 16-18-2-128.7. The Level 5 felony punishment imposed for an illegal abortion in Indiana is the same punishment imposed for involuntary manslaughter. Indiana Code § 35-42-1-4. Simply put, killing an "unborn child" is homicide in Indiana.[25]

The Indiana Abortion Ban communicates unequivocally to the world in general and Indiana residents in particular that a human being comes into existence at conception in Indiana and his/her destruction is homicide. All 11,300 TST Indiana members suffer the stigma of being evil people because they do not believe a human being comes into existence at conception nor do they believe abortion is homicide.

------------------------

[25] *Baker v. State*, 569 N.E.2d 369, 371 (Ind. Ct. App. 1991) ("The difference between murder and involuntary manslaughter is the defendant's intent. Did the defendant intend to kill another human being or did he intend to batter another human being and in the process cause that person's death? ").

Intangible injuries, such as stigmatic injury, can be sufficiently concrete and particularized to constitute "injury in fact" for purposes of Article III standing. *Spokeo, Inc. v. Robins*, 538 U.S. 330, 136 S.Ct. 1540, 1545 (2016). Stigmatic injury is inflicted when state action communicates to the affected citizens that their religious beliefs are explicitly disfavored by the state. *Bostic v. Schaefer*, 760 F.3d 352, 372 (4th Cir. 2014) (Stigmatic injury caused by state law prohibiting same-sex marriage.); *Catholic League v. City of San Francisco*, 624 F.3d 1043, 1048 (9th Cir. 2010) ("[A]dherents to a religion have standing to challenge an official condemnation by their government of their religious views.").

The District Court erred when it gave short shrift to the stigmatic injury caused by the Indiana Abortion Ban to TST members. It characterized their injury as "simply a setback to the organization's abstract social interests." Br.App. 21.

Defendant-Appellee Rokita demonstrated the stigmatic injury inflicted by the Indiana Abortion Ban when he complimented the District Court for a "legally sound" decision that "sustains a pro-life

law."[26]  He said, "[w]e Hoosiers continue to build a solid culture of life whether satanic cultists like it or not."

Defendant-Appellee Rokita characterizes the Indiana Abortion Ban as a "prolife law" because it puts abortion on the same footing as homicide – the destruction of a human being. He praised it as a "legally sound" way to "build a solid culture of life" celebrated by "we Hoosiers" while labeling TST as "satanic cultists."  This public pronouncement by the highest law enforcement officer in the state illustrates the stigma caused by the Indiana Abortion Ban.

A "prolife law" that promotes "the culture of life" legitimizes the religious view shared by "we Hoosiers" that human being comes into existence at conception.[27]  A "prolife law" that promotes "the culture of life" demonizes those who do not believe a human being comes into

---

[26] https://indianacapitalchronicle.com/briefs/federal-judge-dismisses-satanic-temple-lawsuit-that-sought-to-strike-down-indianas-abortion-ban/, last visited January 22, 2024

[27] The Marion County Superior Court has ruled "the question of when life begins is a religious one that the State may not answer legislatively or as a factual matter" *Anonymous Plaintiff #1 et al v. The Individual Members of The Medical Licensing Board of Indiana*, *et al.*, Dkt. No. 49D01-2209-PL-031056 (Slip Op. at ¶34) A-179.

existence at conception to the point where the Attorney General feels free to publicly vilify TST members with the epithet "satanic cultists."

A law that divides the body politic into two opposing camps along religious lines – "we Hoosiers" who believe human beings come into existence at conception versus those heathen "satanic cultists" who do not – inflicts stigmatic injury to the detriment of both sides. *Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 865-66 (7th Cir. 2012) ("The Establishment Clause forbids the government from endorsing a religion or a religious practice and, in so doing, creating a message that there are 'ins' and 'outs' on the basis of religious preference within the political community."). Striking down that law will redress that division. TST members - as a group – therefore have standing to challenge that law.

## E. The District Court Erred By Dismissing Without Leave to Amend.

The District Court refused to allow TST leave to amend its Complaint on the grounds "the Satanic Temple did not use its earlier opportunity to cure its standing deficiencies." Br.App. 34. The District Court abused its discretion because a complaint with a jurisdictional pleading defect should not be dismissed without leave to amend unless it is clear, upon *de novo* review, that the complaint could not be saved by amendment. *Snell v. Cleveland, Inc.,* 316 F.3d 822, 828 n.6 (9th Cir. 2002).

## VI. Conclusion

The District Court's holding that TST has no standing was based on cumulative legal errors. The District Court found TST must comply with a non-existent requirement to be a licensed abortion clinic in Indiana. Building on that error, the District Court held TST had no plan to expand the Clinic into Indiana and thus no imminent injury. The District Court found the Comstock Act will apply to the Clinic even though the only government agency with authority to enforce the Comstock Act – the U.S. Department of Justice - says it will not enforce the Comstock Act in the circumstances proposed by TST.

The District Court found the lack of an (unnecessary) abortion clinic license made the money TST spent to create the Clinic to be a "mitigation expense" and not an injury in fact. Br.App. 21. The District Court found the TST Tenets and TST Abortion Ritual to be "abstract social interests" unworthy of First Amendment protection. Br.App. 21. The District Court ruled TST members have to forfeit their First Amendment right of anonymity to even get into Court. The District Court turned its back on a statistical analysis that shows an indisputable biological fact – a group of 5,000+ women in Indiana of child-bearing age will have dozens of involuntarily pregnant women over the course of a year.

It is obvious the District Court sought to avoid addressing the difficult Constitutional claims posed by the Complaint under the guise of standing. *Arpaio v. Obama*, 797 F.3d 11, 32 (D.C. Cir. 2015) ("[S]tanding presents courts with an opportunity to avoid the vindication of unpopular rights." [internal quotations and citations omitted].). TST respectfully requests the dismissal of the Complaint be reversed and the case remanded for disposition on the merits.

January 29, 2024

*W. James Mac Naughton*

W. James Mac Naughton, Esq.
7 Fredon Marksboro Road
Newton, NJ 07860
wjm@wjmesq.com
732-213-8180
*Attorney for Plaintiff-Appellant*
*The Satanic Temple, Inc.*

## VII. Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1. This document complies with the word limit of Fed. R. App. P. 32 (B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 10,382 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Mac, Ver. 16.16.2. in Century 14-point font.

January 29, 2023

*W. James Mac Naughton*
W. James Mac Naughton, Esq.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the date of this pleading, I electronically filed it with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

James A. Barta
Solicitor General
Office Of Indiana Attorney General Todd Rokita
302 West Washington Street – IGCS – 5th Floor
Indianapolis, IN 46204-2770
Telephone: (317) 232-2826
Facsimile: (317) 232-7979
E-mail: James.Barta@atg.in.gov

*/s/ W. James Mac Naughton*

# APPENDIX TO THE BRIEF

Certification pursuant to Cir. R. 30(d) W. James Mac Naughton certifies this Appendix to the Brief and the separate Appendix contain all of all of the materials required by parts (a) and (b) of Cir. R. 30.

/s/ W. James Mac Naughton

## TABLE OF CONTENTS FOR APPENDIX TO THE BRIEF

Final Judgment Pursuant to Fed. R. Civ. Pro. 58
filed October 25, 2023..............................................................Br.App. 1

Notice of Appeal filed November 22, 2023.............................Br.App. 2

Order filed October 25, 2023...................................................Br.App. 4

Senate Enrolled Act No. 1(ss)................................................Br.App. 27

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

THE SATANIC TEMPLE, INC.,                    )
                                             )
                     *Plaintiff*,            )
                                             )
          v.                                 )          No. 1:22-cv-01859-JMS-MG
                                             )
TODD ROKITA, in his capacity as              )
Attorney General of Indiana, and             )
RYAN MEARS, in his capacity as               )
Marion County Prosecutor,                    )
                                             )
                     *Defendants*.           )

### FINAL JUDGMENT PURSUANT TO FED. R. CIV. PRO. 58

Pursuant to the Order granting Defendants' Motion to Dismiss the First Amended Complaint on October 25, 2023, the Court now enters **FINAL JUDGMENT** in favor of Defendants and against Plaintiff such that Plaintiff's claims against Defendants are **DISMISSED** for lack of jurisdiction without leave to amend, and Plaintiff shall take nothing by way of its First Amended Complaint.

Date: 10/25/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

### Distribution via CM/ECF to All Counsel of Record

Brief Appendix 1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

_____

THE SATANIC TEMPLE, INC.

        Plaintiff

        v.

TODD ROKITA, in his
capacity as the Attorney General of
Indiana and
RYAN MEARS, in his capacity as
Marion County Prosecutor

        Defendants

_____

Case No. 1:22-cv-1859-JMS-MG

## NOTICE OF APPEAL

Plaintiff The Satanic Temple, Inc. hereby appeals to the United States Court of Appeals for the Seventh Circuit the order and judgment dismissing the complaint of the United States District Court for the Southern District of Indiana entered on October 25, 2023, ECF Nos. 66 and 67.

November 22, 2023

        _W. James Mac Naughton_
        W. James Mac Naughton, Esq.
        7 Fredon Marksboro Road
        Newton, NJ 07860
        wjm@wjmesq.com
        _Attorney for Plaintiff The Satanic Temple_

Brief Appendix 2

**CERTIFICATE OF SERVICE**

W. James Mac Naughton certifies that on the date set forth above, I caused a true

and correct copy of this pleading to be served via the Court's ECF system and email on:

Aaron M. Ridlen
Deputy Attorney General
Office Of Indiana Attorney General Todd Rokita
302 West Washington Street – IGCS – 5th Floor
Indianapolis, IN 46204-2770
Telephone: (317) 232-2826
Facsimile: (317) 232-7979
E-mail: Aaron.Ridlen@atg.in.gov

Brief Appendix 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| THE SATANIC TEMPLE, INC., | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )   No. 1:22-cv-01859-JMS-MG |
| | ) |
| TODD ROKITA, in his capacity as | ) |
| Attorney General of Indiana, and | ) |
| RYAN MEARS, in his capacity as | ) |
| Marion County Prosecutor, | ) |
| | ) |
| *Defendants.* | ) |

## **ORDER**

The Satanic Temple, Inc. ("the Satanic Temple") seeks to provide mail-order drugs for its members in Indiana to have abortions.  Indiana, however, criminalizes most abortions.  Ind. Code § 16-34-2-1(a) ("S.B. 1").  The Satanic Temple has sued Attorney General Todd Rokita and Marion County Prosecutor Ryan Mears ("Defendants"), seeking injunctive and declaratory relief on behalf of itself and its members who have become pregnant involuntarily ("Members").  The Satanic Temple alleges that S.B. 1 violates the Indiana Religious Freedom Restoration Act ("RFRA") by prohibiting its Members from performing its Satanic Abortion Ritual; the Fifth Amendment by committing a taking of its Members' uteruses; the Fourteenth Amendment by discriminating against its Members who become pregnant unintentionally in favor of women who become pregnant by rape or incest; and the Thirteenth Amendment by forcing upon its Members the conditions of slavery.  Defendants have filed a Motion to Dismiss the First Amended Complaint for failure to state a claim and lack of standing.  [Filing No. 36.]  The Motion is ripe for the Court's review.

1

Brief Appendix 4

# I.
## STANDARD OF REVIEW

The Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. The case-or-controversy requirement counts the element of standing as one of its essential components. *Flynn v. FCA US LLC*, 39 F.4th 946, 952 (7th Cir. 2022) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). The fundamental requirements of standing are the same in every case: injury in fact, causation, and redressability. *Ass'n of Am. Physicians & Surgeons, Inc. v. Koskinen*, 768 F.3d 640, 642 (7th Cir. 2014).

Generally, while reviewing a motion to dismiss for lack of standing, the district court "must accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor" as a facial matter. *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 691 (7th Cir. 2015). The general rule permits an exception to these favorable presumptions, which arises where "standing is challenged as a factual matter." *Id.* Once evidence calling the plaintiff's standing into question is proffered, "[t]he presumption of correctness that we accord a complaint's allegations falls away[.]" *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) (citation omitted). Then, "no presumptive truthfulness attaches to plaintiff's allegations." *Id.* (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977)). And "the plaintiff bears the burden" of demonstrating standing by "coming forward with competent proof.'" *Id.* (quoting *Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003)). "[C]ompetent proof" means a showing by a "preponderance of the evidence." *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020) (citations omitted).

Further, when the factual prerequisites of jurisdiction are at stake, "the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Apex Digital*, 572 F.3d at 444 (quoting *Mortensen*, 549 F.2d at 891). A

Brief Appendix 5

district court may "resolve factual disputes and make any findings necessary to determine the court's adjudicatory competence." *Craftwood II, Inc. v. Generac Power Sys., Inc.*, 920 F.3d 479, 481 (7th Cir. 2019) (citing *Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1316 (2017)).  Beyond only the pleadings, "the court may . . . view any evidence submitted to determine if subject matter jurisdiction exists." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015).  When the standing question involves disputed factual matters, "the district court may find the facts," and it is "review[ed] . . . for clear error." *Reid L. v. Illinois State Bd. of Educ.*, 358 F.3d 511, 515 (7th Cir. 2004).

As a factual matter, Defendants challenge the Satanic Temple's standing in two ways.  First, Defendants argue that the Satanic Temple does not show that "anyone would use it to procure abortions." [Filing No. 37 at 8.]  Second, Defendants argue that the Satanic Temple does not show that its clinic "exists or is reasonable likely to exist in the near future." [Filing No. 37 at 7.]  These disputed facts are at the heart of the injury-in-fact inquiry, the "[f]irst and foremost" element of standing. *Carello v. Aurora Policemen Credit Union*, 930 F.3d 830, 833 (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998)).  Consequently, the Satanic Temple bears the burden to prove those disputed facts by a preponderance of the evidence.  In this light, the Court presents the case's background and conducts the Court's analysis.

## II.
### BACKGROUND

### A.    Federal and State Laws Regulating Telehealth Abortions

Multiple sources of law impose restrictions on providing abortion-inducing drugs by mail. Federally, the Comstock Act of 1873, still in force today, makes it a criminal offense to mail any "article or thing designed, adapted, or intended for producing abortion." 18 U.S.C. § 1461

Brief Appendix 6

("Mailing obscene or crime-inciting matter").  A first offense against the Comstock Act can lead to imprisonment for up to five years; for each subsequent offense, up to ten years.  *Id.*

In Indiana, as early as 2013, if a physician were permitted to administer an abortion, the "physician [must have] examine[d] [the] pregnant woman in person before prescribing or dispensing an abortion inducing drug"; "'in person' d[id] not include the use of telehealth or telemedicine services."  Ind. Code § 16-34-2-1(a) (2013).  Likewise, as early as 2013, abortion clinics were required to seek licensure in the state.  Ind. Code § 16-21-2-2.5 (2013) ("Adoption of rules concerning birthing centers and abortion clinics; violations as to unlicensed facilities").  A person who "knowingly or intentionally . . . operate[d] . . . an abortion clinic that [was] not licensed" committed a Class A misdemeanor.  *Id.* § (c).  In 2022, Indiana enacted into law S.B.1, which, with little exception, criminalizes most abortions in the state.  Ind. Code § 16-34-2-1(a) (2022).  All of those restrictions remain the law today.

### B.    The Satanic Temple's Telehealth Abortion Clinic

The Satanic Temple, in its own words, "venerates, but does not worship, the allegorical Satan described in the epic poem Paradise Lost – the defender of personal sovereignty against the dictates of religious authority."  [Filing No. 21 at 1-2.]  Members of the Satanic Temple adhere to the Satanic Temple's Tenets, including Tenet III: "One's body is inviolable, subject to one's own will alone."  [Filing No. 21 at 2.]  The Satanic Temple promotes its Tenets by "protecting the exercise of [the Tenets] from government intrusion."  [Filing No. 21 at 2.]  Such promotion includes providing access to abortions.

In late 2022, the Satanic Temple formed an abortion clinic, called the "Samuel Alito's Mom's Satanic Abortion Clinic" ("the Clinic").  [Filing No. 37-2]; *see generally* Formation Records, Corporations and Business Services, N.M. Secretary of State, https://portal.sos.state.nm.us/BFS/online/corporationbusinesssearch (Business  ID#:  7035080).

Brief Appendix 7

The Clinic supports the Satanic Temple's effort to create a wider health network.  *TST Health*, https://www.tsthealth.org/.  The Clinic "does not maintain an office or other physical space," but through online telehealth, it serves patients who are physically located in New Mexico: To receive the Clinic's services, an individual must be "[i]n New Mexico at the time of the online visit," "[h]ave a New Mexico mailing address," and "receive the [abortion-inducing drugs] in New Mexico." *Id.*; [Filing No. 50-1 at 1.]  The Clinic allegedly seeks to extend beyond the borders of New Mexico to reach the State of Indiana. [Filing No. 21 at 14-15.]  In Indiana, the Clinic allegedly would help Members perform the Satanic Abortion Ritual.  [Filing No. 21 at 14-15.]

The Satanic Abortion Ritual is a ritual of "destruction."  [Filing No. 21-1 at 2.]  It is designed to "cast off notions of guilt, shame, and mental discomfort" regarding having an abortion. [Filing No. 21-1 at 2.]  The Ritual invites its Members to consult materials representing "great sacrifices in the struggle to establish reproductive rights" in order to "subdue stigmas" the patient "might feel from those who oppose abortion." [Filing No. 21-1 at 3.]  As the Member induces her abortion, she is urged to read the Satanic Tenets aloud.  [Filing No. 21-1 at 5.]

### C.   This Litigation

On September 21, 2022, on behalf of its Members and in its own right, the Satanic Temple sued Governor Eric Holcomb and Attorney General Todd Rokita to enjoin S.B. 1.  [Filing No. 1.] Governor Holcomb and Attorney General Rokita filed a Motion to Dismiss, [Filing No. 17,] arguing, among other things, that the Satanic Temple lacked standing.  [Filing No. 18 at 6-8.]  The Satanic Temple then amended its Complaint.  [Filing No. 21.]  The First Amended Complaint no longer named the Governor as a Defendant but added Marion County Prosecutor Ryan Mears as a Defendant.  [Filing No. 21 at 1.]  Acknowledging this amendment, the Court then denied the earlier Motion to Dismiss as moot, leaving the First Amended Complaint the operative pleading.  [Filing No. 27 at 1.]

Brief Appendix 8

The Satanic Temple's First Amended Complaint attacks only S.B. 1.  [Filing No. 21 at 4.]. Alleging that it intends to provide abortions to Members in Indiana, the Satanic Temple states that S.B. 1 unlawfully interferes with the rights of its Members.  The Satanic Temple claims that S.B. 1:

- violates the Indiana Religious Freedom Restoration Act by preventing a Member from exercising her Satanic Tenet-based religious beliefs to have an abortion, [Filing No. 21 at 14];

- further violates the Indiana Religious Freedom Restoration Act by imposing a substantial burden on the exercise of the Satanic Abortion Ritual, [Filing No. 21 at 15];

- violates the Equal Protection Clause by providing no exceptions for those who are pregnant by accident, and discriminating in favor of those who are pregnant by rape or incest, [Filing No. 21 at 13-14];

- violates the Takings Clause by providing no compensation for the value of occupying a woman's reproductive system, "taking" the right to otherwise use a woman's uterus, [Filing No. 21 at 10-11]; and

- violates the Thirteenth Amendment by providing no compensation to an involuntarily pregnant woman for "providing the labor necessary to give birth," imposing on such women the conditions of slavery, [Filing No. 21 at 12-13].

Likening its cause to historical litigation by the National Association for the Advancement of Colored People, the Satanic Temple has maintained its suit on behalf of its Members in secrecy. [Filing No. 44 at 20] (citing *NAACP v. Alabama*, 357 U.S. 449, 459 (1958))].  Its Members are unnamed; its declarations are under pseudonym; and its executive director is unidentified, "not disclos[ing] [his/her] real name" for fear of "domestic terrorists."  [Filing No. 44-1 at 1.]  The Satanic Temple justifies the suit's secrecy based on the leak preceding the Supreme Court's decision in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. ---, 142 S. Ct. 2288 (2022); the alleged leak of confidential information by Attorney General Rokita in a prior abortion case; and the Satanic Temple's prior exposure to violence.  [Filing No. 45 at 3.]  "[E]ven [for] high government officials," the Satanic Temple asserts, "the passions stirred up by the culture war over abortion can overcome . . . good judgment."  [Filing No. 45 at 3.]

Brief Appendix 9

The fact that the Satanic Temple (1) does not name the Members on whose behalf it brings this suit and (2) lacks a current Indiana abortion clinic are both at the center of Defendants' Motion to Dismiss for failure to state a claim and lack of standing.  [Filing No. 36.]  In their briefing, Defendants argue that the Court should permit "jurisdictional discovery as to whether The Satanic Temple has standing." [Filing No. 37 at 13.] To that end, the parties submitted evidence, including affidavits and declarations, filings and exhibits, and interrogatories and admissions.  The Court also ordered supplemental briefing on how recent Supreme Court decisions affect the Satanic Temple's standing.  [Filing No. 53.]  Throughout the standing analysis, the Court will turn its attention to the submitted evidence and supplemental briefing that is relevant to the case's ultimate resolution.

The threshold question in this case, as in every case, is the power of the Court to entertain the lawsuit; accordingly, motions that challenge that power are dealt with first.  *See Vt. Agency of Nat. Res. v. U.S. ex rel Stevens*, 529 U.S. 765, 778 (2000).  Accordingly, the Court turns first to the parties' arguments regarding standing.

### III.
#### DISCUSSION

"Of one thing we may be sure," the Supreme Court has stated, "[t]hose who do not possess Art. III standing may not litigate as suitors in the courts of the United States." *Love Church v. City of Evanston*, 896 F.2d 1082, 1084 (7th Cir. 1990) (quoting *Valley Forge Coll. v. Amns. United for the Separation of Church & State*, 454 U.S. 464, 475-76 (1982)).  To have standing for "injunctive relief, a plaintiff must show that [s]he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.,* 555 U.S. 488,

Brief Appendix 10

493 (2009) (citation omitted).  An organization can assert standing either on behalf of its members or in its own right.  The Satanic Temple asserts both.

### A.        Standing on Behalf of the Satanic Temple's Members

Defendants argue that the Satanic Temple does not have associational standing because it has not identified its Members.  [Filing No. 37 at 10.]  Defendants argue that the Satanic Temple "does not specify how many female members are pregnant, whether the members who were pregnant 9 months ago are still pregnant despite the passage of time, whether the women can take advantage of S.B. 1's exceptions, and whether the women still need relief given that a state court enjoined S.B.1." [Filing No. 37 at 11.]  The State notes that the Satanic Temple "has not identified its members, sued on behalf of particular members, filed declarations from them, or given them an opportunity to direct the course of the litigation." [Filing No. 56 at 6.]  Consequently, Defendants assert, the Satanic Temple cannot show that it "'has identified members and represents them in good faith,' much less that unidentified members have standing to sue." [Filing No. 56 at 6 (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2158 (2023)).]  In the place of identified members, the State continues, the Satanic Temple cannot resort to using statistical probability.  [Filing No. 37 at 10-11.]

In response, the Satanic Temple argues that "no authority requires that identity be made by name." [Filing No. 44 at 19.]  The Satanic Temple states that it proceeds on behalf of its Members anonymously because "neither the Court nor Defendants can guarantee their identity will remain secret." [Filing No. 44 at 19 n.16.]  Further, the Satanic Temple argues that the First Amendment grants members a "right to keep his or her membership" in the Satanic Temple a "secret." [Filing No. 44 at 20.]  As a legitimate organization, the Satanic Temple argues, it includes the "involvement of its members in its programs and funding," supporting the fact that it is "representing its members in good faith." [Filing No. 57 at 6.]  In the place of identification, the

Brief Appendix 11

Satanic Temple offers a statistics-based declaration as "the requisite proof" that ninety-four Members of the Satanic Temple will be "individually harmed by the Indiana Abortion Ban every year and at least one" is "pregnant at any given point in time." [Filing No. 44 at 20.]

In reply, Defendants reiterate that the Satanic Temple "has never identified a single member with standing. In fact, it has refused to identify the member(s) it believes provides a basis for standing." [Filing No. 51 at 4.] Further, Defendants assert that an organization cannot establish standing through statistical probability; without specific facts to support identifiable members, the State argues, the Satanic Temple "has failed to meet its burden" to support each disputed element of standing with "competent proof." [Filing No. 51 at 4.]

In general, a plaintiff must assert "her own legal rights, not those of a third party." *Freedom from Religion Found., Inc. v. Zielke*, 845 F.2d 1463, 1468 (7th Cir. 1988). That general rule permits an exception – for "associational standing" on behalf of the plaintiff organization's members. An organization has associational standing when:

a) its members would otherwise have standing to sue in their own right;

b) the interests it seeks to protect are germane to the organization's purpose; and

c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1976). For the first prong, whether a member would have standing to sue in her own right, the Supreme Court has cautioned that allegations of injury must be "specific" to an "identified member." *Earth Island Inst.*, 555 U.S. at 498.

The Satanic Temple argues that it need not identify specific Members because the First Amendment allows each Member not to disclose her affiliation, citing *NAACP v. Alabama*, 357 U.S. 449, 459 (1958). [Filing No. 44 at 20.] Yet the Supreme Court has explained that such anonymity is permitted "only where all the members of the organization are affected by the

Brief Appendix 12

challenged activity." *Earth Island*, 555 U.S. at 498-99 (emphasis omitted).  Here, the challenged

abortion law allegedly affects only some, but not all, of the Satanic Temple's Indiana membership,

only ninety-four out of over 11,000 members.  [Filing No. 44-2 at 3 (ninety-four); Filing No. 44-

1 at 3 (over 11,000).]  Further, in *NAACP*, the organization was willing to "divulg[e] the identity

of its members who . . . [held] official positions."  *NAACP*, 357 U.S. at 464.  Here, the Satanic

Temple is not willing to divulge any such identity.  Its "Executive Director" hides "[his/her] real

name" for fear of "domestic terrorists."  [Filing No. 44-1 at 1.][1]

     The Satanic Temple then quotes the Seventh Circuit as stating, "the requirement for an

individual member to have standing still allows for the member on whose behalf the suit is filed

to remain unnamed by the organization."  [Filing No. 44 at 19 (quoting *Prairie Rivers Network*, 2

F.4th at 1011).]  That statement is correctly quoted, but its context is improperly omitted.  In the

very next sentence, the Seventh Circuit observed that in light of Supreme Court precedent, it would

"reserve for another day whether that statement survives."  *Prairie Rivers Network v. Dynegy*

---

[1] The Court takes seriously the potential risks of retribution faced by unpopular parties accessing the judicial system.  For that reason, the Court provides a mechanism that parties must use to request leave to proceed under a pseudonym.  S.D. Ind. L.R. 10-1.  Utilizing the organization itself as a functional pseudonym is no replacement for abiding by the requirements imposed by Local Rules and within the guidelines of the Seventh Circuit.  *Id.* ("This rule provides a vehicle for a litigant's identity to be disclosed to the court and to the opposing party but not to the public at large pending the outcome of the court's determination of whether the litigant is entitled to proceed anonymously.");  *Doe v. City of Chicago*, 360 F.3d 667, 669 (7th Cir. 2004) ("The danger of retaliation is often a compelling ground for allowing a party to litigate anonymously."); *see also Doe v. Ind. Black Expo, Inc.*, 923 F. Supp. 137, 139-40 (S.D. Ind. 1996).

It is possible for a litigant to proceed anonymously while concurrently providing specific allegations.  *See, e.g., John Doe, formerly known as Jane Doe v. Holcomb*, 883 F.3d 971, 974-75 (7th Cir. 2018) (transgender immigrant proceeded under pseudonym providing specific allegations for suit against state actor to legally change name).  This should be no surprise to the Satanic Temple; its members have litigated under pseudonym in prior proceedings.  *E.g., Doe v. Parson*, 960 F.3d 1115 (8th Cir. 2020) (Satanic Temple member who intended to have abortion sued using pseudonym in suit for declaratory judgment against informed consent law).

*Midwest Generation, LLC*, 2 F.4th 1002, 1011 (7th Cir. 2021); *see Earth Island*, 555 U.S. at 498-99.  The Seventh Circuit then referred to sister circuits which "expressly require names for associational standing on the pleadings." *Id.* (citing *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (Souter, J., sitting by designation); *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013)).

Although the Satanic Temple must identify individual Members specifically, the Satanic Temple attempts to identify them statistically, based on the work conducted by "Dr. J.D." [Filing No. 44-2 at 1.]  Though identified to the Court, Dr. J.D, like the alleged Members of the Satanic Temple, is not identified to the public.  [Filing No. 44-2 at 1.]  Dr. J.D. is not employed by, or contracted with, the Clinic; when asked to identify such licensed physicians, the Satanic Temple answered "none."  [*See* Filing No. 50-2 at 2.]  Dr. J.D. appears to have no personal knowledge of the Satanic Temple's members; the doctor is simply "advised" of the Satanic Temple's procedures.  [*See, e.g.*, Filing No. 44-2 at 4.]  Based on being advised of these procedures, Dr. J.D. estimates the number of injured Members using the following average metrics: the number of Satanic Temple Members of child-bearing age; the 2017 Indiana fertility rate; the 2021 Indiana abortion rate; the percentage of pregnancies that are unintentional; and the percentage of pregnancies that occur due to failure of birth control.  [Filing No. 44-2 at 2-3.]  "[T]o a reasonable degree of medical certainty," Dr. J.D. opines, at least one member the Satanic Temple is involuntarily pregnant each year.  [Filing No. 44-2 at 3.]

These calculated allegations do not inspire confidence.  Most basically, a population average does not guarantee an individual result.  It is statistically possible for the average number of pregnancies to be greater than zero, and for exactly zero Members to be pregnant.  Additionally,

Brief Appendix 14

even if these calculations were accurate, the result does not foreclose the possibility that someone who is involuntarily pregnant might voluntarily decide to bring her pregnancy to term.

The ambiguity inherent in the Satanic Temple's analysis illustrates the exact difficulty the Supreme Court has cautioned to avoid: "In part because of the difficulty of verifying the facts upon which such probabilistic standing depends," the Supreme Court "has required plaintiffs claiming organizational standing to identify members who have suffered the requisite harm—surely not a difficult task" when there are allegedly so many members. *Earth Island Inst.*, 555 U.S. at 499. The Supreme Court has unequivocally prohibited statistical standing lest "[t]his novel approach to the law of organizational standing . . . make a mockery of [the Supreme Court's] prior cases, which have required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm," which requires "naming the affected members." *Id.* at 498-99.

Even if it were "possible–perhaps even likely–that one individual w[ould] meet" the criteria of standing, speculation through statistics is no replacement for specifics. *Id.*; *see, e.g.*, *Prairie Rivers Network*, 2 F.4th at 1009-10 (holding no associational standing for environmental-rights organization that failed to identify "who [its] members [were] or how exactly" they would have been harmed); *Keep Chicago Livable v. City of Chicago*, 913 F.3d 618, 625 (7th Cir. 2019) (holding no associational standing for home-sharing rights organization that left "the record . . . unclear whether any of the six named plaintiffs remain members"); *Disability Rights Wis. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 802 (7th Cir. 2008) (holding no associational standing for disability-rights organization that failed to identify a specific student who would be harmed).

Although standing is permissible for "abortion providers to invoke the rights of their actual or potential patients in challenges to abortion-related regulations," the Satanic Temple has failed

Brief Appendix 15

to meet its burden to prove that there are actual or potential Indiana patients at all.  *June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2118 (2020), *abrogated by Dobbs*, 142 S. Ct. 2228.  The Satanic Temple states it is "highly likely" that one or more Indiana Members would use the Clinic, and it also states that it has received "hundreds of inquiries from [Satanic Temple] [M]embers"; tellingly, however, it specifies no Indiana Member who has called the Clinic, not even anonymously.  [Filing No. 44-1 at 6-7]; *see Common Cause Ind. v. Lawson*, 937 F.3d 944, 952 (7th Cir. 2019) (holding organizations had standing in part because diversion of resources included managing phone calls from Indiana residents).  When asked whether an Indiana Member has ever received abortion-inducing drugs from the Satanic Temple, the Satanic Temple, "to the best of its knowledge," answers no, but "can neither admit," "deny," nor "vouch for" that fact.  [Filing No. 50-1 at 2.]

Overall, the Satanic Temple invites a paradox of inferences.  "To a reasonable degree of medical certainty," it points to statistically identified Members, which the Supreme Court forbids; yet it declines to "vouch for" specifically identified Members, which the Supreme Court requires. Such equivocal allegations fall short of overcoming a factual challenge to standing.  All the Satanic Temple adds is an unidentified doctor opining on unidentified members, identifying them only through statistical probability.  This, the Supreme Court has explained, simply will not do.  The Satanic Temple has failed to prove by a preponderance of the evidence the facts necessary to support associational standing.[2]

---

[2] Because the Satanic Temple has not established associational standing, the Court need not and does not engage in an evaluation of potential injuries to Members that the Satanic Temple claims they actually or imminently might incur.

Brief Appendix 16

### B.       Standing for the Satanic Temple Itself

Defendants argue that the Satanic Temple does not have standing in its own right, falling short of demonstrating injury in fact, causation, and redressability.   [Filing No. 37 at 7-8.] Defendants argue that the Satanic Temple has not demonstrated injury in fact; it has failed to show "such a clinic exists or is reasonably likely to exist in the near future" and that the First Amended Complaint does not "specify where the Clinic is located, what services it performs, or where its providers are licensed." [Filing No. 37 at 7.]  Defendants further assert that the Satanic Temple has not demonstrated causation; "[e]ven before S.B. 1's enactment, both federal and state law would prohibit The Satanic Temple from providing abortion-inducing drugs by mail." [Filing No. 37 at 8-9.]  And Defendants assert that the Satanic Temple has not demonstrated redressability; even if "it had a clinic capable of supporting Indiana patients," it does not show that "anyone would use it to procure abortions that would be lawful but for S.B. 1." [Filing No. 37 at 8.]  Defendants conclude that, in contrast to the plaintiff who intended to engage in prohibited conduct in *303 Creative v. Elenis*, the Satanic Temple never intended to bring its Clinic to Indiana; if it had, it would have intended to "compl[y] with Indiana's unchallenged health and safety regulations." [Filing No. 56 at 3-4 (citing *303 Creative v. Elenis*, 600 U.S. 570, 583 (2023)).]

In response, the Satanic Temple argues that it has met the requirements of standing regarding injury in fact, causation, and redressability.  The Satanic Temple argues that it has suffered multiple injuries, including facing the threat of prosecution, expending costs to comply with S.B. 1, diverting resources to respond to S.B. 1, and being frustrated in its mission to spread the Satanic Tenets and the Satanic Abortion Ritual.  [Filing No. 44 at 9 (threat of prosecution); Filing No. 44 at 12 (cost of compliance); Filing No. 44 at 13 (diversion of resources); Filing No. 44 at 13-14 (frustration of Satanic mission)].  The Satanic Temple states that *Biden v. Nebraska* recognizes that frustrations to its mission amount to an injury in fact [Filing No. 57 at 1-3 (citing

Brief Appendix 17

*Biden v. Nebraska*, 143 S. Ct. 2355, 2368 (2023)].  It asserts that *303 Creative* stands for the proposition that the Satanic Temple's injury stems from the liability "inherent in providing its intended services." [Filing No. 57 at 3-4.]  The only obstacle blocking the Clinic, according to the Satanic Temple, is its fear of civil and criminal consequences.  [Filing No. 44 at 9, 13.]  As to causation and redressability, the Satanic Temple asserts that it seeks to overturn Indiana's entire abortion-law apparatus to the extent it causes the Satanic Temple's injuries.  [Filing No. 44 at 12-13; Filing No. 57 at 3.]

In reply, Defendants argue that the Satanic Temple has demonstrated no actual or imminent injury sufficient for standing.  [Filing No. 51 at 1-2.]  *Biden v. Nebraska*, the State argues, "never held that an abstract injury to an organization's purported mission constitutes injury in fact.  It focused on . . . 'a legally protected interest, like property or money.'" [Filing No. 60 at 2 (quoting *Biden*, 143 S. Ct at 2365-66).]  Defendants assert that the Clinic, based in New Mexico, "has never provided abortions to any woman in Indiana," and has only "generic allegations of an intention to provide abortions to unidentified women at some unspecified time."  [Filing No. 51 at 1-2.]  Defendants reiterate that the Satanic Temple "faces independent legal barriers to providing abortions in Indiana" under state and federal laws prohibiting unlicensed abortion clinics, prohibiting mail-order abortion drugs, and prohibiting telehealth abortions.  [Filing No. 51 at 2-3.]  And Defendants reply that the Satanic Temple's First Amended Complaint "nowhere states" that it is "challenging all medical requirements that would affect its theoretical business model, much less explains how all such health and safety requirements are allegedly invalid."  [Filing No. 51 at 3.]  With the Satanic Temple's proposed abortion model independently illegal, Defendants argue,

Brief Appendix 18

S.B. 1 is neither the cause of the Satanic Temple's injuries nor an appropriate target for redress. [Filing No. 51 at 3.][3]

### 1.   Injury in Fact

Injury in fact is the "first and foremost" element of standing.  *Carello*, 930 F.3d at 833 (quoting *Steel Co.*, 523 U.S. at 103).  As such, this case's multiple alleged injuries are addressed first, beginning with the threat of prosecution and the cost of compliance.

### a.   Threat of Prosecution and Cost of Compliance

If a plaintiff "must comply with the law or face sanctions," the plaintiff can sue to enjoin the law before facing enforcement through a "pre-enforcement challenge." *Hays v. City of Urbana, Ill.*, 104 F.3d 102, 103-04 (7th Cir. 1997) (citing *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925)). In a pre-enforcement challenge, a future harm amounts to injury in fact if the harm is "certainly impending," or if the harm poses a "substantial risk" of occurring, but not if the harm is merely "possible." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  To prove such a threatened injury, the plaintiff must show a "credible threat of prosecution" of conduct arguably affected with a constitutional interest, *Driehaus*, 573 U.S. at 159, and "make[] clear its intention to continue its possibly unlawful conduct," *Sweeney v. Raoul*, 990 F.3d 555, 560 (7th Cir. 2021).  The intent to engage in possibly unlawful conduct must exceed "'some day' intentions"—those "without any description of concrete plans" or "any specification of when the some day will be." *Lujan*, 504 U.S. at 564 (emphasis omitted).  Whether the plaintiff intends to engage in its possibly unlawful conduct is a question of

---

[3] Although the Satanic Temple already benefitted from a chance to submit supplemental briefing, and was warned that extraneous materials may be struck, [Filing No. 53], the Satanic Temple submitted an additional letter to the Court, this time arguing that various Indiana abortion provisions are preempted, [Filing No. 61 at 1].  Defendants have moved to strike the letter.  [Filing No. 62.].  Having warned the Satanic Temple of the consequences, the Court strikes the letter.

fact.  *Younger v. Harris*, 401 U.S. 37, 42 (1971) (holding no standing for certain plaintiffs who had not "alleged that they would be prosecuted for the conduct they planned to engage in," a fact that "the District Court had [not] found.").

The Satanic Temple has no Clinic in Indiana presently: it operates no "licensed . . . abortion clinic in Indiana," employs no "physicians who are licensed to practice medicine in Indiana," and provides no "in-person services to patients" in Indiana.  [Filing No. 50-1 at 1-2.]  Likewise, the Satanic Temple plans no Clinic in Indiana prospectively: it "does not presently intend" to start an in-person abortion clinic in Indiana, and it "does not presently intend" to seek a license for an abortion clinic in Indiana.  [Filing No. 50-1 at 1-2.]

Unlike the plaintiff in *303 Creative*, who claimed an intent to follow through on her prohibited conduct, *see* 600 U.S. at 583, the Satanic Temple is far closer to plaintiffs in other cases who failed to demonstrate that they intended to do the same.  *See, e.g.*, *Ashcroft v. Mattis*, 431 U.S. 171, 172-73 & n.2 (1977) (holding no standing in moot case regarding wrongful death of one son, finding it was "speculative" that another son "might" have been in danger of wrongful death in the future due to involvement with police); *O'Shea v. Littleton*, 414 U.S. 488, 498 (1974) (holding no standing for plaintiffs who failed to "indicate that it [was] otherwise their intention" to violate the law); *Hays*, 104 F.3d at 104 (holding no standing for plaintiff landlords who failed to show they would bear the cost of compliance because they did not rent apartments falling within Section 8 ordinance); *Love Church*, 896 F.2d at 1086 (holding no standing for plaintiff church that failed to apply for a permit and was not threatened with prosecution for operating without a permit).

The Court finds that the Satanic Temple's allegations fall short of even "some day" intentions, and that it fails to meet its burden to make clear it intends to engage in conduct that is

17

unlawful under S.B. 1.  Without such intent, the Satanic Temple has failed to demonstrate that its alleged cost of compliance or threat of prosecution amounts to injury in fact.

b.      Diversion of Resources

If an organization shows a "drain on the organization's resources" as a result of challenged government action, the organization can prove actual injury.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  However, "where the harm is not imminent," "[m]itigation expenses do not qualify as actual injuries." *Remijas*, 794 F.3d at 695 (citing *Clapper*, 133 S. Ct. at 1152 (holding no injury in fact for plaintiffs who "inflict[ed] harm on themselves based on their fears of hypothetical future harm that [was] not certainly impending.")).  As the Court has found above, due to the Satanic Temple's own lack of intent, it faces no imminent harm from the enforcement of S.B. 1; even if the Satanic Temple had diverted its resources, it has fallen short of proving injury in fact.

c.      Frustration to the Satanic Temple's Mission

No matter how longstanding an organization's interest, and no matter how sterling an organization's qualifications, a concrete injury does not include a mere "interest in a problem." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) (holding organization lacked standing even though organization argued it was vindicating the public interest).  Nor does it include "mere indignation." *Carello*, 930 F.3d at 834 (holding plaintiff lacked standing even though plaintiff argued indignation amounted to concrete injury).

After the Court's determination that the Satanic Temple's allegations do not demonstrate injury in fact from the threat of prosecution, the cost of compliance, or the diversion of resources, all that remains is a frustration to promoting the Satanic Tenets and the Satanic Abortion Ritual – in other words – simply a "setback to the organization's abstract social interests." *Havens Realty Corp.*, 455 U.S. at 379 (citing *Sierra Club*, 405 U.S. at 739).  While such a "generalized grievance"

18

Brief Appendix 21

may suit the "rarified atmosphere of a debating society," it does not suffice for standing. *Amns. United for Separation of Church & State, Inc.*, 454 U.S. at 470, 472 (1982); *see also Biden*, 143 S. Ct. at 2365-66 (holding standing for plaintiff that was exposed to concrete injury of millions of dollars); *Keep Chicago Livable*, 913 F.3d at 624 (holding no standing for home-sharing rights organization where home-rental ordinance "burden[ed] the organization's education and advocacy mission" but plaintiffs did not "own[] or rent[] property or otherwise engage[] in activity regulated or protected by" the ordinance); *see also Freedom from Religion Found.*, 845 F.2d at 1467 (holding no standing for advocacy organization where religious display offended the plaintiffs' religious beliefs but plaintiffs suffered only "psychological harm that result[ed] from witnessing conduct with which [they] disagreed").

In sum, the Satanic Temple's allegations fail to prove it has suffered any injury in fact. While this failure alone defeats standing, the Court goes on to consider the remaining elements of standing.

### 2. *Causation and Redressability*

Causation and redressability are the remaining two elements of standing. A plaintiff must prove the defendant caused its injury, and it must be likely that a favorable judicial decision will redress its injury. *Lujan*, 504 U.S. at 560-61. For causation, the plaintiff need not prove proximate cause, but it still must prove a "fairly traceable" connection between the defendant's challenged conduct and the plaintiff's alleged injury. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386, 1391 n.6 (2014). The injury must not have resulted from the "independent action of some third party not before the court." *Lujan*, 504 U.S. at 560. And the injury must not have resulted from conduct or legal provisions not before the court. *See California v. Texas,* 141 S. Ct. 2104, 2119 (2021) (holding no causation in healthcare-law challenge where showing "that the minimum essential coverage requirement is unconstitutional would not show that enforcement

of any of the[] other provisions" injuring the plaintiffs was unconstitutional).  For redressability, it is often intricately linked with causation; if there is no causation, then a favorable decision directed toward the challenged conduct will not likely redress the plaintiff's injury.  That is, if "[a] plaintiff . . . would have been no better off had the defendant refrained from" the challenged acts, then the plaintiff "does not have standing." *Silha*, 807 F.3d at 174 (citation omitted).

In this case, the Satanic Temple alleges that S.B. 1 imposes the threat of prosecution, the cost of compliance, the diversion of its resources, and the frustration to promoting its mission to spread the Satanic Tenets.  Yet, as the Defendants note, other unchallenged federal law and Indiana laws would each independently prohibit the Satanic Temple from lawfully operating its mail-order abortion service.  *See, e.g.*, *Clapper*, 133 S. Ct. at 1148 (holding no causation when plaintiffs seeking an injunction of a statute authorizing surveillance could not demonstrate that government would be unlawfully surveilling them under the challenged statute, as opposed to under some other independent statute); *Int'l Union v. Johnson*, 674 F.2d 1195, 1199 (7th Cir. 1982) (holding no redressability when plaintiffs seeking an injunction of a statute allegedly barring them from receiving unemployment benefits were also independently barred from receiving unemployment benefits by another statute).[4]

---

[4] While the Satanic Temple has introduced exhibits arguing that federal law does not prevent mailing abortion-inducing drugs, that question of law is sharply contested.  *Compare* Filing No. 45-5 at 17 (Memorandum Opinion for the General Counsel of the United States Post Office: The Comstock Act does "not . . . prohibit the conveyance of articles intended for preventing conception or producing an abortion where the sender lacks the intent that those items should be used unlawfully."), *with* Filing No. 45-4 at 2 (Letter from the Missouri Attorney General on behalf of 20 state attorneys general: the Comstock Act "expressly prohibits using the mail to send or receive any drug that will 'be used or applied for producing abortion.' 18 U.S.C. § 1461.").

Brief Appendix 23

In addition to falling short of proving injury in fact, the Satanic Temple has failed to meet its burden of proving causation and redressability.  The result is a lack of standing.  The Court **GRANTS** Defendants' Motion to Dismiss the First Amended Complaint.  [36.]

## IV.
### FURTHER PROCEEDINGS

"When a district court concludes that the plaintiff lacks standing—and thus that the court lacks jurisdiction—the judge may either dismiss without leave to amend or dismiss without prejudice." *Flynn*, 39 F.4th at 954 (citing *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 935 F.3d 573, 581 (7th Cir. 2019)).  Because the Satanic Temple has already used its one amendment as of right, the decision to permit further leave to amend is committed to the Court's "broad" discretion.  Fed. R. Civ. P. 15(a); *MAO-MSO Recovery II, LLC*, 935 F.3d at 586.

The Satanic Temple should have "consider[ed] carefully and promptly the wisdom of amending to meet the arguments in the motion.  A responsive amendment may [have] avoid[ed] the need to decide the motion or reduce the number of issues to be decided, and . . . expedite[d] determination of issues." Fed. R. Civ. P. 15, 2009 Amendment Advisory Committee Notes.  But far from expediting the determination of jurisdiction, the Satanic Temple did not use its earlier opportunity to cure its standing deficiencies.  Instead, it tried to introduce nonresponsive constructive amendments, each slipped into its briefing.  Although it alleged claims under RFRA, in its response brief, the Satanic Temple requested leave to "replead" its RFRA counts as First Amendment claims.  [Filing No. 44 at 39.]  Although it challenged only S.B. 1 in its First Amended Complaint, in its response brief, the Satanic Temple asserted that it seeks to enjoin Indiana's entire abortion-law apparatus to the extent it causes the Satanic Temple's injuries.  [Filing No. 21 at 4 (First Amended Complaint); Filing No. 44 at 13 (response brief).]  Then, in supplemental briefing, the Satanic Temple asserted it wanted to enjoin "any and all Indiana laws" conflicting with the

Brief Appendix 24

Satanic Temple's mission to provide abortion services for its Members in Indiana.  [Filing No. 57 at 3.]

It is rarely appropriate to permit constructive amendments "smuggle[d]" through the briefs. *Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 490 (7th Cir. 2023).  Even if this were the rare appropriate case, the Satanic Temple's requests collide with its central obstacles to standing—no identified Members, and no intent to engage in unlawful conduct—abundantly clear from the Satanic Temple's own admissions of fact.  [Filing No. 50-1.]  Unless the Court permits withdrawal, judicial admissions are "conclusively established." Fed. R. Civ. P. 36(b).  Judicial admissions are not evidence; judicial admissions "trump[] evidence"; they "ha[ve] the effect of withdrawing a fact from contention" entirely.  *Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 333 (7th Cir. 1993) (judicial admissions trump evidence); *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995) (judicial admissions withdraw fact from contention).  These fatal flaws should have been apparent to the Satanic Temple long before the close of briefing.  *See Draper*, 827 F.3d at 3 ("[W]hy the advocacy group would have needed formal discovery to identify which of its own members may have been injured by the regulation is a mystery the group leaves unsolved.").  Granting leave to amend would practically produce only more briefing, which the Court has already once entertained.  [Filing No. 53.]

The Satanic Temple had an opportunity to submit evidence.  It had notice of its standing defects.  And it was given the opportunity to cure them.  It has failed on all fronts.  Ultimately, the Satanic Temple has failed to prove by a preponderance of the evidence those facts essential for granting standing.  Accordingly, the Court **DISMISSES** the First Amended Complaint for lack of jurisdiction without leave to amend.  *See, e.g.*, *Flynn*, 39 F.4th at 950 (dismissal for lack of jurisdiction without leave to amend where plaintiffs "continued to rely on allegations and legal

argument rather than point to evidence of an actual injury"); *MAO-MSO Recovery II, LLC*, 935 F.3d at 586 (dismissal for lack of standing without leave to amend after amendment to the complaint failed to cure problem of standing).

## V.
### CONCLUSION

Based on the foregoing, the Court:

- **GRANTS** Defendants' Motion to Dismiss the First Amended Complaint, [36];

- **DISMISSES** the Satanic Temple's First Amended Complaint for lack of jurisdiction without leave to amend, [21];

- **STRIKES** the Satanic Temple's letter, [61]; and

- **DENIES** Defendants' Motion for Leave to Respond to the Satanic Temple's letter as moot, [62.]

Final judgment will enter accordingly.

Date: 10/25/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via CM/ECF to All Counsel of Record**

Brief Appendix 26

PRINTING CODE. Amendments: Whenever an existing statute (or a section of the Indiana Constitution) is being amended, the text of the existing provision will appear in this style type, additions will appear in **this style type**, and deletions will appear in ~~this style type.~~

Additions: Whenever a new statutory provision is being enacted (or a new constitutional provision adopted), the text of the new provision will appear in **this style type**. Also, the word **NEW** will appear in that style type in the introductory clause of each SECTION that adds a new provision to the Indiana Code or the Indiana Constitution.

Conflict reconciliation: Text in a statute in *this style type* or ~~*this style type*~~ reconciles conflicts between statutes enacted by the 2022 Regular Session of the General Assembly.

# SENATE ENROLLED ACT No. 1(ss)

————

AN ACT to amend the Indiana Code concerning health.

*Be it enacted by the General Assembly of the State of Indiana:*

SECTION 1. IC 16-18-2-1.5 IS REPEALED [EFFECTIVE SEPTEMBER 15, 2022]. ~~Sec. 1.5. (a) "Abortion clinic", for purposes of IC 16-21-2, IC 16-34-2-4.7, IC 16-34-3, and IC 16-41-16, means a health care provider (as defined in section 163(e)(1) of this chapter) that:~~

~~(1) performs surgical abortion procedures; or~~
~~(2) beginning January 1, 2014, provides an abortion inducing drug for the purpose of inducing an abortion.~~
~~(b) The term does not include the following:~~
~~(1) A hospital that is licensed as a hospital under IC 16-21-2.~~
~~(2) An ambulatory outpatient surgical center that is licensed as an ambulatory outpatient surgical center under IC 16-21-2.~~
~~(3) A health care provider that provides, prescribes, administers, or dispenses an abortion inducing drug to fewer than five (5) patients per year for the purposes of inducing an abortion.~~

SECTION 2. IC 16-18-2-9.4 IS REPEALED [EFFECTIVE SEPTEMBER 15, 2022]. ~~Sec. 9.4. "Affiliate", for purposes of IC 16-21-2-11, means any person who directly or indirectly controls, is controlled by, or is under common control of another person.~~

SECTION 3. IC 16-18-2-14, AS AMENDED BY P.L.2-2019, SECTION 2, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 14. (a) "Ambulatory outpatient surgical

**SEA 1(ss) — Concur**



center", for purposes of IC 16-21, IC 16-32-5, and IC 16-38-2, means a public or private institution that meets the following conditions:

(1) Is established, equipped, and operated primarily for the purpose of performing surgical procedures and services.

(2) Is operated under the supervision of at least one (1) licensed physician or under the supervision of the governing board of the hospital if the center is affiliated with a hospital.

(3) Permits a surgical procedure to be performed only by a physician, dentist, or podiatrist who meets the following conditions:

(A) Is qualified by education and training to perform the surgical procedure.

(B) Is legally authorized to perform the procedure.

(C) Is privileged to perform surgical procedures in at least one (1) hospital within the county or an Indiana county adjacent to the county in which the ambulatory outpatient surgical center is located.

(D) Is admitted to the open staff of the ambulatory outpatient surgical center.

(4) Requires that a licensed physician with specialized training or experience in the administration of an anesthetic supervise the administration of the anesthetic to a patient and remain present in the facility during the surgical procedure, except when only a local infiltration anesthetic is administered.

(5) Provides at least one (1) operating room and, if anesthetics other than local infiltration anesthetics are administered, at least one (1) postanesthesia recovery room.

(6) Is equipped to perform diagnostic x-ray and laboratory examinations required in connection with any surgery performed.

(7) Does not provide accommodations for patient stays of longer than twenty-four (24) hours.

(8) Provides full-time services of registered and licensed nurses for the professional care of the patients in the postanesthesia recovery room.

(9) Has available the necessary equipment and trained personnel to handle foreseeable emergencies such as a defibrillator for cardiac arrest, a tracheotomy set for airway obstructions, and a blood bank or other blood supply.

(10) Maintains a written agreement with at least one (1) hospital for immediate acceptance of patients who develop complications or require postoperative confinement.

(11) Provides for the periodic review of the center and the center's

**SEA 1(ss) — Concur**



operations by a committee of at least three (3) licensed physicians having no financial connections with the center.

(12) Maintains adequate medical records for each patient.

(13) Meets all additional minimum requirements as established by the state department for building and equipment requirements.

(14) Meets the rules and other requirements established by the state department for the health, safety, and welfare of the patients.

(b) The term does not include a birthing center.

**(c) "Ambulatory outpatient surgical center", for purposes of IC 16-34, refers to an institution described in subsection (a) and that has a majority ownership by a hospital licensed under IC 16-21.**

SECTION 4. IC 16-18-2-163, AS AMENDED BY P.L.50-2021, SECTION 17, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 163. (a) Except as provided in subsection (c), "health care provider", for purposes of IC 16-21 and IC 16-41, means any of the following:

(1) An individual, a partnership, a corporation, a professional corporation, a facility, or an institution licensed or legally authorized by this state to provide health care or professional services as a licensed physician, a psychiatric hospital, a hospital, a health facility, an emergency ambulance service (IC 16-31-3), a dentist, a registered or licensed practical nurse, a midwife, an optometrist, a pharmacist, a podiatrist, a chiropractor, a physical therapist, a respiratory care practitioner, an occupational therapist, a psychologist, a paramedic, an emergency medical technician, an advanced emergency medical technician, an athletic trainer, or a person who is an officer, employee, or agent of the individual, partnership, corporation, professional corporation, facility, or institution acting in the course and scope of the person's employment.

(2) A college, university, or junior college that provides health care to a student, a faculty member, or an employee, and the governing board or a person who is an officer, employee, or agent of the college, university, or junior college acting in the course and scope of the person's employment.

(3) A blood bank, community mental health center, community intellectual disability center, community health center, or migrant health center.

(4) A home health agency (as defined in IC 16-27-1-2).

(5) A health maintenance organization (as defined in IC 27-13-1-19).

**SEA 1(ss) — Concur**



(6) A health care organization whose members, shareholders, or partners are health care providers under subdivision (1).

(7) A corporation, partnership, or professional corporation not otherwise qualified under this subsection that:

    (A) provides health care as one (1) of the corporation's, partnership's, or professional corporation's functions;

    (B) is organized or registered under state law; and

    (C) is determined to be eligible for coverage as a health care provider under IC 34-18 for the corporation's, partnership's, or professional corporation's health care function.

Coverage for a health care provider qualified under this subdivision is limited to the health care provider's health care functions and does not extend to other causes of action.

(b) "Health care provider", for purposes of IC 16-35, has the meaning set forth in subsection (a). However, for purposes of IC 16-35, the term also includes a health facility (as defined in section 167 of this chapter).

(c) "Health care provider", for purposes of IC 16-32-5, IC 16-36-5, IC 16-36-6, and IC 16-41-10 means an individual licensed or authorized by this state to provide health care or professional services as:

    (1) a licensed physician;

    (2) a registered nurse;

    (3) a licensed practical nurse;

    (4) an advanced practice registered nurse;

    (5) a certified nurse midwife;

    (6) a paramedic;

    (7) an emergency medical technician;

    (8) an advanced emergency medical technician;

    (9) an emergency medical responder, as defined by section 109.8 of this chapter;

    (10) a licensed dentist;

    (11) a home health aide, as defined by section 174 of this chapter; or

    (12) a licensed physician assistant.

The term includes an individual who is an employee or agent of a health care provider acting in the course and scope of the individual's employment.

(d) "Health care provider", for purposes of IC 16-36-7, has the meaning set forth in IC 16-36-7-12.

(e) "Health care provider", for purposes of ~~section 1.5 of this chapter and~~ IC 16-40-4, means any of the following:

**SEA 1(ss) — Concur**



Brief Appendix 30

(1) An individual, a partnership, a corporation, a professional corporation, a facility, or an institution licensed or authorized by the state to provide health care or professional services as a licensed physician, a psychiatric hospital, a hospital, a health facility, an emergency ambulance service (IC 16-31-3), an ambulatory outpatient surgical center, a dentist, an optometrist, a pharmacist, a podiatrist, a chiropractor, a psychologist, or a person who is an officer, employee, or agent of the individual, partnership, corporation, professional corporation, facility, or institution acting in the course and scope of the person's employment.

(2) A blood bank, laboratory, community mental health center, community intellectual disability center, community health center, or migrant health center.

(3) A home health agency (as defined in IC 16-27-1-2).

(4) A health maintenance organization (as defined in IC 27-13-1-19).

(5) A health care organization whose members, shareholders, or partners are health care providers under subdivision (1).

(6) A corporation, partnership, or professional corporation not otherwise specified in this subsection that:

    (A) provides health care as one (1) of the corporation's, partnership's, or professional corporation's functions;

    (B) is organized or registered under state law; and

    (C) is determined to be eligible for coverage as a health care provider under IC 34-18 for the corporation's, partnership's, or professional corporation's health care function.

(7) A person that is designated to maintain the records of a person described in subdivisions (1) through (6).

(f) "Health care provider", for purposes of IC 16-45-4, has the meaning set forth in 47 CFR 54.601(a).

SECTION 5. IC 16-18-2-306.7 IS ADDED TO THE INDIANA CODE AS A **NEW** SECTION TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: **Sec. 306.7. "Rape or incest", for purposes of IC 16-34, means:**

    **(1) sexual intercourse with another person if the other person is related to the person biologically as a parent, child, grandparent, grandchild, sibling, aunt, uncle, niece, or nephew;**

    **(2) rape (IC 35-42-4-1);**

    **(3) child molesting (IC 35-42-4-3);**

    **(4) child seduction (IC 35-42-4-7); or**

**SEA 1(ss) — Concur**



**(5) sexual misconduct with a minor (IC 35-42-4-9);**
**even if a person has not been charged with or convicted of the act**
**or offense. The term includes a delinquent act described in**
**subdivisions (2) through (5) that would be a crime if committed by**
**an adult.**

SECTION 6. IC 16-18-2-327.9, AS ADDED BY P.L.93-2019, SECTION 2, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 327.9. "Serious health risk", for purposes of ~~IC 16-34-2-1(c),~~ **IC 16-34,** means that in reasonable medical judgment, a condition exists that has complicated the mother's medical condition and necessitates an abortion to prevent death or a serious risk of substantial and irreversible physical impairment of a major bodily function. The term does not include psychological or emotional conditions. A medical condition may not be determined to exist based on a claim or diagnosis that the woman will engage in conduct that she intends to result in her death or in physical harm.

SECTION 7. IC 16-21-1-7, AS AMENDED BY P.L.264-2019, SECTION 4, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 7. ~~(a)~~ The executive board may adopt rules under IC 4-22-2 necessary to protect the health, safety, rights, and welfare of patients, including the following:

(1) Rules pertaining to the operation and management of hospitals, ambulatory outpatient surgical centers, ~~abortion clinics,~~ and birthing centers.

(2) Rules establishing standards for equipment, facilities, and staffing required for efficient and quality care of patients.

~~(b) Notwithstanding 410 IAC 15-1.7-1 and 410 IAC 15-2.7-1, the~~
~~following apply to a publication that is referred to in 410 IAC 15:~~

~~(1) The Guidelines for Construction and Equipment of Hospital~~
~~and Medical Facilities refers to the following:~~

~~(A) The 2018 edition or most recent publication of the~~
~~Guidelines for Design and Construction of Hospitals.~~

~~(B) The 2018 edition or most recent publication of the~~
~~Guidelines for Design and Construction of Outpatient~~
~~Facilities.~~

~~(2) The National Fire Protection Association (NFPA) 101, Life~~
~~Safety Code Handbook publication refers to the 2018 edition or~~
~~most recent publication.~~

~~(3) The National Fire Protection Association 99, Health Care~~
~~Facilities publication refers to the 2018 edition or most recent~~
~~publication.~~

~~(4) A publication incorporated by reference is not effective until~~

**SEA 1(ss) — Concur**



7

one hundred eighty (180) days after the date of publication. The executive board shall amend 410 IAC 15-1.7-1 and 410 IAC 15-2.7-1 to reflect the requirements in this subsection. This subsection expires July 1, 2021.

SECTION 8. IC 16-21-2-1, AS AMENDED BY P.L.96-2005, SECTION 5, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 1. (a) Except as provided in subsection (b), this chapter applies to all hospitals, ambulatory outpatient surgical centers, abortion clinics, and birthing centers.

(b) This chapter does not apply to a hospital operated by the federal government.

(c) This chapter does not affect a statute pertaining to the placement and adoption of children.

SECTION 9. IC 16-21-2-2, AS AMENDED BY P.L.96-2005, SECTION 6, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 2. The state department shall license and regulate:

(1) hospitals;
(2) ambulatory outpatient surgical centers; **and**
(3) birthing centers. and
(4) abortion clinics.

SECTION 10. IC 16-21-2-2.5, AS AMENDED BY P.L.205-2018, SECTION 4, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 2.5. (a) The state department shall adopt rules under IC 4-22-2 to do the following concerning birthing centers and abortion clinics: **and other facilities as specified:**

(1) Establish minimum license qualifications.
(2) Establish the following requirements:
 (A) Sanitation standards.
 (B) Staff qualifications.
 (C) Necessary emergency equipment.
 (D) Procedures to provide emergency care.
 (E) Procedures to monitor patients after the administration of anesthesia.
 (F) Procedures to provide follow-up care for patient complications.
 (G) Quality assurance standards.
 (H) Infection control.
 (I) Provision of informed consent brochures, as described in IC 16-34-2-1.5, **to hospitals and ambulatory outpatient surgical centers** in English, Spanish, and a third language determined by the state department. inside abortion clinics.

**SEA 1(ss) — Concur**



Brief Appendix 33

(J) Provision of a hotline telephone number that provides assistance for patients who are:

(i) coerced into an abortion; or

(ii) victims of sex trafficking.

(K) Annual training by law enforcement officers on identifying and assisting women who are:

(i) coerced into an abortion; or

(ii) victims of sex trafficking.

(3) Prescribe the operating policies, supervision, and maintenance of medical records, including the requirement that all forms that require a patient signature be stored in the patient's medical record.

(4) Establish procedures for the issuance, renewal, denial, and revocation of licenses under this chapter. The rules adopted under this subsection must address the following:

(A) The form and content of the license.

(B) The collection of an annual license fee.

(5) Prescribe the procedures and standards for inspections.

(6) Prescribe procedures for:

(A) implementing a plan of correction to address any violations of any provision of this chapter or any rules adopted under this chapter; and

(B) implementing a system for the state department to follow if the ~~abortion clinic or~~ birthing center fails to comply with the plan of correction described in clause (A) and disciplinary action is needed.

(b) A person who knowingly or intentionally:

(1) operates a birthing center ~~or an abortion clinic~~ that is not licensed under this chapter; or

(2) advertises the operation of a birthing center ~~or an abortion clinic~~ that is not licensed under this chapter;

commits a Class A misdemeanor.

~~(c) Not later than January 1, 2019, the state department shall:~~

~~(1) adopt separate rules under IC 4-22-2, including those required under subsection (a), for existing and future abortion clinics that perform only surgical abortions;~~

~~(2) adopt separate rules under IC 4-22-2, including those required under subsection (a), for existing and future abortion clinics that perform abortions only through the provision of an abortion inducing drug; and~~

~~(3) establish procedures regarding the issuance of licenses to existing and future abortion clinics that:~~

**SEA 1(ss) — Concur**



~~(A) perform only surgical abortions;~~

~~(B) perform abortions only through the provision of an abortion inducing drug; or~~

~~(C) perform both surgical abortions and abortions through the provision of abortion inducing drugs.~~

~~(d) A rule or emergency rule adopted under subsection (c)(1), (c)(2), or (c)(3) applies, respectively, to every abortion clinic of the type described in subsection (c)(1), (c)(2), or (c)(3), regardless of the date of adoption of the rule or emergency rule.~~

~~(e) Before January 1, 2019, the state department shall adopt emergency rules in the manner provided under IC 4-22-2-37.1 to carry out the duties established in this section under the following:~~

~~(1) Subsection (a)(2)(E).~~

~~(2) Subsection (a)(2)(F).~~

~~(3) Subsection (a)(2)(I).~~

~~(4) Subsection (a)(2)(J).~~

~~(5) Subsection (a)(2)(K).~~

~~(6) Subsection (a)(3).~~

~~(7) Subsection (a)(5).~~

~~(8) Subsection (a)(6).~~

~~This subsection expires July 1, 2019.~~

SECTION 11. IC 16-21-2-2.6 IS REPEALED [EFFECTIVE SEPTEMBER 15, 2022]. ~~Sec. 2.6. The state department shall inspect an abortion clinic at least one (1) time per calendar year and may conduct a complaint inspection as needed.~~

SECTION 12. IC 16-21-2-10, AS AMENDED BY P.L.96-2005, SECTION 8, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 10. A:

(1) person;

(2) state, county, or local governmental unit; or

(3) division, a department, a board, or an agency of a state, county, or local governmental unit;

must obtain a license from the state health commissioner under IC 4-21.5-3-5 before establishing, conducting, operating, or maintaining a hospital, an ambulatory outpatient surgical center, ~~an abortion clinic,~~ or a birthing center.

SECTION 13. IC 16-21-2-11, AS AMENDED BY P.L.205-2018, SECTION 6, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 11. (a) An applicant must submit an application for a license on a form prepared by the state department showing that:

(1) the applicant is of reputable and responsible character;

**SEA 1(ss) — Concur**



(2) the applicant is able to comply with the minimum standards for a hospital, an ambulatory outpatient surgical center, ~~an abortion clinic,~~ or a birthing center, and with rules adopted under this chapter; and

(3) the applicant has complied with section 15.4 of this chapter.

(b) The application must contain the following additional information:

(1) The name of the applicant.

(2) The type of institution to be operated.

(3) The location of the institution.

(4) The name of the person to be in charge of the institution.

(5) If the applicant is a hospital, the range and types of services to be provided under the general hospital license, including any service that would otherwise require licensure by the state department under the authority of IC 16-19.

(6) Other information the state department requires.

(c) If the department of state revenue notifies the department that a person is on the most recent tax warrant list, the department shall not issue or renew the person's license until:

(1) the person provides to the department a statement from the department of state revenue that the person's tax warrant has been satisfied; or

(2) the department receives a notice from the commissioner of the department of state revenue under IC 6-8.1-8-2(k).

~~(d) An application for an abortion clinic license must require the applicant to do the following:~~

~~(1) Disclose whether the applicant, or an owner or affiliate of the applicant, operated an abortion clinic that was closed as a direct result of patient health and safety concerns.~~

~~(2) Disclose whether a principal or clinic staff member was convicted of a felony.~~

~~(3) Disclose whether a principal or clinic staff member was ever employed by a facility owned or operated by the applicant that closed as a result of administrative or legal action.~~

~~(4) Provide copies of:~~

~~(A) administrative and legal documentation relating to the information required under subdivisions (1) and (2);~~

~~(B) inspection reports; and~~

~~(C) violation remediation contracts;~~

~~if any.~~

SECTION 14. IC 16-21-2-14, AS AMENDED BY P.L.32-2021, SECTION 44, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE

**SEA 1(ss) — Concur**



SEPTEMBER 15, 2022]: Sec. 14. A license to operate a hospital, an ambulatory outpatient surgical center, ~~an abortion clinic,~~ or a birthing center:

(1) expires:

(A) one (1) year after the date of issuance for:

(i) an ambulatory outpatient surgical center; **and**

~~(ii) an abortion clinic;~~

~~(iii)~~ **(ii)** a birthing center; and

~~(iv) a hospital until April 30, 2020; and~~

(B) beginning May 1, 2020, two (2) years after the date of issuance for a hospital;

(2) is not assignable or transferable;

(3) is issued only for the premises named in the application;

(4) must be posted in a conspicuous place in the facility; and

(5) may be renewed each year, or every two (2) years for a hospital, upon the payment of a renewal fee at the rate adopted by the state department under IC 4-22-2.

SECTION 15. IC 16-21-2-16, AS AMENDED BY P.L.96-2005, SECTION 11, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 16. A hospital, an ambulatory outpatient surgical center, ~~an abortion clinic,~~ or a birthing center that provides to a patient notice concerning a third party billing for a service provided to the patient shall ensure that the notice:

(1) conspicuously states that the notice is not a bill;

(2) does not include a tear-off portion; and

(3) is not accompanied by a return mailing envelope.

SECTION 16. IC 16-31-6.5-2, AS AMENDED BY P.L.96-2005, SECTION 12, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 2. This chapter does not apply to the following:

(1) A licensed physician.

(2) A hospital, an ambulatory outpatient surgical center, ~~an abortion clinic,~~ or a birthing center.

(3) A person providing health care in a hospital, an ambulatory outpatient surgical center, ~~an abortion clinic,~~ or a birthing center licensed under IC 16-21.

(4) A person or entity certified under IC 16-31-3.

SECTION 17. IC 16-34-1-0.5 IS ADDED TO THE INDIANA CODE AS A **NEW** SECTION TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: **Sec. 0.5. This article does not apply to in vitro fertilization.**

SECTION 18. IC 16-34-1-8, AS ADDED BY P.L.193-2011,

**SEA 1(ss) — Concur**



SECTION 5, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 8. A qualified health plan (as defined in IC 27-8-33-3) offered under Subtitle D of Title 1 of the federal Patient Protection and Affordable Care Act (P.L. 111-148) may not provide coverage for abortion, ~~except in the following cases:~~

~~(1) The pregnant woman became pregnant through an act of rape or incest.~~

~~(2)~~ **unless** ~~An~~ **the** abortion is ~~necessary to avert the pregnant woman's death or a substantial and irreversible impairment of a major bodily function of the pregnant woman.~~ **permitted under IC 16-34-2-1.**

SECTION 19. IC 16-34-1-9 IS REPEALED [EFFECTIVE SEPTEMBER 15, 2022]. ~~Sec. 9. (a) The general assembly finds the following:~~

~~(1) There is substantial medical evidence that a fetus at twenty (20) weeks of postfertilization age has the physical structures necessary to experience pain.~~

~~(2) There is substantial medical evidence that a fetus of at least twenty (20) weeks of postfertilization age seeks to evade certain stimuli in a manner similar to an infant's or adult's response to pain.~~

~~(3) Anesthesia is routinely administered to a fetus of at least twenty (20) weeks of postfertilization age when prenatal surgery is performed.~~

~~(4) A fetus has been observed to exhibit hormonal stress responses to painful stimuli earlier than at twenty (20) weeks of postfertilization age.~~

~~(b) Indiana asserts a compelling state interest in protecting the life of a fetus from the state at which substantial medical evidence indicates that the fetus is capable of feeling pain.~~

SECTION 20. IC 16-34-1-10, AS ADDED BY P.L.173-2017, SECTION 3, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 10. If the state or an agency of the state has wardship or guardianship of an unemancipated pregnant minor, the state or agency of the state may not consent to an abortion unless the abortion is ~~necessary to avert the pregnant minor's death or a substantial and irreversible impairment of a major bodily function of the pregnant minor, as determined by a physician who certifies the determination in writing.~~ **permitted under IC 16-34-2-1.**

SECTION 21. IC 16-34-2-1, AS AMENDED BY P.L.218-2021, SECTION 4, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 1. (a) Abortion shall in all instances be

**SEA 1(ss) — Concur**



a criminal act, except when performed under the following circumstances:

(1) Except as prohibited in IC 16-34-4, ~~during the first trimester of pregnancy~~ **before the earlier of viability of the fetus or twenty (20) weeks of postfertilization age of the fetus, if:**

    **(A)** for reasons based upon the professional, medical judgment of the pregnant woman's physician, if **either:**

        **(i) the abortion is necessary when reasonable medical judgment dictates that performing the abortion is necessary to prevent any serious health risk to the pregnant woman or to save the pregnant woman's life; or**

        **(ii) the fetus is diagnosed with a lethal fetal anomaly;**

    ~~(A)~~ **(B)** the abortion is performed by the physician **in a hospital licensed under IC 16-21 or an ambulatory outpatient surgical center (as defined in IC 16-18-2-14) that has a majority ownership by a hospital licensed under IC 16-21;**

    ~~(B)~~ **(C)** the woman submitting to the abortion has filed her consent with her physician. However, if in the judgment of the physician the abortion is necessary to preserve the life of the woman, her consent is not required; ~~and~~

    ~~(C)~~ **(D)** the woman submitting to the abortion has filed with her physician the written consent of her parent or legal guardian if required under section 4 of this chapter; **and**

    **(E) before the abortion, the attending physician shall certify in writing to the hospital or ambulatory outpatient surgical center in which the abortion is to be performed, that:**

        **(i) in the attending physician's reasonable medical judgment, performing the abortion is necessary to prevent any serious health risk to the pregnant woman or to save the pregnant woman's life; or**

        **(ii) the fetus has been diagnosed with a lethal fetal anomaly.**

    **All facts and reasons supporting the certification shall be set forth by the physician in writing and attached to the certificate.**

However, **under this article,** an abortion inducing drug may not be dispensed, prescribed, administered, or otherwise given to a pregnant woman after eight (8) weeks of postfertilization age. A physician must dispense the abortion inducing drug in person and

**SEA 1(ss) — Concur**

have the pregnant woman consume the drug in the presence of the physician. A physician shall examine a pregnant woman in person before prescribing or dispensing an abortion inducing drug. The physician shall provide the pregnant woman with a copy of the manufacturer's instruction sheets and require that the pregnant woman sign the manufacturer's patient agreement form. A physician shall also provide, orally and in writing, along with other discharge information, the following statement: "Some evidence suggests that the effects of Mifepristone may be avoided, ceased, or reversed if the second pill, Misoprostol, has not been taken. Immediately contact the following for more information at (insert applicable abortion inducing drug reversal Internet web site and corresponding hotline number)." The physician shall retain a copy of the signed patient agreement form, and the signed physician's agreement form required by the manufacturer, in the patient's file. As used in this subdivision, "in person" does not include the use of telehealth or telemedicine services.

(2) Except as prohibited by IC 16-34-4, ~~after the first trimester of pregnancy and before the earlier of viability of the fetus or twenty (20)~~ **during the first ten (10)** weeks of postfertilization age **of the fetus,** ~~for reasons based upon the professional, medical judgment of the pregnant woman's physician~~ if:

    (A) **the pregnancy is a result of rape or incest;**

    **(B)** all the circumstances and provisions required for legal abortion ~~during the first trimester~~ **set forth in subdivision (1)(C) through (1)(D)** are present and adhered to; ~~and~~

    ~~(B)~~ **(C)** the abortion is performed in a hospital **licensed under IC 16-21** or ambulatory outpatient surgical center (as defined in IC 16-18-2-14) **that has a majority ownership by a hospital licensed under IC 16-21; and**

    **(D) before the abortion, the attending physician shall certify in writing to the ambulatory outpatient surgical center or hospital in which the abortion is to be performed, after proper examination, the abortion is being performed at the woman's request because the pregnancy is the result of rape or incest. All facts and reasons supporting the certification shall be set forth by the physician in writing and attached to the certificate.**

(3) Except as provided in subsection (b) or as prohibited by IC 16-34-4, at the earlier of viability of the fetus or twenty (20) weeks of postfertilization age and any time after, for reasons

**SEA 1(ss) — Concur**



based upon the professional, medical judgment of the pregnant woman's physician if:

(A) **based on reasonable medical judgment, performing the abortion is necessary to prevent any serious health risk to the pregnant woman or to save the pregnant woman's life;**

**(B)** all the circumstances and provisions required for legal abortion ~~before the earlier of viability of the fetus or twenty (20) weeks of postfertilization age~~ **set forth in subdivision (1)(C) through (1)(D)** are present and adhered to;

**(C) the abortion is performed in a hospital licensed under IC 16-21;**

~~(B)~~ **(D)** the abortion is performed in compliance with section 3 of this chapter; and

~~(C)~~ **(E)** before the abortion, the attending physician shall certify in writing to the hospital in which the abortion is to be performed, that in the attending physician's ~~professional,~~ **reasonable medical judgment, performing the abortion is necessary to prevent any serious health risk to the pregnant woman or to save the pregnant woman's life.** ~~medical judgment, after proper examination and review of the woman's history, the abortion is necessary to prevent a substantial permanent impairment of the life or physical health of the pregnant woman.~~ All facts and reasons supporting the certification shall be set forth by the physician in writing and attached to the certificate.

(b) A person may not knowingly or intentionally perform a partial birth abortion unless a physician reasonably believes that:

(1) performing the partial birth abortion is necessary to save the mother's life; and

(2) no other medical procedure is sufficient to save the mother's life.

(c) A person may not knowingly or intentionally perform a dismemberment abortion unless reasonable medical judgment dictates that performing the dismemberment abortion is necessary:

(1) to prevent any serious health risk to the mother; or

(2) to save the mother's life.

(d) Telehealth and telemedicine may not be used to provide any abortion, including the writing or filling of a prescription for any purpose that is intended to result in an abortion.

SECTION 22. IC 16-34-2-1.1, AS AMENDED BY P.L.93-2022, SECTION 4, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 1.1. (a) An abortion shall not be

**SEA 1(ss) — Concur**



performed except with the voluntary and informed consent of the pregnant woman upon whom the abortion is to be performed. Except in the case of a medical emergency, consent to an abortion is voluntary and informed only if the following conditions are met:

(1) At least eighteen (18) hours before the abortion and in the private, not group, presence of the pregnant woman, the physician who is to perform the abortion, the referring physician or a physician assistant (as defined in IC 25-27.5-2-10), an advanced practice registered nurse (as defined in IC 25-23-1-1(b)), or a certified nurse midwife (as defined in IC 34-18-2-6.5) to whom the responsibility has been delegated by the physician who is to perform the abortion or the referring physician has informed the pregnant woman orally and in writing of the following:

(A) The name of the physician performing the abortion, the physician's medical license number, and an emergency telephone number where the physician or the physician's designee may be contacted on a twenty-four (24) hour a day, seven (7) day a week basis.

(B) That follow-up care by the physician or the physician's designee (if the designee is licensed under IC 25-22.5) is available on an appropriate and timely basis when clinically necessary.

(C) The nature of the proposed procedure or information concerning the abortion inducing drug that includes the following statement: "Some evidence suggests that effects of Mifespristone may be avoided, ceased, or reversed if the second pill, Misoprostol, has not been taken. Immediately contact the following for more information at (insert applicable abortion inducing drug reversal Internet web site and corresponding hotline number)."

(D) Objective scientific information of the risks of and alternatives to the procedure or the use of an abortion inducing drug, including:

(i) the risk of infection and hemorrhage;

(ii) the potential danger to a subsequent pregnancy; and

(iii) the potential danger of infertility.

(E) That human physical life begins when a human ovum is fertilized by a human sperm.

(F) The probable gestational age of the fetus at the time the abortion is to be performed, including:

(i) a picture of a fetus;

(ii) the dimensions of a fetus; and

**SEA 1(ss) — Concur**



    (iii) relevant information on the potential survival of an unborn fetus;

at this stage of development.

    (G) That objective scientific information shows that a fetus can feel pain at or before twenty (20) weeks of postfertilization age.

    (H) The medical risks associated with carrying the fetus to term.

    (I) The availability of fetal ultrasound imaging and auscultation of fetal heart tone services to enable the pregnant woman to view the image and hear the heartbeat of the fetus and how to obtain access to these services.

    (J) That the pregnancy of a child less than fifteen (15) years of age may constitute child abuse under Indiana law if the act included an adult and must be reported to the department of child services or the local law enforcement agency under IC 31-33-5.

    (K) That Indiana does not allow a fetus to be aborted solely because of the fetus's race, color, national origin, ancestry, sex, or diagnosis or potential diagnosis of the fetus having Down syndrome or any other disability.

    (L) That no one has the right to coerce the pregnant woman to have an abortion.

(2) At least eighteen (18) hours before the abortion, the pregnant woman will be informed orally and in writing of the following:

    (A) That medical assistance benefits may be available for prenatal care, childbirth, and neonatal care from the county office of the division of family resources.

    (B) That the father of the unborn fetus is legally required to assist in the support of the child. In the case of rape, the information required under this clause may be omitted.

    (C) That adoption alternatives are available and that adoptive parents may legally pay the costs of prenatal care, childbirth, and neonatal care.

    (D) That there are physical risks to the pregnant woman in having an abortion, both during the abortion procedure and after.

    (E) That Indiana has enacted the safe haven law under IC 31-34-2.5.

    (F) The:

      (i) Internet web site address of the state department of health's web site; and

**SEA 1(ss) — Concur**





    (ii) description of the information that will be provided on the web site and that is;

described in section 1.5 of this chapter.

(G) For the facility in which the abortion is to be performed, an emergency telephone number that is available and answered on a twenty-four (24) hour a day, seven (7) day a week basis.

(H) On a form developed by the state department and as described in IC 16-34-3, that the pregnant woman has a right to determine the final disposition of the remains of the aborted fetus.

(I) On a form developed by the state department, that the pregnant woman has a right, after a surgical abortion, to:

    (i) dispose of the remains of the aborted fetus by interment in compliance with IC 23-14-54, or cremation through a licensee (as defined in IC 25-15-2-19) and in compliance with IC 23-14-31; or

    (ii) have the health care facility ~~or abortion clinic~~ dispose of the remains of the aborted fetus by interment in compliance with IC 23-14-54, or cremation through a licensee (as defined in IC 25-15-2-19) and in compliance with IC 23-14-31, and ask which method of disposition will be used by the health care facility. ~~or abortion clinic.~~

(J) On a form developed by the state department:

    (i) that a pregnant woman, after an abortion induced by an abortion inducing drug, will expel an aborted fetus; and

    (ii) the disposition policy of the health care facility ~~or the abortion clinic~~ concerning the disposition of the aborted fetus. The disposition policy must allow the pregnant woman to return the aborted fetus to the health care facility ~~or abortion clinic~~ for disposition by interment in compliance with IC 23-14-54, or cremation through a licensee (as defined in IC 25-15-2-19) and in compliance with IC 23-14-31.

(K) On a form developed by the state department, information concerning any counseling that is available to a pregnant woman after having an abortion.

The state department shall develop and distribute the forms required by clauses (H) through (K).

(3) The pregnant woman certifies in writing, on a form developed by the state department, before the abortion is performed, that:

    (A) the information required by subdivisions (1) and (2) has

**SEA 1(ss) — Concur**



been provided to the pregnant woman;

(B) the pregnant woman has been offered by the provider the opportunity to view the fetal ultrasound imaging and hear the auscultation of the fetal heart tone if the fetal heart tone is audible and that the woman has:

(i) viewed or refused to view the offered fetal ultrasound imaging; and

(ii) listened to or refused to listen to the offered auscultation of the fetal heart tone if the fetal heart tone is audible; and

(C) the pregnant woman has been given a written copy of the printed materials described in section 1.5 of this chapter.

(4) At least eighteen (18) hours before the abortion and in the presence of the pregnant woman, the physician who is to perform the abortion, the referring physician or a physician assistant (as defined in IC 25-27.5-2-10), an advanced practice registered nurse (as defined in IC 25-23-1-1(b)), or a certified nurse midwife (as defined in IC 34-18-2-6.5) to whom the responsibility has been delegated by the physician who is to perform the abortion or the referring physician has provided the pregnant woman with a color copy of the informed consent brochure described in section 1.5 of this chapter by printing the informed consent brochure from the state department's Internet web site and including the following information on the back cover of the brochure:

(A) The name of the physician performing the abortion and the physician's medical license number.

(B) An emergency telephone number where the physician or the physician's designee may be contacted twenty-four (24) hours a day, seven (7) days a week.

(C) A statement that follow-up care by the physician or the physician's designee who is licensed under IC 25-22.5 is available on an appropriate and timely basis when clinically necessary.

(5) At least eighteen (18) hours before an abortion is performed and at the same time that the pregnant woman receives the information required by subdivision (1), the provider shall perform, and the pregnant woman shall view, the fetal ultrasound imaging and hear the auscultation of the fetal heart tone if the fetal heart tone is audible unless the pregnant woman certifies in writing, on a form developed by the state department, before the abortion is performed, that the pregnant woman:

(A) does not want to view the fetal ultrasound imaging; and

(B) does not want to listen to the auscultation of the fetal heart

**SEA 1(ss) — Concur**



tone if the fetal heart tone is audible.

A pregnant woman must be advised, prior to the pregnant woman's decision concerning fetal ultrasound imaging, that an ultrasound image of the fetus will be provided to the pregnant woman to keep at no charge to the pregnant woman if the fetal ultrasound is performed.

(6) At least eighteen (18) hours before the abortion, the physician who is to perform the abortion, the referring physician or a physician assistant (as defined in IC 25-27.5-2-10), an advanced practice registered nurse (as defined in IC 25-23-1-1(b)), or a certified nurse midwife (as defined in IC 34-18-2-6.5) to whom the responsibility has been delegated by the physician who is to perform the abortion or the referring physician shall, in the private, not group, presence of the pregnant woman, verbally ask the pregnant woman if she is being coerced to have an abortion.

(b) This subsection applies to a pregnant woman whose unborn child has been diagnosed with a lethal fetal anomaly. The requirements of this subsection are in addition to the other requirements of this section. At least eighteen (18) hours before an abortion is performed on the pregnant woman, the physician who will perform the abortion shall:

(1) orally and in person, inform the pregnant woman of the availability of perinatal hospice services; and

(2) provide the pregnant woman copies of the perinatal hospice brochure developed by the state department under IC 16-25-4.5-4 and the list of perinatal hospice providers and programs developed under IC 16-25-4.5-5, by printing the perinatal hospice brochure and list of perinatal hospice providers from the state department's Internet web site.

(c) If a pregnant woman described in subsection (b) chooses to have an abortion rather than continuing the pregnancy in perinatal hospice care, the pregnant woman shall certify in writing, on a form developed by the state department under IC 16-25-4.5-6, at least eighteen (18) hours before the abortion is performed, that the pregnant woman has been provided the information described in subsection (b) in the manner required by subsection (b).

(d) For any abortion performed under this article, the physician who is to perform the abortion, the referring physician or a physician assistant (as defined in IC 25-27.5-2-10), an advanced practice registered nurse (as defined in IC 25-23-1-1(b)), or a certified nurse midwife (as defined in IC 34-18-2-6.5) to whom the responsibility has been delegated by the physician who is to perform the abortion or the referring physician shall include, or ensure the inclusion of, a copy of

**SEA 1(ss) — Concur**



a pregnant woman's ultrasound report in the pregnant woman's patient file.

(e) If the physician who is to perform the abortion, the referring physician, a physician assistant (as defined in IC 25-27.5-2-10), an advanced practice registered nurse (as defined in IC 25-23-1-1(b)), or a certified nurse midwife (as defined in IC 34-18-2-6.5) suspects a pregnant woman is being coerced to have an abortion after making the inquiry required under subsection (a)(6), the physician, physician assistant, advanced practice registered nurse, or certified nurse midwife shall:

> (1) inform the pregnant woman that coercing a pregnant woman to have an abortion is illegal;
> (2) inform the pregnant woman that a demand by the father to have an abortion does not relieve him of financial support responsibilities; and
> (3) provide the pregnant woman with:
>> (A) information about:
>>> (i) assistance;
>>> (ii) counseling; and
>>> (iii) protective services offered by social programs and local or state law enforcement agencies;
>> (B) access to a telephone if she needs to make a private telephone call; and
>> (C) access to an alternate exit from the health care facility.

(f) Except as provided in subsection (g), if a physician, physician assistant (as defined in IC 25-27.5-2-10), advanced practice registered nurse (as defined in IC 25-23-1-1(b)), or certified nurse midwife (as defined in IC 34-18-2-6.5) has specific and credible information that a pregnant woman is being coerced into having an abortion, then an abortion may not be provided to the pregnant woman during the twenty-four (24) hour period after the physician, physician assistant (as defined in IC 25-27.5-2-10), advanced practice registered nurse (as defined in IC 25-23-1-1(b)), or certified nurse midwife (as defined in IC 34-18-2-6.5) makes a report under IC 16-34-6-6(b).

(g) The twenty-four (24) hour period described in subsection (f) may be waived if a physician, in the physician's best medical judgment, determines that an abortion is necessary to prevent the death of the pregnant woman or to prevent substantial and irreversible injury to a major bodily function of the pregnant woman.

SECTION 23. IC 16-34-2-3, AS AMENDED BY P.L.193-2011, SECTION 12, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 3. (a) All abortions performed on and

**SEA 1(ss) — Concur**



after the earlier of the time a fetus is viable or the time the postfertilization age of the fetus is at least twenty (20) weeks shall be:

> (1) governed by ~~section 1(a)(3) and 1(b)~~ **section 1** of this chapter;
>
> (2) performed in a hospital having premature birth intensive care units, unless compliance with this requirement would result in an increased risk to the life or health of the mother; and
>
> (3) performed in the presence of a second physician as provided in subsection (b).

(b) An abortion may be performed after the earlier of the time a fetus is viable or the time the postfertilization age of the fetus is at least twenty (20) weeks only if there is in attendance a physician, other than the physician performing the abortion, who shall take control of and provide immediate care for a child born alive as a result of the abortion. During the performance of the abortion, the physician performing the abortion, and after the abortion, the physician required by this subsection to be in attendance, shall take all reasonable steps in keeping with good medical practice, consistent with the procedure used, to preserve the life and health of the viable unborn child. However, this subsection does not apply if compliance would result in an increased risk to the life or health of the mother.

(c) Any fetus born alive shall be treated as a person under the law, and a birth certificate shall be issued certifying the child's birth even though the child may subsequently die, in which event a death certificate shall be issued. Failure to take all reasonable steps, in keeping with good medical practice, to preserve the life and health of the live born person shall subject the responsible persons to Indiana laws governing homicide, manslaughter, and civil liability for wrongful death and medical malpractice.

(d) If, before the abortion, the mother, and if married, her husband, has or have stated in writing that she does or they do not wish to keep the child in the event that the abortion results in a live birth, and this writing is not retracted before the abortion, the child, if born alive, shall immediately upon birth become a ward of the department of child services.

SECTION 24. IC 16-34-2-4, AS AMENDED BY P.L.218-2021, SECTION 6, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 4. **(a) This section does not apply to a minor who is less than eighteen (18) years of age who is pregnant as a result of rape or incest by a parent, legal guardian, or custodian of the unemancipated minor.**

~~(a)~~ **(b)** No physician shall perform an abortion on an unemancipated pregnant minor less than eighteen (18) years of age without first having



**SEA 1(ss) — Concur**



obtained from one (1) of the parents, a legal guardian, or a custodian accompanying the unemancipated pregnant minor:

> (1) the notarized written consent of the parent, legal guardian, or custodian of the unemancipated pregnant minor;
>
> (2) government issued proof of identification of the parent or the legal guardian or custodian of the unemancipated pregnant minor; and
>
> (3) some evidence, which may include identification or other written documentation that provides an articulable basis for a reasonably prudent person to believe that the person is the parent or legal guardian or custodian of the unemancipated pregnant minor.

The physician shall keep records of the documents required under this subsection in the unemancipated pregnant minor's medical file for at least seven (7) years.

~~(b)~~ **(c)** A minor:

> (1) who objects to having to obtain the written consent of her parent or legal guardian or custodian under this section; or
>
> (2) whose parent or legal guardian or custodian refuses to consent to an abortion;

may petition, on her own behalf or by next friend, the juvenile court in the county in which the pregnant minor resides or in which the abortion is to be performed, for a waiver of the parental consent requirement under subsection ~~(a)~~ **(b)** and the parental notification requirement under subsection ~~(d).~~ **(e).** A next friend may not be a physician or provider of abortion services, representative of the physician or provider, or other person that may receive a direct financial benefit from the performance of an abortion.

~~(c)~~ **(d)** A physician who feels that compliance with the parental consent requirement in subsection ~~(a)~~ **(b)** would have an adverse effect on the welfare of the pregnant minor or on her pregnancy may petition the juvenile court within twenty-four (24) hours of the abortion request for a waiver of the parental consent requirement under subsection ~~(a)~~ **(b)** and the parental notification requirement under subsection ~~(d).~~ **(e).**

~~(d)~~ **(e)** Unless the juvenile court finds that it is in the best interests of an unemancipated pregnant minor to obtain an abortion without parental notification following a hearing on a petition filed under subsection ~~(b)~~ **(c)** or ~~(c),~~ **(d),** a parent, legal guardian, or custodian of a pregnant unemancipated minor is entitled to receive notice of the emancipated minor's intent to obtain an abortion before the abortion is performed on the unemancipated pregnant minor. The attorney representing the unemancipated pregnant minor shall serve the notice

**SEA 1(ss) — Concur**



required by this subsection by certified mail or by personal service and provide the court with documentation of the attorney's good faith effort to serve the notice, including any return receipt for a certified mailing. The court shall retain the documentation provided in the confidential records of the waiver proceedings held under this section.

~~(e)~~ **(f)** The juvenile court must rule on a petition filed by a pregnant minor under subsection ~~(b)~~ **(c)** or by her physician under subsection ~~(c)~~ **(d)** within forty-eight (48) hours of the filing of the petition. Before ruling on the petition, the court shall consider the concerns expressed by the pregnant minor and her physician. The requirement of parental consent under this section shall be waived by the juvenile court if the court finds that the minor is mature enough to make the abortion decision independently or that an abortion would be in the minor's best interests. The juvenile court shall waive the requirement of parental notification under subsection ~~(d)~~ **(e)** if the court finds that obtaining an abortion without parental notification is in the best interests of the unemancipated pregnant minor. If the juvenile court does not find that obtaining an abortion without parental notification is in the best interests of the unemancipated pregnant minor, the court shall, subject to an appeal under subsection ~~(g),~~ **(h),** order the attorney representing the unemancipated pregnant minor to serve the notice required under subsection ~~(d).~~ **(e).**

~~(f)~~ **(g)** Unless the juvenile court finds that the pregnant minor is already represented by an attorney, the juvenile court shall appoint an attorney to represent the pregnant minor in a waiver proceeding brought by the minor under subsection ~~(b)~~ **(c)** and on any appeals. The cost of legal representation appointed for the minor under this section shall be paid by the county.

~~(g)~~ **(h)** A minor or the minor's physician who desires to appeal an adverse judgment of the juvenile court in a waiver proceeding under subsection ~~(b)~~ **(c)** or ~~(c)~~ **(d)** is entitled to an expedited appeal, under rules to be adopted by the supreme court.

~~(h)~~ **(i)** All records of the juvenile court and of the supreme court or the court of appeals that are made as a result of proceedings conducted under this section are confidential.

~~(i)~~ **(j)** A minor who initiates legal proceedings under this section is exempt from the payment of filing fees.

~~(j)~~ **(k)** This section does not apply where there is an emergency need for a medical procedure to be performed to avert the pregnant minor's death or a substantial and irreversible impairment of a major bodily function of the pregnant minor, and the attending physician certifies this in writing.

**SEA 1(ss) — Concur**



(k) **(l)** A physician receiving parental consent under subsection (a) **(b)** shall execute an affidavit for inclusion in the unemancipated pregnant minor's medical record. The affidavit must contain the following information:

(1) The physician's name.

(2) Certification that, to the physician's best information and belief, a reasonable person under similar circumstances would rely on the information provided by the unemancipated pregnant minor and the unemancipated pregnant minor's parent or legal guardian or custodian as sufficient evidence of identity and relationship.

(3) The physician's signature.

(l) **(m)** A person who, with intent to avoid the parental notification requirements described in subsection (a), **(b),** falsely claims to be the parent or legal guardian or custodian of an unemancipated pregnant minor by:

(1) making a material misstatement while purportedly providing the written consent described in subsection (a)(1); **(b)(1);** or

(2) providing false or fraudulent identification to meet the requirement described in subsection (a)(2); **(b)(2);**

commits a Level 6 felony.

SECTION 25. IC 16-34-2-4.5, AS AMENDED BY P.L.213-2016, SECTION 15, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 4.5. (a) A physician may not perform an abortion, **including an abortion using an abortion inducing drug,** unless the physician:

(1) has admitting privileges in writing at a hospital located in the county where abortions are provided or in a contiguous county; or

(2) has entered into a written agreement with a physician who has written admitting privileges at a hospital in the county or contiguous county concerning the management of possible complications of the services provided.

A written agreement described in subdivision (2) must be renewed annually.

(b) A physician who performs an abortion, **including an abortion using an abortion inducing drug,** shall notify the patient of the location of the hospital at which the physician or a physician with whom the physician has entered into an agreement under subsection (a)(2) has admitting privileges and where the patient may receive follow-up care by the physician if complications arise.

(c) An abortion clinic **A hospital or ambulatory outpatient surgical center in which abortions are performed** shall:

**SEA 1(ss) — Concur**



(1) keep at the ~~abortion clinic~~ **hospital or ambulatory outpatient surgical center** a copy of the admitting privileges of a physician described in subsection (a)(1) and (a)(2) **who is performing abortions at the hospital or ambulatory outpatient surgical center;** and

(2) submit a copy of the admitting privileges described in subdivision (1) to the state department. ~~as part of the abortion clinic's licensure.~~ The state department shall verify the validity of the admitting privileges document. The state department shall remove any identifying information from the admitting privileges document before releasing the document under IC 5-14-3.

(d) The state department shall annually submit a copy of the admitting privileges described in subsection (a)(1) and a copy of the written agreement described in subsection (a)(2) to:

(1) each hospital located in the county in which the hospital granting the admitting privileges described in subsection (a) is located; and

(2) each hospital located in a county that is contiguous to the county described in subdivision (1);

where abortions are performed.

(e) The state department shall confirm to a member of the public, upon request, that the admitting privileges required to be submitted under this section for ~~an abortion clinic~~ **a hospital or ambulatory outpatient surgical center** have been received by the state department.

(f) Notwithstanding IC 5-14-3-6 and IC 5-14-3-6.5, this section only allows for the redaction of information that is described in subsection (c). This section does not allow the state department to limit the disclosure of information in other public documents.

SECTION 26. IC 16-34-2-4.7, AS AMENDED BY P.L.93-2019, SECTION 4, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 4.7. (a) As used in this section, "abortion complication" means only the following physical or psychological conditions arising from the induction or performance of an abortion:

(1) Uterine perforation.

(2) Cervical laceration.

(3) Infection.

(4) Vaginal bleeding that qualifies as a Grade 2 or higher adverse event according to the Common Terminology Criteria for Adverse Events (CTCAE).

(5) Pulmonary embolism.

(6) Deep vein thrombosis.

(7) Failure to terminate the pregnancy.

**SEA 1(ss) — Concur**



(8) Incomplete abortion (retained tissue).

(9) Pelvic inflammatory disease.

(10) Missed ectopic pregnancy.

(11) Cardiac arrest.

(12) Respiratory arrest.

(13) Renal failure.

(14) Shock.

(15) Amniotic fluid embolism.

(16) Coma.

(17) Placenta previa in subsequent pregnancies.

(18) Pre-term delivery in subsequent pregnancies.

(19) Free fluid in the abdomen.

(20) Hemolytic reaction due to the administration of ABO-incompatible blood or blood products.

(21) Hypoglycemia occurring while the patient is being treated at the ~~abortion facility.~~ **hospital or ambulatory outpatient surgical center.**

(22) Allergic reaction to anesthesia or abortion inducing drugs.

(23) Psychological complications, including depression, suicidal ideation, anxiety, and sleeping disorders.

(24) Death.

(25) Any other adverse event as defined by criteria provided in the Food and Drug Administration Safety Information and Adverse Event Reporting Program.

(b) The following persons shall report to the state department each case in which the person treated a patient suffering from an abortion complication:

(1) A physician licensed under IC 25-22.5.

(2) A hospital licensed under IC 16-21.

(3) ~~An abortion clinic licensed under IC 16-21-2-2.5.~~ **Beginning September 1, 2022, an ambulatory outpatient surgical center licensed under IC 16-21-2.**

(c) The state department shall develop a process for the submission of a report under this section.

(d) A report under this section shall be submitted to the state department in the manner prescribed by the state department.

(e) The report under this section must include the following information concerning the abortion complication:

(1) The date the patient presented for treatment for the abortion complication.

(2) The age of the patient.

(3) The race of the patient.

**SEA 1(ss) — Concur**



(4) The county and state of the patient's residence.

(5) The type of abortion obtained by the patient.

(6) The date of abortion obtained by the patient.

(7) The name of the:

    (A) ~~abortion clinic;~~

    ~~(B) medical facility; or~~

    ~~(C)~~ hospital; **or**

    **(B) ambulatory outpatient surgical center;**

where the patient obtained the abortion.

(8) Whether the patient obtained abortion medication via mail order or Internet web site, and if so, information identifying the source of the medication.

(9) Whether the complication was previously managed by the abortion provider or the abortion provider's required back-up physician.

(10) The name of the medications taken by the patient as part of the pharmaceutical abortion regimen, if any.

(11) A list of each diagnosed complication.

(12) A list of each treated complication, with a description of the treatment provided.

(13) Whether the patient's visit to treat the complications was the original visit or a follow-up visit.

(14) The date of each follow-up visit, if any.

(15) A list of each complication diagnosed at a follow-up visit, if any.

(16) A list of each complication treated at a follow-up visit, if any.

~~(f) Before February 1, 2020, the state department shall inform in writing all providers described in subsection (b) of the new reporting requirements for abortion complications. This subsection expires December 31, 2020.~~

~~(g)~~ **(f)** ~~Not later than June 30 of each year,~~ **On a quarterly basis,** the state department shall compile a public report summarizing the information collected under this section. The report must include statistics for the previous calendar ~~year,~~ **quarter,** with updated information for the most recent calendar ~~year.~~ **quarter.**

~~(h)~~ **(g)** The state department shall summarize the aggregate data from the data submitted under this section and submit the data, on or before June 30 of each year, to the United States Centers for Disease Control and Prevention for its inclusion in the annual Vital Statistics Report.

~~(i)~~ **(h)** The state department shall ensure that no identifying information of a pregnant woman is included in the report described in

**SEA 1(ss) — Concur**



subsection ~~(g).~~ **(f).**

~~(j)~~ **(i)** This subsection applies after August 31, 2020. Each failure to report an abortion complication as required under this section is a Class B misdemeanor.

~~(k)~~ **(j)** ~~Before January 1, 2020,~~ The state department shall adopt rules under IC 4-22-2 to implement this section.

SECTION 27. IC 16-34-2-5, AS AMENDED BY P.L.218-2021, SECTION 7, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 5. (a) Every health care provider who performs a surgical abortion or provides, prescribes, administers, or dispenses an abortion inducing drug for the purposes of inducing an abortion shall report the performance of the abortion or the provision, prescribing, administration, or dispensing of an abortion inducing drug on a form drafted by the state department, the purpose and function of which shall be the improvement of maternal health and life through the compilation of relevant maternal life and health factors and data, and a further purpose and function shall be to monitor all abortions performed in Indiana to assure the abortions are done only under the authorized provisions of the law. For each abortion performed and abortion inducing drug provided, prescribed, administered, or dispensed, the report shall include, among other things, the following:

(1) The age of the patient.

(2) Whether a waiver of consent under section 4 of this chapter was obtained.

(3) Whether a waiver of notification under section 4 of this chapter was obtained.

(4) The date and location, including the facility name and city or town, where the:

   (A) pregnant woman:

      (i) provided consent; and

      (ii) received all information;

   required under section 1.1 of this chapter; and

   (B) abortion was performed or the abortion inducing drug was provided, prescribed, administered, or dispensed.

(5) The health care provider's full name and address, including the name of the physicians performing the abortion or providing, prescribing, administering, or dispensing the abortion inducing drug.

(6) The city and county where the pregnancy termination occurred.

(7) The age of the father, or the approximate age of the father if the father's age is unknown.

**SEA 1(ss) — Concur**



(8) The patient's county and state of residence.

(9) The marital status of the patient.

(10) The educational level of the patient.

(11) The race of the patient.

(12) The ethnicity of the patient.

(13) The number of the patient's previous live births.

(14) The number of the patient's deceased children.

(15) The number of the patient's spontaneous pregnancy terminations.

(16) The number of the patient's previous induced terminations.

(17) The date of the patient's last menses.

(18) The physician's determination of the gestation of the fetus in weeks.

**(19) The reason for the abortion.**

(19) **(20)** Whether the patient indicated that the patient was seeking an abortion as a result of being:

    (A) abused;

    (B) coerced;

    (C) harassed; or

    (D) trafficked.

(20) **(21)** The following information concerning the abortion or the provision, prescribing, administration, or dispensing of the abortion inducing drug:

    (A) The postfertilization age of the fetus (in weeks).

    (B) The manner in which the postfertilization age was determined.

    (C) The gender of the fetus, if detectable.

    (D) Whether the fetus has been diagnosed with or has a potential diagnosis of having Down syndrome or any other disability.

    (E) If after the earlier of the time the fetus obtains viability or the time the postfertilization age of the fetus is at least twenty (20) weeks, the medical reason for the performance of the abortion. ~~or the provision, prescribing, administration, or dispensing of the abortion inducing drug.~~

(21) **(22)** For a surgical abortion, the medical procedure used for the abortion and, if the fetus ~~was viable or~~ had a postfertilization age of at least twenty (20) weeks:

    (A) whether the procedure, in the reasonable judgment of the health care provider, gave the fetus the best opportunity to survive;

    (B) the basis for the determination that the pregnant woman

**SEA 1(ss) — Concur**



Brief Appendix 56

had a condition described in this chapter that required the abortion to avert the death of or serious impairment to the pregnant woman; and

(C) the name of the second doctor present, as required under IC 16-34-2-3(a)(3).

~~(22)~~ **(23)** For a nonsurgical abortion, the precise drugs provided, prescribed, administered, or dispensed, and the means of delivery of the drugs to the patient.

~~(23)~~ **(24)** For a nonsurgical abortion, that the manufacturer's instructions were provided to the patient and that the patient signed the patient agreement.

~~(24)~~ **(25)** For an ~~early pre-viability termination,~~ **abortion performed before twenty (20) weeks of postfertilization age of the fetus,** the medical indication by diagnosis code for the fetus and the mother.

~~(25)~~ **(26)** The mother's obstetrical history, including dates of other abortions, if any.

~~(26)~~ **(27)** Any preexisting medical conditions of the patient that may complicate the abortion.

~~(27)~~ **(28)** The results of pathological examinations if performed.

~~(28)~~ **(29)** For a surgical abortion, whether the fetus was delivered alive, and if so, how long the fetus lived.

~~(29)~~ **(30)** Records of all maternal deaths occurring at the location where the abortion was performed or the abortion inducing drug was provided, prescribed, administered, or dispensed.

~~(30)~~ **(31)** The date the form was transmitted to the state department and, if applicable, separately to the department of child services.

(b) The health care provider shall complete the form provided for in subsection (a) and shall transmit the completed form to the state department, in the manner specified on the form, within thirty (30) days after the date of each abortion. However, if an abortion is for a female who is less than sixteen (16) years of age, the health care provider shall transmit the form to the state department of health and separately to the department of child services within three (3) days after the abortion is performed.

(c) The dates supplied on the form may not be redacted for any reason before the form is transmitted as provided in this section.

(d) Each failure to complete or timely transmit a form, as required under this section, for each abortion performed or abortion inducing drug that was provided, prescribed, administered, or dispensed, is a Class B misdemeanor.

**SEA 1(ss) — Concur**



(e) ~~Not later than June 30 of each year,~~ **On a quarterly basis,** the state department shall compile a public report providing the following:

(1) Statistics for the previous calendar ~~year~~ **quarter** from the information submitted under this section.

(2) Statistics for previous calendar years compiled by the state department under this subsection, with updated information for the calendar ~~year~~ **quarter** that was submitted to the state department after the compilation of the statistics.

The state department shall ensure that no identifying information of a pregnant woman is contained in the report.

(f) The state department shall:

(1) summarize aggregate data from all data submitted under this section; and

(2) submit the data, before July 1 of each year, to the United States Centers for Disease Control and Prevention for its inclusion in the annual Vital Statistics Report.

SECTION 28. IC 16-34-2-7, AS AMENDED BY P.L.93-2019, SECTION 5, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 7. (a) Except as provided in subsections (b) and (c), a person who knowingly or intentionally performs an abortion ~~not expressly provided for in~~ **prohibited by section 1 of** this chapter commits a Level 5 felony.

(b) A physician who performs an abortion intentionally or knowingly in violation of ~~section 1(a)(1)(C)~~ **section 1(a)(1)(D)** or 4 of this chapter commits a Class A misdemeanor.

(c) A person who knowingly or intentionally performs an abortion in violation of section 1.1 of this chapter commits a Class A infraction.

(d) A woman upon whom a partial birth abortion is performed may not be prosecuted for violating or conspiring to violate section 1(b) of this chapter.

(e) A woman upon whom a dismemberment abortion is performed may not be prosecuted for violating or conspiring to violate section 1(c) of this chapter.

SECTION 29. IC 16-34-3-2, AS AMENDED BY P.L.77-2020, SECTION 2, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 2. (a) A pregnant woman who has an abortion under this article has the right to have the ~~health care facility or abortion clinic~~ **hospital or ambulatory outpatient surgical center** dispose of the aborted fetus by interment in compliance with IC 23-14-54, or cremation through a licensee (as defined in IC 25-15-2-19) and in compliance with IC 23-14-31. The pregnant woman who selects to have the ~~health care facility or abortion clinic~~

**SEA 1(ss) — Concur**



**hospital or ambulatory outpatient surgical center** dispose of the aborted fetus has the right to ask which method will be used by the ~~health care facility or abortion clinic.~~ **hospital or ambulatory outpatient surgical center.**

(b) After receiving the notification and information required by IC 16-34-2-1.1(a)(2)(H), IC 16-34-2-1.1(a)(2)(I), and IC 16-34-2-1.1(a)(2)(J), the pregnant woman shall inform the ~~abortion clinic or the health care facility:~~ **hospital or ambulatory outpatient surgical center:**

(1) in writing; and

(2) on a form prescribed by the state department;

of the pregnant woman's decision for final disposition of the aborted fetus by cremation or interment and, in an abortion induced by an abortion inducing drug, whether the pregnant woman will return the aborted fetus to the ~~health care facility or abortion clinic~~ **hospital or ambulatory outpatient surgical center** for disposition by interment in compliance with IC 23-14-54, or cremation through a licensee (as defined in IC 25-15-2-19) and in compliance with IC 23-14-31.

(c) If the pregnant woman is a minor, the ~~abortion clinic or health care facility~~ **hospital or ambulatory outpatient surgical center** shall obtain parental consent in the disposition of the aborted fetus unless the minor has received a waiver of parental consent under IC 16-34-2-4.

(d) The ~~abortion clinic or the health care facility~~ **hospital or ambulatory outpatient surgical center** shall document the pregnant woman's decision concerning disposition of the aborted fetus in the pregnant woman's medical record.

(e) In the case of an abortion induced by an abortion inducing drug, the pregnant woman may return the aborted fetus to the ~~health care facility or abortion clinic~~ **hospital or ambulatory outpatient surgical center** for disposition by interment in compliance with IC 23-14-54, or cremation through a licensee (as defined in IC 25-15-2-19) and in compliance with IC 23-14-31.

SECTION 30. IC 16-34-3-3, AS AMENDED BY P.L.213-2016, SECTION 20, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 3. If the pregnant woman chooses a location for final disposition other than the location of final disposition that is usual and customary for ~~an abortion clinic or a health care facility,~~ **a hospital or ambulatory outpatient surgical center,** the pregnant woman is responsible for the costs related to the final disposition of the aborted fetus at the chosen location.

SECTION 31. IC 16-34-3-4, AS AMENDED BY P.L.77-2020, SECTION 3, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE



**SEA 1(ss) — Concur**



SEPTEMBER 15, 2022]: Sec. 4. (a) ~~An abortion clinic or health care facility~~ **A hospital or ambulatory outpatient surgical center** having possession of an aborted fetus shall provide for the final disposition of the aborted fetus. The burial transit permit requirements of IC 16-37-3 apply to the final disposition of an aborted fetus, which must be interred or cremated. However:

(1) a person is not required to designate a name for the aborted fetus on the burial transit permit and the space for a name may remain blank; and

(2) any information submitted under this section that may be used to identify the pregnant woman is confidential and must be redacted from any public records maintained under IC 16-37-3.

Aborted fetuses may be cremated by simultaneous cremation.

(b) If the ~~abortion clinic or health care facility~~ **hospital or ambulatory outpatient surgical center** conducts the cremation of aborted fetal remains on site, the ~~abortion clinic or health care facility~~ **hospital or ambulatory outpatient surgical center** must comply with all state laws concerning the cremation of human remains as prescribed in IC 23-14-31. The ~~abortion clinic or health care facility~~ **hospital or ambulatory outpatient surgical center** must make the onsite cremation equipment available to the state department for inspection at the time the ~~abortion clinic or health care facility~~ **hospital or ambulatory outpatient surgical center** is inspected. When the ~~abortion clinic or health care facility~~ **hospital or ambulatory outpatient surgical center** contracts with a licensed funeral home for the disposal of the aborted fetal remains, the contract must be made available for review by the state department at the time the ~~abortion clinic or health care facility~~ **hospital or ambulatory outpatient surgical center** is inspected.

(c) Except in extraordinary circumstances where the required information is unavailable or unknown, a burial transit permit issued under IC 16-37-3 that includes multiple fetal remains must be accompanied by a log prescribed by the state department containing the following information about each fetus included under the burial transit permit:

(1) The date of the abortion.

(2) Whether the abortion was surgical or induced by an abortion inducing drug.

(3) The name of the funeral director licensee who will be retrieving the aborted fetus.

(4) In the case of an abortion induced by an abortion inducing drug:

**SEA 1(ss) — Concur**



(A) whether the pregnant woman will cremate or inter the fetus, or will return the fetus to the ~~health care facility or abortion clinic~~ **hospital or ambulatory outpatient surgical center** for disposition; and

(B) if the pregnant woman returns the fetus to the ~~health care facility or abortion clinic,~~ **hospital or ambulatory outpatient surgical center,** whether the returned fetus is included in the burial transit permit.

The ~~abortion clinic or health care facility~~ **hospital or ambulatory outpatient surgical center** must keep a copy of the burial transit permit and accompanying log in a permanent file.

(d) Each time the fetal remains are transported from one entity to another for disposition, the entity receiving the fetal remains must confirm that the number of fetal remains matches the information contained in the burial transit permit and accompanying log. After final disposition, a copy of the log will be sent back to the ~~health care facility or abortion clinic.~~ **hospital or ambulatory outpatient surgical center.** The final log will be attached to the original log described in subsection (c) and will be made available for review by the state department at the time of inspection.

(e) ~~An abortion clinic or a health care facility~~ **A hospital or ambulatory outpatient surgical center** is responsible for demonstrating to the state department that the ~~abortion clinic or the health care facility~~ **hospital or ambulatory outpatient surgical center** has complied with the protocol provided in this section.

(f) A certificate of stillbirth is not required to be issued for an aborted fetus with a gestational age of less than twenty (20) weeks of age.

(g) IC 23-14-31-26, IC 23-14-55-2, IC 25-15-9-18, and IC 29-2-19-17 concerning the authorization of disposition of human remains apply to this section.

SECTION 32. IC 16-34-4-5, AS ADDED BY P.L.213-2016, SECTION 22, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 5. (a) A person may not intentionally perform or attempt to perform an abortion ~~before the earlier of viability of the fetus or twenty (20) weeks of postfertilization age~~ **allowed under IC 16-34-2** if the person knows that the pregnant woman is seeking a sex selective abortion.

(b) A person may not intentionally perform or attempt to perform an abortion ~~after viability of the fetus or twenty (20) weeks of postfertilization age~~ **allowed under IC 16-34-2** if the person knows that the pregnant woman is seeking a sex selective abortion.

**SEA 1(ss) — Concur**



(c) This section is severable as specified in IC 1-1-1-8.

SECTION 33. IC 16-34-4-6, AS ADDED BY P.L.213-2016, SECTION 22, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 6. (a) A person may not intentionally perform or attempt to perform an abortion ~~before the earlier of viability of the fetus or twenty (20) weeks of postfertilization age~~ **allowed under IC 16-34-2** if the person knows that the pregnant woman is seeking the abortion solely because the fetus has been diagnosed with Down syndrome or has a potential diagnosis of Down syndrome.

(b) A person may not intentionally perform or attempt to perform an abortion ~~after viability of the fetus or twenty (20) weeks of postfertilization age~~ **allowed under IC 16-34-2** if the person knows that the pregnant woman is seeking the abortion solely because the fetus has been diagnosed with Down syndrome or has a potential diagnosis of Down syndrome.

(c) This section is severable as specified in IC 1-1-1-8.

SECTION 34. IC 16-34-4-7, AS ADDED BY P.L.213-2016, SECTION 22, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 7. (a) A person may not intentionally perform or attempt to perform an abortion ~~before the earlier of viability of the fetus or twenty (20) weeks of postfertilization age~~ **allowed under IC 16-34-2** if the person knows that the pregnant woman is seeking the abortion solely because the fetus has been diagnosed with any other disability or has a potential diagnosis of any other disability.

(b) A person may not intentionally perform or attempt to perform an abortion ~~after viability of the fetus or twenty (20) weeks of postfertilization age~~ **allowed under IC 16-34-2** if the person knows that the pregnant woman is seeking the abortion solely because the fetus has been diagnosed with any other disability or has a potential diagnosis of any other disability.

(c) This section is severable as specified in IC 1-1-1-8.

SECTION 35. IC 16-34-4-8, AS ADDED BY P.L.213-2016, SECTION 22, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 8. (a) A person may not intentionally perform or attempt to perform an abortion ~~before the earlier of viability of the fetus or twenty (20) weeks of postfertilization age~~ **allowed under IC 16-34-2** if the person knows that the pregnant woman is seeking the abortion solely because of the race, color, national origin, or ancestry of the fetus.

(b) A person may not intentionally perform or attempt to perform an abortion ~~after viability of the fetus or twenty (20) weeks of postfertilization age~~ **allowed under IC 16-34-2** if the person knows

**SEA 1(ss) — Concur**



that the pregnant woman is seeking the abortion solely because of the race, color, national origin, or ancestry of the fetus.

(c) This section is severable as specified in IC 1-1-1-8.

SECTION 36. IC 16-34-5 IS REPEALED [EFFECTIVE SEPTEMBER 15, 2022]. (Miscellaneous Provisions).

SECTION 37. IC 16-41-16-1, AS AMENDED BY P.L.213-2016, SECTION 23, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 1. (a) This chapter applies to persons and facilities that handle infectious waste, including the following:

    (1) Hospitals.

    (2) Ambulatory surgical facilities.

    (3) Medical laboratories.

    (4) Diagnostic laboratories.

    (5) Blood centers.

    (6) Pharmaceutical companies.

    (7) Academic research laboratories.

    (8) Industrial research laboratories.

    (9) Health facilities.

    (10) Offices of health care providers.

    (11) Diet or health care clinics.

    (12) Offices of veterinarians.

    (13) Veterinary hospitals.

    (14) Emergency medical services providers.

    (15) Mortuaries.

    ~~(16) Abortion clinics.~~

(b) Except as provided in sections 2, 4, and 7.5 of this chapter, this chapter does not apply to:

    (1) home health agencies; or

    (2) hospice services delivered in the home of a hospice patient.

SECTION 38. IC 16-50-1-3, AS AMENDED BY P.L.65-2021, SECTION 2, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 3. (a) The state department shall establish a statewide maternal mortality review committee to:

    (1) review cases of maternal morbidity and maternal mortality;

    (2) determine factors contributing to maternal morbidity and maternal mortality;

    (3) identify public health and clinical interventions to improve systems of care and enhance coordination; and

    (4) develop strategies for the prevention of maternal morbidity and maternal mortality;

in Indiana.

(b) The statewide maternal mortality review committee:

**SEA 1(ss) — Concur** 



Brief Appendix 63

(1) shall review cases involving the death of a woman occurring during pregnancy, irrespective of the duration and site of the pregnancy, through one (1) year after the pregnancy; ~~and~~

(2) **shall study how changes in the state's abortion laws affect maternal mortality in Indiana; and**

**(3)** may review cases of maternal morbidity;

to carry out the duties set forth in this chapter.

SECTION 39. IC 16-50-1-12, AS AMENDED BY P.L.65-2021, SECTION 6, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 12. This article expires ~~June 30, 2025.~~ **June 30, 2027.**

SECTION 40. IC 25-1-9.8-10, AS AMENDED BY P.L.9-2022, SECTION 46, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 10. (a) As used in this chapter, "provider facility" means any of the following:

(1) A hospital licensed under IC 16-21-2.

(2) An ambulatory outpatient surgical center licensed under IC 16-21-2.

~~(3) An abortion clinic licensed under IC 16-21-2.~~

~~(4)~~ **(3)** A birthing center licensed under IC 16-21-2.

~~(5)~~ **(4)** Except for an urgent care facility (as defined by IC 27-1-46-10.5), a facility that provides diagnostic services to the medical profession or the general public.

~~(6)~~ **(5)** A laboratory where clinical pathology tests are carried out on specimens to obtain information about the health of a patient.

~~(7)~~ **(6)** A facility where radiologic and electromagnetic images are made to obtain information about the health of a patient.

~~(8)~~ **(7)** An infusion center that administers intravenous medications.

(b) The term does not include the following:

(1) A private mental health institution licensed under IC 12-25.

(2) A Medicare certified, freestanding rehabilitation hospital.

SECTION 41. IC 25-22.5-8-6, AS ADDED BY P.L.173-2017, SECTION 8, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 6. (a) As used in this section, "abortion" has the meaning set forth in IC 16-18-2-1.

(b) Notwithstanding IC 25-1-9, the board:

**(1)** may revoke the license of a physician if, after appropriate notice and an opportunity for a hearing, the attorney general proves by a preponderance of the evidence that the physician

~~(1)~~ failed to transmit the form to the state department of health as described in IC 16-34-2-5(b); ~~or~~ **and**

**SEA 1(ss) — Concur**



(2) **shall revoke the license of a physician if, after appropriate notice and an opportunity for a hearing, the attorney general proves by a preponderance of the evidence that the physician** performed an abortion in violation of IC 16-34-2-7(a) through IC 16-34-2-7(c) with the intent to avoid the requirements of ~~IC 16-34-2.~~ **16-34-2-1.**

SECTION 42. IC 25-36.1-2-1, AS ADDED BY P.L.97-2009, SECTION 1, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 1. As used in this chapter, "health care facility" means the following:

(1) A hospital that is licensed under IC 16-21-2.

(2) An ambulatory outpatient surgical center licensed under IC 16-21-2.

(3) A birthing center licensed under IC 16-21-2.

~~(4) An abortion clinic licensed under IC 16-21-2.~~

SECTION 43. IC 27-1-46-10, AS AMENDED BY P.L.9-2022, SECTION 49, AND BY P.L.36-2022, SECTION 11, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 10. (a) As used in this chapter, "provider facility" means any of the following:

(1) A hospital licensed under IC 16-21-2.

(2) An ambulatory outpatient surgical center licensed under IC 16-21-2.

~~(3) An abortion clinic licensed under IC 16-21-2.~~

~~(4)~~ **(3)** A birthing center licensed under IC 16-21-2.

~~(5)~~ **(4)** Except for an urgent care facility, a facility that provides diagnostic services to the medical profession or the general public, including outpatient facilities.

~~(6)~~ **(5)** A laboratory where clinical pathology tests are carried out on specimens to obtain information about the health of a patient.

~~(7)~~ **(6)** A facility where radiologic and electromagnetic images are made to obtain information about the health of a patient.

~~(8)~~ **(7)** An infusion center that administers intravenous medications.

(b) The term does not include the following:

(1) A private mental health institution licensed under IC 12-25.

(2) A Medicare certified, freestanding rehabilitation hospital.

SECTION 44. IC 27-2-25-11, AS AMENDED BY P.L.9-2022, SECTION 51, AND BY P.L.36-2022, SECTION 12, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 11. As used in this chapter, "provider facility" means any of the following:

**SEA 1(ss) — Concur**



(1) A hospital licensed under IC 16-21-2.

(2) An ambulatory outpatient surgical center licensed under IC 16-21-2.

~~(3) An abortion clinic licensed under IC 16-21-2.~~

~~(4)~~ **(3)** A birthing center licensed under IC 16-21-2.

~~(5)~~ **(4)** Except for an urgent care facility (as defined by IC 27-1-46-10.5), a facility that provides diagnostic services to the medical profession or the general public.

~~(6)~~ **(5)** A laboratory where clinical pathology tests are carried out on specimens to obtain information about the health of a patient.

~~(7)~~ **(6)** A facility where radiologic and electromagnetic images are made to obtain information about the health of a patient.

~~(8)~~ **(7)** An infusion center that administers intravenous medications.

SECTION 45. IC 27-8-33-1, AS ADDED BY P.L.193-2011, SECTION 16, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 1. As used in this chapter, "abortion" ~~means the termination of human pregnancy with an intention other than to produce a live birth or to remove a dead fetus.~~ **has the meaning set forth in IC 16-18-2-1.**

SECTION 46. IC 27-8-33-4, AS ADDED BY P.L.193-2011, SECTION 16, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 4. A qualified health plan offered under Subtitle D of Title 1 of the federal Patient Protection and Affordable Care Act may not provide coverage for abortion, except ~~in the following cases:~~

~~(1) The pregnant woman became pregnant through an act of rape or incest.~~

~~(2) An~~ **when an** abortion is ~~necessary to avert the pregnant woman's death or a substantial and irreversible impairment of a major bodily function of the pregnant woman.~~ **permitted under IC 16-34-2-1.**

SECTION 47. IC 27-13-7-7.5, AS ADDED BY P.L.124-2014, SECTION 2, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 7.5. (a) A health maintenance organization that provides coverage for basic health care services and that is entered into, delivered, amended, or renewed after December 31, 2014, under a group contract or an individual contract may not provide coverage for abortion **unless the abortion is permitted under IC 16-34-2-1.** ~~except in the following cases:~~

~~(1) The pregnant woman became pregnant through an act of rape or incest.~~

**SEA 1(ss) — Concur**



~~(2) An abortion is necessary to avert the pregnant woman's death or a substantial and irreversible impairment of a major bodily function of the pregnant woman.~~

(b) A health maintenance organization that enters into a group contract or an individual contract described in subsection (a) may offer coverage for **an** abortion **permitted under IC 16-34-2-1** through a rider or an endorsement.

SECTION 48. IC 35-41-3-12 IS ADDED TO THE INDIANA CODE AS A **NEW** SECTION TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: **Sec. 12. (a) It is a defense to any crime involving the death of or injury to a fetus that the defendant was a pregnant woman who committed the unlawful act with the intent to terminate her pregnancy.**

**(b) Except as provided in subsection (c), it is a defense to any crime involving the death of or injury to a fetus that the mother of the fetus requested that the defendant terminate her pregnancy, and that the death or injury to the fetus was the result of the defendant's termination or attempted termination of her pregnancy.**

**(c) Subsection (b) is not a defense to:**

**(1) performing an unlawful abortion under IC 16-34-2-7; or**

**(2) feticide (IC 35-42-1-6).**

SECTION 49. IC 35-42-1-6, AS AMENDED BY P.L.203-2018, SECTION 4, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 6. **(a) This section does not apply to:**

**(1) the pregnant mother whose pregnancy is terminated;**

**(2) a person who in good faith provides medical treatment to a pregnant woman that results in the accidental or unintentional termination of the pregnancy; or**

**(3) a physician licensed under IC 25-22.5 who, upon the request of a pregnant woman, performs a medical procedure to terminate her pregnancy, even if the procedure is not authorized under IC 16-34-2-1.**

**(b)** ~~Except as provided in section 6.5 of this chapter,~~ A person who knowingly or intentionally terminates a human pregnancy with an intention other than to produce a live birth or to remove a dead fetus commits feticide, a Level 3 felony.

SECTION 50. IC 35-42-1-6.5, AS ADDED BY P.L.203-2018, SECTION 5, IS AMENDED TO READ AS FOLLOWS [EFFECTIVE SEPTEMBER 15, 2022]: Sec. 6.5. (a) The following sections of this chapter do not apply to an abortion performed in compliance with ~~IC 16-34 or IC 35-1-58.5 (before its repeal):~~ **IC 16-34-2:**

**SEA 1(ss) — Concur**



(1) Section 1 (murder).

(2) Section 3 (voluntary manslaughter).

(3) Section 4 (involuntary manslaughter).

(4) Section 6 (feticide).

(b) The following sections of this chapter do not apply to a pregnant woman who terminates her own pregnancy or kills a fetus that she is carrying:

(1) Section 1 (murder).

(2) Section 3 (voluntary manslaughter).

(3) Section 4 (involuntary manslaughter).

(4) Section 6 (feticide).

SECTION 51. [EFFECTIVE SEPTEMBER 15, 2022] **(a) 410 IAC 26 is void. The publisher of the Indiana Administrative Code and Indiana Register shall remove this article from the Indiana Administrative Code.**

**(b) This SECTION expires July 1, 2024.**

SECTION 52. [EFFECTIVE SEPTEMBER 15, 2022] **(a) 410 IAC 26.5 is void. The publisher of the Indiana Administrative Code and Indiana Register shall remove this article from the Indiana Administrative Code.**

**(b) This SECTION expires July 1, 2024.**

SECTION 53. [EFFECTIVE SEPTEMBER 15, 2022] **(a) The prosecutorial oversight task force is created. The task force shall consist of the following members:**

**(1) Four (4) members of the house of representatives, appointed as follows:**

**(A) Three (3) members appointed by the speaker of the house of representatives, one (1) of whom shall serve as the co-chairperson of the task force.**

**(B) One (1) member appointed by the minority leader of the house of representatives.**

**(2) Four (4) members of the senate, appointed as follows:**

**(A) Three (3) member appointed by the president pro tempore of the senate, one (1) of whom shall serve as the co-chairperson of the task force.**

**(B) One (1) member appointed by the minority leader.**

**(3) The executive director of the prosecuting attorneys council of Indiana, or the executive director's designee.**

**(4) The executive director of the public defender council of Indiana, or the executive director's designee.**

**(5) The president of the Indiana judges association, or the president's designee.**

**SEA 1(ss) — Concur**



The legislative services agency shall provide staff support to the task force. The task force may not have more than five (5) meetings.

(b) The task force shall:

(1) study the circumstances in which a county prosecutor makes a blanket refusal to enforce a specific statute or constitutional provision; and

(2) consider appropriate methods of enforcing the statute or constitutional provision, including:

(A) granting the attorney general concurrent jurisdiction to enforce the statute or constitutional provision under certain circumstances;

(B) granting another prosecuting attorney concurrent jurisdiction to enforce the statute or constitutional provision under certain circumstances;

(C) establishing a procedure to appoint a special prosecuting attorney under certain circumstances; or

(D) any other method the task force determines should be recommended; and

(3) make recommendations under subsection (c) resulting from the task force's study and considerations under this subsection.

(c) Before December 1, 2022, the task force shall make recommendations to the general assembly in an electronic format under IC 5-14-6 concerning the task force's study and findings under subsection (b).

(d) Each member of the task force who is not a state employee is entitled to the minimum salary per diem provided by IC 4-10-11-2.1(b). The member is also entitled to reimbursement for traveling expenses as provided under IC 4-13-1-4 and other expenses actually incurred in connection with the member's duties as provided in the state policies and procedures established by the Indiana department of administration and approved by the budget agency.

(e) Each member of the task force who is a state employee but who is not a member of the general assembly is entitled to reimbursement for traveling expenses as provided under IC 4-13-1-4 and other expenses actually incurred in connection with the member's duties as provided in the state policies and procedures established by the Indiana department of administration and approved by the budget agency.

(f) Each member of the task force who is a member of the

SEA 1(ss) — Concur



general assembly is entitled to receive the same per diem, mileage, and travel allowances paid to legislative members of interim study committees established by the legislative council. Per diem, mileage, and travel allowances paid under this subsection shall be paid from appropriations made to the legislative council or the legislative services agency.

(g) This SECTION expires December 31, 2022.

SECTION 54. **An emergency is declared for this act.**

**SEA 1(ss) — Concur**



_____

President of the Senate

_____

President Pro Tempore

_____

Speaker of the House of Representatives

_____

Governor of the State of Indiana

Date: _____ Time: _____

**SEA 1(ss) — Concur**



Brief Appendix 71