# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

No. 23-3247

THE SATANIC TEMPLE, INC.

      Plaintiff-Appellant

         v.

TODD ROKITA and
RYAN MEYERS

      Defendants-Appellees

Appeal from the United States
District Court for the Southern
District of Indiana, Indianapolis
Division.

No. 1:22-cv-01859-JMS-MG

Jane Magnus-Stinson, *Judge*

## PLAINTIFF-APPELLANT'S APPENDIX

W. James Mac Naughton, Esq.
7 Fredon Marksboro Road
Newton, NJ 07860
wjm@wjmesq.com
732-213-8180
Attorney for Plaintiff-Appellant
The Satanic Temple, Inc.

## TABLE OF CONTENTS

Declaration of Erin Helian dated June 16, 2023..............................A1

Declaration of Dr. J.D. dated June 14, 2023 ...................................A8

Declaration of W. James Mac Naughton dated June 20, 2023...........A13

    Exhibit A – Brief of Defendant Todd Rokita In
    *Members of the Medical Licensing Board of Indiana v.*
    *Planned Parenthood et al*, Case No. 22S-PL-338,
    Indiana Supreme Court .......................................................A17

    Exhibit B – Brief of Defendant Todd Rokita in
    *Members of the Medical Licensing Board of Indiana v.*
    *Anonymous et al*, Case No. 22A-PL-2938,
    Indiana Court of Appeals....................................................A82

    Exhibit C - Order Granting Plaintiffs' Motion For Preliminary
    Injunction filed December 2, 2022 in
    *Anonymous v. Members of the Medical Licensing Board*
    Case No. 49D01-2209-PL-031056
    Marion County Superior Court .......................................A147

    Exhibit D – Letter to Walgreens Boot Alliance, Inc.
    Dated February 1, 2023 from Defendant Todd Rokita ..........A191

    Exhibit E - Memorandum Opinion For The
    General Counsel United States Postal Service
    dated December 23, 2022..................................................A197

    Exhibit F - Order Denying Plaintiffs' Motion For
    Preliminary Injunction filed December 2, 2022 in
    Bernard v. Rokia, Case No. 49D01-2211-MI-03810,
    Marion County Superior Court.......................................A219

Declaration of W. James Mac Naughton filed June 29, 2023 .........A262

Plaintiff's Response To Defendants' First Set Of Requests For
Admission dated June 8, 2023..................................................A264

Plaintiff's Non-Confidential Response To Defendants' First
Set Of Interrogatories To Plaintiff dated June 8, 2023.................A267

Letter to the Court from W. James Mac Naughton
Dated August 31, 2023.........................................................A274

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

---

THE SATANIC TEMPLE, INC.

      Plaintiff

           Case No. 1:22-cv-1859-JMS-MG

      v.

TODD ROKITA, in his
capacity as the Attorney General of
Indiana and
RYAN MEARS, in his capacity as
Marion County Prosecutor

      Defendants

---

**DECLARATION OF ERIN HELIAN**

      Erin Helian, pursuant to 28 U.S.C. §1746, declares under penalty of perjury the following statements are true and correct:

      1.      I am an Executive Director of and also a member of Plaintiff The Satanic Temple ("TST"). My areas of responsibility include the creation and operation of the TST Clinic, as described in the First Amendment Complaint ("Complaint") at ¶¶ 19 to 25. I make this declaration in opposition to the Defendants' motion to dismiss, ECF No. 36.

      2.      Erin Helian is an assumed name. I will not disclose my real name due to my fear of violent retribution from domestic terrorists motivated by animosity to proponents of abortion and non-Christian religious beliefs.

      3.      TST venerates, but does not worship, the allegorical Satan described in the epic poem Paradise Lost - the defender of personal sovereignty against the dictates of religious authority.

**A-1**

4.      Members in TST adhere to seven tenets (the "TST Tenets") commonly associated with secular humanism and described in the Complaint at ¶7.

5.      TST promotes the TST Tenets with a variety of programs, including, but not limited to education and outreach for the purpose of promoting the TST Tenets in general and the Satanic Abortion Ritual in particular.

6.      One of TST's programs has been to litigate the validity of abortion regulations that infringe on the TST Tenets.  TST has financed such litigation in federal courts in Missouri, Texas and the 8th Circuit and in Missouri state court.

7.      TST is a voluntary membership organization, closely identified with TST members and subject to their influence.  TST maintains a website at https://thesatanictemple.com.

8.      TST members can and do routinely organize events to promote the TST Tenets, with the support and encouragement of TST.  TST members can and do routinely voice their opinions on the formulation and implementation of the TST Tenets and TST responds to those opinions.

9.      There is a surprisingly large number of people in the U.S. who profess to be Satanists,[1] including some who actually worship Satan as a deity.  TST serves the segment of the Satanist community that regards Satan as the allegorical figure described in Milton's Paradise Lost.  Adherence to the TST Tenets is central to their concept of being a Satanist and antithetical to the worship of Satan.

---

[1] The dictionary defines a Satanist as "a person who engages in any of a highly diverse group of religious, philosophical, or countercultural practices centered around Satan, either as a deity or a nontheistic symbol of enlightenment, individualism, or ethical egoism." https://www.dictionary.com/browse/satanist, last visited April 21, 2023

**A-2**

10.      TST has at least 11,300 members in Indiana.  They are generally between 16 and 40 years old.

11.      TST has approximately 5,650 female TST members residing in Indiana.

12.      The TST members wish to remain anonymous due to the risk of violent retribution from domestic terrorists motivated by animosity to proponents of abortion and non-Christian religious beliefs.

13.      Consistent with TST Tenets III and V, TST members believe the fetal tissue a pregnant woman carries in her uterus – from conception until viability - is part of her body and not imbued with any humanity or existence separate and apart from that of the woman herself.

14.      Consistent with the TST Tenets III and V, TST members believe a woman who carries a Prenatal Child (as that term is defined in the Complaint at ¶18) in her uterus without her consent must remove that Prenatal Child from her body provided it can be done without jeopardy to her own health and safety.

15.      TST members hold these beliefs without regard to gender or whether they are pregnant.

16.      The concept that a human being comes into existence at conception and must be carried to term by the mother is antithetical to the TST Tenets and deeply offensive to TST members.

17.      Pregnant TST members can and do get abortions, where they are legal, to terminate an unwanted pregnancy as an exercise of their religious beliefs pursuant to the Satanic Abortion Ritual, a copy of which is attached as Exhibit A to the Complaint.

**A-3**

18.     Pregnant TST members in Indiana could lawfully get abortions in the exercise of the Satanic Abortion Ritual prior to September 15, 2022, the effective date of Indiana Senate Bill 1.

19.     TST, doing business as TST Health, Inc., has spent over $75,000 to establish and operate an abortion clinic that serves TST members in New Mexico (the "TST Clinic").

20.     The purpose of the TST Clinic is to:

    A.  Promote the Satanic Abortion Ritual;

    B.  Prescribe mifeprestone and misoprostol ("Abortifacients") to pregnant members of TST nationwide using telemedicine ("Medical Abortions"); and

    C.  Deliver Abortifacients to TST members nationwide for use in Medical Abortions by mail and other means;

    D.  Counsel TST members on the use of Abortifacients in the Satanic Abortion; and

    E.  Counsel TST members on the application of the Satanic Abortion Ritual to surgical abortions

21.     The TST Clinic was established in response to decision by the U.S. Supreme Court in the *Dobbs* case.  Shortly after *Dobbs* was handed down, numerous states began closing abortion clinics and TST members in those states no longer had legal access to abortion services. TST decided that the effective promotion of the Satanic Abortion Ritual will require making the Abortifacients used in the Ritual readily available at minimum expense throughout the country. Creating the TST Clinic is the first step in that effort.

**A-4**

22.     The TST Clinic delivers its services without charge for religious telehealth Medical Abortions.  Patients pay only for the cost of Abortifacients, which typically cost about $90.  Abortifacients are delivered by mail which can be by overnight service.

23.     The TST Clinic was designed to make the Abortifacients used in the Satanic Abortion Ritual readily available at minimum cost throughout the country.  The TST Clinic was designed to be readily scalable, meaning it could expand its services into any state with the minimal expenditure of time and money.  The TST Clinic therefore chose the following procedure to prescribe and deliver Abortifacients (the "Telemedicine Model"):

a.   The TST Clinic maintains a website for purposes of describing its services and providing a means of scheduling an abortion.  The website is at www.tsthealth.org.;

b.   The patient contacts the TST Clinic through the website or by phone or email;

c.   Personnel from the TST Clinic contact the patient by phone or email and collect the information necessary to determine whether Abortifacients can be safely prescribed to the patient in accordance with the risk evaluation and mitigation strategy ("REMS") established by the U.S. Food and Drug Administration ("FDA");

d.   The patient consults with an Advance Practice Registered Nurse ("APRN") by video link, such as Zoom;

e.   The APRN must comply with the risk mitigations and evaluation strategies ("RMS") of the U.S. Food and Drug Administration in prescribing Abortifacients;

f.   The APRN determines during the course of the consultation whether writing the patient a prescription for Abortifacients complies with REMS;

**A-5**

   g.   If so, the APRN writes the prescription for Abortifacients during the consultation which is filled by a third-party pharmacy authorized by the FDA to dispense Abortifacients;

   h.   The Abortifacients are mailed to the patient;

   i.   The patient takes the Abortifacients at home and can consult with the TST Clinic at any time if necessary.

24.    Mailed delivery typically takes three to five days.  Overnight delivery is available at the patient's expense.

25.    The TST Clinic currently prescribes Abortifacients only to patients who provide a New Mexico address.  The APRN's employed by the TST Clinic could safely prescribe Abortifacients in accordance with FDA regulations to TST members in Indiana for inducing abortions at home.  The cost for an APRN to become registered in the State of Indiana is about $300.

26.    The TST Clinic chooses to not prescribe Abortifacients to TST members in Indiana due to the threat of criminal prosecution and jeopardy to the professional licenses of its staff for violating the Indiana Abortion Ban.

27.    Indiana bans the Telemedicine Model.  The cost of complying with Indiana's requirements for abortion providers would dramatically increase the costs for TST to fulfill its mission of efficiently providing Abortifacients to Indiana members for use in the Satanic Abortion Ritual.

28.    The TST Clinic became operational on February 14, 2023.  It has received hundreds of inquiries from TST members about its services.  It has served dozens of patients

**A-6**

since becoming operational and prescribed Abortifacients to numerous women for purposes of engaging in the Satanic Abortion Ritual.

29.     Given the enthusiastic reception of the TST Clinic, it is highly likely that one or more of TST members in Indiana would use the unique services of the TST Clinic but for the Indiana Abortion Ban.

30.     Prior to opening the TST Clinic, TST's programs were focused on education and advocacy, not the practice of medicine.  The creation of the TST Clinic has resulted in a diversion of TST resources from TST's other programs to promote the TST Tenets based on education and advocacy.

June ⎸6, 2023

_____
Erin Helian

7

**A-7**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

_____

THE SATANIC TEMPLE, INC.

       Plaintiff

    v.                                        Case No. 1:22-cv-1859-JMS-MG

TODD ROKITA, in his
capacity as the Attorney General of
Indiana and
RYAN MEARS, in his capacity as
Marion County Prosecutor

       Defendants

_____

**DECLARATION OF DR. J. D.**

    Dr. J.D, pursuant to 28 U.S.C. §1746, declares under penalty of perjury the following statements are true and correct:

    1.     I hold a Doctorate in Osteopathy and am a Fellow in The American Congress of Obstetricians and Gynecologists.  I am licensed to practice medicine in four states.  I have engaged in the practice of medicine as an obstetrics and gynecological specialist for over fifteen (15) years.

    2.     I make this declaration in opposition to the Defendants' motion to dismiss, ECF No. 36.

    3.     I have reviewed the First Amended Complaint (the "Complaint") in this action. The allegations made in the Complaint at ¶¶37 to 40, 43, 45 to 46, 48, 49, 51 to 54 and 56 to 65 are true.

    4.     Virtually all scientific knowledge regarding the matters described in the preceding paragraph has been developed in the 20th and 21st Centuries.  The scientific details for creating a

A-8

human zygote and its progression and development to birth as a human being capable of self-sustaining life were unknown in the 18th and 19th Centuries.

5.      The fertility rate is a commonly used metric in obstetrics and expressed as the number of live births per 1,000 women of child-bearing age. The fertility rate in Indiana in 2017 (the last year for which statistics are available) was 63.5 per 1,000 women.[1]

6.      The induced abortion rate is a commonly used metric in obstetrics and expressed as the number of induced abortions per 1,000 women of child-bearing age.  The induced abortion rate in Indiana in 2021 (the last year for which statistics are available) was 6.0 induced abortions per 1000 women.[2]

7.      I am advised there are 5,650 women of child-bearing age in Indiana who are members of The Satanic Temple ("TST").  It is my opinion, to a reasonable degree of medical certainty based on the fertility and abortions rates for Indiana, that three hundred ninety-two (392) TST members in Indiana are pregnant during the course of a year.[3]

8.      Contraception is routinely used by sexually active women to prevent becoming pregnant.  There are many different forms of contraception, each with its own unique characteristics and risks for failure. With the exceptions of abstinence and sterilization, no method of contraception is fool proof.  Women using contraception are always at risk for getting pregnant, typically (though not always) due to a failure to correctly use their chosen method of contraception.

---

[1] https://www.in.gov/health/reports/natality/2017/tbl31_t.htm, last visited May 25, 2023

[2] https://www.in.gov/health/vital-records/vital-statistics/terminated-pregnancy-reports/, 2021 Terminated Pregnancy Report last visited June 9, 2023.

[3] 5,650 women x (63.5 fertility rate + 6.0 abortion rate) = 392.675

**A-9**

9.      The National Institute of Health reports that 88.2% of all women ages 15 to 44 years used at least one form of contraception during their lifetime.  Among women who could become pregnant but did not wish to do so, 90% use some form of contraception.[4]

10.     The Centers for Disease Control and Prevention report that one-half of all pregnancies in the U.S. are unintended.[5]

11.     The National Institute of Health reports that 48% of unintended pregnancies are due to a failure in the use of birth control.[6]

12.     Applying these statistics, it is my opinion, to a reasonable degree of medical certainty, that ninety-four (94) TST members in Indiana are Involuntarily Pregnant Women during the course of a year.[7]  It is my opinion, to a reasonable degree of medical certainty, that at least one (1) of these women is pregnant at any given point in time during the course of a year.

13.     Gestational surrogacy is common throughout the United States, including Indiana, which permits compensated surrogacy.

14.     There are numerous online advertisements for gestational carriers in Indiana These include:

  a.  Circle Surrogacy, offering $55,000.  See

      https://www.circlesurrogacy.com/surrogacy/surrogacy-by-state/surrogacy-in-indiana#how-much-does-surrogacy-cost-in-indiana, last visited June 13, 2023;

  b.  Creative Family Connections, offering $30,000 to $55,000.  See

---

[4] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7533104/  last visited April 21, 2023

[5] https://www.cdc.gov/reproductivehealth/contraception/unintendedpregnancy/index.htm , last visited April 21, 2023

[6] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2386600/ , last visited April 21, 2023.

[7] 392 x .5 x .48 = 94.08

**A-10**

https://www.creativefamilyconnections.com/about-surrogacy/surrogate-compensation/, last visited June 13, 2023;

c. Storks Nest, offering $40,000 to $50,000.  See https://www.storksnestagency.com/gestational-surrogate-compensation, last visited June 13, 2023;

d. American Surrogacy, offering $60,000+.  See https://www.americansurrogacy.com/surrogate/surrogates-surrogate-pay, last visited June 13, 2023.

15.     I am advised that the TST Clinic uses the following procedure to prescribe and deliver mifeprestone and misoprostol ("Abortifacients") to patients (the "Telemedicine Model"):

a. The patient contacts the TST Clinic by phone or email;

b. Personnel from the TST Clinic contact the patient by phone or email and collect the information necessary to determine whether Abortifacients can be safely prescribed to the patient in accordance with the risk evaluation and mitigation strategy ("REMS") established by the U.S. Food and Drug Administration ("FDA");

c.  The patient consults with an Advance Practice Registered Nurse ("APRN") by video link, such as Zoom;

d. The APRN determines during the course of the consultation whether writing the patient a prescription for Abortifacients complies with REMS;

e. If so, the APRN writes the prescription for Abortifacients during the consultation which is filled by a third-party pharmacy authorized by the FDA to dispense Abortifacients;

**A-11**

f.   The Abortifacients are mailed to the patient.

16.   I am advised that the procedure for obtaining an abortion using Abortifacients in Indiana requires the following procedures:

a.   All abortion related services must be provided by a physician in a hospital at which he or she has admission privileges or at an ambulatory outpatient surgical center for such hospital;

b.   All consultations by the patient with the physician must be in-person;

c.   The patient must sign an "informed consent" form and then wait at least eighteen (18) hours before getting an abortion;

d.   The abortion thus requires two (2) in-person visits by the patient with the physician and the Abortifacients must be ingested in the presence of the physician.

17.   It is my opinion, to a reasonable degree of medical certainty, that due to the travel time and waiting period required by the Indiana procedure, the delivery of an abortion using Abortifacients takes longer following the Indiana procedure than using the Telemedicine Model.

18.   It is my opinion, to a reasonable degree of medical certainty, that due to the requirement in Indiana that only a physician with hospital privileges can prescribe Abortifacients, the cost of an abortion using Abortifacients is more expensive in Indiana than using the Telemedicine Model.

June 14, 2023

_Dr. J.D._

**A-12**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

_____

THE SATANIC TEMPLE, INC.

       Plaintiff

                                 Case No. 1:22-cv-1859-JMS-MG

       v.

TODD ROKITA, in his
capacity as the Attorney General of
Indiana and
RYAN MEARS, in his capacity as
Marion County Prosecutor

       Defendants

_____

**DECLARATION OF W. JAMES MAC NAUGHTON**

      W. James Mac Naughton**,** pursuant to 28 U.S.C. §1746, declares under penalty of perjury

the following statements are true and correct:

      1.      I am the attorney for Plaintiff in this case.  I make this declaration in opposition to

Defendants' Motion to Dismiss, ECF No. 36.

      2.      Attached as Exhibit A is a true copy of the Brief filed by Defendant Todd Rokita

in the matter captioned _Members of the Medical Licensing Board of Indiana et al v. Planned_

_Parenthood Great Northwest Hawaii, Alaska, Indiana, Kentucky, Inc. et al_, Docket No. 22S-PL-

00338, Indiana Supreme Court.  Defendant Rokita states in the Brief at p. 57 that "[a]bortion

terminates the existence of what science shows to be a distinct 'living human being' with the

capacity to think, feel, hear, move, and direct _its own_ development." [emphasis in original]

      3.      Attached as Exhibit B is a true copy of the Brief filed by Defendant Rokita in the

matter captioned _Individual Members of the Medical Licensing Board of Indiana, et al. v._

**A-13**

*Anonymous Plaintiff 1, et al*, Docket No. 22A-PL-02938, Indiana Court of Appeals. The Brief

states as p. 48 "human fetuses are human beings is a scientific fact, not a theological claim."

4.       Attached as Exhibit C is a true copy of an Order Granting Plaintiffs' Motion for

Preliminary Injunction entered in *Anonymous Plaintiff #1 et al v. The Individual Members of The*

*Medical Licensing Board of Indiana*, *et al.*, Dkt. No. 49D01-2209-PL-031056, Circuit Court of

Monroe County, Indiana. The Court ruled at ¶34 that "the question of when life begins is a

religious one that the State may not answer legislatively or as a factual matter."

5.       Attached as Exhibit D is a true copy of a letter sent by Defendant Rokita to

Walgreens Boot Alliance, Inc. dated February 1, 2023.

6.       Attached as Exhibit E is a true copy of  Memorandum Opinion for The General

Counsel United States Postal Service dated December 23, 2022 regarding Application of the

Comstock Act to the Mailing of Prescription Drugs That Can Be Used for Abortions

7.       Attached as Exhibit F is a true copy of an Order Denying Plaintiffs' Request for

Preliminary Injunction entered in the matter captioned *Dr. Caitlin Bernard et al v. Todd Rokita,*

*et al*, Dkt No. 49D01-2211-MI-038101, Marion County Superior Court. The Court said at ¶143

that ('[t]he public statements made by the Attorney General prior to the referral of the matter to

the Medical Licensing Board, therefore, are clearly unlawful breaches of the licensing

investigations statute's requirement that employees of the Attorney General's Office maintain

confidentiality over pending investigations until they are so referred to prosecution."

8.       Plaintiff's offices in Salem MA were subjected to an arson attack last year by an

individual who carried a Bible in his backpack. Schools that have permitted Plaintiff to set up an

After School Satan Club sponsored by Plaintiff have been threatened by zealots to "come in

**A-14**

there and shoot everybody."[1]  Plaintiff takes these threats seriously and, as a consequence, will

not divulge the names of any TST members in these proceedings, even anonymously.

9.      I cannot, in good conscience, advise my client or its members that compliance

with the Court's local rule regarding anonymous filing, Local Rule 10-1, will guarantee the

identity of a TST member will not be publicly disclosed.  I base my belief on the fact that a draft

of the *Dobbs* decision was publicly disclosed months before the final decision was released.   I

also base my belief on the fact that Defendant Rokita violated state law regarding confidentiality

in a matter involving an Indiana physician who performed an abortion on a child victim of rape.

10.      It is clear that the passions stirred up by the culture war over abortion can

overcome the good judgment of even high government officials.  I would have to advise any

TST member who volunteers to be a party to this case by a Doe designation or pseudonym that

there is a risk of the public disclosure of their identify and the possibility of violent retribution

from domestic terrorists motivated by animosity to proponents of abortion and non-Christian

religious beliefs.

June 20, 2023

*W. James Mac Naughton*

---

[1] https://www.mcall.com/2023/02/28/north-carolina-man-phoned-threat-to-saucon-valleyschools-in-response-to-after-school-satan-club-authorities-say

**A-15**

**EXHIBIT A**

IN THE

# Indiana Supreme Court

No. 22S-PL-00338

| | |
|---|---|
| MEMBERS OF THE MEDICAL LICENSING BOARD OF INDIANA, in their official capacities, et al., | Interlocutory Appeal from the Monroe County Circuit Court, |
| Appellants, | Trial Court Case No. 53C06-2208-PL-001756, |
| v. | The Honorable Kelsey Hanlon, Special Judge. |
| PLANNED PARENTHOOD GREAT NORTHWEST, HAWAI'I, ALASKA, INDIANA, KENTUCKY, INC., et al., | |
| Appellees. | |

## CORRECTED BRIEF OF APPELLANTS

THEODORE E. ROKITA
Attorney General of Indiana
Attorney No. 18857-49

THOMAS M. FISHER
Solicitor General
Attorney No. 17949-49

JAMES A. BARTA
Deputy Solicitor General
Attorney No. 31589-49

Office of the Attorney General
IGC-South, Fifth Floor
Indianapolis, Indiana 46204
Tel:  (317) 232-6255
Fax:  (317) 232-7979
Email:  Tom.Fisher@atg.in.gov

MELINDA R. HOLMES
Attorney No. 36851-79
Deputy Attorney General

*Counsel for Appellants*

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................... 4

STATEMENT OF SUPREME COURT JURISDICTION ......................................... 12

STATEMENT OF THE ISSUES ......................................................... 12

STATEMENT OF THE CASE ......................................................... 12

STATEMENT OF FACTS ......................................................... 13

I.   Factual Background ......................................................... 14

II.  Statutory and Regulatory Background ......................................................... 15

    A.   Indiana prohibits abortion from its earliest days until federal
        law requires it to tolerate abortion ......................................................... 15

    B.   After *Roe*, Indiana continues to heavily restrict abortion ................... 17

    C.   Indiana reenacts an abortion ban after *Roe* is overruled .................... 19

III. Procedural Background ......................................................... 20

SUMMARY OF THE ARGUMENT ......................................................... 22

ARGUMENT ......................................................... 26

I.   Plaintiffs Lack Standing To Assert an Article 1, § 1 Claim ........................... 27

    A.   Plaintiffs do not allege personal, direct injury from a violation
        of their own rights ......................................................... 27

    B.   The Court should not embrace federal third-party standing .............. 29

    C.   The plaintiffs cannot satisfy the usual requirements for
        third-party standing regardless ......................................................... 32

II.  Article 1, § 1 of the Indiana Constitution Does Not Confer Judicially
    Enforceable Rights ......................................................... 34

    A.   The constitutional text, structure, and debates demonstrate
        that § 1 is not judicially enforceable ......................................................... 35

2

**A-18**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

B.   The overruled decisions cited by the trial court provide no
persuasive reason for holding that § 1 is enforceable ........................... 40

III.   Any Rights Secured by Article 1. § 1 of the Indiana Constitution
Do Not Include a Right to Abortion .................................................... 42

A.   To the extent that § 1 secures any rights, it protects only
rights with textual and historical support ............................................ 42

B.   No text or history supports a right to abortion ..................................... 44

C.   The trial court's unprecedented rationale for recognizing a
novel right to abortion upends the judicial role ................................... 48

D.   Generic statements about liberty and autonomy cannot support
a right to abortion ............................................................................. 51

E.   S.B. 1 is a permissible exercise of police power ................................... 57

IV.   The Lack of Irreparable Harm and the State's Significant Interest in
Protecting Unborn Children Preclude a Preliminary Injunction .................. 58

A.   No irreparable harm will occur absent a preliminary injunction ........ 59

B.   The compelling public interest in protecting unborn children
from destruction militates against injunctive relief ............................. 60

CONCLUSION .................................................................................................... 62

CERTIFICATE OF WORD COUNT .......................................................................... 63

CERTIFICATE OF SERVICE .................................................................................... 64

**A-19**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

# TABLE OF AUTHORITIES

CASES

*Adams v. State,*
  48 Ind. 212 (1874) .................................................................... 17, 47

*Adler v. State,*
  248 Ind. 193, 225 N.E.2d 171 (1967) ....................................... 28, 30, 31

*Apple Glen Crossing, LLC v. Trademark Retail, Inc.,*
  784 N.E.2d 484 (Ind. 2003) ............................................................... 59

*Avemco Ins. Co. v. State ex rel. McCarty,*
  812 N.E.2d 108 (Ind. Ct. App. 2004) ................................................. 62

*Basset v. State,*
  41 Ind. 303 (1872) .................................................................... 17, 47

*Bd. of Comm'rs of Union Cty. v. McGuinness,*
  80 N.E.3d 164 (Ind. 2017) ....................................................... 27, 28, 30

*Bd. of Trustees of Pub. Employees' Ret. Fund of Ind. v. Pearson,*
  459 N.E.2d 715 (Ind. 1984) ............................................................. 27, 48

*Beebe v. State,*
  6 Ind. 501 (1855) .............................................................. 40, 41, 45, 53

*Box v. Planned Parenthood of Ind. & Ky., Inc.,*
  139 S. Ct. 1780 (2019) .................................................................. 18, 50

*Brewington v. Lowe,*
  1 Ind. 21 (1848) ........................................................................... 30, 31

*Bunker v. Nat'l Gypsum Co.,*
  441 N.E.2d 8 (Ind. 1982) .............................................................. 49, 61

*Carter v. State,*
  2 Ind. 617 (1851) ........................................................................ 17, 47

*Cent. Ind. Podiatry, P.C. v. Krueger,*
  882 N.E.2d 723 (Ind. 2008) .............................................................. 58

*Chavez v. Martinez,*
  538 U.S. 760 (2003) ........................................................................ 44

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

CASES [CONT'D]

*Cheaney v. State,*
   259 Ind. 138, 285 N.E.2d 265 (1972) ...........................................................*passim*

*Churchman v. Martin,*
   54 Ind. 380 (1876) ................................................................................ 26, 41, 48

*City Chapel Evangelical Free Inc. v. City of S. Bend ex rel. Dep't of
   Redevelopment,*
   744 N.E.2d 443 (Ind. 2001) ........................................................................ 26, 43

*City of Gary v. Nicholson,*
   190 N.E.3d 349 (Ind. 2022) ................................................................... 27, 28, 30

*City of Indianapolis v. Ind. State Bd. of Tax Comm'rs,*
   261 Ind. 635, 308 N.E.2d 868 (1974) ................................................................. 28

*Clinic for Women, Inc. v. Brizzi,*
   837 N.E.2d 973 (Ind. 2005) ................................................................... 19, 47, 55

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.,*
   48 F.3d 618 (1st Cir. 1995) ................................................................................ 59

*Diamond v. Charles,*
   476 U.S. 54 (1986) ............................................................................................. 33

*Dobbs v. Jackson Women's Health Org.,*
   142 S. Ct. 2228 (2022) ...........................................................................*passim*

*Doe v. Methodist Hosp.,*
   690 N.E.2d 681 (Ind. 1997) ............................................................................... 52

*Doe v. O'Connor,*
   790 N.E.2d 985 (Ind. 2003) ............................................................................... 39

*Doe v. Town of Plainfield,*
   893 N.E.2d 1124 (Ind. Ct. App. 2008) ................................................ 43, 47, 51, 53

*Driskill v. State,*
   7 Ind. 338 (1855) .............................................................................................. 38

*Elk Grove Unified Sch. Dist. v. Newdow,*
   542 U.S. 1 (2004) .............................................................................................. 33

*EMW Women's Surgical Ctr., P.S.C. v. Cameron,*
   No. 2022-SC-0326-I, 2022 WL 3641196 (Ky. Aug. 18, 2022) ............................... 57

**A-21**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

## CASES [CONT'D]

*Finney v. Johnson*,
  242 Ind. 465, 179 N.E.2d 718 (1962) ....................................... 26, 42, 48

*Hedderich v. State*,
  101 Ind. 564, 1 N.E. 47 (1885) ................................................... 39

*Herman v. State*,
  8 Ind. 545 (1855)................................................... 40, 41, 45, 53

*Hoagland v. Franklin Twp. Cmty. Sch. Corp.*,
  27 N.E.3d 737 (Ind. 2015) ...................................................... 56

*Holcomb v. Bray*,
  187 N.E.3d 1268 (Ind. 2022) ............................................. 28, 38

*Horner v. Curry*,
  125 N.E.3d 584 (Ind. 2019) .......................................... 27, 30, 31

*Ind. Educ. Emp't Relations Bd. v. Benton Cmty. Sch. Corp.*,
  266 Ind. 491, 365 N.E.2d 752 (1977) ............................... 28, 31

*Ind. Fam. & Soc. Servs. Admin. v. Walgreen Co.*,
  769 N.E.2d 158 (Ind. 2002) .................................................... 59

*Judy v. State*,
  275 Ind. 145, 416 N.E.2d 95 (1981) ...................................... 38

*Kerry v. Din*,
  576 U.S. 86 (2015) ................................................................. 44

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004) ..................................................... 31, 33, 34

*In re Lawrance*,
  579 N.E.2d 32 (Ind. 1991) ...................................................... 53

*Ledgerwood v. State*,
  134 Ind. 81, 33 N.E. 631 (1893) ............................................ 16

*Leonard v. State*,
  249 Ind. 361, 232 N.E.2d 882 (1968) .............................. 28, 31

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................ 30

**A-22**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

## CASES [CONT'D]

*Mahaffey v. Att'y Gen.*,
   564 N.W.2d 104 (Mich. Ct. App. 1997) ................................................. 56

*Mich. Coal. of State Emp. Unions v. Mich. Civ. Serv. Comm'n*,
   634 N.W.2d 692 (Mich. 2001) .............................................................. 60

*Miller v. Albright*,
   523 U.S. 420 (1998) .......................................................................... 34

*Moore v. Consol. Edison Co. of New York*,
   409 F.3d 506 (2d Cir. 2005) .............................................................. 59

*O'Brien v. State*,
   422 N.E.2d 1266 (Ind. Ct. App. 1981) ............................................... 42

*Osmulski v. Becze*,
   638 N.E.2d 828 (Ind. Ct. App. 1994) ............................................ 29, 32

*Pence v. State*,
   652 N.E.2d 486 (Ind. 1995) ........................................................... 28, 30

*Pirtle v. State*,
   263 Ind. 16, 323 N.E.2d 634 (1975) ................................................... 54

*Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State*,
   975 N.W.2d 710 (Iowa 2022) ........................................................ 56, 57

*Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of*
   *Health*,
   265 F. Supp. 3d 859 (S.D. Ind. 2017) ................................................. 18

*Planned Parenthood of Indiana v. Carter*,
   854 N.E.2d 853 (Ind. Ct. App. 2006) .................................................. 29

*Planned Parenthood of Se. Pa. v. Casey*,
   505 U.S. 833 (1992) ............................................................... 18, 19, 52

*Plaut v. Spendthrift Farm, Inc.*,
   514 U.S. 211 (1995) .......................................................................... 31

*Powers v. Ohio*,
   449 U.S. 400 (1991) ..................................................................... 29, 32

*Price v. State*,
   622 N.E.2d 954 (Ind. 1993) .......................................................*passim*

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

CASES [CONT'D]

*Rice v. State*,
    7 Ind. 332 (1855) .......................................................................... 38

*Ritchie v. State*,
    809 N.E.2d 258 (Ind. 2004) ........................................................ 38

*Roe v. Wade*,
    410 U.S. 113 (1973) ............................................................. *passim*

*Rosa v. Prather*,
    103 Ind. 191, 2 N.E. 575 (1885) ................................................ 50

*Sanchez v. State*,
    749 N.E.2d 509 (Ind. 2001) ........................................................ 42

*Schmitt v. F. W. Cook Brewing Co.*,
    187 Ind. 623, 120 N.E. 19 (1918) ....................................... *passim*

*Sepe v. Daneker*,
    68 A.2d 101 (R.I. 1949) ............................................................... 56

*Shields v. Gerhart*,
    658 A.2d 924 (Vt. 1995) ................................................... 37, 39, 56

*Sidle v. Majors*,
    264 Ind. 206, 341 N.E.2d 763 (1976) ................................... 49, 62

*Solarize Ind., Inc. v. S. Ind. Gas & Elec. Co.*,
    182 N.E.3d 212 (Ind. 2022) ................................................... 27, 28

*State v. Econ. Freedom Fund*,
    959 N.E.2d 794 (Ind. 2011) ............................................. 35, 58, 60

*State v. Katz*,
    179 N.E.3d 431 (Ind. 2022) ............................................... *passim*

*State v. Williams*,
    728 N.E.2d 342 (Ohio 2000) ........................................... 37, 40, 56

*Union Twp. Sch. Corp. v. State ex rel. Joyce*,
    706 N.E.2d 183 (Ind. Ct. App. 1998) ........................................ 59

*Warth v. Seldin*,
    422 U.S. 490 (1975) ..................................................................... 31

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

CASES [CONT'D]

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ........................................................ 44

*Welsh v. State,*
    126 Ind. 71, 25 N.E. 883 (1890) ........................................ 40

*Whittington v. State,*
    669 N.E.2d 1363 (Ind. 1996) ....................................... 43, 51

*Whole Woman's Health v. Hellerstedt,*
    136 S. Ct. 2292 (2016) ..................................................... 32

*Wiesenberger v. State,*
    202 Ind. 424, 175 N.E. 238 (1931) ................................... 41

*Willey v. State,*
    52 Ind. 421 (1876) ...................................................... 17, 47

CONSTITUIONAL PROVISIONS

Ind. Const. art. 1, § 1 .................................................*passim*

Ind. Const. art. 1, § 2 ............................................... 37

Ind. Const. art. 1, § 3 ............................................... 37

Ind. Const. art. 1, § 4 ............................................... 37

Ind. Const. art. 1, § 9 ........................................... 31, 51

Ind. Const. art. 1, § 10 .............................................. 37

Ind. Const. art. 1, § 14 .............................................. 31

Ind. Const. art. 1, § 18 .............................................. 38

Ind. Const. art. 1, § 23 ..................................... 13, 20, 22

Ind. Const. art. 2, § 5 ............................................... 50

Ind. Const. art. 4, § 9 ............................................... 38

Ind. Const. art. 16, § 1 .............................................. 38

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

## CODIFIED STATUTES

Ind. Code § 9-19-10-2 .................................................................... 50

Ind. Code § 16-18-2-327.9 ............................................................ 19

Ind. Code § 16-34-2-1(a) ............................................................... 19

Ind. Code § 16-34-2-1(a)(1) .................................................... 19, 61

Ind. Code § 16-34-2-1(a)(1)(B) ............................................... 19, 33

Ind. Code § 16-34-2-1(a)(2) .......................................................... 20

Ind. Code § 16-34-2-1(a)(2)(C) ..................................................... 20

Ind. Code § 16-34-2-1(a)(3) .................................................... 20, 61

Ind. Code § 16-34-2-1(a)(3)(C) ..................................................... 33

Ind. Code § 16-34-2-1(a)(3)(C)–(D) .............................................. 20

Ind. Code § 16-34-2-3 .................................................................... 20

Ind. Code § 16-34-2-3(a) ............................................................... 20

Ind. Code § 16-34-2-3(b) ............................................................... 20

Ind. Code § 16-34-2-3(c)–(d) ........................................................ 20

Ind. Code § 34-13-9-8 .................................................................... 34

Ind. Code § 35-42-1-2.5 ................................................................. 50

Ind. Code § 35-48-4-7 .................................................................... 50

Ind. Rev. Stat., pt. 1, ch. 61, §§ 1-2 (1852) ................................. 16

Ind. Rev. Stat., pt. 1, ch. 6, § 36 (1852) ...................................... 46

## SESSION LAWS

Act of Sept. 17, 1807, ch. 24, in Francis S. Philbrick, *Laws of the Indiana Territory 1801-1809* (1930) ............................................. 16, 45

1818 Ind. Laws, ch. LII, p. 308.............................................. 16, 45

1835 Ind. Laws, ch. XLVII, p. 66, § 3................................... 16, 46

A-26

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

SESSION LAWS [CONT'D]

1859 Ind. Laws, ch. LXXXVI, p. 469, § 2. .............................................. 16, 46

1881 Ind. Acts, ch. 37, p. 177, §§ 22–23 .............................................. 16, 46

1905 Ind. Acts, ch. 169, pp. 663–64, §§ 367–368 .............................. 17, 46

P.L. No. 322, § 1, 1973 Ind. Acts, p. 1741 ..................................... 17, 46, 61

P.L. No. 322, § 2, 1973 Ind. Acts, pp. 1743–46 ...................................... 17

P.L. No. 335, §§ 2–3, 1977 Ind. Acts, pp. 1513–14 ................................. 17

P.L. No. 187-1995, 1995 Ind. Acts, pp. 3327–29 .................................... 18

P.L. No. 98-2014, 2014 Ind. Acts, pp. 1119–24 ..................................... 18

P.L. No. 213-2016, 2016 Ind. Acts, pp. 3099–125 .................................. 18

RULES

Indiana Rule of Appellate Procedure 56(A) ....................................... 12, 13

OTHER AUTHORITIES

1 *Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana* (1850) ........................... 36, 37

2 *Brevier Legislative Reports* (1859).............................................. 46

Maureen L. Condic, *When Does Human Life Begin? The Scientific Evidence and Terminology Revisited*, 8 U. St. Thomas J.L. & Pub. Pol'y 44 (2013)................................................................. 14

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012)................................................................. 49

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

## STATEMENT OF SUPREME COURT JURISDICTION

This Court has jurisdiction over this appeal because it granted transfer under Indiana Rule of Appellate Procedure 56(A).

## STATEMENT OF THE ISSUES

1.     Whether the plaintiffs—three abortion clinics, a pro-abortion support group, and a physician—have standing to challenge a statutory abortion ban on the ground that it allegedly infringes pregnant women's right to abortion.

2.     Whether Article 1, § 1 of the Indiana Constitution secures a judicially enforceable right to abortion that can support a preliminary injunction against enforcement of a statutory abortion ban.

3.     Whether a "potential" constitutional violation inflicts per se harm that justifies bocking enforcement of state law and permitting abortion, notwithstanding the State's valid and compelling interest in preventing the killing of unborn children.

## STATEMENT OF THE CASE

On August 31, 2022, Planned Parenthood Great Northwest, Hawai'i, Alaska, Indiana, Kentucky, Inc.; Women's Med Group Professional Corporation; Whole Woman's Health Alliance; All-Options, Inc.; and Amy Caldwell, M.D. (collectively, the challengers) filed suit in Monroe Circuit Court against Members of the Medical Licensing Board of Indiana, the Hendricks County Prosecutor, the Lake County Prosecutor, the Marion County Prosecutor, the Monroe County Prosecutor, the St. Joseph County Prosecutor, the Tippecanoe County Prosecutor, and the Warrick Country Prosecutor challenging the constitutionality of Senate Bill 1 (S.B. 1) under Article 1,

**A-28**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

§§ 1, 12, and 23 of the Indiana Constitution. App. II 43–64. The challengers contemporaneously moved for a preliminary injunction barring enforcement of S.B. 1. App. II 65–66.

On September 22, 2022, the trial court granted the challengers' preliminary-injunction motion. App. II 42. It prohibited the defendant state officials from enforcing S.B. 1 on the ground that it violated Article 1, § 1 of the Indiana Constitution. App. II 38. The state officials appealed, moved for a stay pending appeal, and sought transfer under Indiana Rule of Appellate Procedure 56(A). On October 12, 2022, this Court granted the motion to transfer and denied the motion to stay.

## STATEMENT OF FACTS

From the time Indiana achieved statehood in 1816 until the U.S. Supreme Court recognized a federal right to abortion in *Roe v. Wade*, 410 U.S. 113 (1973), Indiana prohibited nearly all abortions. It then continued to prohibit many abortions during the nearly 50 years that the U.S. Supreme Court recognized a federal abortion right. After the U.S. Supreme Court overruled *Roe* and held that no federal abortion right existed, Indiana enacted S.B. 1—which recognizes that abortion terminates an unborn child's life—to prohibit nearly all abortions once again.

Despite the State's history of prohibiting abortion for two centuries, the trial court enjoined enforcement of S.B. 1 under Article 1, § 1 of the Indiana Constitution. Although § 1 nowhere mentions abortion and "abortion was not lawful at the time the Indiana Constitution was ratified," the trial court ruled that § 1 should be read to protect abortion nonetheless. App. II 37. "[T]hose who wrote our Constitution," the

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

court stated, had "deficits" so "significant" that their decisions cannot foreclose § 1 "from being interpreted at this point" to protect abortion. *Id.* This appeal concerns whether § 1 secures an abortion right.

## I.    Factual Background

Abortion is the intentional termination of an unborn human life after fertilization. App. II 187, 209–10; App. III 5. At fertilization, the single-celled human, or "zygote," bears a unique molecular composition distinct from its parental gametes, and then "directs *its own* development to more mature stages of human life," producing "increasingly complex tissues, structures and organs that work together." App. II 187–88; *see* App. II 209–10; Maureen L. Condic, *When Does Human Life Begin? The Scientific Evidence and Terminology Revisited*, 8 U. St. Thomas J.L. & Pub. Pol'y 44 (2013). That development happens rapidly.

The first sign of the unborn child's developing brain appears within three weeks of fertilization. App. II 188. In the third week after fertilization, the unborn child develops its own heartbeat. App. II 189. A respiratory system starts to form about a week later. *Id.* "During the sixth week, the preborn baby starts moving, and the first sense develops—touch." App. II 190. "More than 90% of the body parts" form by the end of the eighth week. App. II 191.

At nine weeks, an unborn child starts to exhibit "more complex behaviors, such as thumb-sucking, swallowing, and stretching." App. II 191. The unborn child's lips and nose mature into their adult shape by week eleven, and around that time, the child will start "practic[ing] breathing" and producing "complex facial expressions."

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

App. II 192. By thirteen weeks, the unborn "child can feel pain." App. II 193. Ability

to "hear certain sounds" arrives a week later. *Id.*; *see* App. II 195 (explaining that

preborn babies will respond to "music, reading, and singing").

By nineteen to twenty weeks, unborn children will respond "to taste, tempera-

ture, pain, pressure, movement and light." App. II 194–95. And during the eighth and

ninth months of pregnancy, unborn children spend "almost 40% of the time" "prac-

tic[ing] breathing." App. II 196.

## II.   Statutory and Regulatory Background

### A.   Indiana prohibits abortion from its earliest days until federal law requires it to tolerate abortion

Legal prohibition of abortion stretches back to common law. "At common law,

abortion was criminal in at least some stages of pregnancy and was regarded as un-

lawful and could have very serious consequences at all stages." *Dobbs v. Jackson*

*Women's Health Org.*, 142 S. Ct. 2228, 2248 (2022). "The 'eminent common-law au-

thorities (Blackstone, Coke, Hale, and the like)' *all* describe[d] abortion after quick-

ening," the first felt movement of a baby in the womb, "as criminal," and even pre-

quickening abortions were regarded as unlawful such that they could support a hom-

icide charge under a "proto-felony-murder rule." *Id.* at 2249–50 (citation omitted).

And "English cases dating all the way back to the 13th century corroborate the trea-

tises' statements that abortion was a crime." *Id.*

Even before achieving statehood, Indiana incorporated the English common

law's prohibitions on abortion into its own laws. In 1807, William Henry Harrison,

then Governor of the Indiana Territory, adopted an act declaring that the "Common

15

**A-31**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

Law of England, all statutes or acts of the British Parliament, made in aid of the

Common Law, prior to the fourth year of the reign of King James the first" (with three

exceptions) and of general applicability are "of full force" "until repealed by legislative

authority." Act of Sept. 17, 1807, ch. 24, in Francis S. Philbrick, *Laws of the Indiana*

*Territory 1801–1809*, at 323 (1930). After Indiana achieved statehood in 1816, the

General Assembly reenacted the statute. *See* 1818 Indiana Laws ch. LII, p. 308; *Ledg-*

*erwood v. State*, 134 Ind. 81, 33 N.E. 631, 633 (1893) (observing that Indiana adopted

the common law's criminal provisions "without exception or limitation"). It did not

repeal the common law's criminal prohibitions until 1852. *See* Ind. Rev. Stat., pt. 1,

ch. 61, §§ 1-2 (1852).

In its early days of statehood, Indiana, like "the vast majority of [other] States,"

supplemented the common law's prohibitions on abortion with a statutory ban.

*Dobbs*, 142 S. Ct. at 2252. In 1835, the General Assembly made it a criminal offense

to administer "to any pregnant woman[] any medicine, drug, substance or thing what-

ever . . . with intent thereby to procure the miscarriage of any such woman, unless

the same shall have been necessary to preserve the life of such woman." 1835 Ind.

Laws ch. XLVII, p. 66, § 3. Amendments adopted after the 1851 Constitution's adop-

tion expanded the statute to prohibit a "druggist, apothecary, physician, or other per-

son selling medicine" from selling any "medicine . . . known to be capable of producing

abortion or miscarriage, with intent to produce abortion." 1859 Ind. Laws ch.

LXXXVI, p. 469, § 2. In 1881, the penalty for violating the law was raised from a

misdemeanor to a felony. 1881 Ind. Acts, ch. 37, p. 177, §§ 22–23. And in 1905 the

16

**A-32**

Brief of Appellants

Members of the Medical Licensing Board of Indiana, et al.

legislature made it a crime to "solicit" an abortion or miscarriage. 1905 Ind. Acts ch. 169, pp. 663–64, §§ 367–368.

While those laws were in place, this Court upheld multiple criminal convictions under them. *See, e.g.*, *Willey v. State*, 52 Ind. 421 (1876); *Adams v. State*, 48 Ind. 212 (1874); *Basset v. State*, 41 Ind. 303 (1872); *Carter v. State*, 2 Ind. 617 (1851). And in 1972, it rejected the claim that Indiana's abortion ban violates a right to abortion protected by the federal Ninth Amendment. *See Cheaney v. State*, 259 Ind. 138, 285 N.E.2d 265 (1972). The State, this Court held, has a "valid and compelling" interest in protecting unborn children "from the moment of conception." 285 N.E.2d at 270.

### B.      After *Roe*, Indiana continues to heavily restrict abortion

Only after the U.S. Supreme Court declared there to be a fundamental federal right to abortion in *Roe v. Wade*, 410 U.S. 113 (1973), did the General Assembly amend Indiana's abortion ban to conform to "recent U.S. Supreme Court decisions." P.L. No. 322, § 1, 1973 Ind. Acts, p. 1741. The State, however, disclaimed it was recognizing any "constitutional right to abortion on demand" and continued to outlaw as many abortions as federal law permitted. *Id.*; *see* P.L. No. 322, § 2, 1973 Ind. Acts, pp. 1743–46 (prohibiting abortions to the extent permitted under *Roe*'s trimester framework). The State also imposed medical reporting requirements on abortion providers and outlawed experimentation on aborted fetuses. *See* P.L. No. 322, § 2, 1973 Ind. Acts, pp. 1743–46; P.L. No. 335, §§ 2–3, 1977 Ind. Acts, pp. 1513–14.

17

**A-33**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

In 1992, the State acquired additional authority to protect prenatal life and maternal health when the U.S. Supreme Court upheld Pennsylvania's parental-consent, informed-consent, and 24-hour waiting-period requirements. *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992). After *Casey*, Indiana adopted its own informed-consent and 18-hour waiting-period requirements, as well as new protocols for physicians performing abortions, definitions for medical emergency warranting an abortion, and criminal penalties for violating the abortion code. P.L. No. 187-1995, 1995 Ind. Acts, pp. 3327–29. It also enacted a host of new requirements, including requirements related to hospital admitting privileges, pre-abortion ultrasounds, abortion clinic licensing and inspection, and the disposition of fetal remains. P.L. No. 213-2016, 2016 Ind. Acts, pp. 3099–125; P.L. No. 98-2014, 2014 Ind. Acts, pp. 1119–24. And the State banned abortions sought solely because of an unborn child's race, sex, or disability status. P.L. No. 213-2016, 2016 Ind. Acts, pp. 3115–17.

Some of Indiana's abortion restrictions were ruled contrary to the federal abortion right recognized in *Roe* and *Casey*. *See, e.g.*, *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of Health*, 265 F. Supp. 3d 859, 873 (S.D. Ind. 2017) (enjoining anti-discrimination, information-dissemination, and fetal-disposition provisions), *aff'd*, 888 F.3d 300 (7th Cir. 2018), *reh'g en banc granted in part and judgment vacated*, 727 F. App'x 208 (7th Cir. 2018), *opinion reinstated by evenly divided court*, 917 F.3d 532 (7th Cir. 2018), *rev'd in part sub nom. Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780 (2019) (vacating injunction for fetal-disposition provision, but leaving other provisions enjoined). When Indiana's informed-consent

18

**A-34**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

requirements were challenged under the Indiana Constitution, however, this Court declined to decide whether it provided a corresponding state right to abortion, deeming the requirements lawful regardless. *See Clinic for Women, Inc. v. Brizzi*, 837 N.E.2d 973, 978, 988 (Ind. 2005).

### C.   Indiana reenacts an abortion ban after *Roe* is overruled

In June 2022, the U.S. Supreme Court held that the federal constitution did not confer a right to abortion, overruled *Roe* and *Casey*, and "returned to the people" of Indiana and "their elected representatives" the "authority to regulate abortion." *Dobbs*, 142 S. Ct. at 2279. Shortly thereafter, the General Assembly enacted S.B. 1. S.B. 1, like Indiana's pre-*Roe* statutes, makes most abortions a "criminal act." Ind. Code § 16-34-2-1(a). Under S.B. 1, abortion is permitted in three circumstances only:

First, S.B. 1 permits abortions "before the earlier of viability of the fetus or twenty (20) weeks postfertilization age of the fetus" where (i) "reasonable medical judgment dictates that performing the abortion is necessary to prevent any serious health risk to the pregnant woman or to save the pregnant woman's life" or (ii) "the fetus is diagnosed with a lethal fetal anomaly." Ind. Code § 16-34-2-1(a)(1). A "serious health risk" is one "that has complicated the mother's medical condition and necessitates an abortion to prevent death or a serious risk of substantial and irreversible physical impairment of a major bodily function," but "does not include psychological or emotional conditions." Ind. Code § 16-18-2-327.9. Only hospitals and ambulatory surgical centers may perform abortions under that exception. Ind. Code § 16-34-2-1(a)(1)(B).

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

Second, S.B. 1 permits abortions "at the earlier of viability of the fetus or twenty (20) weeks of postfertilization age and any time after" where "necessary to prevent any serious health risk to the pregnant woman or to save the pregnant woman's life." Ind. Code § 16-34-2-1(a)(3). Because those abortions are performed later in the pregnancy, S.B. 1 imposes some additional requirements. Those include that the abortion be "performed in a hospital" and be "performed in compliance with" Indiana Code § 16-34-2-3. Ind. Code § 16-34-2-1(a)(3)(C)–(D). Indiana Code § 16-34-2-3, in turn, requires the presence of a second physician who is prepared to provide care for any "child born alive as a result of the abortion." Ind. Code § 16-34-2-3(b); *see also* Ind. Code § 16-34-2-3(a), (c)–(d) (imposing additional requirements).

Third, S.B. 1 permits abortions "during the first ten (10) weeks of postfertilization age" where the pregnancy arose from rape or incest. Ind. Code § 16-34-2-1(a)(2). Only hospitals and ambulatory surgical centers may perform those abortions. Ind. Code § 16-34-2-1(a)(2)(C).

## III.   Procedural Background

On August 31, 2022, the challengers here filed a complaint challenging S.B. 1's constitutionality and moved for a preliminary injunction. App. II 43–68. The complaint alleged that (1) S.B. 1 violates a right to abortion secured by Article 1, § 1 of the Indiana Constitution; (2) S.B. 1 violates Article 1, § 23's Equal Privileges and Immunities Clause by requiring abortions to be performed at hospitals and ambulatory surgical centers; and (3) S.B. 1 violates Article 1, § 12's Due Course of Law Clause

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

by failing to make clear whether abortions can be performed after the earlier of viability or 20 weeks postfertilization age. App. II 61–63.

The trial court granted the challengers' motion, preliminarily enjoining enforcement of S.B. 1. App. II 42. Relying on a pair of decisions from 1855 that were later overruled, the court declared that Article 1, § 1 "provides judicially enforceable rights." App. II 34. It then declared that those rights include a right to make "decisions about whether to carry a pregnancy to term." App. II 37. In so declaring, the court conceded that "abortion was not lawful at the time the Indiana Constitution was ratified." *Id.* The court, however, disregarded the State's longstanding criminal prohibitions on abortion on the theory that "those who wrote our Constitution" had "significant . . . deficits . . . particularly as they pertain to the liberty of women and people of color." *Id.* "[B]y today's lights," the court asserted, "the 1851 Constitution" left them "in a state incompatible with fundamental principles of ordered liberty." *Id.*

After pronouncing a right to abortion, the trial court ruled that S.B. 1 "materially burdens" that right by banning most abortions, including elective ones, and requiring abortions to be performed by hospitals and ambulatory surgical centers. App. II 37–38. The court admitted that "the State has an interest in regulating abortion" and a "legitimate" interest in "protecting fetal life." App. II 40–41; *see* App. II 37. But it proclaimed S.B. 1's putative violation of the "constitutional rights of Indiana women and girls" to be a "*per se* irreparable harm" justifying a preliminary injunction regardless of countervailing interests. App. II 40–41.

21

**A-37**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

The trial court did not identify any alternative basis for the preliminary injunction. It rejected the challengers' claim that S.B. 1 discriminates against abortion clinics in violation of Article 1, § 23, and the challengers "withdrew" their Article 1, § 12 claim. App. II 38–39.

## SUMMARY OF THE ARGUMENT

The preliminary injunction preventing enforcement of S.B. 1 on the ground that it violates Article 1, § 1 of the Indiana Constitution cannot stand.

I.     The plaintiff abortion clinics, physician who performs abortions, and pro-abortion support group lack standing to challenge S.B. 1. To have standing, litigants must suffer a direct, personal injury stemming from a violation of *their* legal rights—not a third party's. Here, however, the plaintiffs do not allege a violation of their rights. They allege a violation of a *pregnant woman's* right to abortion.

This Court—which has never endorsed precedent permitting a litigant to assert another's private constitutional rights—should not adopt federal third-party standing. Carving out an exception to the traditional rule that litigants must assert their own private rights would undermine the separation of powers, dull the presentation of issues, induce confusion about who is bound by decisions, and produce doctrinal inconsistencies.

Enforcing traditional limits on federal third-party standing would require dismissal in any event. The plaintiffs here have not identified specific pregnant women on whose behalf they allegedly sue; the plaintiffs' interests are potentially in conflict

**A-38**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

with those of the women they purport to represent; and there is no reason why preg-

nant women seeking abortions prohibited by S.B. 1 cannot sue themselves.

II.     The plaintiffs' claim also fails on the merits. Article 1, § 1 of the Indiana

Constitution does not confer any judicially enforceable rights. Section 1 instead de-

clares first principles concerning people's natural rights before "their CREATOR," the

origin of government, and its purposes. As the framers recognized, § 1 does "not con-

travene the power of man" by "law" to limit the exercise of any natural rights. Section

1's theorizing stands in sharp contrast to other constitutional provisions providing

that citizens "shall" have specific, enumerated liberties.

Construing § 1 as enforceable would allow litigants to circumvent deliberate

decisions about which rights to protect in Article 1 and how to frame them. It would

raise inscrutable questions about why § 1 protects a "liberty" right that includes abor-

tion, but why § 1's mention of an "inalienable right" to "life" does not protect unborn

children from being killed. It would pit § 1's mention of an "indefeasible right" to

amend the state government "at all times" against constitutional provisions restrict-

ing how and when the Constitution can be amended. And reading § 1 as enforceable

would produce interminable disputes about what it protects, since it provides no ob-

jective standard for determining what might be included in a right to "life, liberty,

and the pursuit of happiness."

In ruling that § 1 is judicially enforceable, the trial court did not attempt to

explain away the textual, structural, and practical difficulties with its ruling. It in-

stead relied on two decisions from 1855 without mentioning that this Court overruled

**A-39**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

them more than a century ago. Embracing the trial court's view would require repudiating a long line of precedent explaining that courts cannot hold statutes unconstitutional unless they violate a specific constitutional guarantee.

III.     Section 1 does not confer a right to abortion in any event. To the extent § 1 confers enforceable rights, this Court's precedent makes clear that "text and history" must show the "founding generation" would have recognized the putative right as fundamental. *Price v. State*, 622 N.E.2d 954, 959 n.4 (Ind. 1993). As the trial court admitted, however, there is no textual or historical evidence of an abortion right. Indeed, Indiana regarded abortion as criminal before, during, and after the 1816 and 1851 Constitutions were drafted, debated, and ratified.

The trial court sought to justify its disregard of text and history with the statement that "those who wrote our Constitution" had "significant . . . deficits." Under this Court's precedents, however, the Constitution must be enforced as written. Judges cannot disregard the Constitution whenever they deem it or its drafters deficient. The trial court, moreover, offered no viable alternative to text and history. It purported to find the framing generation deficient, but it could not explain why subsequent generations—including the current one—continued to outlaw abortion. Nothing but the trial court's disagreement with S.B. 1 undergirds the decision below.

The trial court's assertion that Hoosiers generally value "self-determination," "bodily autonomy," and "privacy" cannot rescue its decision. This Court's precedents demand a showing that the founding generation recognized the specific right as-

**A-40**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

serted, not liberty generally. Self-determination, bodily autonomy, and privacy—interests that nearly all state laws affect—are not recognized constitutional rights in any event. And even if they were, S.B. 1—which concerns a single, narrow issue within those enormous categories—would not materially burden such rights by preventing them from serving their purpose. It would merely qualify their exercise.

Because there is no constitutional right to abortion, S.B. 1 is a legitimate exercise of the State's police power. Consistent with Indiana's historical abortion regulations, it furthers a compelling interest in protecting unborn children.

IV.    Merits aside, the requirements for preliminary injunctive relief are not satisfied. The trial court ruled the alleged violation here inflicts per se irreparable harm. But irreparable harm cannot be presumed—at least without a showing that the challenged conduct is clearly unlawful and against the public interest. S.B. 1, however, is neither. And the challengers cannot show that their legal remedies are inadequate by pointing to effects on third parties.

"[V]alid and compelling" state interests, including an interest in protecting unborn children from "the moment of conception," also preclude issuance of an injunction. *Cheaney v. State*, 259 Ind. 138, 285 N.E.2d 265, 270 (1972). That federal law once required Indiana to tolerate abortions is no reason to override elected representatives' determination of where the public interest lies.

25

**A-41**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

## ARGUMENT

The order below finding a novel right to abortion amounts to a judicial amendment of the Indiana Constitution. The Constitution nowhere declares a right to abortion, and the Constitution's framers regarded abortion as a criminal act that destroys innocent human life. As even the trial court admitted, "abortion was not lawful at the time the Indiana Constitution was ratified." App. II 37.

That admission should have been the end of the matter. As this Court explained more than a century ago, the judiciary cannot declare a statute unconstitutional "which violates no provision of the . . . state Constitution." *Schmitt v. F. W. Cook Brewing Co.*, 187 Ind. 623, 120 N.E. 19, 22 (1918) (quoting *Churchman v. Martin*, 54 Ind. 380, 383–84 (1876)). The Indiana Constitution is not "an elastic instrument of no particular rigidity, which stretches to meet the demands of the moment." *Finney v. Johnson*, 242 Ind. 465, 179 N.E.2d 718, 721 (1962). So constitutional rights must be rooted in the constitutional text, as illuminated by history. *Price v. State*, 622 N.E.2d 954, 957, 959 n.4 (Ind. 1993). Thus, when confronted with individual-rights claims, this Court has "examined *text* and *history* to determine whether . . . the *founding generation*" would have recognized a putative right. *Id.* at 959 n.4 (emphasis added); *see City Chapel Evangelical Free Inc. v. City of S. Bend ex rel. Dep't of Redevelopment*, 744 N.E.2d 443, 447, 450 (Ind. 2001).

Rather than apply the constitutional text, history, and binding precedent, the trial court disregarded all three. It tried to justify its departure on the ground that, "by today's lights," "those who wrote our Constitution" had "significant . . . deficits."

26

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

App. II 37. Judges, however, may not invent new "rights" whenever the Constitution strikes them as "deficient." Rather, judges "must enforce the Constitution as written and intended." *Bd. of Trustees of Pub. Employees' Ret. Fund of Ind. v. Pearson*, 459 N.E.2d 715, 717 (Ind. 1984). That principle forecloses the trial court's decision to recognize a novel right to abortion that lacks any support in the constitutional text and that history shows the founding generation would never have recognized.

## I. Plaintiffs Lack Standing To Assert an Article 1, § 1 Claim

Although the trial court's open rejection of constitutional boundaries is its most egregious error, standing is a "threshold" obstacle to upholding the decision below. *Solarize Ind., Inc. v. S. Ind. Gas & Elec. Co.*, 182 N.E.3d 212, 216 (Ind. 2022). The decision below declares that, in violation of Article 1, § 1, S.B. 1 infringes "*a woman's right to determine whether she will carry a pregnancy to term.*" App. II 34 (emphasis added). But none of the plaintiffs here are pregnant women seeking abortions prohibited by S.B. 1. The plaintiffs are instead abortion providers and advocates who assert no Article 1, § 1 rights of their own and who therefore lack standing to bring a § 1 claim. The plaintiffs' standing to seek a preliminary injunction is reviewed de novo. *See City of Gary v. Nicholson*, 190 N.E.3d 349, 351 (Ind. 2022).

### A. Plaintiffs do not allege personal, direct injury from a violation of their own rights

Because standing requirements are "vital" to preserving the "separation of powers," a plaintiff must be a "proper person to invoke a court's authority." *Horner v. Curry*, 125 N.E.3d 584, 589 (Ind. 2019). The plaintiff must have a "personal stake in the outcome of the litigation," *Solarize*, 182 N.E.3d at 217 (quoting *Bd. of Comm'rs of*

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

*Union Cty. v. McGuinness*, 80 N.E.3d 164, 168 (Ind. 2017)), and suffer a "personal, direct" injury from the alleged unlawful action, *Holcomb v. Bray*, 187 N.E.3d 1268, 1286 (Ind. 2022); *see City of Gary*, 190 N.E.3d at 351. Standing "denies the courts any jurisdiction absent an actual injured party participating in the case." *Pence v. State*, 652 N.E.2d 486, 488 (Ind. 1995).

Typically, a plaintiff suffers injury only if *the plaintiff's* legal rights were violated. *McGuinness*, 80 N.E.3d at 168–69; *see City of Gary*, 190 N.E.3d at 351 (explaining a generic interest in legal compliance was not an "'individual right' vindicable in the courts" (citation omitted)); *Solarize*, 182 N.E.3d at 219–20 (requiring challenger to show it was "personally affected by the[] particular filings" at issue); *City of Indianapolis v. Ind. State Bd. of Tax Comm'rs*, 261 Ind. 635, 308 N.E.2d 868, 870 (1974) (holding a "non-taxpaying municipal corporation" cannot "allege any injury to a legally protected interest" from a decision burdening taxpayers). As this Court has observed, "[c]onstitutional rights are personal, and violation of a third party's constitutional rights cannot be claimed." *Adler v. State*, 248 Ind. 193, 225 N.E.2d 171, 172 (1967); *see Leonard v. State*, 249 Ind. 361, 232 N.E.2d 882, 885 (1968). This Court thus will not "pass on the constitutionality of a statute until a constitutional determination is necessarily and directly involved in a justiciable controversy and is essential to the protection of the *rights of the parties concerned*." *Ind. Educ. Emp't Relations Bd. v. Benton Cmty. Sch. Corp.*, 266 Ind. 491, 365 N.E.2d 752, 754 (1977) (emphasis added).

**A-44**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

In this case, however, the plaintiffs—three abortion clinics, a physician who performs abortions, and a pro-abortion support group, App. II 46–48, 110–11, 115–16, 119–20, 123, 140—do not allege any personal injury resulting from a violation of *their* rights. They instead allege that S.B. 1 violates "*a woman's* right to determine whether she will carry a pregnancy to term." App. II 34 (emphasis added); *see, e.g.*, App. II 45 (alleging S.B. 1 "strips away the fundamental rights of *people seeking abortion care*" (emphasis added)); App. II 61 (alleging "S.B. 1 prohibits Plaintiffs' *patients and clients* from exercising their fundamental right to privacy, which encompasses the right to abortion" (emphasis added)); App. II 89, 93 (arguing S.B. 1 violates a putative "right to abortion" by preventing women from "deciding whether to continue with a pregnancy and bear a child"). Because the current challengers to S.B. 1 do not seek to exercise that putative right themselves, none have the requisite personal stake to challenge S.B. 1 under Article 1, § 1 of the Indiana Constitution.

## B.   The Court should not embrace federal third-party standing

Relying on federal precedent, some Indiana Court of Appeals decisions hold that a "litigant may raise a claim on behalf of a third party if the litigant can demonstrate that he has suffered a concrete, redressable injury, that he has a close relation with the third party, and that there exists some hindrance to the third party's ability to protect his own interests." *Osmulski v. Becze*, 638 N.E.2d 828, 834 (Ind. Ct. App. 1994) (citing *Powers v. Ohio*, 449 U.S. 400, 411 (1991)); *see also, e.g.*, *Planned Parenthood of Indiana v. Carter*, 854 N.E.2d 853, 870 (Ind. Ct. App. 2006). But this Court has never endorsed decisions permitting a plaintiff to assert another party's

**A-45**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

private constitutional rights. *See McGuinness*, 80 N.E.3d at 168–69. And sound rationales support the traditional rule that a "violation of a third party's constitutional rights cannot be claimed." *Adler*, 225 N.E.2d at 172.

First, the traditional requirement that a plaintiff suffer a personal injury is "vital" for maintaining "the separation of powers." *Horner*, 125 N.E.3d at 589. That requirement serves to prevent courts from intruding into the province of the political branches and from interfering with democratic self-governance. *See id.* at 589–90. As this Court observed nearly two centuries ago, "it would be a perversion of the purposes for which the[ courts] are instituted, and an assumption of functions that do not belong to them, to undertake to settle abstract questions of law." *Brewington v. Lowe*, 1 Ind. 21, 23 (1848). That is why, this Court has long insisted, courts may only decide questions "bearing upon the *rights of the parties*" that concern "some individual right, *directly affecting the parties litigant*." *Id.* (emphasis added).

Allowing litigants to assert the private rights of third parties would undermine the separation of powers. Where a litigant's own rights have not been invaded, the litigant's interest is no different than "that of the general public." *Pence*, 652 N.E.2d at 488. It is an "undifferentiated public interest in . . . compliance with the law." *City of Gary*, 190 N.E.3d at 351 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 577 (1992)). Permitting litigants to assert another's right thus risks having the courts being "called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual

30

**A-46**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

rights." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). That danger is reason enough to avoid recognizing third-party standing: "'Good fences make good neighbors,' after all." *Horner*, 125 N.E.3d at 589–90 (quoting *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 240 (1995)); *see id.* at 612–16 (Slaughter, J., concurring).

Second, the traditional rule ensures that the individuals "who would be chiefly affected by [a] decision" have an "opportunity of being heard," *Brewington*, 1 Ind. at 23, preventing situations in which those advocating for a position have "very different interests from the individuals whose rights they are asserting," *Kowalski v. Tesmer*, 543 U.S. 125, 135 (2004) (Thomas, J., concurring); *cf. Ind. Educ. Emp't Relations Bd.*, 365 N.E.2d at 754 (explaining standing ensures "that litigation will be actively and vigorously contested" without "collusion or attempts to obtain advisory opinions").

Third, the traditional rule avoids hard questions about who is bound by a judicial decision—the actual litigants in a case? The absent third parties whose rights are being asserted?

Permitting the plaintiffs here to assert the putative constitutional rights of third parties would wreak doctrinal havoc. It would create a situation in which some individual rights can be asserted by third parties but not others. *See, e.g.*, *Price v. State*, 622 N.E.2d 954, 958 (Ind. 1993) (holding that parties cannot use overbreadth doctrine to assert the speech rights of third parties under Article 1, § 9); *Leonard*, 232 N.E.2d at 885–86 (declining to permit a litigant to assert a self-incrimination right protected by Article 1, § 14 belonging to a third party); *Adler*, 225 N.E.2d at 172 (refusing to allow third parties to assert a right against unreasonable searches). The

31

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

federal courts' struggle to find principled limits to third-party standing, and the "se-

rious anomalies" it has created in federal law, illustrates why this Court should not

attempt an experiment with exceptions to traditional standing principles. *Whole*

*Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2322 (2016) (Thomas, J., dissenting)

("Lawyers cannot vicariously assert potential clients' Sixth Amendment rights be-

cause they lack any current, close relationship. Yet litigants can assert potential ju-

rors' rights against race or sex discrimination in jury selection even when the litigants

have never met potential jurors and do not share their race or sex." (citation omitted)).

### C. The plaintiffs cannot satisfy the usual requirements for third-party standing regardless

The plaintiffs cannot satisfy the usual requirements for third-party standing

regardless, including that they have "a close relation with the third party" and that

"there exists some hindrance to the third party's ability to protect his own interests."

*Osmulski*, 638 N.E.2d at 834; *see Powers*, 449 U.S. at 411. Although some decisions

have relaxed those traditional requirements for abortion, *Whole Woman's Health*, 136

S. Ct. at 2323 (Thomas, J., dissenting), those cases simply "ignored the [U.S. Su-

preme] Court's third-party standing doctrine," *Dobbs v. Jackson Women's Health*

*Org.*, 142 S. Ct. 2228, 2275 (2022). Whatever else, this Court should not embrace

standing theories giving preferential treatment to abortion providers. The "notion"

that some rights "occup[y] a 'preferred' position" finds no support in the "history and

structure of the Indiana Constitution." *Price*, 622 N.E.2d at 958.

Enforcing the traditional limits on third-party standing, as understood outside

the abortion context, would require dismissal. Although the plaintiff abortion clinics

**A-48**

and Caldwell purport to sue on behalf of "current and future patients," App. II 48, none have identified specific pregnant women currently seeking abortions from them prohibited by S.B. 1. Traditionally, a relationship with "hypothetical" clients is not enough to create a close relationship. *Kowalski*, 543 U.S. at 131 (holding a lawyer could not sue on behalf of hypothetical clients); *see Diamond v. Charles*, 476 U.S. 54, 66–67 (1986) (holding a physician lacked standing to defend an abortion law on behalf of either his daughter or future patients). And All-Options, a support organization that does not provide abortions, cannot even claim to sue on behalf of unspecified hypothetical patients. *See* App. II 47–48.

Potential conflicts of interest disqualify the abortion clinics and Caldwell from asserting the rights of pregnant women as well. S.B. 1 requires abortions to be performed at hospitals or ambulatory surgical centers, Ind. Code § 16-34-2-1(a)(1)(B), (a)(3)(C), in part because those facilities can provide a "safer environment" and better "continuity of care" for women, App. III 51, 54. That places the interests of women in potential conflict with those of the plaintiff abortion clinics and Caldwell, who performs abortions at clinics, disqualifying them from asserting women's rights. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 (2004) (refusing third-party standing where the interests of the parent and child were "potentially in conflict").

Additionally, the plaintiffs have identified no reason pregnant women desiring abortions could not challenge S.B. 1 themselves. A genuine hindrance is something that "signals that the rightholder did not simply decline to bring the claim on his own

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

behalf, but could not in fact do so." *Miller v. Albright*, 523 U.S. 420, 450 (1998) (O'Con-
nor, J., concurring). No such hindrance exists here. State courts provide pregnant
women seeking abortions "open avenues" for challenging S.B. 1. *Kowalski*, 543 U.S.
at 132–33 (holding attorneys lacked standing to challenge state procedure for ap-
pointing counsel because their potential clients could challenge it). Indeed, some non-
pregnant women have already (albeit, prematurely, in the State's view) challenged
S.B. 1 on the ground that it violates their statutory rights. *See Anonymous Plaintiffs
1–5 v. The Individual Members of the Medical Licensing Board of Indiana*, No. 49D01-
2209-PL-031056 (Marion Super. Ct.) (asserting claims under Ind. Code § 34-13-9-8).

## II.   Article 1, § 1 of the Indiana Constitution Does Not Confer Judicially Enforceable Rights

The plaintiffs cannot succeed on their claim that S.B. 1 violates Article 1, § 1
of the Indiana Constitution. As the text, structure, and constitutional debates demon-
strate, that provision is a precatory statement of political philosophy and does not
confer any judicially enforceable rights. The only support the trial court offered for
its contrary view was two decisions from 1855 striking down liquor laws. More than
100 years ago, however, this Court overruled those decisions as unprincipled exer-
cises of judicial fiat. The judiciary, it explained, may not invalidate a statute that
violates no specific textual guarantee even if it offends someone's general sense of
liberty. That reasoning forecloses the trial court's attempt to wield § 1's generic men-
tion of "liberty" to enjoin a statute that violates no enumerated constitutional right.
And it means that the plaintiffs cannot satisfy the requirement for a preliminary in-
junction of showing a "reasonable likelihood of success"—an issue reviewed de novo.

**A-50**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

*State v. Econ. Freedom Fund*, 959 N.E.2d 794, 803 (Ind. 2011); *see id.* at 800 ("An

abuse of discretion occurs when the trial court misinterprets the law").

### A.   The constitutional text, structure, and debates demonstrate that § 1 is not judicially enforceable

Article 1 § 1 of the Constitution does not enumerate individual rights enforce-

able by the judiciary. It expresses a basic philosophy of government and the relation-

ship between the individual and the State, but it does not include specific protections

against governmental overreach. It states the fundamental frame of political society

in broad terms:

> WE DECLARE, That all people are created equal; that they are endowed by
> their CREATOR with certain inalienable rights; that among these are life, lib-
> erty, and the pursuit of happiness; that all power is inherent in the people; and
> that all free governments are, and of right ought to be, founded on their au-
> thority, and instituted for their peace, safety, and well-being. For the advance-
> ment of these ends, the people have, at all times, an indefeasible right to alter
> and reform their government.

Ind. Const. art. 1, § 1.

Section 1 reflects the "natural rights philosophy that informs the Indiana Con-

stitution." *State v. Katz*, 179 N.E.3d 431, 447 (Ind. 2022). It acknowledges the exist-

ence of "inalienable rights" with which people are "endowed by their CREATOR." It

recognizes the "inherent" repository of "all power," namely "in the people." From these

Lockean first principles, § 1 "DECLARES" the origins and ends of government, *i.e.,* a

"free government[]" "founded on" "the authority" of "all people" and "instituted for

their peace, safety and well-being." Section 1 itself, however, does not purport to de-

scribe how the government will be structured to achieve those ends, what specific

powers it will have, or what rights citizens will retain after "ced[ing] a quantum of

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

their 'natural' rights." *Price v. State*, 622 N.E.2d 954, 958–59 (Ind. 1993). Those are all matters the Constitution addresses elsewhere.

As delegates to the constitutional convention observed, § 1 reflects "the sentiment . . . found in the Declaration of Independence" and Indiana's "theory of civil government." 1 *Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana* 955 (1850) (*Debates of the Convention*); *see id.* at 956–57, 969, 972. It describes "the rights of man as existing under the law of nature"—*i.e.*, before the institution of government—declaring all people to be free and equal. *Id.* at 959. Delegates, however, acknowledged that the political fundamentals expressed in § 1 might not yield "practically true or theoretically true" outcomes for every individual in a governed society. *Id.* at 955; *see id.* at 963–64 (observing "this grave *political idea* . . . is a truth too far in advance of the age").

Debate records also make clear that § 1 did not purport to describe the enforceable rights citizens held under "the laws of man," such as those retained after the 1851 Constitution's adoption. 1 *Debates of the Convention*, *supra*, at 959. The delegates understood civil government had the power to "restrain[]" citizens "from exercising the rights that naturally belong" to them. *Id.* at 967; *see id.* at 138 ("It is evident that it would not do to allow all men the unrestrained and unrestricted exercise of their natural rights"); *id.* at 305, 502, 701 (describing the Constitution itself as a restriction on natural rights). As John B. Howe observed, it would be a "misapprehension" to read § 1 as anything but an acknowledgment of rights held under the "laws of nature." *Id.* at 972–73. Section 1, he explained, did "not contravene the power of

36

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

man[,] . . . by the public or municipal laws of States, to divest other men of those rights." *Id.* at 973. Accordingly, § 1 cannot be read as a "self-executing provision . . . subject to judicial enforcement." *State v. Williams*, 728 N.E.2d 342, 354 (Ohio 2000) (addressing a similar Ohio constitutional provision); *see Shields v. Gerhart*, 658 A.2d 924, 929 (Vt. 1995) (holding a similar Vermont constitutional provision does not establish "any right amenable to legal enforcement" but lists "philosophical truisms").

The constitutional structure confirms § 1 is not enforceable. Section 1 "DE-CLARES" certain broad principles of government. By contrast, all other provisions in Article 1 state that Hoosiers "shall" have specific, enumerated rights, *see, e.g.*, Ind. Const. art. 1, § 2 ("All people shall be secured in the natural right to worship . . ."), § 3 ("No law shall . . . control the free exercise and enjoyment of religious opinions . . ."), § 4 ("No preference shall be given, by law, to any creed, religious society, or mode of worship . . ."), or "may" take specific actions, Ind. Const. art. 1, § 10 ("In all prosecutions for libel, the truth of the matters alleged . . . may be given in justification"). The textual differences between § 1's sweeping declarations of fundamental truths and the specific and mandatory language of §§ 2 to 37 are stark.

Reading § 1 as an enforceable provision, moreover, would wreak havoc on the constitutional structure. Treating § 1 as an enforceable right would permit litigants to circumvent the framers' deliberate choices about which rights to include in Article 1 and how to frame them. Litigants unsatisfied with the speech rights afforded by § 9 or search protections afforded by § 11 could simply invoke § 1's capacious reference to "life, liberty, and the pursuit of happiness" instead.

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

The consequences of treating § 1 as enforceable go well beyond its impact on Indiana's Bill of Rights. Section 1 says "the people have, at all times, an indefeasible right to alter and reform their government." Ind. Const. art. 1, § 1. If that were enforceable, constitutional provisions governing the process, *see* Ind. Const. art. 16, § 1, and timing of constitutional amendments, *see* Ind. Const. art. 4, § 9; *Holcomb v. Bray*, 187 N.E.3d 1268, 1277–84 (Ind. 2022), would be vitiated. Hoosiers could simply invoke their "indefeasible right" to alter their government "at all times." The only coherent way to read § 1 is as an unenforceable statement of political theory intended to guide courts' understanding of more specific, enforceable provisions.

Section 1 also says Hoosiers have an "inalienable" right to "life." But the Indiana Constitution has never been understood to prohibit the death penalty, even though Article 1, § 18 directs criminal penalties to be founded on "principles of reformation." *See, e.g.*, *Ritchie v. State*, 809 N.E.2d 258, 261 (Ind. 2004); *Judy v. State*, 275 Ind. 145, 416 N.E.2d 95, 105 (1981); *Driskill v. State*, 7 Ind. 338, 343 (1855); *Rice v. State*, 7 Ind. 332, 338 (1855). Besides, if a God-given "inalienable right" to "life" exists, would not unborn children also have that right? The trial court's decision offers no explanation of how § 1 can be construed to provide a judicially enforceable right to abortion while not also giving unborn children a judicially enforceable right to life.

Other difficulties with construing § 1 as judicially enforceable abound. Attempting to enforce § 1's capacious references to "life, liberty, and the pursuit of happiness" and "all power [being] inherent in the people" would place the judiciary in a

38

Brief of Appellants

Members of the Medical Licensing Board of Indiana, et al.

policymaking role contrary to separation-of-powers principles. Section 1 itself provides no "standard that c[an] be routinely and uniformly applied." *Doe v. O'Connor*, 790 N.E.2d 985, 991 (Ind. 2003). Plainly, "opinions as to what constitutes natural rights greatly differ, and if courts should assume the function of revising the acts of the legislature, on the ground that they invaded natural rights, a conflict would arise which could never end, for there is no standard by which the question could be finally determined." *Hedderich v. State*, 101 Ind. 564, 1 N.E. 47, 47–48 (1885).

This case illustrates that danger. The trial court conceded that "those who wrote our Constitution" did not believe it protected a right to abortion. App. II 37. In fact, they outlawed abortion. *Id.*; *see* pp. 15–17, *supra*. The trial court nonetheless ruled that § 1 protects abortion because *it* regarded abortion as a core value "by today's lights," App. II 37, even though Hoosiers' elected representatives have consistently rejected that view from the State's founding until now, including through S.B. 1's enactment, *see* pp. 15–20, *supra*. Permitting judicial enforcement of § 1 paves the way for individual judges to read into the Constitution whatever values they happen to like, without regard for traditional tools of constitutional interpretation.

The danger is particularly acute considering that § 1 describes not only "life" and "liberty" as "inalienable rights" but also "the pursuit of happiness." If § 1 were judicially enforceable, litigants would be able to "call the state to task for infringing the right to pursue happiness, which makes no sense within a traditional conception of ordered liberty." *Gerhart*, 658 A.2d at 929. "Happiness is such a broad concept that

39

**A-55**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

no court could ever adequately protect every individual's happiness without transgressing the happiness of another." *Williams*, 728 N.E.2d at 354. This Court should not allow parties to use § 1 to circumvent deliberate choices about which constitutional powers to grant the State and which constitutional liberties to protect.

### B. The overruled decisions cited by the trial court provide no persuasive reason for holding that § 1 is enforceable

The trial court's decision provides no persuasive reason for treating § 1 as judicially enforceable. The court nominally recognized that "interpretation of the Indiana Constitution is controlled by the text itself, illuminated by history and by the purpose and structure of our constitution and the case law surrounding it." *Price*, 622 N.E.2d at 957; *see* App. II 34 ("a court must examine the language of the provision in light of the history surrounding the drafting and its ratification as well as its purpose"). But the trial court eschewed § 1's text, the constitutional structure, and ratification-era history.

The trial court instead cited *Beebe v. State*, 6 Ind. 501 (1855), and *Herman v. State*, 8 Ind. 545 (1855), which invalidated state liquor laws as contrary to common-law rights. App. II 34. More than a century ago in *Schmitt v. F. W. Cook Brewing Co.*, 187 Ind. 623, 120 N.E. 19 (1918), however, this Court repudiated *Beebe* and the "cases following" because it could not determine "on what principle the court was acting." 120 N.E. at 21. Every law, the Court observed, "is a restriction upon the common-law right of the individual citizen." *Id.* at 22 (quoting *Welsh v. State*, 126 Ind. 71, 25 N.E. 883, 885 (1890)). But "'the judicial department cannot hold'" void a statute that "'violates no provision of the federal or state Constitution,'" even if it is "repugnant to

40

**A-56**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

general principles of justice, liberty, and rights not expressed in the Constitution."

*Id.* at 20, 22 (quoting *Churchman v. Martin*, 54 Ind. 380, 383–84 (1876)). *Beebe*, the

Court explained, had ignored that principle when it invalidated a liquor law, even

though neither it nor "any [other] decision of this Court" had identified a "particular

provision of the Constitution" that "forbids the prohibition of the manufacture and

sale of intoxicating liquor." *Id.*

The principles announced in *Schmitt* foreclose using § 1 to hold legislation un-

constitutional. As *Schmitt* explains, a court may declare a statute unconstitutional

only if violates a "particular provision of the Constitution." 120 N.E. at 22. It is not

enough to allege that the law offends "general principles of justice, liberty, and

rights." *Id.* at 20. Here, however, all that the plaintiffs allege is a violation of § 1's

general reference to "liberty." App. II 34; *see* App. II 89 ("By protecting the inalienable

right to liberty, Article 1, section 1 confers on Hoosiers the freedom to live their pri-

vate lives as they see fit, without unnecessary government interference."). That is

precisely the sort of "general principle[]" that *Schmitt* deemed insufficient for declar-

ing legislation unconstitutional.

Holding that § 1 is judicially enforceable would require repudiating *Schmitt*

and many decisions since. Whatever the judicial philosophy might have been when

*Beebe* and *Herman* were decided, it is now firmly established that the State "may

subject persons and property to restraints and burdens" that "impair 'natural rights.'"

*Price*, 622 N.E.2d at 959 (quoting *Wiesenberger v. State*, 202 Ind. 424, 175 N.E. 238,

41

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

240 (1931)). Constitutional claims cannot be rooted in the "shifting sands of philo-sophical inquiry" but must "'have their origin in the express terms of the constitution or which are necessarily to be implied from those terms.'" *Id.* at 959 n.4 (quoting *O'Brien v. State*, 422 N.E.2d 1266, 1270 (Ind. Ct. App. 1981)); *see Sanchez v. State*, 749 N.E.2d 509, 516 (Ind. 2001) ("constitutional rights not grounded in a specific con-stitutional provision should not be readily discovered"). This Court should not sweep aside decades of precedent by transforming § 1 into a self-executing guarantee of whatever rights someone now believes are part of "life, liberty, and the pursuit of happiness."

### III. Any Rights Secured by Article 1, § 1 of the Indiana Constitution Do Not Include a Right to Abortion

In no event does § 1 protect a right to abortion—a practice prohibited as crim-inal before, during, and after the adoption of Indiana's 1816 and 1851 Constitutions. The trial court's recognition of a novel abortion right rests on the unprecedented no-tion that judges can disregard constitutional limits that offend their sensibilities.

#### A. To the extent that § 1 secures any rights, it protects only rights with textual and historical support

This Court long ago rejected the view that the Indiana Constitution is "an elas-tic instrument of no particular rigidity, which stretches to meet the demands of the moment." *Finney v. Johnson*, 242 Ind. 465, 179 N.E.2d 718, 721 (1962). Instead, "[i]nterpretation of the Indiana Constitution is controlled by the text itself, illumi-nated by history and by the purpose and structure of our constitution and the case law surrounding it." *State v. Katz*, 179 N.E.3d 431, 443 (Ind. 2022) (quoting *Price v.*

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

*State*, 622 N.E.2d 954, 957 (Ind. 1993)). Thus, when confronted with individual-rights claims under § 1, this Court has "examined *text* and *history* to determine . . . whether the *founding generation* would have considered" the asserted right to be "fundamental or 'natural.'" *Price*, 622 N.E.2d at 959 n.4 (emphasis added); *see City Chapel Evangelical Free Inc. v. City of S. Bend ex rel. Dep't of Redevelopment*, 744 N.E.2d 443, 447, 450 (Ind. 2001).

In undertaking that textual and historical analysis, moreover, this Court has focused on the specific "type" of right asserted. *Katz*, 179 N.E.3d at 448; *see, e.g.*, *id.* at 448–50 (asking whether non-consensual expression involving "private, sexual activity" was protected, not expression generally); *Whittington v. State*, 669 N.E.2d 1363, 1370 (Ind. 1996) (distinguishing between speech "focuse[d] on the conduct of a private party" and "political" speech); *Price*, 622 N.E.2d at 959–61 & n.9 (asking whether pure "political speech" was protected, not "speech generally"). To establish that § 1 protects a right to abortion, it therefore is not enough to demonstrate that the founding generation valued liberty, autonomy, or privacy in some or even many contexts. Rather, "text" and "history" must demonstrate that the "founding generation" considered abortion specifically to be a protected core value. *Price*, 622 N.E.2d at 959 n.4; *see Doe v. Town of Plainfield*, 893 N.E.2d 1124, 1131–32 (Ind. Ct. App. 2008) (demanding evidence the founding generation specifically recognized a constitutional "right to enter public parks for legitimate purposes").

Requiring that particularized historical showing is critical to preserving the separation of powers. Section 1, unlike other provisions in Indiana's Bill of Rights,

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

provides no textual guideposts for determining what constitutes an enforceable inter-

est in "life, liberty, and the pursuit of happiness." The only way to prevent § 1 from

becoming a vehicle for amending the Constitution by judicial fiat is to examine "*text*

*and history* to determine whether a given interest is of such a quality that *the found-*

*ing generation* would have considered it fundamental or 'natural.'" *Price* 622 N.E.2d

at 959 n.4 (emphasis added). That is precisely why federal substantive due-process

decisions require a "'careful description' of the asserted fundamental liberty interest"

and a showing that it is "objectively, deeply rooted in this Nation's history and tradi-

tion." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (citations omitted); *see*

*Chavez v. Martinez*, 538 U.S. 760, 775 (2003); *Kerry v. Din*, 576 U.S. 86, 93 (2015)

(Scalia, J., joined by Roberts, C.J., and Thomas, J.). Without an objective standard to

guide a § 1 analysis, "Indiana constitutional jurisprudence" would be cast upon the

uncertain, "shifting sands of philosophical inquiry." *Price*, 622 N.E.2d at 959 n.4.

### B.   No text or history supports a right to abortion

No text or history even remotely suggests that the framers of the 1816 or 1851

Constitutions recognized a right to abortion—and neither the trial court nor plaintiffs

have purported to identify any. Neither § 1 nor any other constitutional provision

mentions a right to abortion—or even a more general right to privacy or bodily au-

tonomy. And as the trial court conceded, "abortion was not lawful at the time the

Indiana Constitution was ratified." App. II 37.

Indeed, Indiana law has consistently treated abortion as a criminal act

throughout the State's existence. "At common law, abortion was criminal in at least

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

some stages of pregnancy and was regarded as unlawful and could have very serious consequences at all stages." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2248 (2022). Indiana expressly incorporated those prohibitions on abortion into its own laws as early as 1807 with its common-law reception statute. *See* Act of Sept. 17, 1807, ch. 24, in Francis S. Philbrick, *Laws of the Indiana Territory 1801–1809*, at 323 (1930); 1818 Indiana Laws ch. LII, p. 308. And Indiana courts "followed" precedent deeming an "unborn child" to have an independent, cognizable existence "without regard to the state of gestation." *Cheaney v. State*, 259 Ind. 138, 285 N.E.2d 265, 267 (1972) (quotation marks omitted).

The common law's prohibition of abortion cannot be brushed aside. Even in *Beebe v. State*, 6 Ind. 501 (1855), the Court recognized that it is "important to ascertain with some degree of precision what" interests rise to the level of an enforceable right, and it stressed that only rights recognized by "the common law" could be judicially enforced. *Id.* at 510–11; *see Herman v. State*, 8 Ind. 545, 557–58 (1855) (looking to common-law authorities to determine with "precision" what the State may not prohibit). More recent precedents demanding textual and historical evidence of a right are even less tolerant of judicial efforts to secure novel rights under nebulous text.

Criminal statutes addressing abortion provide further proof that the founding generation did not regard abortion as a protected core value. As early as 1835, Indiana made it a criminal offense to "willfully administer to any pregnant woman, any medicine, drug, substance or thing whatever," or to "use or employ any instrument or other means whatever, with the intent thereby to procure the miscarriage of any such

45

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

woman, unless the same shall be necessary to preserve the life of such woman." 1835

Ind. Laws ch. XLVII, p. 66 § 3. That prohibition was in effect when the 1851 Consti-

tution was drafted and ratified, and the legislature reenacted it with minor amend-

ments a year after ratification. *See* Ind. Rev. Stat., pt. 1, ch. 6, § 36 (1852). No delegate

at the convention or legislator in 1852 (seven of whom had been delegates) suggested

that the State's abortion ban was inconsistent with its new Constitution.

To the contrary, the historical record shows that Hoosiers thought abortion

laws did not go far enough. In 1859, Indiana expanded its abortion statute to prohibit

a "druggist, apothecary, physician, or other person selling medicine" from selling any

"medicine . . . known to be capable of producing abortion or miscarriage, with intent

to produce abortion." 1859 Ind. Laws ch. LXXXVI, p. 469, § 2; *see also* 2 *Brevier Leg-*

*islative Reports* 128 (1859) (resolving to examine "whether the crime of procuring

abortion has a sufficient punishment under the Statutes—equal to the enormity of

the offense"). In 1881, the legislature raised the penalty from a misdemeanor to a

felony. *See* 1881 Ind. Acts, ch. 37, p. 177, §§ 22–23. And in 1905, the legislature made

it a crime to "solicit" an abortion. 1905 Ind. Acts ch. 169, pp. 663–64, §§ 367–368.

Those prohibitions remained in effect until the U.S. Supreme Court required Indiana

to tolerate abortion as a matter of federal law in *Roe v. Wade*, 410 U.S. 113 (1973).

Even after *Roe*, moreover, Indiana did not accept abortion. It instead dis-

claimed any "constitutional right to abortion on demand." P.L. No. 322, § 1, 1973 Ind.

Acts, p. 1741. The State then continued to prohibit abortion to the extent possible

under federal law, imposed stringent regulations on abortion clinics and physicians,

**A-62**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

and after the U.S. Supreme Court returned authority to the States by overruling *Roe*,
promptly reenacted a comprehensive ban. *See* pp. 17–20, *supra*. That history belies
the notion that Hoosiers of any generation regarded abortion as a cherished core
value. *See Katz*, 179 N.E.3d at 448, 450 (declining to recognize "[n]onconsensual por-
nography"—a practice prohibited by an "overwhelming majority of state legisla-
tures"—as a core value without textual evidence (citations omitted)); *Town of Plain-
field*, 893 N.E.2d at 1130–32 (declining to recognize a "right to enter public parks for
legitimate purposes" without textual or historical evidence).

The mere fact that, in 2005, this Court deemed it "unnecessary to determine
whether there is any right to privacy or abortion" does not suggest otherwise. *Clinic
for Women, Inc. v. Brizzi*, 837 N.E.2d 973, 978 (Ind. 2005). *Brizzi* did not recognize an
abortion right, and prior decisions never "even hinted" that abortion was a core value.
*Id.* at 990 (Dickson, J., concurring). To the contrary, prior decisions upheld criminal
convictions under Indiana's pre-*Roe* abortion laws. *See, e.g., Willey v. State*, 52 Ind.
421 (1876); *Adams v. State*, 48 Ind. 212 (1874); *Basset v. State*, 41 Ind. 303 (1872);
*Carter v. State*, 2 Ind. 617 (1851). And this Court rejected a federal constitutional
challenge to the law on the ground that both U.S. law generally and Indiana law
specifically recognized a "valid and compelling" state interest in prohibiting abortion.
*Cheaney*, 285 N.E.2d at 266–70; *accord Dobbs*, 142 S. Ct. at 2248–59. The Court could
hardly have reached that conclusion if Indiana law regarded abortion as a protected
core value.

47

**A-63**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

## C. The trial court's unprecedented rationale for recognizing a novel right to abortion upends the judicial role

This Court's precedents demand textual and historical evidence that the "founding generation" would have recognized an asserted right. *Price*, 622 N.E.2d at 959 n.4. The trial court identified no such evidence and even admitted that "abortion was not lawful at the time the Indiana Constitution was ratified." App. II 37. The trial court instead took the unprecedented position that Indiana's constitutional text and history could be cast aside because the judge deemed "those who wrote our Constitution"—and the "1851 Constitution" itself—to have "significant . . . deficits" "by today's lights." *Id.*

That breathtaking rationale defies the Court's precedents. As this Court has explained, "[j]udges must enforce the Constitution as written and intended." *Bd. of Trustees of Pub. Employees' Ret. Fund of Ind. v. Pearson*, 459 N.E.2d 715, 717 (Ind. 1984). No exception exists for provisions that strike a court as outmoded. The Constitution is not "an elastic instrument" that "stretches to meet the demands of the moment." *Finney*, 179 N.E.2d at 721. Courts thus must "examine[] *text* and *history* to determine whether the *founding generation*" would have recognized a right. *Price*, 622 N.E.2d at 959 n.4 (emphasis added). They have no warrant to declare a statute unconstitutional "which violates no provision of the . . . state Constitution." *Schmitt v. F. W. Cook Brewing Co.*, 187 Ind. 623, 120 N.E. 19, 22 (1918) (quoting *Churchman v. Martin*, 54 Ind. 380, 383–84 (1876)).

The trial court's repudiation of constitutional limits lacks any principled basis. Written constitutions exist to restrain *all* branches of government, courts included.

48

**A-64**

Brief of Appellants

Members of the Medical Licensing Board of Indiana, et al.

*See Bunker v. Nat'l Gypsum Co.*, 441 N.E.2d 8, 11 (Ind. 1982). The courts are "not a 'supreme legislature,'" empowered to "substitute [their] convictions as to the desirability or wisdom of legislation for those of our elected representatives." *Id.* (emphasis omitted) (quoting *Sidle v. Majors*, 264 Ind. 206, 341 N.E.2d 763, 766 (1976)). Disregarding that principle would leave all constitutional provisions vulnerable to changing fashions. Perhaps in days of sharp partisan conflict the founding generation's reverence for political speech will eventually strike some as a relic. *Cf. Price*, 622 N.E.2d at 961–63. Does that mean the judiciary may then curtail protections for speech on the theory that the Constitution, or those who wrote it, carried "deficits"?

Ultimately, the notion that judges can improvise to improve upon "constitutional . . . text enfeebles democratic policy," striking at written constitutionalism itself. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 4 (2012). "A system of democratically adopted laws cannot endure—it makes no sense—without the belief that words convey discernible meanings and without the commitment of legal arbiters to abide by those meanings." *Id.* at xxix.

The trial court's decision, moreover, offers no principled replacement for text and history. "[L]iberty," it says, "is an enormous concept," with some contemporary sources defining it as "the power to do as one pleases." App. II 34 (citation omitted). Obviously, the term "liberty" in § 1 cannot confer a right "to do as one pleases"—no law could survive such an expansive definition. But the trial court's decision offers no principle for deciding what "liberty" should encompass, or why only women have a "liberty" right and not their unborn children. The decision below does not even offer

49

**A-65**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

criteria for determining what might fall within a less expansive right to "self-deter-

mination," "bodily autonomy," or "privacy." How is a court supposed to decide whether

prohibitions on assisted suicide, *see* Ind. Code § 35-42-1-2.5, recreational drugs, *see*

Ind. Code § 35-48-4-7, or driving without a seatbelt, *see* Ind. Code § 9-19-10-2, infringe

on those putative rights? The decision below offers no answers.

On its own terms, the trial court's rationale cannot withstand even superficial

inquiry. The trial court faulted "those who wrote our Constitution" for denying "[m]ar-

ried women . . . property rights" and "people of color . . . the right to vote." App. II 37.

But it identified no evidence suggesting that Indiana's longstanding prohibition on

abortion had anything to do with those issues. In fact, abortion historically has been

used to "implement[] . . . discriminatory preferences," including against people of color

and women. *Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780, 1790

(2019) (Thomas, J., concurring); *see id.* at 1787–91 (Thomas, J., concurring).

Nor could the trial court explain why Indiana continued to ban abortion long

after the issues it identified were addressed. *See* Ind. Const. art. 2, § 5 (repealed Mar.

14, 1881); *Rosa v. Prather*, 103 Ind. 191, 2 N.E. 575, 578 (1885) (observing the "most

notable" disabilities of married women, including a woman's "inability to enter into a

contract" and "to control her own property," had been "removed" by statute). The only

plausible explanation is that a majority of Hoosier voters and their elected represent-

atives have *never* considered abortion as a core value. Embracing the trial court's

theory would require declaring that Hoosiers of every generation—including the cur-

rent one—have "deficits" so "significant" that their views must be disregarded.

50

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

### D. Generic statements about liberty and autonomy cannot support a right to abortion

1. In rejecting the framers' view that no right to abortion existed, the trial court invoked a handful of this Court's decisions it construed to elevate "self-determination," "bodily autonomy," and "privacy." App. II 35–37. As this Court's precedents make clear, however, rights cannot be defined at so high a level of generality. Instead, the question is whether the framing generation recognized the specific asserted right. *See Price*, 622 N.E.2d at 959 n.4, 960–61; *Town of Plainfield*, 893 N.E.2d at 1131–32. Even when addressing speech—a right the Constitution expressly protects—this Court has demanded evidence that the specific "type" of expression at issue is within Article 1, § 9's core. *Katz*, 179 N.E.3d at 447; *see, e.g.*, *id.* at 448–50 (asking about nonconsensual pornography, not expression generally); *Whittington*, 669 N.E.2d at 1370 (distinguishing between speech "focuse[d] on the conduct of a private party" and "political" speech); *Price*, 622 N.E.2d at 961 (asking about right to "pure political speech," not speech generally). The generic statements the trial court invoked regarding "self-determination, "bodily autonomy," and "privacy"—terms that appear nowhere in the Constitution—cannot show abortion is a protected core value.

The breadth of the concepts "self-determination," "bodily autonomy," and "privacy" illustrates why the Court must focus on whether abortion itself is protected. "Self-determination" and "bodily autonomy" are concepts so capacious that nearly any law—including drug laws, seatbelt laws, truancy laws—will infringe on someone's concept of those terms. And "privacy" (a relatively "new" concept foreign to the fram-

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

ers, *Doe v. Methodist Hosp.*, 690 N.E.2d 681, 684 (Ind. 1997)) could potentially encompass any activity occurring outside of public view, from taking family pictures, to cultivating marijuana, to making child pornography. Treating any state law that affects self-determination, autonomy, or privacy as infringing a core value would make it impossible for the State to "exercise its police power to promote the health, safety, comfort, morals, and welfare of the public." *Price*, 622 N.E.2d at 959.

As this Court has recognized, moreover, a "fundamental distinction" exists between abortion and other putative liberty, autonomy, and privacy interests. *Cheaney*, 285 N.E.2d at 269. "Abortion," as even its proponents have recognized, "is a unique act . . . fraught with consequences for others." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 852 (1992), *overruled by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). "What sharply distinguishes the abortion right" from other putative interests is that "[a]bortion destroys" what even abortion apologists call "potential life" and what Indiana, through S.B. 1, regards as an unborn child. *Dobbs*, 142 S. Ct. at 2258; *see Cheaney*, 285 N.E.2d at 269 (explaining the difference between contraceptives and abortion is "the difference between prevention and destruction"); App. II 212–18 (explaining how abortion arguments diverges from patient-autonomy and -integrity arguments in medical ethics); App. III 6–9 (explaining how a harm-to-others principles justifies prohibiting abortion as an ethical and policy matter). That "valid and compelling" interest in protecting unborn children is why this Court recognized decades ago that the State may ban abortion. *Cheaney*, 285 N.E.2d at 270.

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

2.    Regardless, the trial court's theory of a constitutional right to "self-de-termination," "bodily autonomy," or "privacy" fails on its own terms. None of the de-cisions the trial court cited recognizes such a capacious right. At most, *Beebe* and *Herman* stand for the proposition that legislation cannot infringe some unwritten "common law" rights. *Beebe*, 6 Ind. at 510–11; *see Herman*, 8 Ind. at 557–58 (looking to common-law authorities to determine what the legislature may and may not pro-hibit). But the common law never recognized a right to abortion; it regarded abortion as "criminal" after quickening and as "unlawful" at every stage of pregnancy. *Dobbs*, 142 S. Ct. at 2248. And more than a century ago this Court overruled *Beebe* and *Her-man*—a development that the trial court ignored—explaining that they were unprin-cipled exercises of judicial will bereft of constitutional support. *See Schmitt*, 120 N.E. at 21–23.

In re Lawrance, 579 N.E.2d 32 (Ind. 1991), recognizes no right to self-determi-nation either. *Lawrance* concerned Indiana's Health Care Consent Act, not the Con-stitution. *See id.* at 37, 39. Although *Lawrance* mentioned § 1 in passing, it never held that § 1 secures enforceable rights. *Lawrance* merely observed that "those who wrote the constitution believed that liberty included the opportunity to manage one's own life *except* in those areas yielded up to the body politic." *Id.* at 39 (emphasis added). That observation, however, provides no insight into which rights were retained and which were yielded to the body politic. *See Town of Plainfield*, 893 N.E.2d at 1131–32. As this Court later explained, answering that question requires looking to "text and history." *Price*, 622 N.E.2d at 959 n.4 (citing *Lawrance*, 579 N.E.2d at 39).

**A-69**

Brief of Appellants

Members of the Medical Licensing Board of Indiana, et al.

The only other decision that the trial court identified as supporting the exist-

ence of a right to "privacy," App. II 36, is even further afield. In *Pirtle v. State*, 263

Ind. 16, 323 N.E.2d 634 (1975), this Court "h[e]ld that a person who is asked to give

consent to search while in police custody is entitled to the presence and advice of

counsel prior to making the decision whether to give such consent." 323 N.E.2d at

640. It nowhere mentioned abortion or recognized a general privacy right. Instead,

this Court merely observed that a Fourth Amendment violation invades "the privacy

of a person or his property." *Id.* at 642. That the trial court could not identify a single

decision holding there is a right to privacy, much less abortion, speaks volumes.

3.     Other problems attend the trial court's attempt to make this case about

"self-determination," "autonomy," or "privacy." As the trial court recognized, App. II

36, this Court's material-burden analysis requires a court to ask whether "the right,

as impaired, would no longer serve the purpose for which it was designed," *Price*, 622

N.E.2d at 960 n.7; *see id.* at 960. Here, however, the trial court refused to commit to

whether the "right" S.B. 1 allegedly impairs is "a privacy right, a right to bodily au-

tonomy, a right of self-determination, a bundle of liberty rights, or [a right known] *by*

*some other appellation*." App. II 37 (emphasis added). That refusal to identify the

right at stake renders the trial court's statement that S.B. 1 materially burdens the

right groundless. A court cannot conclude that a law frustrates the "purpose for which

[a right] was designed" without first identifying the right at issue. *Cf. Katz*, 179

N.E.3d at 448 ("we first look to the type of expression at issue").

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

Nor does it follow that S.B. 1 materially burdens a "bundle of liberty interests," "a right of self-determination," or any of the other putative rights on the trial court's list. As discussed above, liberty, self-determination, autonomy, and privacy potentially encompass huge swaths of human conduct. *See* pp. 49–50, *supra*. Every voluntary choice potentially constitutes an exercise in self-determination; every activity occurring inside a private residence or physician's office potentially falls within "privacy" (at least under the challengers' view). S.B. 1, however, regulates only a single, narrow activity: abortion. S.B. 1 does not plausibly "alienate"—rather than merely "qualify"—the right at stake if the question is whether Hoosiers still enjoy liberty, autonomy, or privacy on a whole. *Price*, 622 N.E.2d at 960.

*Clinic for Women, Inc. v. Brizzi*, 837 N.E.2d 973 (Ind. 2005), does not establish otherwise. There, this Court assumed a "woman's right to terminate her pregnancy"—a far narrower interest than an undifferentiated interest in self-determination, bodily autonomy, or privacy. *Id.* at 982; *see id.* 984 (same).

Indeed, while invoking *Brizzi*, the trial court made no serious attempt to apply it. The trial court faulted S.B. 1 for requiring any permitted abortions to be performed at hospitals and ambulatory surgical centers because that would reduce "availability" of abortions and increase "cost." App. II 38. The *Brizzi* majority, however, expressly rejected arguments that an abortion regulation "increas[ing] the cost of care" materially burdened any abortion right, even though the regulation might cause "*many* women" to "travel to other states to obtain abortions," "carry pregnancies to term," or "seek alternatives to legal abortions." 837 N.E.2d at 981 (citation omitted).

55

**A-71**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

4.    As a last-ditch effort, the trial court mentioned that some courts in other

States have found a right to abortion under *their* constitutions. App. II 41. But those

decisions cannot justify the trial court's disregard for the Indiana Constitution's text,

structure, and history. Whatever other state courts have done, "an interpretation of

Indiana's Constitution" must ultimately be "conducted independently." *Hoagland v.*

*Franklin Twp. Cmty. Sch. Corp.*, 27 N.E.3d 737, 741 (Ind. 2015).

In that regard, the trial court made no attempt to explain why decisions from

other States are persuasive. Without analysis, it cited three out-of-state trial-court

decisions—mentioned for the first time in a reply filed the day before the hearing.

App. II 41. It, however, did not even acknowledge that each relied in whole or part on

constitutional provisions nothing like § 1—the only provision at issue in this case.

*See, e.g.*, App. III 106–07 (invoking Ohio's "Health Care Freedom Amendment"); App.

III 124–26 (invoking "due process"); App. III 171 (invoking "equal protection").

Nor did the trial court acknowledge that other courts have rejected its views.

As pointed out below, several state courts have rejected the trial court's view that

constitutional provisions with language similar to § 1 create judicially enforceable

rights. *See, e.g.*, *Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State*,

975 N.W.2d 710, 743 n.23 (Iowa 2022); *State v. Williams*, 728 N.E.2d 342, 352 (Ohio

2000); *Shields v. Gerhart*, 658 A.2d 924, 928–29 (Vt. 1995); *Sepe v. Daneker*, 68 A.2d

101, 105 (R.I. 1949). And still more have rejected arguments that generic references

to liberty in state constitutions protect abortion. *See, e.g.*, *Planned Parenthood of the*

*Heartland*, 975 N.W.2d at 740–42; *Mahaffey v. Att'y Gen.*, 564 N.W.2d 104, 109–11

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

(Mich. Ct. App. 1997) (per curiam); *cf. EMW Women's Surgical Ctr., P.S.C. v. Cameron*, No. 2022-SC-0326-I, 2022 WL 3641196, at *1 (Ky. Aug. 18, 2022) (declining to stay enforcement of state law "effectively outlaw[ing] abortion"). Recently, for example, the Iowa Supreme Court held that its constitution's "silen[ce]" on abortion and Iowa's long history of banning abortion demonstrated that no right to abortion existed. *Planned Parenthood of the Heartland*, 975 N.W.2d at 739–40.

### E.   S.B. 1 is a permissible exercise of police power

In the absence of a core constitutional right to abortion, the General Assembly is entitled to exercise its police power to ban abortion—just as it did before *Roe*. Abortion terminates the existence of what science shows to be a distinct "living human being" with the capacity to think, feel, hear, move, and "direct[] *its own* development." App. II 187–88; *see* App. II 188–96. Usually, around or shortly after the woman becomes aware of her pregnancy, an unborn child's brain will have begun to develop and the child will have a heartbeat. App. II 188–89. And an unborn child will start moving, practicing breathing, engaging in complex behaviors, feeling pain, hearing sounds, and much more—all within 14 weeks of fertilization. App. II 189–93. In short, unborn children, being human beings, have all the *characteristics* of a human being— many of them acquired in the earliest stages of pregnancy.

As this Court has recognized, the State has a "valid and compelling" interest in protecting unborn children who are, "at the very least, from the moment of conception a living being and potential human life." *Cheaney*, 285 N.E.2d at 270. Protecting unborn human beings is consistent with traditional views of ordered liberty, which

**A-73**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

allows restrictions on liberty to prevent harm to others, and the longstanding, majority view of medical ethicists that physicians should not intentionally kill humans. *See* App. II 208–19; App. III 5–9. The argument that an unfettered right to abortion exists "pretend[s]" that the unborn have "no competing interest" that can justify abortion restrictions. App. III 9; *see* App. III 6–9; App. II 212–14. As even the trial court conceded, "the State has an interest in regulating abortion so long as that regulation is not in violation of the Indiana Constitution." App. II 40; *see* App. II 37.

## IV.   The Lack of Irreparable Harm and the State's Significant Interest in Protecting Unborn Children Preclude a Preliminary Injunction

Not only do the challengers here have no likelihood of success on the merits, but the remaining requirements for injunctive relief are lacking. A preliminary injunction is "an extraordinary equitable remedy that should be granted in rare instances" only. *State v. Econ. Freedom Fund*, 959 N.E.2d 794, 801 (Ind. 2011) (internal quotation marks omitted). An injunction may only issue where "remedies at law are inadequate," the threatened injury to the party seeking an injunction outweighs the potential harm to others, and the public interest favors injunctive relief. *Cent. Ind. Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 727 (Ind. 2008). A trial court's weighing of those considerations is reviewed for abuse of discretion. *Econ. Freedom Fund*, 959 N.E.2d at 800. An abuse "occurs when the trial court misinterprets the law." *Id.* Such an abuse occurred here.

58

**A-74**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

### A.  No irreparable harm will occur absent a preliminary injunction

The trial court ruled that legal remedies were inadequate solely on the theory that a § 1 violation constitutes "*per se* irreparable harm." App. II 40. But this Court has never held that *all* legal violations automatically inflict irreparable harm; any such a rule would collapse the preliminary-injunction test from four factors to three. *See Ind. Fam. & Soc. Servs. Admin. v. Walgreen Co.*, 769 N.E.2d 158, 162 & n.3 (Ind. 2002). And although "a relaxed standard may sometimes be applied for clear, uncontested unlawful conduct," this Court has stated that a relaxed standard is "'*only* proper'" for cases involving "*clearly unlawful*" conduct "*against the public interest.*" *Id.* at 162 (emphasis added) (quoting *Union Twp. Sch. Corp. v. State ex rel. Joyce*, 706 N.E.2d 183, 192 (Ind. Ct. App. 1998)). S.B. 1—which is consistent with abortion restrictions at the time of the Constitution's ratification, contravenes no express constitutional guarantee, and furthers a compelling state interest in protecting unborn children who cannot protect themselves—falls well outside any per se rule.

That the plaintiffs do not allege a violation of their own legal rights further weakens any assertion of irreparable injury. Whether or not "plaintiffs have *standing* to raise the injury claims of their clients and patients," App. II 40 (emphasis added), a requirement for a preliminary injunction is that "the *movant's* remedies at law are inadequate," *Apple Glen Crossing, LLC v. Trademark Retail, Inc.*, 784 N.E.2d 484, 487 (Ind. 2003) (emphasis added); *see Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 511 (2d Cir. 2005) ("alleged harm to third parties did not provide plaintiff a basis for a preliminary injunction"); *CMM Cable Rep., Inc. v. Ocean Coast Props.,*

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

*Inc.*, 48 F.3d 618, 622 (1st Cir. 1995) ("a preliminary injunction requires a showing of irreparable harm *to the movant* rather than to one or more third parties"). That requirement makes sense: A preliminary injunction is an "extraordinary" remedy intended to prevent irreparable harm occurring before trial. *Econ. Freedom Fund*, 959 N.E.2d at 801; *see Mich. Coal. of State Emp. Unions v. Mich. Civ. Serv. Comm'n*, 634 N.W.2d 692, 699–701 (Mich. 2001). Where a litigant asserts the rights of unidentified, absent parties, however, there can be no assurance that injunctive relief is required.

### B.    The compelling public interest in protecting unborn children from destruction militates against injunctive relief

The balance of harms and public interest preclude injunctive relief as well. As the trial court admitted, there are significant state interests in regulating abortion, including "protection of maternal health, preserving fetal life, maintaining societal ethics, promulgating medical ethical standards, and creating bright line rules distinguishing between infanticide and lawful abortion." App. II 37. It nonetheless deemed a preliminary injunction proper because "Indiana women and girls" face "*potential* constitutional deprivations." App. II 40 (emphasis added); *see* App. II 41 (similar). In *Cheaney v. State*, 259 Ind. 138, 285 N.E.2d 265 (1972), however, this Court held that the State's "valid and compelling" interests would justify a ban on abortion *even if* a "certain right to privacy does exist." 285 N.E.2d at 267, 270. An "unborn child," the Court observed, has "certain rights" that "the state may protect." *Id.* at 269. *Cheaney* thus makes clear that, when "balancing" the interests of women against those of unborn children, the balance favors the State's abortion ban. *Id.* at 269–70.

60

**A-76**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

*Cheaney*'s observation is consistent with traditional legal and ethical views. Abortion irreversibly terminates an unborn child's life—an act the unborn child is powerless to prevent. "[T]reating human beings in the fetal stage with the basic respect of not intentionally killing them" "aligns with centuries of medical tradition," App. II 219; *see* App. II 208–19; finds "ample support in the history of American public bioethics," App. III 5; *see* App. III 7–9; and accords with the traditional legal view that "abortion kills a human being," *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2255 (2022); *see id.* at 2249–56. It is no answer to say that some women who want abortions might face difficulties, financial or otherwise. Should a pregnancy threaten a woman's life or pose a serious health risk, abortion remains an option. *See* Ind. Code § 16-34-2-1(a)(1), (3). As centuries of tradition reflect, the State's compelling interest in preventing intentional destruction of human life outweighs impacts that do not rise to the level of seriously threatening life or health.

Without addressing *Cheaney*, the trial court observed that less stringent abortion regulations were in place "for nearly fifty years." App. II 41. But the mere fact that the law once imposed different requirements does not show there is a public interest in permitting abortion. For one thing, pre-S.B. 1 abortion laws were enacted under protest "to conform" to now-overruled "U.S. Supreme Court decisions" requiring Indiana to tolerate abortion. P.L. No. 322, § 1, 1973 Ind. Acts, p. 1741. They do not show there is a public interest in allowing abortion. For another, it is not the courts' role to second guess "our elected representatives'" determinations as to where the public interest lies. *Bunker v. Nat'l Gypsum Co.*, 441 N.E.2d 8, 11 (Ind. 1982)

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

(quoting *Sidle v. Majors*, 264 Ind. 206, 341 N.E.2d 763, 766 (1976)); *see Avemco Ins. Co. v. State ex rel. McCarty*, 812 N.E.2d 108, 121 (Ind. Ct. App. 2004) ("The laws promulgated by the General Assembly reflect its determination of what is in public interest."). As *Cheaney* stated, abortion regulation is a "legislative function and properly outside the ambit of the judiciary." 285 N.E.2d at 269.

## CONCLUSION

The trial court's grant of a preliminary injunction should be reversed.

Respectfully submitted,

THEODORE E. ROKITA
Attorney General of Indiana
Attorney No. 18857-49

By:  /s/ Thomas M. Fisher
THOMAS M. FISHER
Solicitor General
Attorney No. 17949-49

Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
Phone:  (317) 232-6255
Fax:  (317) 232-7979
Email:  Tom.Fisher@atg.in.gov

JAMES A. BARTA
Deputy Solicitor General
Attorney No. 31589-49

MELINDA R. HOLMES
Attorney No. 36851-79
Deputy Attorney General

*Counsel for Appellants*

62

**A-78**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

## CERTIFICATE OF WORD COUNT

I verify that this brief contains 13,953 words.


<u>/s/ Thomas M. Fisher</u>
Thomas M. Fisher
Solicitor General

**A-79**

Brief of Appellants
Members of the Medical Licensing Board of Indiana, et al.

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2022, I electronically filed the foregoing document using the Indiana E-filing System (IEFS). I also certify that on November 2, 2022, the foregoing document was served upon the following persons using the IEFS:

Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org

Jared M. Schneider
400 West Seventh Street, Suite 105C
Bloomington, IN 47404
Jared@schneiderpc.com

Paul Benjamin Linton
921 Keystone Ave.
Northbrook, IL 60062
pblconlaw@aol.com

Zechariah D. Yoder
Adler Attorneys
136 South 9th Street
Noblesville, IN 46060
zech@noblesvilleattorney.com

Carlos Federico Lam
Lam Law Office
P.O. Box 20267
Indianapolis, IN 46220-0267
lamlawindy@gmail.com

/s/ Thomas M. Fisher
Thomas M. Fisher
Solicitor General

Office of the Attorney General
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
Telephone: (317) 232-6255
Fax: (317) 232-7979
Email: Tom.Fisher@atg.in.gov

**A-80**

# EXHIBIT B

IN THE
INDIANA COURT OF APPEALS

—————————

No. 22A-PL-02938

—————————

| | |
|---|---|
| THE INDIVIDUAL MEMBERS OF THE MEDICAL LICENSING BOARD OF INDIANA, in their official capacities, et al., | Interlocutory Appeal from the Marion Superior Court, |
| Appellants, | Trial Court Case No. 49D01-2209-PL-031056, |
| v. | The Honorable Heather A. Welch, Judge. |
| ANONYMOUS PLAINTIFF 1, et al., | |
| Appellees. | |

## BRIEF OF APPELLANTS

THEODORE E. ROKITA
Attorney General of Indiana
Attorney No. 18857-49

THOMAS M. FISHER
Solicitor General
Attorney No. 17949-49

JAMES A. BARTA
Deputy Solicitor General
Attorney No. 31589-49

Office of the Attorney General
IGC-South, Fifth Floor
Indianapolis, Indiana 46204
Tel:  (317) 232-6255
Fax: (317) 232-7979
Email:  Tom.Fisher@atg.in.gov

MELINDA R. HOLMES
Attorney No. 36851-79
RAZI S. LANE
Attorney No. 37798-49
Deputy Attorneys General

*Counsel for Appellants*

Case 1:22-cv-01859-JMS-MG   Document 45-2   Filed 06/20/23   Page 3 of 65 PageID #: 367
Case: 23-3247   Document: 13   Filed: 01/29/2024   Pages: 298
Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ 4

STATEMENT OF THE ISSUES ........................................................ 9

STATEMENT OF THE CASE ........................................................... 10

STATEMENT OF FACTS .................................................................. 10

I.     Regulation of Abortion in Indiana ............................................ 10

    A.  The Science and Secular Ethics of Fetal Development and Abortion ................................................................................. 10

    B.  Indiana's Restrictions on Abortion ...................................... 12

II.    Plaintiffs Challenge S.B. 1 on Religious-Exercise Grounds ........... 15

    A.  Complaint and demand for relief ....................................... 15

    B.  Named plaintiffs .................................................................. 16

        1.  Anonymous Plaintiff 1 ............................................... 16

        2.  Anonymous Plaintiff 2 ............................................... 17

        3.  Anonymous Plaintiff 3 ............................................... 18

        4.  Anonymous Plaintiffs 4 and 5 ................................... 19

        5.  Hoosier Jews for Choice ............................................ 21

    C.  Preliminary Injunction ....................................................... 21

SUMMARY OF THE ARGUMENT ................................................. 24

ARGUMENT ..................................................................................... 29

    I.    The Court Lacks Jurisdiction To Hear These Claims ................ 29

    A.  Hoosier Jews for Choice lacks standing to assert its members' RFRA claims against S.B. 1 ................................................. 29

    B.  None of plaintiffs' claims is ripe for review ......................... 33

**A-83**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

1. No plaintiff asserts facts necessary to review whether S.B. 1 substantially burdens sincere religious exercise ..................... 34

2. No plaintiff presents facts necessary to undertake individual compelling-interest inquiry ....................................... 40

3. This is an as-applied challenge, but the trial court improperly applied ripeness standards for facial challenges ..................... 41

II.  Notwithstanding RFRA, the State May Enforce S.B. 1 Even Where an Abortion Is Motivated By a Sincere Religious Belief ............... 42

A. The record shows that neither abortion nor plaintiffs' birth control practices carry religious significance for these plaintiffs ..................... 42

B. S.B. 1 is the least restrictive means of furthering the State's compelling interest in protecting unborn human lives......................... 48

1. The State's compelling interests justify any burden on the plaintiffs' religious exercise ....................................... 48

2. S.B. 1 is the least restrictive means to achieve the State's compelling interests ................................................ 52

III.  The Plaintiffs Failed to Demonstrate the Remaining Preliminary Injunction Factors Favor Injunctive Relief .................................. 57

A. Irreparable harm ................................................................ 57

B. The balance of harms and public interest weigh against injunctive relief .................................................................... 59

C. The requested relief exceeds the remedies RFRA authorizes and fails to meet Trial Rule 65(D)'s requirements ....................... 61

CONCLUSION............................................................................. 62

A-84

Case 1:22-cv-01859-JMS-MG   Document 45-2   Filed 06/20/23   Page 5 of 65 PageID #: 369
Case: 23-3247   Document: 13   Filed: 01/29/2024   Pages: 298
Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

## TABLE OF AUTHORITIES

### CASES

*Abington Sch. Dist. v. Schempp,*
    374 U.S. 203 (1963) ......................................................... 32

*Ackerman v. Washington,*
    16 F.4th 170 (6th Cir. 2021) ........................................ 26, 43

*Adkins v. Kaspar,*
    393 F.3d 559 (5th Cir. 2004) ............................................ 43

*Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.,*
    13 F.4th 531 (6th Cir. 2021) ............................................. 30

*Avemco Ins. Co. v. State ex rel. McCarty,*
    812 N.E.2d 108 (Ind. Ct. App. 2004) ............................. 28, 60

*Baranowski v. Hart,*
    486 F.3d 112 (5th Cir. 2007) ............................................ 43

*Barr v. City of Sinton,*
    295 S.W.3d 287 (Tex. 2009) ......................................... 31, 35

*Bd. of Comm'rs of Union Cnty. v. McGuinness,*
    80 N.E.3d 164 (Ind. 2017) ............................................ 25, 30

*Bd. of Comm'rs v. Ne. Ind. Bldg. Trades Council,*
    954 N.E.2d 937 (Ind. Ct. App. 2011) ................................. 30

*Blattert v. State,*
    190 N.E.3d 417 (Ind. Ct. App. 2022) ...........................*passim*

*Box v. Planned Parenthood of Ind. & Ky., Inc.,*
    139 S. Ct. 1780 (2019) .................................................... 51

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014) ....................................................*passim*

*Central Rabbinical Cong. Of U.S. & Canada v. N.Y.C. Dep't of Health*
    *& Mental Hygiene,*
    763 F.3d 183 (2d Cir. 2014) .............................................. 55

*Cheaney v. State,*
    285 N.E.2d 265 (Ind. 1972) ........................................*passim*

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

*Church of the Lukumi Babalu Aye, Inc. v. Hialeah,*
    508 U.S. 520 (1993) ................................................................... 52, 53, 55

*Civil Liberties for Urb. Believers v. City of Chicago,*
    342 F.3d 752 (7th Cir. 2003) ................................................................ 43

*Crossman Cmtys., Inc. v. Dean,*
    767 N.E.2d 1035 (Ind. Ct. App. 2002)............................................. 27, 59

*Daugherty v. Allen,*
    729 N.E.2d 228 (Ind. Ct. App. 2000).................................................... 58

*Dobbs v. Jackson Women's Health Org.,*
    142 S. Ct. 2228 (2022) .................................................................*passim*

*Doe v. Rokita,*
    54 F.4th 518 (7th Cir. 2022) ................................................................ 51

*E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.,*
    414 F.3d 700 (7th Cir. 2005) ................................................................ 58

*Employment Div., Dep't of Human Res. v. Smith,*
    494 U.S. 872 (1990) ............................................................................ 43

*Foundations of E. Chi., Inc. v. City of East Chicago,*
    927 N.E.2d 900 (Ind. 2010) ........................................................... 24, 25

*Fulton v. City of Philadelphia,*
    141 S. Ct. 1868 (2021) ................................................................... 55, 56

*Gonzales v. Carhart,*
    550 U.S. 124 (2007) ............................................................................ 51

*Gonzalez v. O Centro Espirita Beneficente Uniao de Vegetal,*
    546 U.S. 418 (2006) .................................................................*passim*

*Green Haven Prison Preparative Meeting of Religious Soc'y of Friends*
    *v. N.Y. State Dep't of Corr. & Cmty. Supervision,*
    16 F.4th 67 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2676 (2022) .......................... 44

*Harris v. McRae,*
    448 U.S. 297 (1980) .................................................................*passim*

*Holcomb v. Bray,*
    187 N.E.3d 1268 (Ind. 2022) ........................................... 29, 34, 41, 42

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

*Horner v. Curry*,
    125 N.E.3d 584 (Ind. 2019) ................................................................ 29, 34

*Hunt v. Wash. State Apple Advertising Comm'n*,
    432 U.S. 333 (1977) ...................................................................... 30

*Ind. Dep't of Envtl. Mgmt. v. Chem. Waste Mgmt., Inc.*,
    643 N.E.2d 331 (Ind. 1994) ............................................ 25, 34, 39, 40

*Ind. Family Inst. Inc. v. City of Carmel*,
    155 N.E.3d 1209 (Ind. Ct. App. 2020) ........................................ 34

*In re Ind. Newspapers v. Junior Achievement of Central Ind.*,
    963 N.E.2d 534 (Ind. Ct. App. 2013) ........................................ 23

*Ind. Pacers L. P. v. Leonard*,
    436 N.E.2d 315 (Ind. Ct. App. 1982) ........................................ 58

*Indiana Fam. & Soc. Servs. Admin. v. Walgreen Co.*,
    769 N.E.2d 158 (Ind. 2002) .................................................. 27, 58

*McGowan v. Maryland*,
    366 U.S. 420 (1961) ...................................................................... 52

*Ex parte Phillips*,
    287 So.3d 1179 (Ala. 2018) ................................................ 49

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
    134 S. Ct. 506 (2013) ............................................................ 60

*Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State*,
    975 N.W.2d 710 (Iowa 2022) .................................................. 48

*Planned Parenthood of Se. Pa. v. Casey*,
    505 U.S. 833 (1992) ...................................................... *passim*

*Planned Parenthood v. Carter*,
    963 N.E.2d 853 (Ind. Ct. App. 2006) ........................................ 23

*Roe v. Wade*,
    410 U.S. 113 (1973) ...................................................... *passim*

*Save the Valley, Inc. v. Ind.-Ky. Elec. Corp.*,
    820 N.E.2d 677 (Ind. Ct. App. 2005) ........................................ 30

*Schloss v. City of Indianapolis*,
    553 N.E.2d 1204 (Ind. 1990) .................................................. 29, 42

**A-87**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

*State v. Merrill,*
    450 N.W.2d 318 (Minn. 1990) ................................................................ 48

*State v. Econ. Freedom Fund,*
    959 N.E.2d 794 (Ind. 2011) ............................................................ 42, 61

*Texas v. United States,*
    523 U.S. 296 (1988) .............................................................................. 34

*Thomas v. Review Bd. of. Ind. Emp. Security Div.,*
    450 U.S. 707 (1981) .............................................................................. 47

*Tilley v. Roberson,*
    725 N.E.2d 150 (Ind. Ct. App. 2000) .................................................... 58

*Tyms-Bey v. State,*
    69 N.E.3d 488 (Ind. Ct. App. 2017) ...................................................... 53

*United States v. Affleck,*
    765 F.2d 944 (10th Cir.1985) ................................................................ 35

*United States v. Bauer,*
    84 F.3d 1549 (9th Cir. 1996) ................................................................ 36

*United States v. Christie,*
    825 F.3d 1048 (9th Cir. 2016) ........................................................ 40, 53

*United States v. Grady,*
    18 F.4th 1275 (11th Cir. 2021) .............................................................. 53

*United States v. Quaintance,*
    315 Fed. App'x 711 (10th Cir. 2009) ..................................................... 35

*United States v. Quaintance,*
    608 F.3d 717 (10th Cir. 2010) .............................................................. 35

*Wagler Excavating Corp. v. McKibben Const., Inc.,*
    679 N.E.2d 155 (Ind. Ct. App. 1997) ....................................... 27, 57, 58

*Whole Woman's Health v. Hellerstedt,*
    579 U.S. 582 (2016) .............................................................................. 30

*Williams-Yulee v. Fla. Bar,*
    575 U.S. 433 (2015) .............................................................................. 53

7

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

**STATUTES**

1835 Ind. Laws ch. XLVII, p. 66, § 3 ........................................................ 12

1859 Ind. Laws ch. LXXXVI, p. 469, § 2 ................................................. 12

1995 Ind. P.L. 187-1995 ............................................................................ 13

2014 Ind. P.L. 98-2014 .............................................................................. 13

2016 Ind. P.L. 213-2016 ............................................................................ 13

1881 Ind. Acts, Chapter 37, p. 177, §§ 22–23 ........................................ 12

Ind. Code § 16-18-2-327.9 ......................................................................... 14

Ind. Code § 16-34-2-1 ...................................................................... 9, 14, 15, 60

Ind. Code § 16-34-2-3 ................................................................................ 15

Ind. Code § 34-13-9-7 ................................................................................ 29

Ind. Code § 34-13-9-8 ..........................................................................*passim*

Ind. Code § 34-13-9-10 ................................................................... 28, 39, 40, 61

Ind. Code § 35-1-58-1 (1971) .................................................................... 12

P.L. 1973 Ind. Acts, pp. 1743–46 No. 322, § 1, 2 ................................. 13

8

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

## STATEMENT OF THE ISSUES

S.B. 1 criminalizes the performance of abortions in most cases except where a pregnancy seriously endangers the mother's health or life, the pregnancy is the result of rape or incest, or the fetus has a lethal anomaly. Ind. Code § 16-34-2-1. The plaintiffs in this case—five women and an organization—have challenged S.B. 1 on the grounds that it "substantially burdens" their "religious exercise" under Indiana's Religious Freedom Restoration Act, while failing to be the "least restrictive means" of furthering a "compelling government interest." Ind. Code § 34-13-9-8. None of the plaintiffs is pregnant; even if pregnant, none would be certain to have an abortion; even if one or more would have an abortion, none would *necessarily* be motivated by religious beliefs. Still, the trial court granted the plaintiffs a preliminary injunction, ruling, among other things, that the State lacks a compelling interest in protecting fetal life before viability. The trial court's order gives rise to three issues for review:

1.      Whether Indiana courts lack jurisdiction to hear these claims because plaintiffs cannot assert existing or imminent direct injury giving rise to ripe justiciable claims under the Religious Freedom Restoration Act.

2.      Whether, notwithstanding the Religious Freedom Restoration Act, Indiana may prohibit an abortion where a woman concludes that her religious beliefs permit or even require her to have an abortion.

3.      Whether plaintiffs failed to demonstrate that an injunction will prevent certain harm to their religious exercise.

9

**A-90**

The Individual Members of the Medical Licensing Board of Indiana, et al.

## STATEMENT OF THE CASE

On September 8, 2022, Anonymous Plaintiffs 1-5 and Hoosier Jews for Choice filed suit in Marion County against the Individual Members of the Licensing Board of Indiana, the Lake County Prosecutor, Marion County Prosecutor, Monroe County Prosecutor, St. Joseph County Prosecutor, and Tippecanoe County Prosecutor (collectively, the State), challenging Senate Bill 1 (S.B. 1) under Indiana's Religious Freedom Restoration Act (RFRA), Ind. Code § 34-13-9-0.7, *et seq*. App. II 60. The plaintiffs contemporaneously moved for a preliminary injunction barring enforcement of S.B. 1 against them. App. II 87.

On December 2, 2022, the trial court granted plaintiffs' preliminary-injunction motion, enjoining state officials from enforcing S.B. 1 against the plaintiffs on the ground that it substantially burdens their religious exercise without furthering a compelling government interest. App. II 59. The State filed its notice of appeal and moved for immediate transfer to the Indiana Supreme Court on December 9, 2022. The Indiana Supreme Court has not ruled on that motion.

## STATEMENT OF FACTS

I.   **Regulation of Abortion in Indiana**

   A. **The Science and Secular Ethics of Fetal Development and Abortion**

Abortion at any time after fertilization is the intentional termination of an unborn human being. Dr. Tara Sander Lee, a biochemist and researcher with over twenty years of experience in academic and clinical medicine, says "[a] living human being, unique from all other persons, is created at fertilization when a man's sperm

**A-91**

Brief of Appellants

The Individual Members of the Medical Licensing Board of Indiana, et al.

combines with a woman's egg inside the fallopian tube." App. II 203 (Declaration of

Dr. Tara Sander Lee). Dr. Farr Curlin, a licensed physician and bioethics professor

at Duke University, says "whether or not a particular person believes that the life of

a human organism begins at conception (fertilization of the egg), the scientific con-

sensus is that it does. "App. III 7 (Declaration of Dr. Farr Curlin).

Fertilization occurs when a male's sperm combines with a female's egg, result-

ing in a "single-celled . . . zygote" genetically distinct from the parents. App. II 203

(Sander Lee). From the start of its existence, a human zygote contains the full 46

chromosomes of DNA necessary for it "to develop, grow and become an adult." *Id.* Its

unique DNA sequence also "produces the genetic variation that creates a person's

biological individuality, including sex, eye color, and other physical traits." *Id.*

Following fertilization, "[t]he zygote produces increasingly complex tissues,

structures and organs that work together in a coordinated way," App. II 203, and

"[t]he embryo develops over time because these structures develop as part of the plan

set forth in the organism's DNA." App. V 128 (Declaration of Dr. Brian Gray). "This

organized, coordinated behavior of the embryo is the defining characteristic of a hu-

man organism." App. II 203 (Sander Lee); *see also* App. III 6 (Curlin) ("It is an uncon-

troversial scientific holding that an organism is: 'An individual living thing that can

react to stimuli, reproduce, grow, and maintain homeostasis.'").

Thus, absent interruption in the process (such as miscarriage or abortion),

from fertilization, a human organism genetically distinct from—even though depend-

ent on—the mother, exists. "[W]hether or not a particular person believes that the

11

**A-92**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

life of a human organism begins at conception" as a religious matter, "the *scientific* consensus is that it does." App. III 7 (Curlin) (emphasis added).

Furthermore, according to Carter Snead, a bioethicist and director of the Center for Ethics and Culture at the University of Notre Dame, ethically speaking, "all living human beings are entitled to moral concern and the equal protection of the law, without discrimination." App. III 45–46. Abortion restrictions therefore preserve the lives of human organisms between fertilization and birth. App. III 47 (Snead). Snead also observed that, "[o]ne need not profess any religious faith at all to understand and assent to these propositions." App. III 46.

### B. Indiana's Restrictions on Abortion

Indiana has long restricted abortion. From its earliest days of statehood, Indiana prohibited abortion at any stage by statute. *See, e.g.*, 1835 Ind. Laws ch. XLVII, p. 66, § 3; 1859 Ind. Laws ch. LXXXVI, p. 469, § 2; 1881 Ind. Acts, ch. 37, p. 177, §§ 22–23. In 1972, just before *Roe v. Wade*, the Indiana Supreme Court upheld the State's prohibition of all abortions except where "necessary to preserve [the mother's] life." *Cheaney v. State*, 285 N.E.2d 265, 266 (Ind. 1972) (quoting Ind. Code § 35-1-58-1 (1971)). In *Cheaney*, the court assumed "that a certain [federal constitutional] right to privacy does exist," but considered "whether there is a compelling state interest in the regulation of this activity." *Id.* at 267. It held there is: according to *Cheaney*, the "State's interest" in protecting an unborn child "from the moment of conception" and throughout fetal development "is both valid and compelling." *Id.* at 270.

12

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

One year later, however, the U.S. Supreme Court declared abortion a federal fundamental right and established a viability-based understanding of the State's interest in that context. *Roe v. Wade*, 410 U.S. 113, 93, 163–164 (1973). As a result, the General Assembly amended Indiana's abortion ban to conform to "recent Supreme Court decisions" but still prohibited abortions to the extent permitted under *Roe*'s trimester framework. P.L. No. 322, § 1, 2, 1973 Ind. Acts, pp. 1743–46.

In 1992, the U.S. Supreme Court expanded states' authority to protect prenatal life and maternal health when it upheld Pennsylvania's parental consent, informed consent, and 24-hour waiting period requirements. *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992). But *Casey*, like *Roe*, imposed the "viability" line on the State's interest in protecting fetal life. *Id.* at 846. After *Casey*, Indiana adopted additional regulations, including informed consent and 18-hour waiting period requirements, new protocols for physicians performing abortions, definitions for medical emergency warranting an abortion, and criminal penalties for violating the abortion code. *See* 1995 Ind. P.L. 187-1995; *see also, e.g.*, 2014 Ind. P.L. 98-2014 (hospital admitting privileges, ultrasound requirements, and clinic licensing and inspection laws); 2016 Ind. P.L. 213-2016 (prohibiting race-selective, sex-selective and disability-selective abortions and regulating disposition of fetal remains).

In June 2022, the U.S. Supreme Court held that the federal constitution does not confer a right to abortion, reversed *Roe* and *Casey*, and "returned to the people" of Indiana and "their elected representatives" the "authority to regulate abortion." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2279 (2022). *Dobbs* rejected

13

**A-94**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

*Roe* and *Casey*'s viability line, describing the "glaring deficiencies" in their reasoning and observing they provided no "principled defense of the viability line"—which is, the U.S. Supreme Court further explained, nothing more than an "arbitrary line." *Id.* at 2268–72.

Shortly thereafter, in August 2022, the General Assembly enacted S.B. 1, which, like Indiana's historical restrictions on abortions, makes "abortion" a "criminal act" except when expressly authorized. Ind. Code § 16-34-2-1(a) (as amended by S.B. 1, Sec. 21). Under S.B. 1, abortion is permitted in only three circumstances:

*First*, as amended, Indiana Code § 16-34-2-1(a)(1) permits abortions "before the earlier of viability of the fetus or twenty (20) weeks postfertilization age of the fetus" where (i) "reasonable medical judgment dictates that performing the abortion is necessary to prevent any serious health risk to the pregnant woman or to save the pregnant woman's life" or (ii) "the fetus is diagnosed with a lethal fetal anomaly." A "serious health risk" is one "that has complicated the mother's medical condition and necessitates an abortion to prevent death or a serious risk of substantial and irreversible physical impairment of a major bodily function," but "does not include psychological or emotional conditions." Ind. Code § 16-18-2-327.9. Only hospitals and ambulatory surgical centers may perform abortions under subsection (a)(1). Ind. Code § 16-34-2-1(a)(1)(B).

*Second*, Indiana Code § 16-34-2-1(a)(3) permits abortions "at the earlier of viability of the fetus or twenty (20) weeks of postfertilization age and any time after" where "necessary to prevent any serious health risk to the pregnant woman or to save

14

**A-95**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

the pregnant woman's life." Because subsection (a)(3) permits abortions later in pregnancy than subsection (a)(1), it imposes some additional requirements. Those include that the abortion be "performed in a hospital" and be "performed in compliance with" Indiana Code § 16-34-2-3.  Ind. Code § 16-34-2-1(a)(3)(C)–(D). Indiana Code § 16-34-2-3—which governs "abortions performed on or after the earlier" of viability twenty (20) weeks postfertilization age—in turn requires the presence of a second physician who is prepared to provide care for any "child born alive as a result of the abortion." Ind. Code § 16-34-2-3(b); *see also id.* Ind. Code § 16-34-2-3(a), (c)–(d) (imposing additional requirements).

*Third*, Indiana Code § 16-34-2-1(a)(2) permits abortions "during the first ten (10) weeks of postfertilization age" where the pregnancy arose from rape or incest. Only hospitals and ambulatory surgical centers may perform abortions under subsection (a)(2). Ind. Code § 16-34-2-1(a)(2)(C).

## II.   Plaintiffs Challenge S.B. 1 on Religious-Exercise Grounds

### A. Complaint and demand for relief

The named plaintiffs are five women and the organization Hoosier Jews for Choice. On September 8, 2022, they filed a putative class action complaint challenging S.B. 1 under Indiana's Religious Freedom Restoration Act (RFRA), Ind. Code § 34-13-9-0.7, *et seq.*, App. II 60, and a motion for preliminary injunction, App. II 87. The complaint alleges that S.B. 1 "burdens the plaintiffs' sincere religious beliefs, and those of a putative class of those similarly situated," by prohibiting abortion in circumstances where plaintiffs' religion "direct[s]" them to obtain an abortion. App. II

**A-96**

Brief of Appellants

The Individual Members of the Medical Licensing Board of Indiana, et al.

61. The plaintiffs seek "a preliminary injunction, later to be made permanent, enjoining defendants from taking any action that would prevent or otherwise interfere with the ability of the individual plaintiffs, the class members, and Hoosier Jews for Choice's members from obtaining abortions as directed by their sincere religious beliefs." App. II 85. Although the plaintiffs styled their complaint a "class action complaint," App. II 60, the parties are briefing the plaintiffs' motion for class certification in the trial court, and no class has been certified, App. II 19.

### B. Named plaintiffs

#### 1. Anonymous Plaintiff 1

Anonymous Plaintiff 1 is a 39-year-old woman who is married and has one child. App. II 126–27. Anonymous 1 "wish[es] to try to have another child," App. II 132, but fears that "because of [her] age . . . a pregnancy might seriously endanger [her] health, without necessarily causing death or [the] serious risk of substantial and irreversible physical impairment" sufficient to obtain an abortion under S.B. 1's exceptions. App. II 131–32. She also might seek an abortion if her future child is diagnosed with a genetic abnormality in the womb, regardless of whether such diagnosis would meet the statutory exception under S.B. 1. App. II 131; App. III 123:7–12. But, of course, she might also choose to have a baby with a genetic abnormality. App. III 124:18–21.[1]

---

[1]    By agreement between the parties, plaintiffs' counsel redacted identifying information from the Anonymous Plaintiffs' depositions in the record.

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

Anonymous 1 believes "according to Jewish law and teachings . . . that the life of a pregnant woman, including her physical and mental wellbeing, must take precedence over the potential for life embodied in a fetus." App. II 128. Whether circumstances justify or require abortion "is something that can be interpreted by an individual" and is ultimately an individual decision. App. III 109:7–8. According to Anonymous 1, "there's not one answer for me." App. III 121:1.

Lately, "because [she] would not have the option to terminate a pregnancy if [she] decided [she] needed one," Anonymous 1 has not been trying to become pregnant. App. III 125:10–12, 15–16. Anonymous 1 is "not having sex with [her] husband" yet is still "taking birth control." App. III 126:3–6. When asked what might change if granted a preliminary injunction, Anonymous 1 "imagine[d] [she] would resume sexual relations with [her] husband" but "can't say for sure," ultimately concluding that she does not know how her behavior would change—if at all. App. III 127:16–23.

## 2. Anonymous Plaintiff 2

Anonymous Plaintiff 2 is 30 years old and has a husband and two children. App. II 134. Although she does not wish to have another child right now, Anonymous 2 stated that she "may in the future become pregnant," yet be unable to obtain an abortion should her "beliefs . . . require" one. App. II 136. Anonymous 2, who "use[d] condoms every now and then" and used "the rhythm method . . . much more than . . . now," has increased the "extent" to which she tracks ovulation and abstains from physical intimacy with her husband. App. III 194:13–195:16. If granted a preliminary injunction, Anonymous 2 said she would "go back to [her] normal behavior" by being

17

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

less "stringent" with the "extra precautions" to avoid pregnancy. App. III 195:15, 198:2–7.

Anonymous 2 believes that "within the universe exists a supernatural force or power that connects all humans" and "direct[s] [us] to act in a manner that promotes and does not harm our fellow humans or this community of humanity." App. II 135. For Anonymous 2, "if a pregnancy or the birth of another child would not allow [her] to fully realize [her] humanity and inherent dignity, [she] should terminate that pregnancy." App. II 136. "[R]ealiz[ing] [her] humanity" includes (1) "being able to continue with [her] education and then continue on with [her] career as [she] wanted," (2) "financial stability," and (3) "do[ing] as [she is] doing in [her] life right now." App. III 155:22–156:21.

### 3.  Anonymous Plaintiff 3

Anonymous Plaintiff 3 is a 24-year-old unmarried Muslim woman who does not have children and "do[es] not want to have children at any point in the foreseeable future," in part because she suffers from Crohn's disease. App. II 138–40. For Anonymous 3, "if [her] health or wellbeing—physical, mental, or emotional—were harmed by a pregnancy or a pregnancy-related condition, [she] should terminate the pregnancy." App. II 140. This harm could arise when "a pregnancy . . . [i]s simply unwanted," *id.*, where she has "flare-ups" from Crohn's disease, App. IV 56:11, or where the pregnancy implicates her "financial well-being or just not being able to take care of a . . . child." App. IV 56:9–10.

18

**A-99**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

Although she would like to have children someday, Anonymous 3 believes she must "abstain from sexual intercourse" to "ensure that [she] will not need an abortion that would be prohibited" by S.B. 1—even though her partner successfully used contraceptives when they were intimate before S.B. 1's enactment, App. II 141; *see* App. IV 69:13–20, and would presumably continue using them even with an injunction. App. IV 57:16–19. Anonymous 3 said that, if granted an injunction, she would "not be abstinent." App. IV 12:18.

Anonymous 3 believes, "according to the teachings of Islam," that "life does not begin at conception," but rather at the time an unborn child's soul is "breathed into a womb at around 120 days' gestation." App. II 139. She further believes "that the life of a pregnant woman, including her overall wellbeing, always takes precedence over a fetus." *Id.*

### 4. Anonymous Plaintiffs 4 and 5

Anonymous Plaintiff 4 and Anonymous Plaintiff 5 are married "female individuals." App. II 143. They would like to conceive a child using "assisted reproductive technologies." App. II 145. Anonymous 4 "was going to be the one to first . . . try to become pregnant and carry," App. IV 103:16–18, and Anonymous 5 is willing to "be the backup." App. IV 166:19. Despite wishing to become pregnant, this couple wishes to have abortion available if things do not work out as they envision. So, while before S.B. 1 they had begun "[c]onsulting a doctor" about becoming pregnant, App. IV 103:1, they suspended that process to avoid becoming pregnant during a time when abortion

19

**A-100**

is unavailable, App. II 145. Anonymous 4 acknowledged that, even if granted a preliminary injunction, she "would still be hesitant to get pregnant, because if an appeal went through and [the injunction] was overturned again, then [she] would be pregnant but in a place where the law [against abortion] was still standing." App. IV 109:12–16.

Why might a couple seeking to become pregnant be concerned about access to abortion?  In addition to concern about needing an abortion if her "life would possibly be in danger"—which S.B. 1 would permit—Anonymous 4 wishes for abortion to be available in case "something else was going on where [she] felt [she] needed to have an abortion." App. IV 104:22–25.

Anonymous 4 and 5 believe Judaism teaches that "the life of a pregnant person, including their physical and mental health and wellbeing, takes precedence over the potential for life embodied in a fetus." App. II 144. They believe that, where their "physical or mental health would be harmed by a pregnancy, but where the pregnancy d[oes] not put [them] at risk of death or permanent impairment of a bodily system," their "religious beliefs would direct [them] to terminate a pregnancy." App. II 145.

For Anonymous 4, "I think my Jewish faith tells me that if having an abortion is the way that means that I'm taking care of my health and well-being, that I should do that to take care of myself as the person who is living in the world right now. . . . [My faith] would require me to take care of myself in how I felt that I should in order to be a healthy person living in the world." App. IV 106:25–107:9. Likewise, for Anonymous 5, "if there was something that emotionally or physically was going on that

Brief of Appellants

The Individual Members of the Medical Licensing Board of Indiana, et al.

was causing distress, Judaism and my faith and my values would mean that I would

need to have an abortion." App. IV 161:9–13.

### 5. Hoosier Jews for Choice

Hoosier Jews for Choice, a newly formed organization, "exists to take action

within the Jewish community and beyond to advance reproductive justice, support

abortion access, and promote bodily autonomy . . . across the state of Indiana." App.

II 149. The organization subscribes to the belief that "an abortion is directed to occur

if it is necessary to prevent physical or emotional harm to a pregnant person." *Id.*

"The pregnant person" makes the decision whether an abortion is necessary—Hoosier

Jews for Choice "do[es not] think there's one answer for every pregnant person." App.

V 33:18–22.

Hoosier Jews for Choice avers that some of its members—around 45, App. V

55:19—"are capable of becoming pregnant and if they became pregnant, could require

an abortion that would be prohibited" by S.B. 1. App. II 149. Individuals need not

hold the same Jewish beliefs, however—or any religious beliefs for that matter—to

be members of Hoosier Jews for Choice. App. V 35:25–36:2, 36:8–12.

### C. Preliminary Injunction

On December 2, 2022, the trial court issued an order enjoining enforcement of

S.B. 1 "against the Plaintiffs." App. II 59. It concluded that they "demonstrated by

the greater weight of the evidence that the Plaintiffs have a prima facie likelihood of

success on the merits of their claims," namely that the law "substantially burdens the

**A-102**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

religious exercise of the Plaintiffs" and "is not the least restrictive means to achieve

a compelling government interest." App. II 59.

Regarding the plaintiffs' burden, the trial court "f[ound] that the Plaintiffs'

practices regarding abortion are religious in nature," and that they demonstrated

S.B. 1 substantially burdens those practices because the plaintiffs "are avoiding be-

coming pregnant" and have changed their "sexual and reproductive practices." App.

II 46–47.

As for the State's interest, the trial court refused to apply Indiana Supreme

Court precedent holding that the State's interest in protecting fetal life at all stages

of development is "compelling." App. II 50–51 (citing *Cheaney*, 285 N.E.2d at 265).

Although it recognized that, as a "factual" matter, "[o]f course, it is not disputed that

human zygotes, embryos, and fetuses are of the human species," the trial court

faulted the State for "attempting to establish as a factual matter when a human

comes into being." App. II 48–49. Notably, "[the] Court f[ound] that the question of

when life begins is a theological one not a factual question for this Court." App. II 49.

Thus, in the trial court's view, it and "other Courts"—including the Indiana Supreme

Court—cannot hold that the State's interest in protecting human lives inside the

womb is compelling because such a holding would require "select[ing] different theo-

logical or religious definitions of conception," which "is prohibited under RFRA." App.

II 51.

And despite acknowledging that the U.S. Supreme Court overruled *Roe v.

Wade* and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, the trial court

22

**A-103**

Brief of Appellants

The Individual Members of the Medical Licensing Board of Indiana, et al.
nevertheless invoked their articulation of the State's interest at "viability" because,
according to the court, "*Dobbs* said nothing to suggest that the nature of the State's
interest has somehow changed." App. II 51. So, according to the trial court, while the
General Assembly and courts may not decide that a protectable human being exists
upon fertilization, the U.S. Supreme Court's overturned precedents irrefutably estab-
lish a state interest in protecting a fetus at viability but not before.

As for the justiciability issues raised by the State, the court first held that
"Hoosier Jews for Choice has standing to raise its claim under Indiana law caselaw
[sic] and RFRA." App. II 40. In the court's view, Hoosier Jews for Choice may bring
its members' claims because it meets the statutory requirement of an organization
bringing a RFRA claim—it "exists for a religious purpose"—and "the Indiana Court
of Appeals has recognized third-party standing specifically in the abortion context."
App. II 39 (citing *Planned Parenthood v. Carter*, 963 N.E.2d 853, 870 (Ind. Ct. App.
2006); *In re Ind. Newspapers v. Junior Achievement of Central Ind.*, 963 N.E.2d 534,
549 (Ind. Ct. App. 2013)). And while the court described standing in general, includ-
ing the requirement that "a party . . . show a specific injury," the court did not identify
an injury suffered by Hoosier Jews for Choice. *See* App. II 39–40.

The court further concluded that "this matter is sufficiently ripe for review"
because "[t]he Plaintiffs in this case are . . . merely challenging the validity of the
statute" and need not "become pregnant before they may challenge the law." App. II
40–41. For the court, "that the Plaintiffs are suffering injury and altering their be-
havior" related to birth control and sexual practices is enough to satisfy ripeness for

23

**A-104**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

their RFRA claims about abortion access—even though none alleged that their sexual

practices (or desire to use artificial reproductive technology) constitute a religious

exercise. App. II at 40.

After concluding all "requirements for a preliminary injunction [we]re met,"

the court "ENJOIN[ED] the Defendants and their officers from enforcing the provi-

sions of [S.B. 1] against the Plaintiffs." App. II 59. The injunction order is not limited

to circumstances where the plaintiffs seek an abortion for sincere religious reasons.

*See* App. II 56–59.

## SUMMARY OF THE ARGUMENT

After several decades of federal restrictions on the State's ability to regulate

abortion, the U.S. Supreme Court has "returned to the people" of Indiana "and their

elected representatives" the "authority to regulate abortion." *Dobbs*, 142 S. Ct. at

2279. The trial court, however, has enjoined the State from enforcing its new abortion

law against Hoosier Jews for Choice and five women because, in the court's view, S.B.

1's restrictions on when abortions may be performed substantially burdens plaintiffs'

religious exercise without furthering a compelling government interest. App. II 46–

55. That holding must be overturned for several reasons.

I. Indiana's standing and ripeness doctrines bar plaintiffs' RFRA claims. First,

Hoosier Jews for Choice lacks standing to assert its members' RFRA claims. "The

judicial doctrine of standing focuses on whether the complaining party is the proper

party to invoke the court's power." *Foundations of E. Chi., Inc. v. City of East Chicago*,

24

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

927 N.E.2d 900, 903 (Ind. 2010). Here, although RFRA allows an organization to as-

sert its own claims, it does not authorize it to assert its members' personal religious-

exercise claims. Moreover, associational-standing doctrine—the availability of which

is not certain, *Bd. of Comm'rs of Union Cnty. v. McGuinness*, 80 N.E.3d 164, 169–70

(Ind. 2017)—does not otherwise allow Hoosier Jews for Choice to do so. Religious-

exercise claims "ordinarily require[] individual participation" of members, and their

participation is even more important where—as is the case here—the asserted reli-

gious beliefs depend entirely on individual assessments. *Harris v. McRae*, 448 U.S.

297, 321 (1980).

Second, no plaintiff's claim is ripe for review. The doctrine of ripeness demands

that the record be adequately developed for adjudication so that courts decide the

"issues in a case . . . based on actual facts rather than on abstract possibilities." *Ind.*

*Dep't of Envtl. Mgmt. v. Chem. Waste Mgmt., Inc.*, 643 N.E.2d 331, 336 (Ind. 1994).

RFRA claims require "case-by-case consideration" of sincere religious exercise, sub-

stantial burden, and compelling interest in each case. *Gonzalez v. O Centro Espirita*

*Beneficente Uniao de Vegetal*, 546 U.S. 418, 436 (2006). The record here lacks the

facts necessary for a court to decide the plaintiffs' RFRA claims—namely, whether

S.B. 1 "substantially burdens" the plaintiffs' "sincere exercise of religion," *Blattert v.*

*State*, 190 N.E.3d 417, 421 (Ind. Ct. App. 2022)—which plaintiffs define as "obtaining

an abortion" under future, contingent, and as-yet unknown circumstances.

II. Regardless, plaintiffs' claims fail under RFRA. The plaintiffs have not met

their burden of showing that obtaining an abortion—or having unfettered access to

abortion—is "religious exercise" under the statute. "Religious exercise" means that an action *itself* is imbued with "religious significance." *Ackerman v. Washington*, 16 F.4th 170, 189 n.10 (6th Cir. 2021). Abortion does not carry religious significance to these plaintiffs, but is instead a means by which they can mitigate "harm" to their "physical, mental, or emotional" "health or wellbeing" if, in their estimation, a pregnancy threatens them. App. II 70–71, 76, 81, 83. The plaintiffs' birth control practices likewise do not carry religious significance, and they do not claim that these practices are the religious exercise for which they seek relief from a government-imposed burden. They have therefore failed to make their prima facie showing.

Even if plaintiffs have met their burden of demonstrating a substantial burden to their sincere religious exercise, the State nevertheless may enforce S.B. 1 against the plaintiffs because S.B. 1 is the "least restrictive means" of furthering its "compelling government interest" in protecting human lives in the womb. Ind. Code § 34-13-9-8(a). The Indiana Supreme Court has already held that the State's interest in protecting unborn children is "valid and compelling" from "the moment of conception." *Cheaney v. State*, 285 N.E.2d 265, 270 (1972). The trial court refused to apply *Cheaney* because, despite being overruled, *Roe* and *Casey* still mean that the State cannot act to protect human life before fetal viability. That is not a valid reason for refusing to apply *Cheaney*, which remains binding precedent on all lower Indiana courts. Besides, regardless of precedent, protecting human life from destruction at all stages of development is grounded in science and ethics, not religion, and the trial court erred in concluding that the legislature has no power to establish such ethical norms.

**A-107**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

Further, S.B. 1 is sufficiently narrowly tailored in advancing the State's interest in protecting human life at all stages of development. S.B. 1's narrow exceptions—where there is serious risk to the life of the mother, serious risk of serious, permanent injury to the mother, the fetus has a lethal abnormality, or the pregnancy was the result of criminal conduct—do not render it impermissibly underinclusive in pursuing this interest. Because S.B. 1 undoubtedly furthers the State's interest in protecting unborn human lives by prohibiting abortions in nearly all cases, and no other means would further its interest while being less restrictive on the plaintiffs' asserted religious exercise, it meets the least-restrictive-means requirement.

III. Finally, the remaining preliminary-injunction factors weigh against granting injunctive relief to these plaintiffs because they have not demonstrated that an injunction will prevent any certain RFRA violation and, moreover, broadly enjoins future conduct that may not constitute RFRA violations at all.

Indiana does not endorse per-se irreparable harm, *Indiana Fam. & Soc. Servs. Admin. v. Walgreen Co.*, 769 N.E.2d 158, 162 & n.3 (Ind. 2002), and the plaintiffs have shown no "certain" threat to their alleged religious exercise, *Wagler Excavating Corp. v. McKibben Const., Inc.*, 679 N.E.2d 155, 157 (Ind. Ct. App. 1997). Indeed, there is no certainty whatever that (1) any plaintiff will ever become pregnant in the future; (2) in the event of a future pregnancy, she will seek an abortion, let alone one motivated by sincere religious beliefs; and (3) the circumstances under which she seeks an abortion will not meet one of S.B. 1's exceptions. "[I]njunctive relief is not to be used simply to eliminate a possibility of a remote future injury," *Crossman Cmtys.,*

27

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

*Inc. v. Dean*, 767 N.E.2d 1035, 1041 (Ind. Ct. App. 2002), but that is all plaintiffs seek

to do here.

The balance of harms and public interest also disfavor injunctive relief, as the

State's interest in protecting unborn children carries great weight, and the legisla-

ture's law reflects the public interest. *Avemco Ins. Co. v. State ex rel. McCarty*, 812

N.E.2d 108, 121 (Ind. Ct. App. 2004).

Additionally, the relief granted here—"ENJOIN[ING] the Defendants and

their officers from enforcing the provisions of S.E.A. 1 against the Plaintiffs," App. II

59—exceeds the court's remedial authority. For one, this broad injunction fails to

"specif[y] in terms[, and] . . . describe in reasonable detail, and not by reference to the

complaint or other document, the act or acts sought to be restrained," as Indiana Trial

Rule 65(D) requires. The trial court's injunction also enjoins conduct far beyond

RFRA's remedial authorization. RFRA allows injunctive relief that "prevents, re-

strains, corrects, or abates the violation," Ind. Code § 34-13-9-10(b)(1), but the trial

court has enjoined the State from enforcing S.B. 1 against the plaintiffs without limit,

implicating future government conduct that may not constitute a "violation" of RFRA

at all.

For these reasons, the Court should reverse the trial court's order granting a

preliminary injunction.

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

## ARGUMENT

**I.     The Court Lacks Jurisdiction To Hear These Claims**

### A. Hoosier Jews for Choice lacks standing to assert its members' RFRA claims against S.B. 1

Hoosier Jews for Choice lacks standing to bring its members' RFRA claims. RFRA allows an organization to bring its *own* RFRA claim where its practices are implicated. Ind. Code § 34-13-9-7. So, for example, churches have brought RFRA claims to use controlled substances in their religious ceremonies. *See, e.g.*, *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 423–24 (2006) (religious sect sued under federal RFRA to protect practice of "receiv[ing] communion by drinking a sacramental tea" containing federally banned hallucinogen). Here, however, Hoosier Jews for Choice asserts the purported religious-exercise rights of its *members* "to access abortion care consistently with their religion." App. II 83; App. II 36–38.

Standing "is a limit on the court's jurisdiction which restrains the judiciary to resolving real controversies in which the complaining party has a demonstrable injury." *Schloss v. City of Indianapolis*, 553 N.E.2d 1204, 1206 (Ind. 1990). The court reviews procedural defenses, like standing, de novo. *Holcomb v. Bray*, 187 N.E.3d 1268, 1275 (Ind. 2022). The doctrine is predicated on the "express distribution of powers clause" of Article 3, Section 1. *Horner v. Curry*, 125 N.E.3d 584, 589–90 (Ind. 2019). The Court's "responsibility lies in preserving these boundaries." *Id.* ("Good fences make good neighbors"). It is therefore incumbent upon the Court to police its jurisdiction and not create new exceptions to standing doctrine.

**A-110**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

Although federal courts in certain circumstances allow associations to assert claims on behalf of their members, judges and academics increasingly critique the doctrine. Critics observe, for example, that associational standing in the federal courts lack "historical support," and "arose more from historical accident than practice." *Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, 13 F.4th 531, 538–39 (6th Cir. 2021). Allowing associations to assert standing premised on their members' injuries also creates problems of enforcement and remedy: are *all* present and future members entitled to relief and bound by the judgment? *Id.* at 541. Moreover, as a practical matter, "when the wrong party litigates a case, [the court] end[s] up resolving disputes that make bad law." *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 2322–23 (2016) (Thomas, J., dissenting). The availability of this doctrine in Indiana remains uncertain, as the Indiana Supreme Court has "never . . . ruled with respect to associational standing." *Bd. of Comm'rs of Union Cnty. v. McGuinness*, 80 N.E.3d 164, 169–70 (Ind. 2017) ("assuming without deciding" the doctrine applied). The Court should decline to recognize it here.

Even if the Court applies the "federal" doctrine of associational standing, *McGuinness*, 80 N.E.3d at 169–70, that doctrine does not permit Hoosier Jews for Choice to assert its members' RFRA claims here. Where the Court of Appeals has considered associational standing, it has applied the requirements articulated in *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333 (1977)). *See, e.g., Bd. of Comm'rs v. Ne. Ind. Bldg. Trades Council*, 954 N.E.2d 937, 941 (Ind. Ct. App. 2011) (citing *Save the Valley, Inc. v. Ind.-Ky. Elec. Corp.*, 820 N.E.2d 677 (Ind. Ct. App.

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

2005)). One such requirement—that "neither the claim asserted nor the relief re-

quested requires participation of individual members in the lawsuit," *id.*—bars Hoos-

ier Jews for Choice from asserting its members' RFRA claims.

The individual-participation requirement is met where the claim "does not in-

volve or implicate individual [members] in determining operative facts." *Bd. of

Comm'rs*, 954 N.E.2d at 942. Religious-exercise claims like RFRA, however, require

"case-by-case consideration" and individualized determinations of operative facts.

*Gonzalez*, 546 U.S. at 436 (federal RFRA); *see also, e.g.*, *Barr v. City of Sinton*, 295

S.W.3d 287, 302 (Tex. 2009) (Texas' RFRA "requires a case-by-case, fact-specific in-

quiry").

For a plaintiff to meet her burden under RFRA, she must "show[] the disputed

governmental action substantially burdens a sincerely held religious belief." *Blattert*,

190 N.E.3d at 421. After that, "the burden shifts to the government to establish that

a compelling governmental interest is 'satisfied through application of the challenged

law 'to the person'—the particular claimant whose sincere exercise of religion is being

substantially burdened." *Id.* (quoting *Gonzales*, 546 U.S. at 420). Thus, the resolution

of multiple issues in a RFRA case—including whether the plaintiffs' religious exercise

is sincere, whether the government action substantially burdens the religious exer-

cise, and whether the government's application of the law to the claimant furthers

the claimed government interest—require the *individual claimant*'s participation.

**A-112**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

Critically, the U.S. Supreme Court has rejected associational standing by an organization advancing the claims of low-income members demanding federal funding for abortion as a matter of religious exercise. *Harris v. McRae*, 448 U.S. 297, 321 (1980). The Court explained, "[s]ince 'it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion,'" religious-exercise claims "ordinarily require[] individual participation." *Id.* (quoting *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 223 (1963)). The claims in *Harris* were no exception. There, the organization "concede[d] that 'the permissibility, advisability and/or necessity of abortion according to circumstance is a matter about which there is a diversity of view within . . . our membership, and is a determination which must be ultimately and absolutely entrusted to the conscience of the individual before God." *Id.* Accordingly, the Court held that "the participation of individual members" is "essential to a proper understanding and resolution of their free exercise claims." *Id.*

The same is true here. Hoosier Jews for Choice itself explained that, in its view, whether a woman's circumstances require an abortion under Jewish law "is probably [determined] on a case-by-case basis," and the organization "do[es not] think there's one answer for every pregnant person." App. V 33:18–22. Just as the claims in *Harris* required individual participation by members because the "necessity of abortion" was left to the "conscience of the individual before God," *Harris*, 448 U.S. at 321, in Hoos-

32

**A-113**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

ier Jews for Choice's view, "[t]he pregnant person" decides whether abortion is required "depending on . . . the circumstances surrounding the pregnancy, or the pregnant person's physical and mental health." App. V 33:10–12, 22.

Perhaps even more significant, Hoosier Jews for Choice will accept anyone who wishes to join, not only those who hold the same religious beliefs. App. V 35:25–36:19. Thus, simply claiming membership in Hoosier Jews for Choice does not guarantee an individual holds sincere religious beliefs consistent with Hoosier Jews for Choice's professed beliefs.

Because the analysis of each member's sincerity and the substantial burden on their religious exercise necessarily will differ from that of other members', participation of the members in this litigation is "essential to a proper understanding and resolution of their free exercise claims," *Harris*, 448 U.S. at 321. No proper understanding of associational standing doctrine allows Hoosier Jews for Choice to bring these claims.

## B. None of plaintiffs' claims is ripe for review

This Court cannot review the merits of the individual plaintiffs' claims because they brought their claims far too early, and no claim is sufficiently ripe for adjudication. Put simply, the sincerity of plaintiffs' beliefs that their religions require abortion, and the level of burden on their exercise of those beliefs, are highly circumstantial and must be assessed in the moment under concrete circumstances, not in the abstract.

**A-114**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

"[R]ipeness asks whether [a] claim is sufficiently developed to merit judicial review." *Holcomb*, 187 N.E.3d at 1285. A corollary of standing doctrine, ripeness is a "vital element in the separation of powers," as it "limits the judiciary to resolving concrete disputes between private litigants while leaving questions of public policy to the legislature and the executive." *Horner*, 125 N.E.3d at 589. "Ripeness relates to the degree to which the defined issues in a case are based on actual facts rather than on abstract possibilities." *Ind. Dep't of Envtl. Mgmt. v. Chem. Waste Mgmt., Inc.*, 643 N.E.2d 331, 336 (Ind. 1994). Importantly, "[a] claim is not ripe for adjudication if it rests upon contingent future events 'that may not occur as anticipated or . . . may not occur at all." *Ind. Family Inst. Inc. v. City of Carmel*, 155 N.E.3d 1209, 1218 (Ind. Ct. App. 2020) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1988)).

The claims in this case are entirely too premature for any court to decide without resorting to reliance on "abstract possibilities," *Ind. Dep't of Envtl. Mgmt.*, 643 N.E.2d at 336, about "contingent future events," *Ind. Family Inst. Inc.*, 155 N.E.3d at 1218.

## 1. No plaintiff asserts facts necessary to review whether S.B. 1 substantially burdens sincere religious exercise

RFRA first requires the claimant to "show[] that the disputed governmental action substantially burdens a sincerely held religious belief." *Blattert*, 190 N.E.3d at 421 (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 705 (2014)); Ind. Code § 34-13-9-8(a). Whether the plaintiff has met that burden necessarily involves a "case-by-case consideration" sensitive to individual facts and circumstances. *Gonzales v. O*

34

**A-115**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

*Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006) (applying federal RFRA); *see also, e.g.*, *United States v. Quaintance*, 315 Fed. App'x 711, 713 (10th Cir. 2009) (quoting *United States v. Affleck*, 765 F.2d 944, 952 (10th Cir.1985)) ("whether a particular question is 'substantial' [under federal RFRA] must be determined on a case-by-case basis"); *Barr v. City of Sinton*, 295 S.W. 3d 287, 302 (Tex. 2009) (Texas' RFRA "requires a case-by-case, fact-specific inquiry").

The plaintiffs' claims here—that S.B. 1 "severely burdens [their] sincere religious beliefs" by prohibiting abortions under circumstances where their "sincere religious beliefs direct them to obtain an abortion," App. II 61—evade the "focused inquiry required by RFRA." *Gonzales*, 546 U.S. at 432.

To start, this analysis requires an inquiry into the plaintiffs' sincerity. *Blattert v. State*, 190 N.E.3d 417, 421 (Ind. Ct. App. 2022) (plaintiff's burden under RFRA requires demonstrating burden on her "sincere exercise of religion"). In any given circumstance, the decision to obtain an abortion could be motivated either by sincere religious belief or another reason for which religion is asserted as pretext. *See, e.g.*, *United States v. Quaintance*, 608 F.3d 717, 722 (10th Cir. 2010) (Gorsuch, J.) (describing "numerous pieces of evidence in this case strongly suggest[ing] that the Quaintances' marijuana dealings were motivated by commercial or secular motives rather than sincere religious conviction").

Thus far, however, the State has not been able to make a direct sincerity argument because no plaintiff has presented concrete facts about seeking an abortion by which her sincerity might be considered. "Neither the government nor the court has

35

**A-116**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

to accept the [claimant's] mere say-so," *United States v. Bauer*, 84 F.3d 1549, 1559 (9th Cir. 1996), and so the State is entitled to test a claimant's sincerity when she makes the abortion decision, not ex ante months or years before the relevant circumstances come to pass.

In any event, an abortion is possible only if there is a pregnancy, so the existence of a pregnancy is essential to the plaintiffs' request to obtain "an abortion in the future consistent with the[ir] beliefs." App. II 61. In *Harris v. McRae*, for example, the U.S. Supreme Court held that some of the individual plaintiffs could not bring their free-exercise claims demanding state-funded abortions because, although they "provide[d] a detailed description of their religious beliefs," they "failed to allege either that they are or expect to be pregnant or that they are eligible to receive Medicaid." 448 U.S. at 2690. Thus, the plaintiffs "lack[ed] the personal stake in the controversy needed to confer standing to raise such a challenge to the Hyde Amendment." *Id.* Likewise, here, no plaintiff is currently pregnant, and whether any will become pregnant—and whether, if pregnant, any will wish to have an abortion for religious (or any other) reasons—is speculative.

Even in the event of a future pregnancy, whether any plaintiff also will face circumstances she believes require abortion—under circumstances not meeting one of S.B. 1's exceptions—is uncertain and highly contingent on multiple speculative future events. For example, Hoosier Jews for Choice explained, "if [its members] became pregnant, [they] could require an abortion that would be prohibited by S.E.A.

36

**A-117**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

1," if the pregnant person determines that "it is necessary to prevent physical or emo-
tional harm to [her]." App. II 149. This could include anything from minor discomfort
from pregnancy to mental-health concerns. App. V 32:23–25, 33:13–19. It depends
entirely on what "[t]he pregnant person" decides is necessary. App. V 33:18–22. The
individual plaintiffs described similarly speculative circumstances under which they
might seek an abortion in the future.

Take Anonymous 1, for instance: "if my health or wellbeing—physical, mental,
or emotional—were endangered by a pregnancy, pregnancy-related condition, or fetal
abnormality, I must terminate the pregnancy." App. II 128. She acknowledged that
in "most of the cases," the presence of the "same chromosomal abnormality that [she]
had in [her] previous pregnancy" would fall within S.B. 1's exception for lethal fetal
anomalies. App. III 124:1–7, 126:23–127:3. And even if a future pregnancy does not
fall within the exceptions, Anonymous 1 would not necessarily abort the fetus. App.
III 124:8–11, 18–21. Instead, if faced with those circumstances, she would at that
time consider "[t]he impact on [her] physical, mental, and emotional well-being and
health." App. III 124:22–25. In any event, however, Anonymous 1 is not pregnant,
does not wish to become pregnant soon, and is taking precautions to prevent preg-
nancy. App. III 125:1–4, 10–12, 125:22–126:3. Any burden S.B. 1 imposes on Anony-
mous 1's ability to obtain an abortion is thus remote and contingent on several as-
yet-unknown events.

Anonymous 2 "believe[s] that if a pregnancy or the birth of another child would
not allow me to fully realize my humanity and inherent dignity, I should terminate

37

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

that pregnancy." App. II 136. This includes myriad considerations such as whether she can "mentally . . . take on another human" and whether she can "financially sustain a living." App. III 188:22, 189:10–11. In fact, "[i]t entails everything" and requires her to "do as [she] see[s] fit for [her]self and [her] family" at that time. App. III 189:18–20. Anonymous 2 is not pregnant and is taking precautions to prevent pregnancy. App. III 194:6–15. But she explained, "if I deem that it is necessary for me to have another child in order to realize . . . my full humanity, then I would have another child." App. III 189:23–190:1. Thus, any application of S.B. 1 to Anonymous 2's circumstances is highly remote and contingent on future circumstances, particularly her future state of mind.

For Anonymous 3, "according to my Islamic beliefs, if my health or wellbeing—physical, mental, or emotional—were harmed by a pregnancy or a pregnancy-related condition, I should terminate the pregnancy." App. II 140. "This could include circumstances involving a pregnancy that was simply unwanted, as pregnancy and childbirth involve significant discomfort, pain, and health risk, or instances of risk to my physical health . . . ." *Id.* Anonymous 3 is not pregnant and is remaining abstinent to prevent pregnancy. App. IV 57:22–24, 67:14–17. In the unlikely event of a future pregnancy, Anonymous 3 will not necessarily seek an abortion. Instead, the decision will depend on many considerations, including her "financial well-being" and whether she has "go[ne] into remission [for Crohn's disease] for an extended period of time." App. IV 60:15–16, 24. With so many contingencies, no court can assess whether and how S.B. 1 imposes a substantial burden on Anonymous 3's sincere religious exercise.

38

**A-119**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

And for Anonymous 4 and Anonymous 5, "[i]f we became pregnant, there are circumstances in which our religious beliefs would direct us to terminate a pregnancy, but where such a termination would be prohibited by S.E.A. 1." App. II 145. Anonymous 4 and Anonymous 5, who are married, are under no certain or immediate risk of getting pregnant, which would require use of artificial insemination or in vitro fertilization. Nevertheless, in case of a future pregnancy, they want to have a child and would only decide to get an abortion if their "physical, mental, [or] emotional well-being endangered their holistic well-being," which "is up to that individual person." App. IV 152:13–14, 154:15–16; App. IV 103:7, 106:25–107:3. Again, whether they will face a substantial burden to their sincere religious exercise of obtaining an abortion depends on a host of contingencies, preventing a court from making the necessary assessments under RFRA at this time.

Identifying concrete facts is also critical because RFRA does not authorize a court to grant an injunction preventing application of S.B. 1 to the plaintiffs in all circumstances. RFRA requires that any relief be tailored to "prevent[], restrain[], correct[], or abate[] the [alleged] violation." Ind. Code § 34-13-9-10(b)(1). The trial court's order, which vaguely "ENJOINS the Defendants and their officers from enforcing the provisions of S.E.A. 1 against the Plaintiffs," App. II 59, covers conduct far beyond preventing a "violation of" RFRA.

The plaintiffs' claims are unripe because none rely on "actual facts" but instead require the Court to accept their reliance on mere "abstract possibilities." *Ind. Dep't*

39

**A-120**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

*of Envtl. Mgmt.*, 643 N.E.2d at 336. And without actual facts as to these issues, no

court can make these determinations—and grant appropriate relief—under RFRA.

### 2. No plaintiff presents facts necessary to undertake individual compelling-interest inquiry

In the State's view, its compelling interest in saving prenatal life *always* justi-

fies applying S.B. 1's general prohibition on abortion to religious claimants. The

plaintiffs, however, have argued that the State's interest justifies S.B. 1's application

only to *some* women or under *some* circumstances. *See* App. V 116. If the plaintiffs

are correct, however, a "fact-specific," "context-dependent" analysis as to this compel-

ling interest is required, *United States v. Christie*, 825 F.3d 1048, 1062 (9th Cir.

2016), yet the plaintiffs have failed to present the necessary context by which a court

can make this assessment.

"RFRA empowers courts to grant *exceptions* to generally applicable laws . . . ."

*Christie*, 825 F.3d at 1064 (emphasis added); *see* Ind. Code § 34-13-9-10(b)(1) (author-

izing relief to "prevent[], restrain[], correct[], or abate[] *the violation*" (emphasis

added)). It requires an individual assessment as to whether the "compelling govern-

mental interest is 'satisfied through application of the challenged law "to the per-

son"—the particular claimant whose sincere exercise of religion is being substantially

burdened.'" *Blattert*, 190 N.E.3d at 421 (quoting *Gonzales*, 546 U.S. at 420)).

For all plaintiffs, their asserted religious exercise of "obtaining abortions," App.

II 84, is nothing more than an "abstract possibilit[y]." *Ind. Dep't of Envtl. Mgmt.*, 643

N.E.2d at 336. No plaintiff is certain to become pregnant in the future, no plaintiff is

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

certain to seek an abortion in case of a future pregnancy, and, furthermore, no plaintiff is certain to do so under circumstances not allowed under S.B. 1. The plaintiffs have therefore failed to present claims that are ripe for adjudication under RFRA, which requires particularized assessments of each plaintiffs' sincerity, the alleged substantial burden to religious exercise, and the government's compelling interest.

### 3. This is an as-applied challenge, but the trial court improperly applied ripeness standards for facial challenges

In the trial court's view, the case was ripe because "[t]he Plaintiffs in this case are doing as did the Governor in *Holcomb v. Bray* and merely challenging the validity of a statute." App. II 40. This analysis is entirely too facile and ignores critical distinctions with *Holcomb v. Bray*.

Merely "challenging the validity of a statute" does not satisfy ripeness; such a rule would require nothing more than a complaint to be filed. The Indiana Supreme Court's cases—including *Holcomb v. Bray*—demand more. In *Holcomb v. Bray*, the Supreme Court explained that "the Governor alleges the law is unconstitutional *on its face*, [so it] need not consider specific facts." 187 N.E.3d at 1287. Indeed, the Court specifically observed that no additional "occurrence would add anything to the record to help [the Court] address HEA-1123's constitutionality." *Id.* at 1288.

Here, in contrast, the plaintiffs do *not* assert a facial constitutional challenge against S.B. 1 but rather seek individual exceptions authorized by another statute when fact-dependent criteria are met. As explained above, the record is *not* adequately developed because no one knows what circumstances the plaintiffs will face

41

**A-122**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

in the future. *Holcomb v. Bray*, a facial constitutional challenge that acknowledged

the absence of any factual questions, does not support ripeness in this case.

Finally, whether "the Plaintiffs are suffering injury and altering their behavior

at the current time," App. II 40, likewise does not support ripeness. At most, it demon-

strates the individual plaintiffs are injured for purposes of standing. *Schloss*, 553

N.E.2d at 1206 ("The standing requirement is a limit on the court's jurisdiction which

restrains the judiciary to resolving real controversies in which the complaining party

has a demonstrable injury."). But standing and ripeness involve different inquiries.

*Holcomb v. Bray*, 187 N.E.3d at 1285. While current and ongoing injury may be rele-

vant to standing and mootness, it does not demonstrate that the claim is ripe for

adjudication, which requires adequate development of the record for adjudication of

the claims. *Id.* Here, no plaintiff's claim is ripe for review.

## II.   Notwithstanding RFRA, the State May Enforce S.B. 1 Even Where an Abortion Is Motivated By a Sincere Religious Belief

The plaintiffs' claims also fail on the merits under RFRA. No reasonable un-

derstanding of religious liberty encompasses the plaintiffs' extraordinary claims of

entitlement to abortion. Thus plaintiffs failed to demonstrate a "reasonable likelihood

of success"—an issue reviewed de novo. *State v. Econ. Freedom Fund.*, 959 N.E.2d

794, 800 (Ind. 2011).

### A. The record shows that neither abortion nor plaintiffs' birth control practices carry religious significance for these plaintiffs

To succeed on their RFRA claims, plaintiffs must make a prima-facie showing

that the challenged government action "substantially burden[s] a person's exercise of

religion." Ind. Code § 34-13-9-8(a); *Blattert v. State*, 190 N.E.3d 417, 421 (Ind. Ct.

42

**A-123**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

App. 2022). This burden is heavy: "[A] substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable." *Civil Liberties for Urb. Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003). The plaintiffs have not made that showing—they have not demonstrated that "obtain[ing] abortions under circumstances where abortions are now prohibited in Indiana," App. V 92, is a "religious exercise." Merely believing that a fetus is but an appendage of the mother's body or that the mother's physical, mental, and emotional health and wellbeing take precedence over her child while it is in the womb, do not make abortion—or unfettered access to abortion—a "religious exercise."

Religious exercise requires "'not only belief and profession'" but also "'performance of (or abstention from) physical acts' that are 'engaged in for religious reasons,'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 710 (2014) (quoting *Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 877 (1990)). "Religious exercise" means that an action *itself* is imbued with "religious significance." *Ackerman v. Washington*, 16 F.4th 170, 189 n.10 (6th Cir. 2021) ("[T]he food at issue in a RLUIPA case must have some religious significance or else there is no claim in the first place.").

Cognizable religious exercises have included prison diets for "keeping kosher," *Baranowski v. Hart*, 486 F.3d 112, 124 (5th Cir. 2007), "Sabbath and holy day gatherings," *Adkins v. Kaspar*, 393 F.3d 559, 568 (5th Cir. 2004), and "participating in sacramental use of bread and wine," *Smith*, 494 U.S. at 877. In contrast, preferring

43

**A-124**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

Saturdays over Wednesdays for religious meetings does not qualify for religious pro-

tection when, though it better facilitates religious meetings, the day of the meeting

carries no religious significance. *Green Haven Prison Preparative Meeting of Religious*

*Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 85 (2d

Cir. 2021), *cert. denied*, 142 S. Ct. 2676 (2022) (holding that Quaker prisoners "failed

to establish that scheduling the Quarterly Meetings on Saturdays (as opposed to any

other day) bears any religious significance whatsoever" even if it "would inconven-

ience" some plaintiffs).

Obtaining an abortion—or having unfettered access to abortion—is not itself

religious for plaintiffs. Plaintiffs' own words belie any claim that abortion itself car-

ries religious significance for them.

Anonymous 1 would welcome another child, so it is no surprise that she would

never get pregnant with the intention of having an abortion. App. III 125:5–9. She

also does not believe her faith ever requires her to have an abortion where she does

not want to have one. App. III 121:6–7. Nowhere does Anonymous 1 claim that abor-

tion itself carries religious significance; instead, she believes her faith requires her to

take care of her "physical, mental, and emotional well-being and health," which may

in some cases involve delivering the baby and in others involve abortion. App. III

124:15–17, 22–25.

Anonymous 2, in contrast, does not want another child right now. App. III

194:8–9. Nevertheless, she is taking precautions to prevent pregnancy, App. III

194:13–195:1, would not become pregnant with the intention of having an abortion,

44

**A-125**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

191:13–15, and would not seek an abortion if she "deem[s] that it is necessary for [her] to have another child." App. III 189:23–190:1. She asserts that "bodily autonomy" and "realiz[ing her] own humanity" are important aspects of her spiritual beliefs, App. III 163:14–15. Abortion itself, however, is not one of her spiritual practices. *See* App. III 162:22–165:22.

Like Anonymous 2, Anonymous 3 does not wish to become pregnant anytime soon, and she is avoiding pregnancy by remaining abstinent. App. IV 67:14–17. While Anonymous 3 believes Islam requires her not to act in a manner that would harm herself, App. IV 34:5–6, she would not seek to have an abortion as a religious practice, but rather to avoid harm, *see* App. IV 29:11–16.

Anonymous 4 and Anonymous 5, who would like to have children and "definitely would not go into a pregnancy with the intent to have an abortion," App. IV 165:15–17, explained that Judaism "does not require us to become pregnant," App. IV 165:7. Rather, they believe they must prioritize their physical, mental, and emotional health and well-being while they are pregnant. App. II 144–45.

Unlike previously recognized protected religious exercises, which were burdened with every application of the challenged law or policy, abortion is not necessarily or always associated with a religious viewpoint for these plaintiffs. Rather, it is merely one way for an individual, in some circumstances, to achieve an outcome that her religion deems important—namely, primacy of her physical, mental, and emotional health and wellbeing over that of the unborn child. Plaintiffs, after all, will not necessarily seek abortion to terminate a future pregnancy. And they can make

45

**A-126**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

other attempts to protect their wellbeing before resorting to abortion. *See, e.g.*, App. III 109:13–15 (Anonymous 1 would consult doctors for medical advice).

For instance, they might seek counseling to alleviate anxiety and other mental- and emotional-health concerns. To reduce harm to their well-being arising from financial concerns, they could seek public or private financial assistance and resources. And they can always seek the guidance of physicians to take care of their physical and mental health needs through means other than abortion.

Notably, the plaintiffs identify no principle that makes abortion a religious act any more than countless other actions that they believe affect their physical, mental, and emotional health and wellbeing. Adopting plaintiffs' view would permit RFRA exceptions to any law that regulates practices the plaintiffs believe could affect their wellbeing, including restrictions on raw milk or marijuana, even if the action itself carries no religious significance.

In concluding that the plaintiffs face a substantial burden on their religious exercise, the trial court's order veered from their articulation of their alleged religious exercise—"obtaining abortions," App. II 84—to the plaintiffs' sexual and birth control practices, stating "[t]he government's pressure upon them to abandon their religious beliefs is clear." App. II 47. In a free-exercise challenge, however, the relevant subject of any "pressure" is on the adherent "to violate his *beliefs*." App. II 44 (quoting *Thomas v. Review Bd. of. Ind. Emp. Security Div.*, 450 U.S. 707, 718 (1981)) (emphasis added). Any "pressure" to change birth control or sexual practices does not go to the plaintiffs' alleged religious exercise of "obtaining an abortion" under circumstances not allowed

46

**A-127**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

by S.B. 1. Indeed, the plaintiffs themselves disclaimed that the birth control practices they are undertaking carry religious significance for them.

Anonymous 3, for example, raises no religious objection to using "birth control" in general, but instead has concerns about how "birth control medication" might cause "complications associated with Crohn's" disease. App. IV 66:2–7. In fact, Anonymous 3 and her partner have been—and presumably will continue—using condoms to avoid pregnancy. App. IV 69:14–17. Anonymous 2 and her husband likewise often use "a condom" and "track [her] ovulation" to avoid pregnancy. App. III 154:25–155:1. Meanwhile, Anonymous 1 "do[es not] know" what Jewish religious sources say about taking birth control, or other family planning decisions, but believes using birth control is permissible. App. III 103:11–13, 104:17–19. Indeed, she "resumed taking birth control" after her "last pregnancy" ended in early 2022, well before S.B. 1's enactment. App. III 126:5–6; App. II 130–31. Anonymous 4 and Anonymous 5, who will not become pregnant unless they use artificial reproductive technology, do not believe that Judaism requires them to make those attempts to become pregnant, App. IV 165:7.

Because none of the alleged conduct—whether obtaining an abortion or changing sexual or birth control practices—carries any more religious significance than any other act taken to support the plaintiffs physical, mental, or emotional health or well-being, the plaintiffs failed to demonstrate S.B. 1 substantially burdens their religious exercise.

47

**A-128**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

## B. S.B. 1 is the least restrictive means of furthering the State's compelling interest in protecting unborn human lives

Next, RFRA allows the State to enforce S.B. 1 against plaintiffs because it is the least restrictive means to achieve a compelling government interest—namely, protecting unborn human lives from intentional destruction in most circumstances.

### 1. The State's compelling interests justify any burden on the plaintiffs' religious exercise

In lower courts, the State's compelling interest is not up for debate. In *Cheaney v. State*, the Indiana Supreme Court held that the State's interest in protecting unborn children is "valid and compelling" from "the moment of conception." 285 N.E.2d 265, 270 (Ind. 1972). Other jurisdictions agree, recognizing that States have an interest in protecting unborn human life at various stages during pregnancy. *Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State*, 975 N.W.2d 710, 736 n.16 (Iowa 2022), *reh'g denied* (July 5, 2022) ("[T]he State has a compelling interest in promoting human life" in the womb); *State v. Merrill*, 450 N.W.2d 318, 322 (Minn. 1990) (recognizing that the State has an interest in "protect[ing] . . . the unborn child, whether an embryo or a nonviable or viable fetus"); *Ex parte Phillips*, 287 So.3d 1179, 1234 (Ala. 2018) (affirming double-homicide conviction for convict who killed a pregnant woman).

A basic understanding of biology supports these holdings. "That human fetuses are human beings is a scientific fact, not a theological claim." App. III 5 (Curlin). Regardless whether an individual person believes this, "the scientific consensus" is that "[d]evelopment begins at fertilization," after which the newly created "unicellu-

48

**A-129**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

lar zygote divides many times and becomes progressively transformed into a multi-

cellular human being through cell division, migration, growth, and differentiation."

App. III 7. The "living human being . . . created at fertilization" has DNA "packaged

into 46 chromosomes, [with] . . . every instruction [it] needs to develop, grow and

become an adult . . . including sex, eye color, and other physical traits." App. II 203

(Sander Lee). This "DNA sequence produces the genetic variation that creates a per-

son's biological individuality." *Id*. Science thus tells us that "[t]he act of performing

an induced abortion during *any* stage of pregnancy, from fertilization up to birth,

ends the life of an innocent human being." App. II 202. The State's interest in pro-

tecting unborn fetal life at any stage from intentional destruction accordingly is noth-

ing less than "compelling." *Cheaney*, 285 N.E.2d at 270.

After the trial court, however, held that the State "has not established a compelling

interest in enforcing S.E.A. 1 against the plaintiffs." App. II 47. The court refused to

apply *Cheaney*'s holding for two reasons, neither of which is valid.

First, it invoked the overruled cases *Roe v. Wade* and *Planned Parenthood v.

Casey*, under which the Supreme Court deemed the State's interest in protecting un-

born human lives not to be compelling, at least "prior to fetal viability." App. II 51

(citing *Roe v. Wade*, 410 U.S. 113 (1973), and *Planned Parenthood of Se. Pa. v. Casey*,

505 U.S. 833 (1992)). The trial court concluded that "[w]hile *Dobbs* determined that

the Constitution does not protect a fundamental liberty interest in abortion, *Dobbs*

said nothing to suggest that the nature of the State's interest has somehow changed."

*Id.*

49

**A-130**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

The trial court was clearly mistaken. In *Dobbs*, the U.S. Supreme Court explained in detail the "glaring deficiency [in] *Roe*'s failure to justify the critical distinction it drew between pre- and post-viability abortions" and its relationship to the government's compelling interest. *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2268 (2022). The viability line that *Roe* leaned on is "arbitrary," and *Casey* also "provided no principled defense of the viability line," and instead "merely rephrased what *Roe* had said." *Id.* at 2269, 2271. Having demonstrated that "[t]he viability line . . . makes no sense" by which to understand the State's interest, the Court overruled *Roe* and *Casey* and "return[ed] th[e] authority to the people and their elected representatives" to regulate abortion. *Id.* at 2270, 2284.

If the U.S. Supreme Court's renouncement of the viability line is not enough, the Indiana Supreme Court also expressly—and in great detail—rejected viability as a boundary on the State's interest. In *Cheaney*, the Supreme Court noted that, in the torts context at that time, "many of the cases cling to a viability distinction," but "that the distinction was based on the extent of the medical knowledge at the time." 285 N.E.2d at 268. The Court observed that "medical science has made great strides since that time," and, citing medical sources, "[i]t is now established that some sort of independent life begins at conception." *Id.* at 268. Thus, the Court stated that "biologically [viability] is merely an arbitrary distinction," and rejected it as a basis for cabining the State's interest in prohibiting abortion. *Id.* at 269. The trial court's reason-

50

**A-131**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

ing here, which relies on the viability line to limit the State's interest, directly con-

flicts with both the U.S. Supreme Court's and the Indiana Supreme Court's rejection

of such a line.

Second, the trial court refused to follow *Cheaney*'s holding because, in the

court's view, it "and other Courts cannot select different theological or religions['] def-

initions of conception as such is prohibited under RFRA." App. II 51. And it faulted

the State for "attempting to establish as a factual matter when a human comes into

being." App. II 48–49. Not only is the court's reasoning factually wrong, *supra* p. 49,

it conflicts with case law establishing that States are "entitled to have, express, and

act on, their own views about contestable subjects," including "fetal personhood." *Doe*

*v. Rokita*, 54 F.4th 518, 520 (7th Cir. 2022). *Cf. Box v. Planned Parenthood of Ind. &*

*Ky., Inc.*, 139 S. Ct. 1780, (2019) ("a State has a 'legitimate interest in proper disposal

of fetal remains'").

Not even *Roe* or *Casey* supports the trial court's assertions here; both acknowl-

edged that the "[t]he State has legitimate interests from the outset of the pregnancy

in protecting . . . the life of the fetus." *Casey*, 410 U.S. at 846; *Roe*, 410 U.S. at 150,

154 (observing the "State's interest . . . in prenatal life," even prior to viability, is "le-

gitimate"). While perhaps *courts* cannot decide when life begins, *legislatures* certainly

can. *See, e.g., Gonzales v. Carhart*, 550 U.S. 124, 127 (2007) (explaining States may

enact abortion regulations that "promote respect for life").

States can, and do, enact laws based on norms of ethical behavior, and they are

not invalid simply because they "happen[] to coincide or harmonize with the tenets of

51

**A-132**

some or all religions." *McGowan v. Maryland*, 366 U.S. 420, 442 (1961); *see also Harris*, 448 U.S. at 319 ("That the Judaeo-Christian religions oppose stealing does not mean that a State or the Federal Government may not, consistent with the Establishment Clause, enact laws against larceny."). And without *any* evidence that the Indiana General Assembly acted to target religion, *see Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 534 (1993), the trial court had no basis for disregarding *Cheaney*'s decision embracing the State's interest in protecting fetal life. The trial court gravely erred when it held the State's interest invalid, and this Court should not let this shocking disregard for Indiana Supreme Court precedent go unchecked.

In sum, the State's interest in protecting unborn children from intentional destruction is both "valid and compelling." *Cheaney*, 285 N.E.2d at 275. The plaintiffs' disagreement with that interest, *see* App. II 38, does not negate its validity and importance. Accordingly, even if S.B. 1 substantially burdens the plaintiffs' religious exercise, it does so in furtherance of a compelling governmental interest.

### 2. S.B. 1 is the least restrictive means to achieve the State's compelling interests

S.B. 1's restriction on when an abortions may occur also "is the least restrictive means of furthering" the State's compelling interest in preserving fetal life. Ind. Code § 34-13-9-8(b). "The relevant 'means,' for purposes of RFRA, is the 'burden' the party hopes to avoid." *Tyms-Bey v. State*, 69 N.E.3d 488, 491 (Ind. Ct. App. 2017). Here, the burden that the plaintiffs seek to avoid is S.B. 1's limitations on when abortions may

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

be performed. "[T]he least-restrictive-means standard invokes a 'comparative analy-sis,'" meaning the Court "must take the State's preferred means . . . and then [it] must 'lay such preferred means side by side with other potential options." *Blattert*, 190 N.E.3d at 424 (quoting *United States v. Christie*, 825 F.3d 1048, 1061 (9th Cir. 2016)). "[I]n order to be a viable least-restrictive means for purposes of RFRA, the proposed alternative need[s] to accommodate both the religious exercise practiced in this case . . . *and simultaneously achieve the government's compelling interest*[]." *United States v. Grady*, 18 F.4th 1275, 1287 (11th Cir. 2021) (emphasis added).

The plaintiffs have never proposed an alternative that would allow the State to achieve its interest; indeed, they could not because their claimed religious exercise requires aborting unborn children, while the State's interest requires preventing those abortions. Instead, they asserted that S.B. 1 is "underinclusive." App. II 118. The mere existence of exceptions, however, does not spoil narrow tailoring under RFRA. Instead, courts hold a law is underinclusive where exceptions (1) "reveal that [the] law does not actually advance a compelling interest, *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015); (2) suggest viable alternatives, *Hobby Lobby*, 573 U.S. at 728–32; or (3) exclude all non-religious conduct, demonstrating a "targeting" of reli-gion, *Lukumi*, 508 U.S. at 547. S.B. 1's extremely narrow exceptions do not render the law impermissibly underinclusive.

First, the inclusion of numerous, arbitrary exceptions may in some cases indi-cate that the government is not actually pursuing a compelling interest. *See, e.g.*, *Lukumi*, 508 U.S. at 547 (explaining under First Amendment strict scrutiny analysis,

53

**A-134**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

"a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited" (cleaned up)). But that is not always the case, as in *Blattert*, where a parental corporal punishment exception from the child battery prohibition did not undermine the compelling nature of the State's interest in preventing child abuse. 190 N.E.3d at 422–23. Both there and here, no one can seriously doubt that the law materially advances the State's compelling interest, notwithstanding narrow exceptions. Narrow tailoring within S.B. 1 does not undermine its capacity to preserve human life.

Second, exceptions can be problematic if they suggest the adequacy of more narrowly tailored alternatives. In *Burwell v. Hobby Lobby Stores, Inc.*, for example, the Court ruled that *for-profit* companies were entitled to religious exemption because the law already afforded a religious exception for *non-profit* companies. 573 U.S. at 728–32. With no relevant distinction between non-profits and for-profits, the exception for non-profits undermined the government's claim that no less restrictive alternative would work. *Id.* But while distinguishing between non-profits and for-profits advanced no legitimate government interest, here distinguishing between the exceptions defined by statute and those demanded by the plaintiffs does. S.B. 1 affords exceptions for limited circumstances defined in law and, in some cases, assessed by medical professionals. Unlike the law at issue *Hobby Lobby*, however, S.B. 1 does not provide any exceptions for religiously motivated conduct. It therefore does not indicate that a means less restrictive on religion is available.

**A-135**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

Third, even if sometimes a law's exclusion of a broad swath of conduct—but not religious conduct—may indicate invidious discrimination against religion, there is no suggestion that S.B. 1 "targets" religious conduct. In stark contrast to the ordinances in *Lukumi*, S.B. 1 "make[s] virtually all abortions illegal in Indiana," App. II 90, covering as much if not more non-religious conduct than religious conduct. *Contrast Lukumi*, 508 U.S. at 535–36 (invalidating ordinances that "target[ed] Santeria sacrifice" because the narrow definition of prohibited conduct and broad exceptions meant that "few if any killings of animals [we]re prohibited other than Santeria sacrifice").

Nevertheless, the trial court concluded that S.B. 1 "invidious[ly] discriminat[es] against the religious beliefs" of the plaintiffs by exempting narrow categories of conduct from its prohibition without also categorically exempting religiously motivated conduct. App. II 55. This argument is untenable, however, and incorrectly conflates strict scrutiny with the "general applicability" inquiry in First Amendment free-exercise claims.

In the First Amendment context, a law that "single[s] out" religious conduct—such as by "inclu[ding] . . . a formal system of entirely discretionary exceptions," *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1878 (2021)—triggers strict scrutiny. *Central Rabbinical Cong. Of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 197 (2d Cir. 2014). But "this does not mean that the [law] is not narrowly tailored—a factor relevant in the application of strict scrutiny, and not to

55

**A-136**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

the question of whether strict scrutiny applies." *Id.* Importantly, the presence of exceptions sufficient to trigger strict scrutiny does not automatically fail the law for a lack of narrow tailoring; they are different inquiries. *See Fulton*, 141 S. Ct. at 1876. Here, RFRA already requires strict scrutiny, and the mere presence of narrow exceptions to the law is not a fatal blow to narrow tailoring.

In contrast, the trial court's broad injunction would swallow S.B. 1 and entirely undermine the State's interest. *See* App. II 59. The trial court asserted a "limiting principle"—"the Plaintiffs' sincerely held religious beliefs," App. II 54, but the plaintiffs' own statements demonstrate it is no limit at all. Although the court faulted the State for "unfairly criticiz[ing] the Plaintiffs' Religious practices as subjective," *id.*, the plaintiffs themselves described their beliefs as depending on individual persons, which is the very definition of subjective.

For Hoosier Jews for Choice, whether Jewish law requires an abortion is up to "the pregnant person," who decides "on a case-by-case basis," "depending on, perhaps, the circumstances surrounding the pregnancy, or the pregnant person's physical and mental health." App. V 33:10–12, 18–22. There is not "one answer for every pregnant person." *Id.* at 33:18–19.

The same is true for the individual plaintiffs' beliefs. Anonymous 4 and Anonymous 5 explained, "Judaism . . . leaves us to be able to decide . . . if [abortion] is the right avenue for us," App. IV 100:10–16, and the religious guidance "[i]s whatever decision that individual makes," App. IV 154:19–20. Anonymous 1 agrees. App. III 109:7–9. An individual thus could choose to get an abortion solely because they face

56

**A-137**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

minor discomfort from pregnancy because whether it constitutes a harm to their physical health "is something that can be interpreted by an individual." App. III 109:5–8; *see also* App. IV 101:6–9 (Anonymous 4); App. IV 154:13–20 (Anonymous 5). Anonymous 2 and Anonymous 3 explained that they could feel a religious mandate to abort a future pregnancy even if the child is "simply unwanted" at that time. App. II 140. Anonymous 3 explained that it "is up to . . . the personal discretion of different women and their . . . school of teachings." App. IV 52:22–24. All that matters for Anonymous 2 is whether "I deem that it is necessary for me to have another child in order to realize  . . . my full humanity." App. III 189:23–190:1.

The effect of the trial court's injunction therefore is to authorize abortions at any point in the future for any reason, including to alleviate morning sickness or anxiety. No understanding of religious liberty heretofore has encompassed such an extraordinary claim, with all its unfathomable implications. The Court should reject it here.

### III.   Plaintiffs Failed to Demonstrate They Are Otherwise Entitled to Injunctive Relief

#### A. Irreparable harm

Merits aside, plaintiffs also failed to meet their "burden of demonstrating an injury which [would be] certain and irreparable if the injunction is denied." *Wagler Excavating Corp. v. McKibben Const., Inc.*, 679 N.E.2d 155, 157 (Ind. Ct. App. 1997). To obtain an injunction, a plaintiff must demonstrate personal harm. *See, e.g., Tilley v. Roberson*, 725 N.E.2d 150, 154 (Ind. Ct. App. 2000) ("Tilley had the burden of show-

**A-138**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

ing that her remedies at law were inadequate, thereby causing her to suffer irrepa-

rable harm."). Critically, "speculative injuries do not justify th[e] extraordinary rem-

edy" of an injunction. *E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage

Co.*, 414 F.3d 700, 704 (7th Cir. 2005); *see Ind. Pacers L. P. v. Leonard*, 436 N.E.2d

315, 318 (Ind. Ct. App. 1982). Nor "apprehensions or fears . . . unsustained by facts."

*Daugherty v. Allen*, 729 N.E.2d 228, 236 (Ind. Ct. App. 2000).

The trial court accepted the plaintiffs' argument that an "unlawful" action al-

ways inflicts irreparable harm "per se." App. II 56. But that amounts to saying that

plaintiffs need never establish irreparable harm independent of establishing unlaw-

ful conduct. The Indiana Supreme Court has never endorsed this "per se" rule and

has even disclaimed any such rule absent "clearly unlawful" challenged conduct that

is "against the public interest." *Indiana Fam. & Soc. Servs. Admin. v. Walgreen*, 769

N.E.2d 158, 162 & n.3 (Ind. 2002). No conduct here is "clearly unlawful" given that

no plaintiff is pregnant, no plaintiff would necessarily seek an abortion if she becomes

pregnant in the future, and the State has a compelling interest in protecting the un-

born.

Moreover, a preliminary injunction is not justified here because the plaintiffs

failed to demonstrate "an injury which is certain and irreparable if the injunction is

denied." *Wagler Excavating Corp.*, 679 N.E.2d at 157. Plaintiffs' religious exercise—

"obtaining abortions that are directed by their sincere religious beliefs," App. II 84—

is by no means facing a "certain" threat. None of the plaintiffs are currently pregnant,

58

**A-139**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

and no plaintiff will necessarily seek an abortion if she becomes pregnant in the future. "[I]njunctive relief is not to be used simply to eliminate a possibility of a remote future injury." *Crossman Cmtys., Inc. v. Dean*, 767 N.E.2d 1035, 1041 (Ind. Ct. App. 2002).

Although the plaintiffs may change their sexual or birth control practices, they do not claim that those are the religious conduct for which they claim exemption from S.B. 1. Indeed, S.B. 1 has nothing to do with birth control or sexual practices. Even if getting an abortion were a religious exercise in some circumstances for these plaintiffs, none makes a case that a preliminary injunction would prompt them to undertake *any* religious exercise whatever. This is simply not a case where a preliminary injunction could temporarily remedy an injury to legally protected behavior that is the subject of the suit.

### B. The balance of harms and public interest weigh against injunctive relief

The balance of harms and public interest weigh heavily against a preliminary injunction as well. An injunction here risks the infliction of irreparable harm on unborn Hoosiers whose existence the plaintiffs would seek to terminate in indeterminate circumstances. App. II 112–13; *see* App. II 202 (Sander Lee). As with ending any life, abortion is an *irreversible* procedure; once an unborn life has been intentionally taken, it cannot be restored. *See* App. III 43–45 (Snead). Consequently, the state and public interest in preventing the irreparable harms that the plaintiffs seek to inflict

**A-140**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

is paramount. As the Indiana Supreme Court has observed, there is a "valid and compelling" interest in protecting prenatal human life at all stages. *Cheaney*, 285 N.E.2d at 270.

Moreover, the plaintiffs' asserted harms regarding their religious exercise— "obtaining abortions that are directed by their sincere religious beliefs," App. II 84— depend on a chain of contingencies that have not yet begun and may never come to pass. And their asserted harms regarding changes to their contraceptive and sexual practices do not outweigh the grave consequences of killing an unborn child. Importantly, should a future pregnancy threaten a life or pose a serious health risk, abortion remains an option under the statute. *See* Ind. Code § 16-34-2-1(a)(1), (3). The balance of harms favors the enforcement of S.B. 1.

Finally, the legislature has decided what "balance" to strike between "the rights of the unborn child" and "the rights of the mother," *Cheaney*, 285 N.E.2d at 269, and "[t]he laws promulgated by the General Assembly reflect its determination of what is in public interest," *Avemco Ins. Co. v. State ex rel. McCarty*, 812 N.E.2d 108, 121 (Ind. Ct. App. 2004). Moreover, it is in the public interest to enforce the laws duly enacted by the people's representatives. *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 134 S. Ct. 506 (2013) (Scalia, J., concurring in denial of application to vacate stay). The trial court failed to address these factors in its balance of harms and assessment of the public interest. *See* App. II 58. Both weigh

**A-141**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

decidedly against granting a preliminary injunction to the named plaintiffs. In con-

cluding that the preliminary-injunction factors favored relief, the trial court abused

its discretion. *See State v. Econ. Freedom Fund.*, 959 N.E.2d 794, 800 (Ind. 2011).

### C. The requested relief exceeds the remedies RFRA authorizes and fails to meet Trial Rule 65(D)'s requirements

Not only is injunctive relief disfavored under the preliminary-injunction fac-

tors, the relief granted by the trial court exceeds its remedial authority. First, the

court's order "ENJOIN[ING] the Defendants and their officers from enforcing the

provisions of S.E.A. 1 against the Plaintiffs," App. II 59, fails to "specif[y] in terms[,

and] . . . describe in reasonable detail, and not by reference to the complaint or other

document, the act or acts sought to be restrained," as Indiana Trial Rule 65(D) re-

quires. Because no plaintiff is pregnant, it is unclear what acts, specifically, the in-

junction targets.

Second, the order enjoins future government enforcement actions that may not

constitute a "violation" of RFRA at all. RFRA authorizes only relief that "prevents,

restrains, corrects, or abates the violation of this chapter." Ind. Code § 34-13-9-

10(b)(1). The trial court's order, however, prevents the State from enforcing S.B. 1

against the plaintiffs full stop, regardless whether a particular enforcement action

constitutes a "violation" of RFRA. This unlimited injunction, not grounded in even

the plaintiffs' sincere religious beliefs, far exceeds the court's remedial authority un-

der RFRA.

**A-142**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

Accordingly, in any event, the preliminary injunction cannot stand because it exceeds the remedies authorized by RFRA and violates Trial Rule 65's specificity requirement.

## CONCLUSION

The trial court's order granting a preliminary injunction should be reversed.

Respectfully submitted,

THEODORE E. ROKITA
Attorney General of Indiana
Attorney No. 18857-49

By:   /s/ Thomas M. Fisher
THOMAS M. FISHER
Solicitor General
Attorney No. 17949-49

JAMES A. BARTA
Deputy Solicitor General
Attorney No. 31589-49

Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
Phone:  (317) 232-6255
Fax:  (317) 232-7979
Email:  Tom.Fisher@atg.in.gov

MELINDA R. HOLMES
Attorney No. 36851-79
RAZI S. LANE
Attorney No. 37798-49
Deputy Attorneys General

*Counsel for Appellants*

62

**A-143**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

## CERTIFICATE OF WORD COUNT

I verify that this brief contains no more than 14,000 words.

<u>/s/ Thomas M. Fisher</u>
Thomas M. Fisher
Solicitor General

**A-144**

Brief of Appellants
The Individual Members of the Medical Licensing Board of Indiana, et al.

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2023, I electronically filed the foregoing

document using the Indiana E-filing System (IEFS). I also certify that on January 17,

2023, the foregoing document was served upon the following persons using the IEFS:

> Kenneth J. Falk
> Gavin M. Rose
> Stevie J. Pactor
> ACLU of Indiana
> 1031 E. Washington St.
> Indianapolis, IN 46202
> kfalk@aclu-in.org
> grose@aclu-in.org
> spactor@aclu-in.org

/s/ Thomas M. Fisher
Thomas M. Fisher
Solicitor General

Office of the Attorney General
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
Telephone: (317) 232-6255
Fax: (317) 232-7979
Email: Tom.Fisher@atg.in.gov

**A-145**

**EXHIBIT C**

F I L E D

December 2, 2022

CLERK OF THE COURT
MARION COUNTY
LB

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE MARION SUPERIOR COURT |
| | ) | |
| COUNTY OF MARION | ) | CAUSE NO. 49D01-2209-PL-031056 |

| | |
|---|---|
| ANONYMOUS PLAINTIFF 1, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| THE INDIVIDUAL MEMBERS OF THE | ) |
| MEDICAL LICENSING BOARD OF | ) |
| INDIANA, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## <u>ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

### I.    Procedural History

On September 8, 2022, Plaintiffs, Anonymous Plaintiffs 1-5 on their own behalf and on behalf of those similarly situated; Hoosier Jews for Choice ("Plaintiffs") filed a Complaint challenging Senate Enrolled Act No. 1(ss) ("S.E.A. 1") under Indiana's Religious Freedom Restoration Act ("RFRA") and a Motion for Preliminary Injunction.  On September 12, 2022, the Plaintiffs filed a Memorandum in Support of their Motion for Preliminary Injunction and initial evidentiary submission.

On October 3, 2022, the Defendants, The Individual Members of the Medical Licensing Board of Indiana, and the Marion County Prosecutor, Lake County Prosecutor, Monroe County Prosecutor, St. Joseph County Prosecutor, and Tippecanoe County Prosecutor ("Defendants') filed their Objection to Plaintiffs Motion for Preliminary Injunction.  On October 11, 2022, the Plaintiffs filed their Reply in Support of their Motion for Preliminary Injunction.  On October 14, 2022, the Court heard oral argument on the

above motions from counsel for the Plaintiffs and Defendants.[1]   The Plaintiffs and Defendants' attorneys submitted proposed findings of fact and conclusions of law to the Court on October 28, 2022.

The Complaint alleges that S.E.A. 1 violates RFRA because it "burdens the plaintiffs' sincere religious beliefs, and those of a putative class of those similarly situated," by prohibiting abortion in circumstances where Plaintiffs' religion "direct[s]" them to obtain an abortion. Compl. ¶¶ 2, 11. The complaint also requested "a preliminary injunction, later to be made permanent, enjoining defendants from taking any action that would prevent or otherwise interfere with the ability of the individual plaintiffs, the class members, and Hoosier Jews for Choice's members obtaining abortions as directed by their sincere religious beliefs." Compl. at 26.   The Plaintiffs move for a preliminary injunction enjoining enforcement of S.E.A. 1.   Plaintiffs argue that S.E.A. 1—which prohibits abortion except where a pregnancy seriously endangers a mother's health or life, a pregnancy is the result of rape or incest, or the unborn child has a lethal anomaly— violates their rights under Indiana's RFRA.

The Defendants argue that the Plaintiffs' claims are not ripe and also fail on the merits. Furthermore, the Defendants argue that at this early stage of the case that the Plaintiffs have failed to demonstrate that S.E.A. 1 substantially burdens their exercise of religion, and that S.E.A. 1 is the least restrictive means to further a compelling government interest.

---

[1] The Court recognizes and appreciates the excellent advocacy and arguments by both counsel for Plaintiffs and counsel for Defendants at the hearing on this matter, as well as in their briefs.

Plaintiffs also seek relief on behalf of a putative class and have filed a motion for class certification. The parties agreed to postpone briefing on the motion for class certification while the preliminary-injunction motion is pending. No class has been certified.   Plaintiffs are five individuals and one organization.

## II.    Propriety of injunctive relief

The Defendants argue in a footnote that because another Indiana court has issued an injunction as to S.E.A. 1, the plaintiffs do not have standing to raise a claim or seek a preliminary injunction. (State's Br. at 5). See *Planned Parenthood Great Northwest, Hawai'i, Alaska, Indiana, Kentucky, Inc., et al. v. Member of the Medical Licensing Board of Indiana, et al.*, No. 53C06-2208-PL-001756 (Mon. Circ. Ct. Sept. 22, 2022), *petition to transfer granted*, 22A-PL-2260.

The Court takes judicial notice of the fact that the State sought a stay of the above preliminary injunction. The stay request was denied by the Indiana Supreme Court and the case has been set for oral argument in the Indiana Supreme Court on January 19, 2023.

The State is pursuing its defense of S.E.A. 1 in that litigation, and a resolution of that matter will not resolve the issues raised in this case, as the cases are based on entirely different legal claims and sources of rights.   See *Northwest Immigrant Rights Project v. USCIS*, 496 F. Supp. 3d 31 (D.D.C. 2020) (finding that plaintiffs were suffering irreparable harm and entitled to a preliminary injunction despite the fact that the challenged rule had been enjoined in a parallel proceeding in a different court).

[3]

**A-149**

## III.   Findings of Fact[2]

### A.  The History of Indiana's abortion law

1.      Prior to the effective date of S.E.A. 1, abortions were generally lawful in Indiana (with some exceptions) up to the earlier of fetal viability or 20 weeks post fertilization. Indiana Code 16-34-2-1(a).

2.      However, this was altered by S.E.A. 1, which prohibits all abortions in Indiana, with only three limited exceptions, listed below in paragraphs 3 through 5.

3.      An abortion may be performed if a physician determines that an "abortion is necessary when reasonable medical judgment dictates that performing the abortion is necessary to prevent any serious health risk to the pregnant woman or to save the pregnant woman's life." Ind. Code § 16-34-3-1(1)(A)(i), (3)(A) (eff. Sept. 15, 2022). "Serious health risk" means "a condition exists that has complicated the mother's medical condition and necessitates an abortion to prevent death or a serious risk of substantial and irreversible physical impairment of a major bodily function." Ind. Code § 16-18-2-327.9. The term expressly excludes "psychological or emotional conditions." *Id.*

4.      An abortion may be performed if a physician determines that the fetus has a "lethal fetal anomaly," before the earlier of viability or twenty (20) weeks of postfertilization age. Ind. Code § 16-34-2-1(a)(1)(A)(ii) (eff. Sept. 15, 2022). A "lethal fatal anomaly," as defined as "a fetal condition diagnosed before birth that, if the pregnancy results in a live birth, will with reasonable certainty result in the death of the child not more than three (3) months after the child's birth." Ind. Code § 16-25-4.5-2.

---

[2]      Citations to the record include the filings made by the parties accompanying their briefing, the consideration of which was stipulated to by the parties at the hearing held on October 14, 2022.

[4]

**A-150**

5.     An abortion may be performed "during the first ten (10) weeks of postfertilization age of the fetus" if the pregnancy is the result of rape or incest. Ind. Code § 16-34-2-1(a)(2) (eff. Sept. 15, 2022).[3]

6.     Physicians who violate the prohibitions in S.E.A. 1 face criminal penalties, Ind. Code § 16-34-2-7 (amended eff. Sept. 15, 2022), and revocation of their licenses to practice medicine, Ind. Code § 25-22.5-8-6(b)(2).

7.     "At common law, abortion was criminal in at least some stages of pregnancy and was regarded as unlawful and could have very serious consequences at all stages." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2248 (2022). Indiana incorporated the common law's criminal prohibitions "without exception or limitation" into its own laws as early as 1807 while it was still a territory. *Ledgerwood v. State*, 33 N.E. 631, 633 (Ind. 1893); *see* Act of Sept. 17, 1807, ch. 24, in Francis B. Philbin, Laws of the Indiana Territory 1801–1809, at 323 (1930); 1818 Indiana Laws ch. LII, p. 308.

8.     Indiana, like "the vast majority of the States" in early America, also "enacted statutes criminalizing abortion at all stages of pregnancy." *Dobbs*, 142 S. Ct. at 2252. Indiana's first statute dates from 1835. That statute imposed criminal penalties on "every

---

[3]     S.E.A. 1 also amends preexisting prohibitions on abortion because of disability or other status, so that, effective September 15, 2022:

a.     A person may not intentionally perform or attempt to perform an abortion allowed under IC 16-34-2 if the person knows that the pregnant woman is seeking the abortion solely because the fetus has been diagnosed with Down syndrome or has a potential diagnosis of Down syndrome. Ind. Code § 16-34-4-6(a) (eff. Sept. 15, 2022).

b.     A person may not intentionally perform or attempt to perform an abortion allowed under IC 16-34-2 if the person knows that the pregnant woman is seeking the abortion solely because the fetus has been diagnosed with any other disability or has a potential diagnosis of any other disability. Ind. Code § 16-34-4-7(a) (eff. Sept. 15, 2022).

[5]

**A-151**

person" who administered "to any pregnant woman[] any medicine, drug, substance or thing whatever . . . with intent thereby to procure the miscarriage of any such woman, unless the same shall have been necessary to preserve the life of such woman." 1835 Ind. Laws ch. XLVII, p. 66 § 3. Amendments adopted after the 1851 Constitution's adoption expanded the statute to prohibit a "druggist, apothecary, physician, or other person selling medicine" from selling any "medicine . . . known to be capable of producing abortion or miscarriage, with intent to produce abortion." 1859 Ind. Laws ch. LXXXVI, p. 469, § 2. In 1881, the penalty for violating the law was raised from a misdemeanor to a felony. 1881 Ind. Acts, ch. 37, §§ 22–23, p. 177. And in 1905 the legislature made it a crime to "so-licit" an abortion or miscarriage. 1905 Ind. Acts ch. 169, §§ 367–368, pp. 663–64.

9.     The United States Supreme Court held that abortion was a fundamental right in 1973, *see Roe v. Wade*, 410 U.S. 113, 93 (1973), and the Indiana General Assembly amended Indiana law to permit abortion under some circumstances, *see* 1973 Ind. Acts, P.L. No. 322 (codified at Ind. Code § 35-1-58.5-1 to -8 (1973)); 1977 Ind. Acts, ch. 335, § 21.

10.     In 1992, Indiana acquired additional authority to enact abortion regulations when the U.S. Supreme Court upheld Pennsylvania's parental consent, informed consent, and 24-hour waiting period requirements. *See Planned Parenthood of Southeast Pennsylvania. v. Casey*, 505 U.S. 833 (1992). Following *Casey*, Indiana adopted its own requirements for performing abortions, including informed consent and 18-hour waiting period requirements. *See* 1995 Ind. Acts, P.L. 187-1995, pp. 3327–29; *see also* 2014 Ind. Acts, P.L. 98-2014, pp. 1119–24 (requiring hospital admitting privileges, requiring

ultrasounds, and regulating abortion clinic licensing and inspections); 2016 Ind. Acts, P.L. 213-2016, pp. 3099–125 (banning abortions sought solely because of race, sex, or disability; regulating disposition of fetal remains, and imposing other requirements).

11.    In June 2022, the U.S. Supreme Court held that the federal Constitution does not confer a right to abortion, reversing *Roe* and *Casey*, and "returned to the people" of Indiana and "their elected representatives" the "authority to regulate abortion." *Dobbs*, 142 S. Ct. at 2279. Shortly thereafter, in August 2022, the Indiana General Assembly enacted S.E.A. 1, which makes performing an "abortion" a "criminal act" unless one of the following three statutory exceptions apply. Ind. Code § 16-34-2-1(a) (as amended by S.E.A. 1).

12.    Indiana Code § 16-34-2-1(a)(1) permits abortions "before the earlier of viability of the fetus or twenty (20) weeks postfertilization age of the fetus" where (i) "reasonable medical judgment dictates that performing the abortion is necessary to prevent any serious health risk to the pregnant woman or to save the pregnant woman's life" or (ii) "the fetus is diagnosed with a lethal fetal anomaly." A "serious health risk" is one "that has complicated the mother's medical condition and necessitates an abortion to prevent death or a serious risk of substantial and irreversible physical impairment of a major bodily function," but "does not include psychological or emotional conditions." Ind. Code § 16-18-2-327.9. Only hospitals and ambulatory surgical centers majority owned by hospitals may perform abortions under subsection (a)(1). Ind. Code § 16-34-2-1(a)(1)(B).

13.    Indiana Code § 16-34-2-1(a)(3) permits abortions "at the earlier of viability of the fetus or twenty (20) weeks of postfertilization age and any time after" where "necessary to prevent any serious health risk to the pregnant woman or to save the pregnant woman's

**A-153**

life." Because subsection (a)(3) permits abortions later in the pregnancy than subsection (a)(1), it imposes some additional requirements. Those include that the abortion be "performed in a hospital" and be "performed in compliance with" Indiana Code § 16-34-2-3. Ind. Code § 16-34-2-1(a)(3)(C)–(D). Indiana Code § 16-34-2-3—which governs "abortions performed on or after the earlier" of viability twenty (20) weeks postfertilization age—in turn requires the presence of a second physician who is prepared to provide care for any "child born alive as a result of the abortion." Ind. Code § 16-34-2-3(b); *see also* Ind. Code § 16-34-2-3(a), (c)–(d) (imposing additional requirements).

14. Indiana Code § 16-34-2-1(a)(2) permits abortions "during the first ten (10) weeks of postfertilization age" where the pregnancy arose from rape or incest. Only hospitals and ambulatory surgical centers majority owned by hospitals may perform abortions under subsection (a)(2). Ind. Code § 16-34-2-1(a)(2)(C).

15. Physicians who violate the prohibitions in S.E.A. 1 face criminal penalties, Ind. Code § 16-34-2-7 (amended September 15, 2022), and revocation of their licenses to practice medicine, Ind. Code § 25-22.5-8-6(b)(2).

**B. Abortion and Religious Practice**

**i. Judaism**

16. Under Jewish law, a fetus attains the status of a living person only at birth, when the greater part emerges from the mother. (Declaration of Rabbis Dennis and Sandy Sasso ["Sassos"] ¶ 9; Declaration of Rabbi Brett Krichiver ["Krichiver"] ¶ 6). Prior to that time, the fetus is considered as part of the woman's body, not having a life of its own or independent rights. (Sassos ¶ 9; Krichiver ¶ 6). Rabbinic sources note that prior to the 40th day of gestation, the embryo is considered to be "mere water." (Sassos ¶ 9).

**A-154**

17.     In order to protect the woman, Jewish law recognizes that there are circumstances in which abortion should occur and is mandated even if there is not a physical health risk that is likely to cause death or the substantial and irreversible physical impairment to a woman's major bodily function. (Krichiver ¶ 8). An abortion is mandated to stop a pregnancy that may cause serious consequences to the woman's physical or mental health. (*Id.*; Sassos ¶ 10). For example, Judaism recognizes that an abortion should be allowed if necessary to prevent the mother's mental anguish that could arise from severe physical or mental health issues, even if there is not a physical health risk that is likely to cause substantial and irreversible physical impairments of a major bodily function. (Sassos ¶ 10). Judaism allows for and requires that an abortion be provided if the pregnancy threatens the woman's mental health, for instance if the pregnancy would aggravate psychological problems or cause such problems. (Krichiver ¶ 8).

18.     Rabbinic law requires the alleviation of the pain and suffering of the woman if the fetus endangers her physical or mental health. (*Id.* ¶ 8). Jewish law therefore stresses the necessity of protecting the physical and mental health of the mother prior to birth as the fetus is not considered a person. (Sassos ¶ 11; Krichiver ¶ 7).

### ii.   Islam

19.     Islam also does not believe that a fetus is ensouled at the moment of fertilization or conception. (Declaration of Rima Shahid ¶ 7).

20.     Although, as in any religion, there are different Islamic schools and views, some Muslim scholars take the position that the fetus does not possess a soul until 120 days after conception. (*Id.* ¶¶ 5, 7). This is based on a tradition in which the Prophet (SAW) mentions that an angel breathes the soul into a fetus by 120 days. (*Id.* ¶ 7).

[9]

**A-155**

21.   Muslim scholars indicate that within 40 days of conception, it is proper and appropriate to seek an abortion for any reason, including reasons not authorized by S.E.A. 1. (*Id.* ¶ 8).

22.   Once the fetus reaches 40 days from conception, conservative Muslim scholars believe that an abortion must be available if there is a pressing need that justifies it in the eyes of Islamic law. (*Id.* ¶ 9). This pressing need includes the physical or mental health of the mother, even if the physical health risk does not involve death or the potential substantial impairment of a major bodily function, and therefore Islam allows abortions, even in situations prohibited by S.E.A. 1 (*Id.*). Thus, in a number of Muslim-majority nations, e.g., Kuwait, Jordan, Qatar, Bahrain, and the United Arab Emirates, abortions are allowed in cases of a risk to woman's mental or physical health. They may also occur in these countries in cases of fetal impairment. (*Id.* ¶ 10).

### iii.   Unitarian Universalism

23.   The Unitarian Universalist community has long supported reproductive justice. (Declaration of Reverend Catherine Josephine Romano Griffin ¶ 7). A core belief of Unitarian Universalists is that every human being has inherent worth and dignity, which is an endowed right bestowed by the Creator. (*Id.* ¶ 8).

24.   Denying a pregnant person, the ability to obtain an abortion impinges on this endowed right. (*Id.* ¶ 10). Therefore, being denied the ability to obtain an abortion when a Unitarian Universalist believes the abortion is necessary breaks the covenant that adherents have to honor their own inherent worth and dignity. (*Id.* ¶ 11). In this situation, a Unitarian Universalist is directed to obtain an abortion to maintain the covenant. (*Id.*).

### iv.   Paganism

**A-156**

25.     Paganism is not a specific religious belief, but is an umbrella term that comprises many spiritual belief systems that are polytheistic in nature. (Declaration of J.D. Grove ¶ 4).

26.     These spiritual belief systems play similar roles in the lives of Pagans as do monotheistic religions for believers in those religious traditions. (*Id.* ¶ 5).

27.     Many Pagans recognize that there are Gods and Goddesses and stress the feminine face of divinity. (*Id.* ¶ 6). Creation and life-giving are seen as feminine acts, and Pagans emphasize the importance of women being free and autonomous as representations of the Goddesses in their many forms. (*Id.* ¶ 7).

28.     Because of this, most Pagans demand, as part of their religious and spiritual tradition, that women exercise control over their bodies, free from interference by others. (*Id.* ¶ 8). As part of their religious and spiritual beliefs, therefore, many Pagans believe that in recognition of women's autonomy demanded by their sincere beliefs, women must be allowed to obtain abortions. (*Id.* ¶ 9).

### v.     Episcopalianism

29.     The Episcopal Church also affirms that abortions may occur under situations not allowed by S.E.A. 1. (Declaration of Reverend Julia Whitworth ¶ 5). Specifically, if a pregnant person is in a situation where continuing a pregnancy will cause serious problems to her mental or physical health, even if the health problems are not severe enough to fall within the limited exceptions to the ban on abortions erected by S.E.A. 1, it is religiously permissible for the woman to obtain an abortion and it should be obtained. (*Id.* ¶¶ 5, 8).

30.     This is because the wellbeing of the pregnant person is of primary importance. (*Id.*).

31.     This is part of the Episcopal Church's recognition that "equitable access to women's health care, including women's reproductive health care, is an integral part of a woman's struggle to assert her dignity and worth as a human being." (*Id.* ¶ 6).

### C. The Plaintiffs

#### i. Anonymous Plaintiff 1

32.     Anonymous Plaintiff ("Anon.") 1 is a 39-year-old married woman with one child who resides in Monroe County. (Declaration of Anon. 1 ["Anon. 1 Dec."] ¶¶ 1-3). She is Jewish and her religious beliefs inform her life, including her lifestyle, moral and ethical decision-making, family life, and observance of holidays. (*Id.* ¶ 4). She is active in her synagogue and observes Jewish traditions. (*Id.* ¶ 5-8).

33.     Anon. 1's Jewish beliefs include the belief that life begins for the child at its birth. (*Id.* ¶ 9). She also believes, according to Jewish law and teachings, that the life of a pregnant woman, including her physical and mental health and wellbeing, must take precedence over the potential life. (*Id.* ¶ 10). Therefore, according to her Jewish beliefs, if her health or wellbeing—physical, mental, or emotional—were endangered by a pregnancy, pregnancy-related condition, or fetal abnormality, she must terminate the pregnancy. (*Id.*).

34.     Anon. 1's first pregnancy resulted in a live birth, but she experienced a variety of pregnancy-related and post-partum complications and health conditions. (*Id.* ¶¶ 14-16).

35.     Genetic testing of Anon. 1's subsequent pregnancy revealed that the fetus had a severe non-hereditary chromosomal defect that generally results in the fetus being either

miscarried or stillborn or, if a live birth occurs, results in the child being severely disabled with no more than 10% of the children surviving beyond 12 months. (*Id.* ¶¶ 23-24). The pregnancy put Anon. 1's physical, mental, and emotional health at risk and would have continued to do so even though (1) it would not have resulted in her death or caused a serious risk of substantial and irreversible physical impairment to a major bodily function and (2) may not have resulted in the child dying within three months of birth. (*Id.* ¶¶ 25-26). She obtained an abortion in March of 2022 in accordance with her religious belief that the abortion was required to protect her physical and mental health. (*Id.* ¶¶ 27-28).

36.     Anon. 1 would like to have another child. (*Id.* ¶ 31; Deposition of Anonymous Plaintiff 1 ["Anon. 1 Dep."] at 50:5-6). She understands that she is of advanced maternal age and therefore any pregnancy carries with it heightened risk both to herself and to the fetus, including increased occurrence of certain pregnancy-related health conditions and non-hereditary chromosomal fetal abnormalities. (Anon. 1 Dec. ¶ 31). Because of her age, any pregnancy would be high risk, and Anon. 1 is aware that a pregnancy might seriously endanger her health, without necessarily causing death or a serious risk of substantial and irreversible physical impairment of a major bodily function. (*Id.* ¶¶ 12-13). For example, during any pregnancy she would be prone to serious health effects such as high blood pressure that could lead to pre-eclampsia and gestational diabetes. (*Id.* ¶¶ 12, 14, 15, 31, 32).

37.     There are many scenarios under which Anon. 1's physical or mental health would be at risk in the pregnancy, such that her religious beliefs would direct her to terminate the pregnancy, but where such a termination would not be permitted by the newly enacted statute. (*Id.* ¶ 33).

[13]

A-159

38.    Individuals of Jewish ancestry also face heightened risks of passing on certain genetic disorders to children, many of which are severe and will result in profound physical and cognitive disabilities and which will result in death prior to adulthood, although they may not do so within the three months following birth. (*Id.* ¶ 13).

39.    Anon. 1 is also aware that in other states, where abortion bans have already taken effect, some women have experienced extreme and emergent risks to their physical health because physicians delayed providing necessary medical care, for fear of violating similar statutes. (*Id.* ¶ 34). She believes that her religion instructs her that she cannot imperil her life in that way given that Jewish law instructs her that a fetus is not a life. (*Id.* ¶¶ 34-35).

40.    Anon. 1 has ceased having sex with her husband due to her fear of getting pregnant. (Anon. 1 Dep. at 52:2-25).

41.    Anon. 1's religious beliefs are sincerely held.

42.    Although Anon. 1 and her husband wish to try to have another child, she is unwilling to become pregnant unless she is able to obtain an abortion consistent with her religious beliefs, and she is refraining from becoming pregnant due exclusively to the enactment of S.E.A. 1. (Anon. 1 Dec. ¶ 36; Anon. 1 Dep. at 50:10-16).

43.    If S.E.A. 1 were preliminarily enjoined, Anon. 1 imagines that she would resume sexual relations with her husband. (Anon. 1 Dep. at 52:16-17).

### ii.  Anonymous Plaintiff 2

43.    Anonymous Plaintiff 2 is a 30-year-old woman who resides in Allen County and is married with two children. (Declaration of Anon. 2 ["Anon. 2 Dec."] ¶¶ 1-3).

[14]

**A-160**

44.     She does not belong to a specific religious denomination, but has personal religious and spiritual beliefs that guide her moral and ethical practice and life. (*Id.* ¶ 4). She does not believe in a single, theistic god, but believes that there is within the universe a supernatural force or power that connects all humans and is larger than any individual person. (*Id.* ¶¶ 6-7).

45.     Central to her spiritual beliefs is the belief that persons are endowed with bodily autonomy and that the bodily integrity of others should not be infringed upon. (*Id.* ¶¶ 8-9). To do so constitutes a spiritual and moral wrong and inhibits the full expression of a person's humanity. (*Id.* ¶ 9).

46.     Anon. 2 believes that, at least prior to viability, a fetus is a part of the body of the mother. (*Id.* ¶¶ 10-11).

47.     Central to her religious beliefs is that she maintains spiritual and physical autonomy over her own body, including a fetus, and it is her spiritual obligation to determine whether to remain pregnant. (*Id.* ¶ 12).

48.     She believes that if a pregnancy or the birth of another child would not allow her to fully realize her humanity and inherent dignity, she should terminate that pregnancy, and this is so in circumstances which would not be permitted under S.E.A. 1. (*Id.* ¶ 13). Anon. 2 has terminated a pregnancy for precisely this reason in the past. (*Id.* ¶ 14).

49.     Anon. 2's religious beliefs are sincerely held.

50.     Anon. 2 may in the future become pregnant, and there are therefore circumstances in which her beliefs would require her to terminate a pregnancy, but such termination would not be allowed by S.E.A. 1. (*Id.* ¶ 15).

**A-161**

51.     The passage of S.E.A. has caused Anon. 2 significant anxiety about the possibility

of an unintended pregnancy and her inability to terminate such a pregnancy under S.E.A.

1. (*Id.* ¶ 16). This anxiety has resulted in a reduction in physical intimacy between Anon.

2 and her husband and in Anon. 2 using birth control methods that she otherwise would

not. (Deposition of Anonymous Plaintiff 2 ["Anon. 2 Dep."] at 55:13-56:16).

52.     If S.E.A. 1 were preliminarily enjoined, Anon. 2 would go back to her normal

behavior. (Anon. 2 Dep. at 58:23-59:2).

### iii.  Anonymous Plaintiff 3

53.     Anonymous Plaintiff 3 is an unmarried 24-year-old woman who lives in Marion

County. (Declaration of Anon. 3 ["Anon. 3 Dec."] ¶¶ 1-3). She does not have children and

does not wish to have children at any time in the near future. (*Id.* ¶ 3).

54.     She is Muslim and her understanding of Islam influences many aspects of her life,

including her daily activities such as diet and wardrobe. (*Id.* ¶¶ 4-5).

55.     She believes, consistent with her understanding of Islam, that life does not begin

at conception and that the life of a pregnant woman, including her overall wellbeing, takes

precedence over a fetus. (*Id.* ¶¶ 9-10).

56.     She holds this belief, among other reasons, because she understands that even

among Islam's strongest beliefs and practices, a person's physical health and wellbeing

is always the priority.  (*Id.* ¶ 11).

57.     For example, during the holy month of Ramadan, when individuals are

commanded to fast between sunrise and sunset, an individual may eat if fasting would

harm their health or wellbeing.  (*Id.* ¶ 11). This harm need not take the form of a risk of

[16]

**A-162**

death or the permanent impairment of a major bodily function—it may take the form of pain or other discomfort. (*Id.* ¶ 12).

58.     Therefore, according to her Islamic beliefs, if her health or wellbeing—physical, mental, or emotional—were harmed by a pregnancy or a pregnancy-related condition, she should terminate the pregnancy. (*Id.* ¶ 13).

59.     Anon. 3's religious beliefs are sincerely held.

60.     There are many circumstances in which such a need might arise, where an abortion would be directed by her religious beliefs but prohibited by the statute, involving risks to her physical or mental health, since the statute only allows for abortion in limited circumstances.  (*Id.* ¶¶ 14-15).

61.     Anon. 3 has Crohn's disease for which she continuously takes a prescribed immunosuppressant medication and intermittently takes a steroid medication when she has flare-ups. (*Id.* ¶ 16). She understands that women with active Crohn's disease, including herself, have a higher risk of miscarriage and stillbirth, which themselves pose risks to the women's health. (*Id.* ¶¶ 17-18). This disease, in combination with a pregnancy, would also result in significant related risks to her health. (*Id.* ¶ 19).  When she has Crohn's flare-ups, it is almost impossible for her to eat, and in the midst of these episodes, she sometimes has to receive intravenous nutrition supplements.  (*Id.* ¶ 20).  As a result of past flare-ups, she has lost 70-80 pounds over the past three years.  (*Id.*).  And although steroids are a necessary medication for her during flare-ups, she understands that steroids are not advised during pregnancy. (*Id.* ¶ 21).

62.     She is at risk of becoming pregnant, and if she did, she would seek to terminate a pregnancy under circumstances not permitted by S.E.A. 1.  (*Id.* ¶ 22). She does not want

to start hormonal birth control, because she is concerned about the potential side effects, particularly in light of her Crohn's disease.  (*Id.* ¶ 23).

63.     She is therefore abstaining from sexual intercourse, as that is the only way she can ensure that she will not need an abortion that would be prohibited by S.E.A. 1.  (*Id.* ¶ 24). She is making this decision solely because of the application of S.E.A. 1. (*Id.* ¶ 25).

64.     Without the operation of S.E.A. 1, and if it were preliminarily enjoined, Anon. 3 would once again be able to be intimate. (Deposition of Anonymous Plaintiff 3 ["Anon. 3 Dep."] at 68:9-12).

### iv.  Anonymous Plaintiffs 4 and 5

65.     Anonymous Plaintiffs 4 and 5 are women who live in Monroe County and are married to each other.  (Declaration of Anons. 4 and 5 ["Anons. 4 and 5 Dec."] ¶¶ 1-2). They are Jewish and their understanding of Judaism impacts and informs their lives. (*Id.* ¶ 3).

66.     They believe, according to Jewish law and teachings, that the life of a pregnant woman, including her physical and mental health and wellbeing, takes precedence over the potential for life embodied in a fetus. (*Id.* ¶ 10). The fetus is not a life. (*Id.* ¶ 9). Therefore, according to their Jewish beliefs, if their health or wellbeing—physical, mental, or emotional—were endangered by a pregnancy, pregnancy-related condition, or fetal abnormality, they would be directed by those beliefs to terminate the pregnancy. (*Id.* ¶ 12).

67.     Prior to the passage of S.E.A. 1, Anons. 4 and 5 were planning to use assisted reproductive technologies in order try to become pregnant. (*Id.* ¶ 11). Either individual

could become pregnant, depending on the outcome of the medical tests and procedures required to facilitate such a pregnancy. (*Id.* ¶ 11).

68.     If either Anons. 4 or 5 become pregnant, there are circumstances in which their religious beliefs would direct whoever was pregnant to terminate that pregnancy, but where such a termination would be prohibited by S.E.A. 1. (*Id.* ¶ 12). This includes circumstances in which the pregnant person's physical or mental health would be harmed by a pregnancy, but where the pregnancy did not put them at risk of death or permanent impairment of a major bodily function. (*Id.* ¶ 13). It would also include circumstances of a non-fatal fetal anomaly or a fetal anomaly that would be fatal, but not within three months of birth. (*Id.* ¶ 13).

69.     Anons. 4 and 5 are also aware that in other states, where abortion bans have already taken effect, some women have experienced extreme and emergent risks to their physical health because physicians were delayed in providing necessary medical care, for fear of violating similar statutes. (*Id.* ¶ 14). They believe that their religion instructs them that they cannot imperil their life in that way. (*Id.* ¶ 14).

70.     The religious beliefs of Anons. 4 and 5 are sincerely held.

71.     Although Anons. 4 and 5 wish to try to have a child, neither is willing to become pregnant unless they would be able to obtain an abortion consistent with their religious beliefs, and they are therefore refraining from becoming pregnant due exclusively to the enactment of S.E.A. 1. (*Id.* ¶ 16).

72.     If the statute was preliminarily enjoined Anon. 5 would feel more secure in being able to use assisted reproductive technologies to attempt to become, or for Anon. 4 to

[19]

**A-165**

attempt to become pregnant. (Deposition of Anonymous Plaintiff 5 ["Anon. 5 Dep."] at 48:17-49:2).

### v. Hoosier Jews for Choice

73.     Hoosier Jews for Choice is a membership organization comprised of Jewish persons, and it exists to take action within the Jewish community and beyond to advance reproductive justice, support abortion access, and promote bodily autonomy for all people across the state of Indiana.  (Declaration of Rabbi Leon Olenick ["Olenick Dec."] ¶ 3).

74.     The organization is made up of persons who believe that under Jewish law and religious doctrine, life does not begin at conception, and that a fetus is considered a physical part of the woman's body, not having a life of its own or independent right. (*Id.* ¶ 4). The organization endorses this belief. (*Id.* ¶ 5).

75.     The organization and its members believe that under Jewish law an abortion is directed to occur if it is necessary to prevent physical or emotional harm to a pregnant person, even if there is not a physical health risk that is likely to cause substantial and irreversible physical impairment of a major bodily function. (*Id.* ¶ 6).

76.     Some members of the organization are capable of becoming pregnant and if they became pregnant, could require an abortion that would be prohibited by S.E.A. 1. (*Id.* ¶ 7). Under those circumstances, they would not be permitted to act as directed by their religious beliefs. (*Id.* ¶ 7). Hoosier Jews for Choice has about 128 members. Exhibit 9, HJ4C Membership Demographics. It avers that some members—around 45, Defendants' Exhibit 10, 30(B)(6) Deposition of Hoosier Jews for Choice Through Amalia Shifriss (Hoosier Jews Dep.) 53:19—"are capable of becoming pregnant and if they became pregnant, could require an abortion that would be prohibited" by S.E.A. 1. Pltfs.' Ex. 5,

[20]

**A-166**

Hoosier Jews Decl. ¶ 7. A few such members—perhaps six—have "alter[ed] their sexual practices, birth control practices, and family planning as a result of the law and their fear of becoming pregnant." *Id.* Specifically, according to Hoosier Jews for Choice Steering Committee Chair Amalia Shifriss, "[a] couple people are having their husbands get vasectomies" while "several" others opted for "arm implants or IUDs." Defs.' Ex. 10, Hoosier Jews Dep. 53:7, 8; 10–12. Shifriss "doubt[s]" these members would alter their efforts at birth control—i.e., reverse vasectomies or remove implants and IUDs—should the Court grant a preliminary injunction, even concluding that she "do[esn't] think" that they would. *Id.* at 55:9–10. She stressed twice on cross examination that her own "behavior would not change because the preliminary injunction is temporary." *Id.* at 58:34. Hoosier Jews for Choice believes that "a person's right to . . . have an abortion . . . should just be between that person and their doctor," and when asked whether the State has a "role to play in the regulation of abortion," answered "[w]e don't believe it should." *See id.* at 27:8–10; 29:2–11. Shifriss allowed that a woman pregnant after the point of viability who seeks to terminate her pregnancy to preserve her physical or mental well-being might do so through induction of labor, which may save the child's life. *Id.* at 61:2–15. Yet she also answered "yes" when asked whether "there be a circumstance where even if induction is available, a woman might, consistent with Jewish law and tradition, want to have an abortion." *Id.* at 61:10–15.

77.     The religious beliefs of the members of Hoosier Jews for Choice are sincerely held, as are the beliefs of the organization.

78.     Members are currently altering their sexual practices, birth control practices, and family planning as a result of the law and their fear of becoming pregnant. (*Id.* ¶ 7; Deposition of Hoosier Jews for Choice ["HJ4C Dep."] at 53:5-22).

### D.  Beliefs about when life begins are theological or philosophical in nature

79.     Facts about the process of human zygotic, embryonic, and fetal development do not answer the question of when life begins. See Declaration of Dr. Peter Schwartz.

80.     The "personhood" status of a zygote, embryo, or fetus cannot be stated as matters of fact. See *Id.*

81.     For many individuals, such as the Plaintiffs, questions such as the beginning of life or when personhood begins cannot be stated without reference to moral, ethical, spiritual, and religious beliefs. (See *Id.*; Anon. 1 Dec. ¶ 9; Anon. 2 Dec. ¶¶ 10-11; Anon. 3 Dec. ¶ 9; Anons. 4 and 5 Dec. ¶ 9; HJ4C Dec. ¶ 5).

### E.  Summary of findings of fact

82.     The plaintiffs' religious beliefs are sincerely held and mandate that they receive abortions in circumstances that are prohibited by S.E.A. 1.  The plaintiffs are currently altering their sexual and/or reproductive behaviors as a direct consequence of S.E.A. 1 and their behaviors would be different but-for the operation of the statute and would be different if a preliminary injunction of the statute issued.

## IV.    Conclusions of Law

### A.  Standing as to Hoosier Jews for Choice

1.      The State has challenged whether Hoosier Jews for Choice has standing to bring its claim, conceding that RFRA specifically confers standing on religious organizations, but argues that principles of standing in the federal or abortion context preempt this.

(State's Br. at 28-29).  The Plaintiffs argue that RFRA clearly provides Hoosier Jews for Choice have standing.

2.      The text of RFRA is states: "a group organized and operated primarily for religious purposes" is a "person" who may raise a RFRA claim.  It is undisputed that Hoosier Jews for Choice exists for a religious purpose, and the evidence establishes that this religious purpose is the sole reason for its existence. Ind. Code § 34-13-9-7. Furthermore, the Indiana Court of Appeals has recognized third-party standing specifically in the abortion context.  *See, e.g., Planned Parenthood v. Carter*, 854 N.E.2d 853, 870 (Ind. Ct. App. 2006) (allowing Planned Parenthood to raise the interests of its patients); *In re Indiana Newspapers v. Junior Achievement of Central Indiana*, 963 N.E.2d 534, 549 (Ind. Ct. Ap. 2013) (allowing the *Indianapolis Star* to raise the First Amendment interests of an anonymous commentator who made online comments to a news article).

3.      The doctrine of standing "asks whether the plaintiff is the proper person to invoke a court's authority". *Horner v. Curry*, 125 N.E.3d 584, 589 (Ind. 2019).   "The party challenging the law must show adequate injury or the immediate danger of sustaining some injury." *Id.* The Indiana Supreme Court has held that "the purpose of standing— along with the corollary doctrines of mootness and ripeness—is to ensure the resolution of real issues through vigorous litigation, not to engage in academic debate or mere abstract speculation. *Id.*  "Standing implicates the constitutional foundations on which our system of government lies. By requiring a party to show a specific injury, the doctrine limits the judiciary to resolving concrete disputes between private litigants while leaving questions of public policy to the legislature and the executive". *Id.*  Indeed, standing "precludes courts from becoming involved ... too far into the provinces of the other

[23]

**A-169**

branches." Jon Laramore, *Indiana Constitutional Developments*, 37 Ind. L. Rev. 929, 930 (2004).

4.      This Court finds that Hoosier Jews for Choice has standing to raise its claim under Indiana law caselaw and RFRA.

   **B.  This matter is ripe for adjudication**

5.      The doctrine of ripeness "asks whether [a] claim is sufficiently developed to merit judicial review." *Holcomb v. Bray*, 187 N.E.3d 1268, 1285 (Ind. 2022). "There must exist not merely a theoretical question or controversy but a real or actual controversy, or at least the ripening seeds of such a controversy." *Id.* at 1287 (internal citation omitted). The issues presented in the case must be "based on actual facts rather than abstract possibilities," and there must be an adequately developed record on which such issues might be decided. *Id.*  In *Holcomb v. Bray*, the Indiana Supreme Court specifically held that Governor Holcomb had demonstrated the controversy was ripe for determination by the Court because he questioned the validity of several statutes.  *Id.*

6.      The Plaintiffs in this case are doing as did the Governor in *Holcomb v. Bray* and merely challenging the validity of a statute.

7.      The undisputed evidence demonstrates, based on actual facts, that the Plaintiffs are suffering injury and altering their behavior at the current time solely because of S.E.A. 1. Anons. 1, 4, and 5 are currently not attempting to become pregnant when—absent the statute—they would. Anon. 3 is currently abstinent when she otherwise would not be. And Anon. 2 has severely decreased her sexual intimacy with her husband and has been required to use birth control measures that she otherwise would not. Members of Hoosier Jews for Choice are altering their sexual and reproductive practices due to S.E.A. 1.

**A-170**

8.      The undisputed evidence shows why the Plaintiffs have taken these measures because their only alternative is the unacceptable risk of needing a termination of a pregnancy that would be required by their religious beliefs but prohibited by Indiana law under S.E.A. 1.

9.      The Plaintiffs will change their behavior if a preliminary injunction is granted.

10.     The Plaintiffs are all experiencing actual and present harm. The Court finds Indiana law does not require the Plaintiffs to become pregnant before they may challenge the law, and this matter is sufficiently ripe for review.

### C.  The preliminary injunction standard

11.     To obtain a preliminary injunction, the moving party must demonstrate by the greater weight of the evidence that: (1) its remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action; (2) there exists a reasonable likelihood of success at trial; (3) the threatened injury to the movant outweighs the potential harm to the nonmovant from the granting of an injunction; and (4) the public interest would not be disserved.  If the movant fails to prove any of these requirements, the trial court should deny a request for a preliminary injunction. *B&S of Fort Wayne, Inc. v. City of Fort Wayne*, 159 N.E.3d 67, 73 (Ind. Ct. App. 2020) (internal citations omitted). A preliminary injunction is "an extraordinary equitable remedy that should be granted in rare instances" only. *State v. Econ. Freedom Fund*, 959 N.E.2d 794, 801 (Ind. 2011) (internal quotation marks omitted).

### D.  The plaintiffs have established a likelihood of success on the merits

12.     In order to meet their burden to show a likelihood of success on the merits of their claim, Plaintiffs must "establish[] a prima facie case." *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 911 (Ind. Ct. App. 2011). Plaintiffs are not required to show that they

[25]

**A-171**

are entitled to relief as a matter of law in order to obtain preliminary injunctive relief.

*Abercrombie & Fitch Stores, Inc. v. Simon Prop. Grp., L.P.*, 160 N.E.3d 1103, 1109 (Ind.

Ct. App. 2020).

### i. RFRA

13.　Indiana's RFRA provides that:

(a)　Except as provided in subsection (b), a governmental entity may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability.

(b)　A governmental entity may substantially burden a person's exercise of religion only if the governmental entity demonstrates that application of the burden to the person:

　(1) is in furtherance of a compelling governmental interest; and

　(2) is the least restrictive means of furthering that compelling governmental interest.

Indiana Code § 34-13-9-8. (enacted in 2015).

14.　This statute "applies to all governmental entity statutes, ordinances, resolutions, executive or administrative orders, regulations, customs, and usages, including the implementation or application thereof." Ind. Code § 34-13-9-1. "Governmental entity" includes the whole or part of any department, agency, official, or other persons acting under color of state law as part of state government, political subdivision, or other instrumentalities of government. Ind. Code § 34-13-9-6.

15.　The "exercise of religion" that falls within the statute's ambit "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." Ind. Code § 34-13-9-5. Under Ind. Code § 34-13-9-9, RFRA provides both a defense and private right of action for relief: "[a] person whose exercise of religion has been substantially burdened, or is likely to be substantially burdened, by a violation of this statute may assert the violation or impending violation as a claim or defense in a judicial or administrative proceeding[.]"　If a violation is found, Indiana's RFRA allows for

[26]

**A-172**

injunctive and declaratory relief as well as damages and attorneys' fees. Ind. Code § 34-13-9-10.

16.     The parties agree that there are few reported Indiana cases that have been decided under, or even discuss, Indiana's RFRA. See *Blattert v. State*, 190 N.E.3d 417 (Ind. Ct. App. 2022); *Indiana Family Institute, Inc. v. City of Carmel*, 155 N.E.3d 1209 (Ind. Ct. App. 2020); *House of Prayer Ministries, Inc. v. Rush County Bd. of Zoning Appeals*, 91 N.E.3d 1053 (Ind. Ct. App. 2018), *trans. denied*; *Doe 1 v. Boone Co. Prosecutor*, 85 N.E.3d 902 (Ind. Ct. App. 2017); *Tyms-Bey v. State*, 69 N.E.3d 488, 490-92 (Ind. Ct. App. 2017), *trans. denied*.

17.     It should be noted that "[t]he relevant statutory language in Indiana's RFRA largely tracks the language in the federal RFRA statute, so federal caselaw provides some useful guidance. See 42 U.S.C.A. § 2000bb-1." *Blattert*, 190 N.E.3d at 421 n.1. And the text of the federal RFRA, 42 U.S.C. § 2000bb-1, *et seq.*, is "nearly identical" to that of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, *et seq.*, so that cases decided under the two federal statutes are used interchangeably. *Lindh v. Warden*, 2013 WL 139699, *8 (S.D. Ind. Jan. 11, 2013) ("Because of their substantial similarity, both RFRA and RLUIPA cases are relied on by the Court interchangeably.*").

18.     Given the similarity of all three statutes, the Indiana Court of Appeals has freely cited cases applying both RLUIPA and the federal RFRA in interpreting Indiana's RFRA. *See Blattert*, 190 N.E.3d at 421-23 (citing federal RFRA cases *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006); *U.S. v. Wilgus*, 638 F.3d 1274 (10th Cir. 2011), and

RLUIPA cases, *Holt v. Hobbs*, 574 U.S. 352 (2015); *Smith v. Owens*, 13 F.4th 1319 (11th Cir. 2021); *Fowler v. Crawford*, 524 F.3d 931 (8th Cir. 2008)); *see also House of Prayer Ministries,* 91 N.E.3d at 1064 (noting the similarity between Indiana's RFRA and RLUIPA in interpreting the Indiana law in light of the United States Supreme Court's decision in *Hobby Lobby*).

### i. S.E.A. 1 imposes a substantial burden on plaintiffs' religious exercise

19.     Religious exercise is substantially burdened if the government "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Rv. Bd. of Ind. Emp. Security Division*, 450 U.S. 707, 718 (1981).  Under Indiana's RFRA, "a governmental entity may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability," unless it "demonstrates that application of the burden to the person" is: (1) "in furtherance of a compelling governmental interest" and (2) "the least restrictive means of furthering that compelling governmental interest."  *Blattert*, 190 N.E.3d at 421, Ind. Code § 34-13-9-8. RFRA does not exempt criminal statutes, so defendants may raise a RFRA defense in criminal prosecutions. *Blattert*, 190 N.E.3d at 421.

20.     The Indiana Court of Appeals held in *Blattert* that "A party establishes a prima facie RFRA defense by showing the disputed governmental action substantially burdens a sincerely held religious belief. *Id., citing Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 705, 134 S. Ct. 751, 189 L. Ed. 675 (2014).   Then the burden shifts to the government to establish that a compelling governmental interest is "satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Blattert*, 190 N.E.3d at 421; *citing*

**A-174**

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 420, 126 S. Ct. 1211, 163 L.Ed.2d 1017 (2006). The government must also establish that the substantial burden is the least restrictive means of furthering that interest. *Blattert*, 190 N.E.3d at 421, Ind. Code § 34-13-9-8; *see Hobby Lobby*, 573 U.S. at 728, 134 S. Ct. 2751.

21.     Under Ind. Code § 34-13-9-10(a), if the party asserting RFRA meets its prima facie burden, and the government does not meet its burden, then "the court ... shall allow a defense ... and shall grant appropriate relief against the governmental entity."

22.     This Court finds that the Plaintiffs have satisfied their prima facie burden that they have a defense under RFRA.

23.     The State's primary argument as to substantial burden is that the Plaintiffs' religious exercise is not substantially burdened because abortion is not a religious practice, "but a secular means to a religious end." (See State's Br. at 30). The State also argues that in light of the U.S. Supreme Court's holding in *Dobbs* "returning to [t]he people and their elected representatives the right to regulate abortion", *Dobbs*, 142 S. Ct. 2285, and that because the State has a compelling interest in protecting the unborn that this deprives the Plaintiffs of their rights under RFRA.

24.     This Court finds that the State's arguments are nearly identical to those already rejected by the U.S. Supreme Court in *Hobby Lobby*. 573 U.S. 682.  In that case, the Supreme Court held that requiring closely-held for-profit corporations to pay for employees' health coverage, which could include payment for contraceptives that the plaintiffs considered to be abortion-inducing, compelled the owners of the company to engage in conduct that violated their religious beliefs. 573 U.S. at 720.  This was so even

[29]

**A-175**

though the only activity engaged in by the plaintiffs was the payment of money, rejecting the government's characterization of this behavior as too attenuated to constitute a religious practice. *Id.* at 725.

25.     The Plaintiffs argue that a variety of activities, including those that may be "secular" to some, constitute religious practices, and that the Plaintiffs' practices are as well. (*See* Plaintiffs' Reply Br. at 13-18). The Supreme Court has detailed many activities that—while they may not have religious significance to some people—are religious practices for those who believe. The same is true for the Plaintiffs in this case. *See Holt v. Hobbs*, 574 U.S. 352, 369 (2015) (growth of facial hair); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 525, 547 (1993) (ritual slaughter of animals); *Wisconsin v. Yoder*, 406 U.S. 205, 210-12, 234 (1972) (compulsory education beyond the eighth grade).

26.     This Court finds that the Plaintiffs practices regarding abortion are religious in nature: they have established that, under circumstances that would be prohibited by S.E.A. 1, their religious beliefs would compel them to have abortions.

27.     The State further contends that even if the Plaintiffs have a religious obligation to obtain an abortion, S.E.A. 1 nonetheless does not burden them, because Plaintiffs are taking steps to prevent the possibility of becoming pregnant.

28.     The Court also rejects this argument, as did the Supreme Court in *Sherbert v. Verner*, 374 U.S. 398 (1963), *abrogation on other grounds recognized in Holt*, 574 U.S. at 357. There, the plaintiff's employment was terminated because she was unwilling to work on Saturday, her religion's Sabbath. She was unable to find substitute employment due to her religious obligation, as the other available jobs would have required Saturday work. *Id.* at 401. The State denied her unemployment benefits as a result of her "fail[ing,]

[30]

**A-176**

without good cause, to accept suitable work when offered." *Id.* at 401.  There, the Court held that the "pressure upon her to forego" her religious practice was unmistakeable," and that the State was forcing her "to choose between following the precepts of her religion" and receiving unemployment.  *Id.* at 404. "Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against [her] for her Saturday worship." *Id.*

29.    Anons. 1, 4, and 5 are avoiding becoming pregnant, even though they would like to have children.  Anon. 1 has ceased having sexual intercourse with her husband, and Anon. 2 has severely curtailed sexual activity with her husband. And Anon. 3 has become abstinent. Members of Hoosier Jews for Choice are also altering their sexual and reproductive practices. It is undisputed that all of these actions have been taken solely due to S.E.A. 1, and they are actions that the Plaintiffs do not want to take.  They have adopted these practices solely to avoid placing themselves in circumstances that would require them to exercise their religious belief, but where that exercise would be prohibited by S.E.A. 1.  The government's pressure upon them to abandon their religious beliefs is clear.

30.    This Court finds that the Plaintiffs have made a prima facie showing that they have a likelihood of success on the merits that S.E.A. 1 imposes a substantial burden on Plaintiffs' religious exercise.

### ii.    The State has not established a compelling interest in enforcing S.E.A. 1 against the plaintiffs

31.    RFRA requires that once a plaintiff demonstrates that the "disputed governmental action substantially burdens a sincerely held religious belief . . . the burden shifts to the government to establish that a compelling governmental interest is 'satisfied through the

application of the challenged law "to the person"—the particular claimant whose sincere exercise of religion is being substantially burdened.'" *Blattert,* 190 N.E.2d at 421 (quoting *O Centro*, 546 U.S. at 420). The government may not simply enunciate a general reason for the statute, as RFRA requires a "more focused inquiry." *Id.* RFRA demands that there be a "case-by-case consideration of religious exemptions to generally applicable rules." *Id.* at 436.

32.     The State first argues that the interest in preventing abortion is compelling. The State argues that abortion at any gestational age beginning at fertilization "ends the life of an innocent human being" (State's Br. at 32), and that it has a compelling interest in protecting this class of "vulnerable human beings" from being killed. (*Id.* at 33).  The State's interest is based entirely on the legislative determination that "human physical life" begins when sperm meets egg. Ind. Code § 16-34-2-1.1(a)(1)(E). The State presents as a statement of fact that "it is a simple scientific observation" that "the human fetus is a human being" (State's Br. at 6), as are zygotes and embryos, (*Id.* at 35).

33.     Of course, it is not disputed that human zygotes, embryos, and fetuses are of the human species. In making these factual assertions, the State is therefore attempting to establish as a factual matter when a human comes into being—the "being" part of the phrase "human being." In so doing, the State seeks to establish (1) that the question of when life begins has been definitively answered by science and medicine, and therefore that any theological opinions regarding this question are either wrong or are rendered irrelevant; and (2) it has a compelling interest in prohibiting the termination of pregnancy from the moment of fertilization forward.

34.     The Supreme Court already recognized in *Hobby Lobby* that the question of when life begins is a religious one that the State may not answer legislatively or as a factual matter. 573 U.S. at 720 (taking as the starting point that "the [plaintiffs] have a sincere religious belief that life begins at conception").  The nature of this enduring question and the dispute surrounding it are illustrated by the very fact of the competing affidavits filed by both sides.

35.     This Court finds that the question of when life begins is a theological one not a factual question for this Court.  The U.S. Supreme Court has held that "the First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general" and government may not act "to benefit religion or particular religions." *Lukumi Babalu Aye*, 508 U.S. at 532. "The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968).

36.     In addition, the State may not dictate the parameters of what constitutes a question of religion. As the Supreme Court made clear in the context of the government's attempt to define religion as necessarily involving belief in a "Supreme Being," the State may not construct the confines of religious belief and place some things—such as when life begins—outside of it.  *United States v. Seeger*, 380 U.S. 163, 183-84 (1965).

37.     While the State may question the sincerity of a plaintiff's religious belief, it may not question the belief's veracity. The State ignores the fact that "courts have no business addressing whether the religious belief asserted in a RFRA case is reasonable." *Hobby Lobby*, 573 U.S. at 724. To do so would place a court as the arbiter of the reasonableness and propriety of religious beliefs and would violate the First Amendment. *United States v.*

[33]

**A-179**

*Ballard*, 322 U.S. 78, 86 (1944) (noting that the Free Exercise Clause "embraces the right to maintain theories of life and death and of the hereafter which are rank heresy to followers of the orthodox faiths. . . . Men may believe what they cannot prove . . . . The First Amendment does not select any one group or any one type of religion for preferred treatment. It puts them all in that position.").

38.     This Court finds that Indiana, in its own statutes, does not endow zygotes, embryos, and pre-viability fetuses with the legal status of human being.

39.     Indiana's health code does not define a "human being," but it defines a human embryo as "a human egg cell with a full genetic composition capable of differentiating and maturing into a complete human being." Ind. Code § 16-18-2-183.5.

40.     Indiana's criminal code defines "human being" as "an individual who has been born and is alive." Ind. Code § 35-31.5-2-160. For purposes of an action for wrongful death or injury, a "child" is defined as either a child born alive or a fetus after it has attained viability. Ind. Code § 34-23-2-1(b).  The Court of Appeals has noted that there is an inherent distinction between a child born alive and a fetus as "the child who has been born has an independent existence outside the mother's body, and the unborn fetus lives within her body." *McVey v. Sargent*, 855 N.E.2d 324, 328 (Ind. Ct. App. 2006).  In *Humphreys v. Clinic for Women, Inc.*, 796 N.E.2d 247, 255 (Ind. 2003), while the State argued that it had a "valid and compelling" interest in protecting fetal life, the Court concluded that this interest was not strong enough to allow the State to refuse to fund certain abortions.

41.     The State relies primarily on *Cheaney v. State*, 285 N.E.2d 265 (Ind. 1972) to support its position that the State has a compelling interest. The *Cheaney* case does not support the State's statement that life begins at fertilization. First, *Cheaney* was decided

[34]

**A-180**

prior to *Roe v. Wade*, 410 U.S. 113 (1973), *overruled by Dobbs v. Jackson Women's Health Org.*, –U.S.–, 142 S. Ct. 2228 (2022), in which the Supreme Court recognized that a state has an "important and legitimate interest in potential life" that becomes "compelling" at viability. *Id.* at 163. And in *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992), *overruled by Dobbs*, the Court emphasized that the state's interests are not compelling prior to fetal viability. 505 U.S. at 846. While *Dobbs* determined that the Constitution does not protect a fundamental liberty interest in abortion, *Dobbs* said nothing to suggest that the nature of the State's interest has somehow changed. Moreover, no subsequent Indiana case has relied on *Cheaney*'s compelling interest language including *Humphreys*, which cited the State's reliance on *Cheaney.* In 1972, the Indiana Supreme Court held "that a State interest in what is, at the very least, from the moment of conception a living being and potential human life, is both valid and compelling. *Cheaney*, 285 N.E.2d at 270. However, this Court and other Courts cannot select different theological or religions definitions of conception as such is prohibited under RFRA. For example, Anon. Plaintiffs 1, 4, and 5 practicing the Jewish faith have a sincerely held religious belief that conception begins a birth.

42.     This Court must look at the application of the statute to those whose "exercise of religion is being substantially burdened," *O Centro*, 546 U.S. at 430-31, has led courts applying RLUIPA and the federal RFRA to exempt persons from coverage of otherwise valid laws to allow the persons' religious beliefs to be accommodated. For example, the Supreme Court held that exemptions should be provided so that plaintiffs could ingest otherwise-prohibited controlled substances, *O Centro*, 546 U.S. at 425-27, 439, or grow a beard that was otherwise prohibited in the prison setting, *Holt*, 574 U.S. at 369-70.

**A-181**

43.     The undisputed evidence establishes that the Plaintiffs do not share the State's belief that life begins at fertilization or that abortion constitutes the intentional taking of a human life. To the contrary, they have different religious beliefs about when life begins, and they believe that under certain circumstances not permitted by S.E.A. 1, they would be required to receive abortions.  Under the law, the Court finds these are sincere religious beliefs.

44.     The State has not asserted a compelling interest in refusing to provide an exception to the Plaintiffs if the law were otherwise enforceable. Indiana has no interest in violating the sincere religious beliefs and exercise of the Plaintiffs, particularly as the Plaintiffs take no issue with the manner in which their religious exercise was accommodated under Indiana's prior abortion law.

45.     This Court find that the defendants have failed to satisfy their burden under RFRA to demonstrate a compelling governmental interest, either in general or as applied specifically to Plaintiffs.

### iii.     The State has not established that S.E.A. 1 is the least restrictive means to achieve its stated interest

46.     The Court further finds that if there were a compelling interest which there is not that the Defendants must demonstrate that S.E.A. 1 "is the least restrictive means of furthering [its] compelling governmental interest." Ind. Code § 34-13-9-8(b)(2). "The least-restrictive-means standard is exceptionally demanding and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." *Holt*, 574 U.S. at 364-65 (internal quotation and citation omitted).

[36]

**A-182**

47.    The State's position is that a human life begins at fertilization and that, as a result, it has in interest in preventing the "killing of an innocent human being."(State's Br. at 33).

48.    A statute is not narrowly tailored if it is underinclusive in scope. *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1125 (9th Cir. 2020) (referring to First Amendment analysis). "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 802 (2011) (referring to First Amendment analysis). Therefore, "[u]nderinclusiveness can . . . reveal that a law does not actually advance a compelling interest." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015) (referring to First Amendment analysis).

49.    The Plaintiffs argue that S.E.A. 1 is not narrowly tailored and is underinclusive, in that it provides exceptions for some abortions—though not religious exceptions—in circumstances that directly contravene the State's purported interest.

50.    The State argues that abortion, regardless of gestational age of the zygote, embryo, or fetus, is the killing of an innocent human being, and its interest is in preventing that killing. (State's Br. at 33).

51.    However, the statute explicitly allows abortions in circumstances that the State acknowledges constitute the "killing" of an "innocent human being": for example, where the pregnancy is the result of rape or incest and where the fetus is viable but will not live beyond three months after birth.

52.    The State raises several arguments in response to the Plaintiffs' claims of underinclusiveness.   First, the State contends that "[p]ermitting these Plaintiffs—or anyone else—to abort their children in the future would necessarily require the State to forgo its interest entirely." (State's Br. at 37).   The law explicitly allows some persons to

[37]

**A-183**

seek abortions, as the State itself recognizes, "where there is a compelling interest on the other side." (State's Br. at 35-36). The State is willing in these instances to "forgo" its interest where it deems the countervailing interest "compelling," but not where a religious mandate rests on the other side of the balance.

53.     The State's argues to narrowly tailor a religious exemption for the Plaintiffs would "turn entirely on the subjective preferences of individual women who may wish to choose abortion for a wide variety of reasons connected to physical or mental health or even self-actualization.  Such a broad exception has no limiting principle and would blow a hole in Indiana's abortion prohibition." (State's Br. at 40).

54.     This Court finds that there is a limiting principle, as there is in any case involving religious discrimination: the Plaintiffs' sincerely held religious beliefs provide the limits.

55.     In this case, the State's arguments unfairly criticize the Plaintiffs' Religious practices as subjective and minimize the importance of the Plaintiffs' religious beliefs which are permitted under RFRA.  The Plaintiffs' religious beliefs are no more or less subjective than believing that a human being comes into existence at the moment that a sperm meets an egg or at the moment of birth. In *O Centro*, in refusing to allow the government to prohibit a religious sect from gaining access to a hallucinogen that was otherwise prohibited as a Schedule I substance by the Controlled Substances Act, the Court did not criticize the "subjective preferences" of the members of this small sect. 546 U.S. at 434. Instead, the Court noted that given that there was an exception in the Act for the use of peyote by recognized Indian Tribes, there was no reason to restrict its use to the plaintiffs who had sincere religious needs for the hallucinogen: "if any Schedule I substance is always highly dangerous in any amount no matter how used, what about the

[38]

unique relationship with the Tribes justifies allowing their use of peyote?" *Id.* (Court's emphasis). Similarly, if an abortion always kills a human being, there is no reason not to extend the exceptions in S.E.A. 1 to persons whose sincere religious beliefs compel them to obtain abortions in light of the current exception in S.E.A. 1.

56.    Finally, the State argues that the exceptions allowed under S.E.A. 1 do not "reveal sinister treatment of religion" and the law cannot be deemed to be underinclusive because it does not indicate invidious discrimination against religion. (State's Br. at 36-37). The State does not cite any legal authority for its claim that there must be a "sinister" motive, and this Court finds no legal requirement that the State must have "sinister" motive. It is enough that the State has allowed exceptions to the law in some situations, but not in the religiously mandated situations presented by Plaintiffs. This is invidious discrimination against the religious beliefs to which the State does not subscribe but that the Plaintiffs hold. *See, e.g., Schwartz v. Bhd. of Maint. of Way Employees*, 264 F.3d 1181, 1186 (10th Cir. 2001) ("Discrimination is invidious if based upon impermissible or immutable classification such as race or other constitutionally protected categories, or arises from prejudice or animus.") (internal quotation and citation omitted).

57.    This Court does not find that S.E.A. 1 is the least restrictive means for the government to achieve that interest in light of the Plaintiffs' sincerely held religious beliefs.

58.    This Court further finds that the Plaintiffs are likely to prevail on the merits of their claims that S.E.A. 1, as applied to them, violates RFRA.

### E.  The other requirements for a preliminary injunction are met

#### i.  Because the State's actions violate RFRA, the plaintiffs need not show irreparable harm or a balance of hardships in their favor

59.     As the Court of Appeals has held, "When a motion seeks to enjoin an action that would violate a law or statute, however, the act is considered to case *per se* irreparable harm. when the acts sought to be enjoined are unlawful, the plaintiff need not make a showing of irreparable harm or a balance of the hardship in his favor." *Short On Cash.Net of New Castle, Inc. v. Department of Financial Institutions*, 811 N.E.2d 819, 823 (Ind. Ct. App. 2004). Should the Court find that the nonmovant has committed such an unlawful act, Indiana law deems the public interest in stopping the activity so great that "the injunction should issue regardless of whether the plaintiff has actually incurred irreparable harm or whether the plaintiff will suffer greater injury than the defendant. *Id* at 823. In other words, where a Court finds that denying a preliminary injunction would permit the nonmovant to continue committing unlawful conduct, the Court need not consider the remaining preliminary injunction factors and instead must issue the relief sought by the movant.

60.     In sum, the Plaintiffs maintain that Defendants have violated RFRA with the enactment of S.E.A. 1and that this "unlawful act[s]" which "constitute[] *per se* irreparable harm for purposes of the preliminary injunction analysis", *Clay Twp. of Hamilton Cnty. ex rel. Hagan v. Clay Twp. Reg'l Waste Dist.*, 838 N.E.2d 1054, 1063 (Ind. Ct. App. 2005) (quoting *Short On Cash.Net of New Castle, Inc. v. Dep't of Fin. Insts.*, 811 N.E.2d 819, 823 (Ind. Ct. App. 2004)), and thus should be found to have committed irreparable harm *per se* against them.

61.     Since this Court has found that the State's violation of Plaintiffs' rights under RFRA occurred with the enactment of S.E.A 1, the Plaintiffs have suffered *per se* irreparable harm and that the balance of harms favors the Plaintiffs. Even though this Court has

[40]

**A-186**

concluded that the Plaintiffs are reasonably likely to prevail on their claims that S.E.A. 1 violates RFRA and that per se irreparable harm exists, this Court will address the additional factors necessary to grant a preliminary injunction even though caselaw does not require it.

### ii.    In the absence of an injunction, the plaintiffs will suffer irreparable harm for which there is no adequate remedy at law

62.    Just as in the First Amendment, federal RFRA, and RLUIPA context, the loss of religious freedoms guaranteed by Indiana's RFRA constitutes irreparable harm for which damages are an inadequate remedy. *See, e.g., Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (further citations omitted); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (referring to the federal RFRA); *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (same, citing *Jolly*).

63.    The Court has concluded that the plaintiffs' religious exercise is being substantially burdened, that they are suffering irreparable harm, and that they would receive relief by the issuance of a preliminary injunction.  The State argues that the Plaintiffs would need to bring their claim once they are pregnant and wish to terminate the pregnancy based on their sincere religious beliefs. For the same reasons that this Court concluded that the Plaintiffs' claims are ripe for review, the Court rejects the State's contention that any harm to the Plaintiffs is merely speculative.   The Court finds that the Plaintiffs have established irreparable harm as S.E.A. 1 violates their sincerely held religious beliefs.

**A-187**

### iii.    The balance of harms favors the issuance of a preliminary injunction

64.     "Preliminary injunctions are generally used to preserve the status quo as it existed before a controversy, pending a full determination on the merits of the dispute." *Stoffel v. Daniels*, 908 N.E.2d 1260, 1272 (Ind. Ct. App. 2009) (citation omitted).

65.     An injunction will prevent the violation of Plaintiffs' rights under RFRA while maintaining the status quo that has existed in Indiana for decades regarding abortion.

66.     Given that plaintiffs have established that they are likely to succeed on the merits of their claim, "no substantial harm to others can be said to inhere in" granting the injunction. *Déjà vu of Nashville, Inc., v. Metro Gov't of Nashville*, 274 F.3d 377, 400 (6th Cir. 2001) (referring to a demonstration that a law violates the First Amendment). Instead, an injunction will only force the Defendants to conform their conduct to what is required by RFRA to protect Plaintiffs' religious rights.  The balance of harms favors the Plaintiffs.

### iv.    The public interest favors the grant of a preliminary injunction

67.     When a statute is violated "the public interest is so great that the injunction should issue" regardless of the balance of harms between the parties and the existence of independent irreparable harm. *Short on Cash.Net*, 811 N.E.2d at 823.

68.     It is in the public interest to enforce RFRA, and it is in the public interest to do so here.  *See Opulent Life Church*, 697 F.3d at 298 (RLUIPA).

### v.    The preliminary injunction will issue without bond

69.     The Defendants do not dispute that no bond should be required, and as there is no evidence that the injunction will cause any monetary damages or injury, no bond is required here.  See *Kennedy v. Kennedy*, 616 N.E.2d 39, 44 (Ind. Ct. App. 1993) (internal

**A-188**

citation omitted); *see also, Crossman Communities, Inc. v. Dean*, 767 N.E.2d 1035, 1043 (Ind. Ct. App. 2002) (same).

## V. Order

For all of the reasons discussed in this Order, the Court finds that S.E.A. 1 substantially burdens the religious exercise of the Plaintiffs and that S.E.A. 1 is not the least restrictive means to achieve a compelling governmental interest.  The Court finds that the Plaintiffs have demonstrated by the greater weight of the evidence that the Plaintiffs have a prima facie likelihood of success on the merits of their claims, the Plaintiffs will suffer irreparable harm, the balance of harms is in favor of the Plaintiffs and the public interest will not be disserved by granting the Plaintiffs' Motion for Preliminary Injunction to maintain the status quo.  The preliminary injunction shall issue without bond.

**THEREFORE**, the Court **GRANTS** the plaintiffs' Motion for Preliminary Injunction, and hereby **ENJOINS** the Defendants and their officers from enforcing the provisions of S.E.A. 1 against the Plaintiffs.

December 2, 2022
_____                _____
Date                                    Judge, Marion Superior Court

CC:    Counsel of record

[43]

**A-189**

**EXHIBIT D**



ATTORNEY GENERAL OF MISSOURI

ANDREW BAILEY

February 1, 2023

Danielle Gray, Executive Vice President
Walgreens Boots Alliance, Inc.
108 Wilmot Road
Deerfield, IL 60015

Dear Ms. Gray:

Following your company's recent announcement that it plans to obtain and sell abortion pills using the mail,[1] we write to advise you of the current law in this changing legal landscape. We know your company intends to comply with the law, and we know that duty requires a heavy lift for a nationwide company like yours that must keep apprised not only of federal law, but also of the laws of the various states. As the principal legal and law enforcement officers of our 20 states, we offer you these thoughts on the current legal landscape.

First, many people are not aware that federal law expressly prohibits using the mail to send or receive any drug that will "be used or applied for producing abortion." 18 U.S.C. § 1461. Although many people are unfamiliar with this statute because it has not been amended in a few decades, the text could not be clearer: "*every* article or thing designed, adapted, or intended for producing abortion … shall not be conveyed in the mails." And anyone who "knowingly takes any such thing from the mails for the purpose of circulating" is guilty of a federal crime. Obviously, a federal criminal law—especially one that is, as here, enforceable through a private right of action—deserves serious contemplation.

In December, the Biden administration's Office of Legal Counsel encouraged the U.S. Postal Service to disregard this plain text.[2] But the text, not the Biden administration's view, is what governs. And the Biden administration's opinion fails to stand up even to the slightest amount of scrutiny.

---

[1] *CVS and Walgreens Plan to Offer Abortion Pills Where Abortion Is Legal*, N.Y. Times (Jan. 5, 2023), https://www.nytimes.com/2023/01/05/health/abortion-pills-cvs-walgreens.html.
[2] 46 Op. O.L.C. ___, at 1-2 (Dec. 23, 2022) (slip op.), https://www.justice.gov/olc/opinion/file/1560596/download.

**Supreme Court Building**
207 W. High Street
P.O. Box 899
Jefferson City, MO 65102
Phone: (573) 751-3321
Fax: (573) 751-0774
www.ago.mo.gov

**A-191**

The Biden administration's opinion *admits* that the plain text of § 1461 prohibits using the mail to send or receive any drug that will be used for abortion. Op. at 6 ("'the letter of the statute would cover all acts'"). But then the Biden administration argues that the text should not be "'[t]aken literally.'" *Id.* Marshalling a series of increasingly strange antitextual arguments, the opinion concludes that § 1461—contrary to its plain text—should be read to prohibit distributing abortion pills through the mail *only* when the mailer or recipient specifically intends that the pill be used in violation of other laws. Op. at 1.

We reject the Biden administration's bizarre interpretation, and we expect courts will as well. Courts do not lightly ignore the plain text of statutes. And the Supreme Court has been openly aversive to other attempts by the Biden administration to press antitextual arguments. *E.g.*, *Alabama Ass'n of Realtors v. Dep't of Health and Human Servs.*, 141 S.Ct. 2485, 2486 (2021) ("strains credulity"); *Terry v. United States*, 141 S. Ct. 1858, 1863 (2021) ("sleight of hand"). A future U.S. Attorney General will almost certainly reject the Biden administration's results-oriented, strained reading. And consequences for accepting the Biden administration's reading could come far sooner. Section 1461 can be enforced not only by the U.S. Attorney General, but also through civil litigation by State Attorneys General and private parties under § 1964(c).

Second, like federal law, the laws of many states also prohibit using the mail to send or receive abortion drugs. In Missouri, for example, it is unlawful to distribute an abortion drug through the mail. Mo. Rev. Stat. § 188.021.1; *see also, e.g.*, Ind. Code § 16–34–2–1. Missouri law also prohibits unfair or deceptive trade practices—and trade practices that violate federal law necessarily are unfair and deceptive. *Id.* § 407.020.1.

These state laws reflect not only our commitment to protecting the lives and dignity of children, but also of women. Abortion pills are far riskier than surgical abortions, according to established scientific consensus: "Medication abortions were 5.96 times as likely to result in a complication as first-trimester aspiration abortions."[3] Abortion pills carry the added risk that when these heightened complications invariably occur, women suffer those harms at home, away from medical help. And finally, mail-order abortion pills also invite the horror of an increase in coerced abortions. When abortion drugs are mailed or consumed outside a regulated medical facility, the risk of coercion is much higher—indeed, guaranteed—because there is no oversight. Outside the regulated medical context, a person can obtain an abortion pill quite easily and then coerce a woman into taking it.

---

[3] Upadhyay, et al., *Incidence of Emergency Department Visits and Complications After Abortion*, Obstet. Gynecol. 2015 Jan.; 125:175, 181, https://www.ansirh.org/sites/default/files/publications/files/upadhyay-jan15-incidence_of_emergency_department_visits.pdf (parenthetical omitted).

Case 1:22-cv-01859-JMS-MG   Document 45-4   Filed 06/20/23   Page 4 of 6 PageID #: 477
Case: 23-3247       Document: 13       Filed: 01/29/2024       Pages: 298

Page **3** of **5**

We emphasize that it is our responsibility as State Attorneys General to uphold the law and protect the health, safety, and well-being of women and unborn children in our states. Part of that responsibility includes ensuring that companies like yours are fully informed of the law so that harm does not come to our citizens.

Please do not hesitate to contact our offices if you have any questions or would like to make any assurances about your compliance with the federal law and the laws of our respective states.

Sincerely,

Andrew Bailey
Missouri Attorney General

Steve Marshall
Alabama Attorney General

Treg Taylor
Alaska Attorney General

Tim Griffin
Arkansas Attorney General

Ashley Moody
Florida Attorney General

Chris Carr
Georgia Attorney General

Todd Rokita
Indiana Attorney General

Brenna Bird
Iowa Attorney General

Daniel Cameron
Kentucky Attorney General

Jeff Landry
Louisiana Attorney General

Lynn Fitch
Mississippi Attorney General

Austin Knudsen
Montana Attorney General

Drew Wrigley
North Dakota Attorney General

Dave Yost
Ohio Attorney General

Gentner F. Drummond
Oklahoma Attorney General

Alan Wilson
South Carolina Attorney General

Marty Jackley
South Dakota Attorney General

Ken Paxton
Texas Attorney General

**A-194**

Sean D. Reyes
Utah Attorney General

Patrick Morrisey
West Virginia Attorney General

**EXHIBIT E**

(Slip Opinion)

## Application of the Comstock Act to the Mailing of Prescription Drugs That Can Be Used for Abortions

Section 1461 of title 18 of the U.S. Code does not prohibit the mailing of certain drugs that can be used to perform abortions where the sender lacks the intent that the recipient of the drugs will use them unlawfully. Because there are manifold ways in which recipients in every state may lawfully use such drugs, including to produce an abortion, the mere mailing of such drugs to a particular jurisdiction is an insufficient basis for concluding that the sender intends them to be used unlawfully.

December 23, 2022

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
UNITED STATES POSTAL SERVICE

In the wake of the United States Supreme Court's recent decision overruling *Roe v. Wade*, 410 U.S. 113 (1973),[1] you have asked for this Office's view on whether section 1461 of title 18 of the United States Code prohibits the mailing of mifepristone and misoprostol, two prescription drugs that are commonly used to produce abortions,[2] among other purposes. Memorandum for Christopher Schroeder, Assistant Attorney General, Office of Legal Counsel, from Thomas J. Marshall, General Counsel, United States Postal Service, *Re: Request for an Interpretation of 18 U.S.C. § 1461*, at 1 (July 1, 2022) ("USPS Request"). Originally enacted as part of the Comstock Act of 1873, section 1461 currently declares "[e]very article or thing designed, adapted, or intended for producing abortion," as well as "[e]very article, instrument, substance, drug, medicine, or thing which is advertised or described in a manner calculated to lead another to use or apply it for producing abortion," to be "nonmailable matter" that the United States Postal Service ("USPS") may not lawfully deliver. 18 U.S.C. § 1461.

We conclude that section 1461 does not prohibit the mailing, or the delivery or receipt by mail, of mifepristone or misoprostol where the sender

---

[1] *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).

[2] *See* Ctrs. for Disease Control & Prevention, U.S. Dep't of Health & Hum. Servs., *Abortion Surveillance—United States, 2019*, 70 MMWR Surveillance Summaries, Nov. 26, 2019, at 8, https://www.cdc.gov/mmwr/volumes/70/ss/ss7009a1.htm.

1

**A-197**

46 Op. O.L.C. __ (Dec. 23, 2022)

lacks the intent that the recipient of the drugs will use them unlawfully.[3] This conclusion is based upon a longstanding judicial construction of the Comstock Act, which Congress ratified and USPS itself accepted. Federal law does not prohibit the use of mifepristone and misoprostol. Indeed, the U.S. Food and Drug Administration ("FDA") has determined the use of mifepristone in a regimen with misoprostol to be safe and effective for the medical termination of early pregnancy.[4] Moreover, there are manifold ways in which recipients in every state may use these drugs, including to produce an abortion, without violating state law. Therefore, the mere mailing of such drugs to a particular jurisdiction is an insufficient basis for concluding that the sender intends them to be used unlawfully.[5]

---

[3] A cognate provision, 18 U.S.C. § 1462, imposes similar abortion-related prohibitions on using an express company or other common carrier for "carriage" of such items. Our analysis in this memorandum is applicable to that provision as well.

Sections 1461 and 1462 refer not only to persons who transmit such items by mail or by common carrier—the senders—but also to individuals who "knowingly cause[]" such items to be mailed, *id.* § 1461; "knowingly take[]" any such items from the mail for the purpose of circulating or disposing of them, *id.*; or "knowingly take[] or receive[]" such items from an express company or common carrier, *id.* § 1462. In the different contexts of obscenity and child pornography, courts of appeals have held that section 1461 applies to the act of the recipient who orders the nonmailable material and thereby "causes" it to be mailed. *See, e.g.*, *United States v. Carmack*, 910 F.2d 748, 748 (11th Cir. 1990); *United States v. Johnson*, 855 F.2d 299, 305–06 (6th Cir. 1988). *But see Johnson*, 855 F.2d at 307–11 (Merritt, J., dissenting); *United States v. Sidelko*, 248 F. Supp. 813, 815 (M.D. Pa. 1965). As far as we know, however, these provisions have never been applied to prosecute the recipients of abortion- and contraception-related materials. Moreover, the court of appeals decisions we discuss below construed the relevant provisions of the Comstock Act to turn on the nature of the sender's intent, not that of the recipient. Consistent with this practice, we focus on the sender throughout this memorandum. To the extent a recipient might be covered, however, our analysis herein would apply and therefore section 1461 would not prohibit that person from ordering or receiving the drugs if she does not intend that they be used unlawfully.

[4] *See Mifeprex (Mifepristone) Tablets*, U.S. Food & Drug Admin. 2 (Mar. 2016), https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020687s022lbl.pdf (mifepristone label); *see also Mifeprex (Mifepristone) Information*, U.S. Food & Drug Admin., https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/mifeprex-mifepristone-information (last updated Dec. 16, 2021).

[5] For purposes of this opinion, we assume but do not decide that section 1461 could be constitutionally applied to the mailing of drugs intended to produce abortions. We also assume without deciding that state law, as well as federal, is relevant to the application of section 1461. In addition, we do not address here whether and under what circumstances the mailing of mifepristone or misoprostol might violate other federal laws. Finally, as

2

**A-198**

*Application of the Comstock Act to Drugs That Can Be Used for Abortions*

## I.

The Comstock Act has a long and complex history. The original 1873 law was the handiwork of Anthony Comstock—"a prominent anti-vice crusader who believed that anything remotely touching upon sex was . . . obscene"—who successfully lobbied Congress and state legislatures in the nineteenth century to enact expansive laws "to prevent the mails from being used to corrupt the public morals." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 70 n.19 (1983) (omission in original) (quotation marks and citations omitted); *see also* Priscilla J. Smith, *Contraceptive Comstockery: Reasoning from Immorality to Illness in the Twenty-First Century*, 47 Conn. L. Rev. 971, 982–84 (2015). Originally entitled "An Act for the Suppression of Trade in, and Circulation of, obscene Litera- ture and Articles of immoral Use," Act of Mar. 3, 1873, ch. 258, 17 Stat. 598 ("1873 Act"), the Act is perhaps best known for having prohibited the distribution of a wide range of writings until courts and the Executive Branch determined that the Free Speech Clause of the First Amendment significantly limited the permissible reach of the law, *see, e.g.*, *Bolger*, 463 U.S. at 69–75. In addition, the Act also included several restrictions on the conveyance of things designed to prevent conception or to produce abortion.[6] Congress largely repealed the references to contraceptives in

---

you note, USPS Request at 3, some states have independently enacted laws to restrict the mailing of these drugs for abortion purposes within their jurisdiction. *See, e.g.*, Tex. Health & Safety Code § 171.063(b-1). We do not here assess the possible effect of federal law on such state restrictions, other than to note our agreement with your view that the doctrine of intergovernmental immunity would preclude application of such state laws against USPS employees who are complying with their duties under federal law. *See Intergovernmental Immunity for the Department of Veterans Affairs and Its Employees When Providing Certain Abortion Services*, 46 Op. O.L.C. __, at *1–5, *10 (Sept. 21, 2022).

[6] The original 1873 Act consisted of five sections, three of which are relevant to this opinion. Section 1 of the Act prohibited, *inter alia*, the sale, distribution, or possession, in the District of Columbia and federal territories, of "any drug or medicine, or any article whatever, for the prevention of conception, or for causing *unlawful* abortion," along with advertisements for contraceptives and abortion services and information about how to obtain them. 1873 Act § 1, 17 Stat. at 598–99 (emphasis added). Congress chose not to include that prohibition when it comprehensively enacted title 18 into positive law in 1948. *See* Pub. L. No. 80-772, § 21, 62 Stat. 683, 864 (1948) (repealing, *inter alia*, 18 U.S.C. § 512 (1946)).

Section 2 of the Act, which eventually became codified as section 1461, criminalized the mailing of, *inter alia*, "obscene, lewd, or lascivious" writings; "any article or thing

3

**A-199**

46 Op. O.L.C. __ (Dec. 23, 2022)

1971. *See* Pub. L. No. 91-662, 84 Stat. 1973 (1971) (discussed *infra* Part I.C).

In its current form, section 1461, which is derived from section 2 of the 1873 Act, begins by declaring "[e]very obscene, lewd, lascivious, indecent, filthy or vile article, matter, thing, device, or substance" to be "nonmailable matter" that "shall not be conveyed in the mails or delivered from any post office or by any letter carrier." 18 U.S.C. § 1461. The next clauses declare nonmailable "[e]very article or thing designed, adapted, or intended for producing abortion, or for any indecent or immoral use; and [e]very article, instrument, substance, drug, medicine, or thing which is advertised or described in a manner calculated to lead another to use or apply it for producing abortion, or for any indecent or immoral purpose." *Id.*; *see also* 39 U.S.C. § 3001(a) (likewise declaring such matter to be "nonmailable"). Section 1461 further makes it a felony to "knowingly use[] the mails for the mailing, carriage in the mails, or delivery" of any such things, or to "knowingly cause[]" them "to be delivered by mail according to the direction thereon." 18 U.S.C. § 1461. In addition, 18 U.S.C. § 1462 imposes two other, related prohibitions: it makes it unlawful to bring those same things "into the United States, or any place subject to the jurisdiction thereof," and it prohibits the knowing use of "any

---

intended or adapted for any indecent or immoral use or nature"; and "any article or thing designed or intended for the prevention of conception or procuring of abortion." 1873 Act § 2, 17 Stat. at 599. Before Congress enacted title 18 into positive law in 1948, the provision that is now section 1461 was codified at 18 U.S.C. § 334 (1925–1926).

Section 3 of the 1873 Act prohibited all persons "from importing into the United States" any of the "hereinbefore-mentioned articles or things"—referring to the items prohibited by sections 1 and 2. 1873 Act § 3, 17 Stat. at 599. One year later, *see* Act of June 20, 1874, ch. 333, 18 Stat. pt. 3, at 113–14, Congress codified section 3 of the Comstock Act as section 2491 of the Revised Statutes and, in doing so, replaced the section's reference to the "hereinbefore-mentioned articles or things" with a list of articles and things pulled from the other provisions of the Comstock Act, *see* Rev. Stat. § 2491 (1st ed. 1875), 18 Stat. pt. 1, at 460; *see also* Rev. Stat. § 2491 (2d ed. 1878), 18 Stat. pt. 1, at 457. In supplying content to these words, Congress prohibited the importation of articles or things "for causing unlawful abortion," reflecting the language of section 1 of the original Comstock Act. Rev. Stat. § 2491 (1st ed. 1875), 18 Stat. pt. 1, at 460. Congress consistently retained the words "unlawful abortion" in follow-on versions of this restriction, including in subsequent Tariff Acts through 1930, after which the provision was codified at 19 U.S.C. § 1305.

4

**A-200**

:22-cv-01859-JMS-MG   Document 45-5   Filed 06/20/23   Page 6 of 22 PageID
Case: 23-3247      Document: 13      Filed: 01/29/2024      Pages: 298

*Application of the Comstock Act to Drugs That Can Be Used for Abortions*

express company or other common carrier or interactive computer service" for "carriage" of such items "in interstate or foreign commerce."[7]

Over the course of the last century, the Judiciary, Congress, and USPS have all settled upon an understanding of the reach of section 1461 and the related provisions of the Comstock Act that is narrower than a literal reading might suggest. This construction occurred long before the Supreme Court's decisions in *Griswold v. Connecticut*, 381 U.S. 479 (1965), and *Roe* and thus was not dependent upon the Court's recognition of constitutional rights regarding the prevention or termination of pregnancy. Beginning early in the twentieth century, federal courts construed the provisions not to prohibit all mailing or other conveyance of items that can be used to prevent or terminate pregnancy. By the middle of the century, the well-established, consensus interpretation was that none of the Comstock Act provisions, including section 1461, prohibits a sender from conveying such items where the sender does not intend that they be used unlawfully. USPS accepted that construction and informed Congress of it. On several occasions, Congress reenacted and amended the Comstock Act against the backdrop of the judicial precedent in a manner that ratified the federal courts' narrowing construction.

### A.

Since early in the twentieth century, federal courts have agreed that section 1461 and related Comstock Act provisions do not categorically prohibit the mailing or other conveyance of items designed, adapted, or intended for preventing or terminating pregnancy.

In 1915, in *Bours v. United States*, 229 F. 960 (7th Cir. 1915), the U.S. Court of Appeals for the Seventh Circuit reversed the conviction of a doctor who had mailed a letter addressing how a woman might procure an "operation" from him. The court noted that Congress enacted the provision that is now section 1461 pursuant to its "national power of controlling the mails" and held that, "[i]n applying the national statute to an alleged offensive use of the mails at a named place, it is immaterial what

---

[7] The importation prohibition—along with 19 U.S.C. § 1305 (prohibiting the importation into the United States of "any drug or medicine or any article whatever for causing unlawful abortion")—derives from section 3 of the original 1873 Act, *see* § 3, 17 Stat. at 599. The common-carrier prohibitions derive from an 1897 law extending the mailing prohibitions of the original Comstock Act to common carriers. *See* Act of Feb. 8, 1897, ch. 172, 29 Stat. 512.

**A-201**

46 Op. O.L.C. __ (Dec. 23, 2022)

the local statutory definition of abortion is, what acts of abortion are included, or what excluded." *Id.* at 964. The court further held that "[t]hough the letter of the statute would cover all acts of abortion," under a "reasonable construction," the statute should not be read to prohibit the mailing of advertisements for a procedure a doctor would perform in order "to save [the] life" of the woman. *Id.* Because the indictment had not drawn this distinction, the defendant had no opportunity to explain whether he had intended to perform the operation "only under such circumstances as would make it the duty of any reputable physician to perform the act." *Id.* at 965. Therefore, the court reversed the judgment and remanded the case. *Id.* at 966.

Fifteen years later, in *Youngs Rubber Corp. v. C.I. Lee & Co.*, 45 F.2d 103 (2d Cir. 1930), the U.S. Court of Appeals for the Second Circuit also reasoned in dicta that the statute could not be construed as expansively as its language might suggest. *Youngs Rubber* was a trademark infringement suit in which the defendants argued that the plaintiff's business was unlawful because it involved sending Trojan condoms to druggists for retail sale via the mail and common carriage, a practice that—according to the defendant—violated the Comstock Act. *Id.* at 108. "Taken literally," the appeals court wrote, the Comstock Act's "language would seem to forbid the transportation by mail or common carriage of anything 'adapted,' in the sense of being suitable or fitted, for preventing conception or for any indecent or immoral purpose, even though the article might also be capable of legitimate uses and the sender in good faith supposed that it would be used only legitimately." *Id.* "Such a construction," the court cautioned, "would prevent mailing to or by a physician of any drug or mechanical device 'adapted' for contraceptive or abortifacient uses, although the physician desired to use or to prescribe it for proper medical purposes." *Id.* The court observed that New York law did not prohibit supplying such articles to physicians "or by their direction or prescription." *Id.* at 109 (quotation marks omitted). Reasoning that "[t]he intention to prevent a proper medical use of drugs or other articles merely because they are capable of illegal uses is not lightly to be ascribed to Congress," the court construed the statute's contraception and abortion prohibitions to "requir[e] an intent on the part of the sender that the article mailed or shipped by common carrier be used for illegal contraception or abortion." *Id.* at 108.

In 1933, the U.S. Court of Appeals for the Sixth Circuit embraced the same limiting construction of the Comstock Act. *Davis v. United States*,

6

**A-202**

*Application of the Comstock Act to Drugs That Can Be Used for Abortions*

62 F.2d 473 (6th Cir. 1933), involved a defendant who was convicted of, among other things, the sale of "rubber sundries" to druggists that were delivered by common carrier. *Id.* at 474. Invoking the "rule of reasonable construction," *id.* at 475, the *Davis* court reversed the conviction because the district court did not permit the admission of evidence that the defendant had sent the items intending that they be used for "treatment and prevention of disease" rather than to prevent conception, *id.* at 474. The court quoted with approval *Youngs Rubber*'s view that the statute should be read to "requir[e] an intent on the part of the sender that the article mailed or shipped by common carrier be used for illegal contraception or abortion or for indecent or immoral purposes," *id.*, and noted that the "soundness of its reasoning commends itself to us," *id.* at 475. The court accordingly rejected the district court's conclusion that the statute "brings within the condemnation of each section articles or things that are capable of being used for the specified purposes without respect to their having a legitimate use, and without regard to the intent of the persons mailing [them]," *id.* at 474, holding instead that "intent that the articles . . . shipped in interstate commerce were to be used for condemned purposes is a prerequisite to conviction," *id.* at 475.

Three years later, the Second Circuit revisited the issue and adopted *Youngs Rubber*'s dicta as a holding in *United States v. One Package*, 86 F.2d 737 (2d Cir. 1936). In that case, a New York gynecologist had imported vaginal pessaries from a Japanese sender who had asked the doctor to use them in her practice to assess whether they were useful for contraceptive purposes. *Id.* at 738. At the time, New York law prohibited the sale or provision of articles for the prevention of conception, but it included an exception for the provision of such things to physicians "who may in good faith prescribe their use for the cure or prevention of disease." *Id.* (citing N.Y. Penal Law § 1145 (Consol. Laws, c. 40)). The doctor testified that she prescribed the items only where her patient had a health-related reason such that "it would not be desirable for a patient to undertake a pregnancy," which the court of appeals apparently understood to fall within the exception under New York law that permitted physicians to provide patients with contraceptives for particular purposes. *Id.*[8] The court quoted favorably, and at length, from the dicta in *Youngs Rubber*, and noted the accord of the Sixth Circuit in *Davis*. *Id.* at 738–39. It then

---

[8] The court of appeals noted that the accuracy and good faith of the doctor's testimony was "not questioned." *One Package*, 86 F.2d at 738.

**A-203**

46 Op. O.L.C. __ (Dec. 23, 2022)

dismissed the case because none of the relevant provisions should be read to prohibit the mailing or importation of items to prevent or terminate pregnancy with the intent that they be used for lawful purposes. *Id.* at 739–40. The court reasoned that it was appropriate to, in effect, imply the insertion of the adjective "unlawful," which expressly modified the word "abortion" in some provisions of the Comstock Act, to modify the terms "prevention of conception" and "abortion" throughout the various provisions that derived from the Act. *Id.* [9] The court elaborated:

> [W]e are satisfied that this statute, as well as all the acts we have referred to, embraced only such articles as Congress would have denounced as immoral if it had understood all the conditions under which they were to be used. Its design, in our opinion, was not to prevent the importation, sale, or carriage by mail of things which might intelligently be employed by conscientious and competent physicians for the purpose of saving life or promoting the well being of their patients. The word "unlawful" would make this clear as to

---

[9] The case involved the "prevention of conception" prong of the Tariff Act of 1930—a descendent provision of the original Comstock Act—which prohibited importing articles "for the prevention of conception or for causing *unlawful* abortion." *One Package*, 86 F.2d at 738 (emphasis added) (quoting 19 U.S.C. § 1305(a) (1934)); *see also supra* note 6. The court noted that the original 1873 Comstock Act likewise used the adjective "unlawful" to modify "abortion" in one of its provisions (section 1—involving the sale and possession of abortifacients in federal territories) but not in others, and not as to articles for preventing conception. *One Package*, 86 F.2d at 739. The court reasoned that Congress could not reasonably have had the design to make the "unlawful" nature of the intended use an element of the offense under some of the abortion-related prohibitions but not others, or as to the importation of items used for abortion but not those used for contraception. *See id.* ("[I]n the Comstock Act, . . . the word 'unlawful' was sometimes inserted to qualify the word 'abortion,' and sometimes omitted. It seems hard to suppose that under the second and third sections articles intended for use in procuring abortions were prohibited in all cases while, under the first section, they were only prohibited when intended for use in an 'unlawful abortion.'"). Instead, the court reasoned, the adjective "unlawful" must in effect be read to modify all of the prohibitions. *Id.*; *see also id.* at 740 (Learned Hand, J., concurring) ("[I]t is of considerable importance that the law as to importations should be the same as that as to the mails; we ought not impute differences of intention upon slight distinctions in expression."). The *One Package* court's analysis that the adjective "unlawful" should be read to modify all of the provisions of the Comstock Act is bolstered by the 1874 Congress's understanding of the term "hereinbefore-mentioned articles" in section 3 of the Comstock Act to prohibit the import only of articles, drugs, or medicines "for causing unlawful abortion." *See supra* note 6; Rev. Stat. § 2491 (1st ed. 1875), 18 Stat. pt. 1, at 460.

8

**A-204**

*Application of the Comstock Act to Drugs That Can Be Used for Abortions*

articles for producing abortion, and the courts have read an exemption into the act covering such articles even where the word "unlawful" is not used. The same exception should apply to articles for preventing conception. . . . It seems unreasonable to suppose that the national scheme of legislation involves such inconsistencies and requires the complete suppression of articles, the use of which in many cases is advocated by such a weight of authority in the medical world.

*Id.*

The Second Circuit again reaffirmed this construction of the statute shortly thereafter in *United States v. Nicholas*, 97 F.2d 510 (2d Cir. 1938), which involved the Comstock Act's prohibition on mailing information about contraception. Citing *Youngs Rubber* and *One Package*, the court in *Nicholas* noted: "We have twice decided that contraceptive articles may have lawful uses and that statutes prohibiting them should be read as forbidding them only when unlawfully employed." *Id*. at 512.[10] Applying this reading, the court held that USPS was required to deliver a magazine containing contraception-related information to a magazine editor who might then distribute it to persons such as physicians who could use the information lawfully. *Id.* The court further held that USPS should detain a book containing such information when it was addressed to an individual "about whom nothing" was known "except that he was not a physician," *id.* at 511, but allowed for the recipient to "prove whether he is among the privileged classes" whose possession of the book "would be lawful," *id.* at 512.

---

[10] Although *Nicholas* described the relevant inquiry as being whether the articles were "unlawfully employed," rather than whether the sender *intended* that they be used unlawfully—the touchstone the court had adopted in *Youngs Rubber* and *One Package*—this difference in phrasing does not reflect a departure relevant to our analysis. The court's invocation of those two earlier decisions without qualification, as well as its further citation to *Davis*, indicates that it did not intend to deviate from the interpretation of the Act that the court had adopted in those decisions. Both the Historical and Revision Note to section 1461 and subsequent federal decisions understood *Nicholas* similarly. *See* 18 U.S.C. § 1461 (Historical and Revision Note) (observing that *Nicholas* followed "[t]he same rule" as *Davis*, which held that "the *intent* of the person" that a mailing "be used for condemned purposes was necessary for a conviction" (emphasis added)); *United States v. Gentile*, 211 F. Supp. 383, 385 n.5 (D. Md. 1962) (citing, *inter alia*, *Nicholas* for the proposition that "contraceptive devices [must be] shipped and received with intent that they be used for *illegal* contraception or abortion").

**A-205**

46 Op. O.L.C. __ (Dec. 23, 2022)

In 1944, the U.S. Court of Appeals for the D.C. Circuit also narrowly construed the statute in the context of a report about contraceptive materials that a consumer group had published and mailed to individuals who submitted a signed certificate attesting, "I am married and use prophylactic materials on the advice of a physician." *Consumers Union of United States, Inc. v. Walker*, 145 F.2d 33, 33 (D.C. Cir. 1944). The appeals court explained that it was "inclined to follow the interpretation [of the Comstock Act] which has been adopted in other circuits," citing to *Nicholas*, *Davis*, *Youngs Rubber*, and *One Package*. *Id.* at 35 & n.11. It therefore concluded that "Congress did not intend to exclude from the mails properly prepared information intended for properly qualified people," and held that the report "was proper in character within the meaning of those decisions." *Id.* at 35.

Subsequent judicial discussions of the relevant Comstock Act provisions recognized the narrowing construction upon which the courts of appeals had converged. *See, e.g.*, *United States v. Gentile*, 211 F. Supp. 383, 385 n.5 (D. Md. 1962) ("It seems clear under the authorities that in order to make out an offense under this paragraph the Government should be required to allege and prove that contraceptive devices are shipped and received with intent that they be used for *illegal* contraception or abortion or for indecent or immoral purposes." (citing *Youngs Rubber*, *Davis*, and *Nicholas*)); *United States v. H.L. Blake Co.*, 189 F. Supp. 930, 934–35 (W.D. Ark. 1960) ("It would seem reasonable to give the word 'adapted' a more limited meaning than that above suggested and to construe the whole phrase 'designed, adapted or intended' as requiring an intent on the part of the sender that the article mailed or shipped by common carrier be used for illegal contraception or abortion or for indecent or immoral purposes." (quoting *Youngs Rubber*, 45 F.2d at 108)); *United States v. 31 Photographs*, 156 F. Supp. 350, 357 (S.D.N.Y. 1957) (characterizing the appellate court decisions as "upholding importation of contraceptives and books dealing with contraception when sought to be brought into the country for purposes of scientific and medical research," such that "only contraceptives intended for 'unlawful' use were banned" (citing, *inter alia*, *One Package*, *Nicholas*, *Davis*, and *Walker*)); *see also Poe v. Ullman*, 367 U.S. 497, 546 n.12 (1961) (Harlan, J., dissenting) ("[B]y judicial interpretation . . . the absolute prohibitions of the [Comstock] law were qualified to exclude professional medical use." (citing *Youngs Rubber*, *Davis*, and *One Package*)).

10

**A-206**

*Application of the Comstock Act to Drugs That Can Be Used for Abortions*

As the court in one of those later cases noted, the analysis in *Youngs Rubber* "has been cited many times and has become the law to be applied to the facts where the question of a violation of the statute . . . is before the court." *H.L. Blake Co.*, 189 F. Supp. at 934. Under that "law to be applied," the court explained, "it is well established that the defendants should not be convicted unless it is established beyond a reasonable doubt that at the time they mailed the sample packages of prophylactics . . . they intended them to 'be used for illegal contraception.'" *Id.* at 935 (quoting *Youngs Rubber*, 45 F.2d at 108).[11]

### B.

Congress has amended the Comstock Act's provisions numerous times since the federal courts' decisions in *Bours*, *Youngs Rubber*, *Davis*, *One Package*, *Nicholas*, and *Walker*, each time perpetuating the wording of the Act's abortion-related provisions. Moreover, as we explain in greater detail below, USPS accepted the courts' narrowing construction of the Act in administrative rulings, and it informed Congress of the agency's acceptance of that construction in connection with Congress's amendment of the contraception-related provisions of the Comstock Act.

We conclude that Congress's repeated actions, taken "[a]gainst this background understanding in the legal and regulatory system," *Texas Dep't of Housing & Cmty. Affs. v. Inclusive Cmtys. Project*, 576 U.S. 519, 536 (2015), ratified the Judiciary's settled narrowing construction. *See id.* ("If a word or phrase has been . . . given a uniform interpretation by inferior courts . . . , a later version of that act perpetuating the wording is presumed to carry forward that interpretation." (omissions in original) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpre-

---

[11] The leading cases that established this accepted construction—*Youngs Rubber*, *One Package*, and *Davis*—each involved items that could be used to prevent conception rather than to produce abortion. Nevertheless, the canonical passage from *Youngs Rubber*, repeated in each of the cases and in others thereafter, referred both to items designed to prevent conception and to those designed to induce abortions. Moreover, the court in *One Package* went to lengths to explain that all of the relevant Comstock Act prohibitions should be read consistently to require proof of a sender's intent to facilitate unlawful downstream use. *See supra* note 9; *see also Bours*, 229 F. 960 (construing narrowly the prohibition on mailing of information about how to obtain abortions). We therefore agree with your assessment that "there is no apparent reason why the case-law principles applicable to contraceptive articles (formerly) under Section 1461 would not also apply to abortion-inducing articles under the same provision." USPS Request at 3 n.3.

**A-207**

46 Op. O.L.C. __ (Dec. 23, 2022)

tation of Legal Texts 322 (2012))); *Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."); *cf. Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well."); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 244 n.11 (2009) (holding that when Congress amended the Individuals with Disabilities Education Act without altering the text of a provision that the Supreme Court had previously interpreted, Congress "implicitly adopted [the Court's] construction of the statute").

The conclusion that Congress ratified the longstanding judicial view of the Comstock Act is strongly reinforced by the Historical and Revision Note that was included in the 1945 report of the House Committee on the Revision of the Laws[12] when Congress enacted title 18 of the U.S. Code into positive law.[13] That Note subsequently was appended to the official U.S. Code entries for sections 1461 and 1462. *See* 18 U.S.C. § 1461 (Historical and Revision Note).[14] It specifically "invited" the "attention of Congress" to the courts of appeals' decisions in *Youngs Rubber*, *Davis*, *Nicholas*, and *One Package*, and quoted at length from *Youngs Rubber*, including its conclusion that the relevant provisions of the statute should be construed to require "an intent on the part of the sender that the article

---

[12] *See* H.R. Rep. No. 79-152, at A96–97 (1945).

[13] *See* Pub. L. No. 80-772, 62 Stat. at 768.

[14] The Historical and Revision Notes were written by a staff of experts hired by Congress to revise the U.S. Code in the 1940s, including the editorial staffs of the West and Thompson publishing companies, the former Chief of the Appellate Section of the Department of Justice Criminal Division, and other contributors from both inside and outside of government. *See* H.R. Rep. No. 79-152, at 1–7 (1945) (describing in detail this revision process and noting that "[t]he [House] Committee on Revision of the Laws has exercised close and constant supervision over this work through its general counsel . . . and its special counsel"). The Supreme Court has discussed or relied on Historical and Revision Notes numerous times, most frequently during the middle of the twentieth century. *See, e.g.*, *Ex parte Collett*, 337 U.S. 55, 65–71 (1949) (discussing a revision note to 28 U.S.C. § 1404 and concluding that the revision note was highly significant in determining the meaning of section 1404(a)); *W. Pac. R.R. Corp. v. W. Pac. R.R. Co.*, 345 U.S. 247, 254–55 (1953); *Muniz v. Hoffman*, 422 U.S. 454, 471–73 (1975).

12

**A-208**

*Application of the Comstock Act to Drugs That Can Be Used for Abortions*

mailed or shipped by common carrier be used for illegal contraception or abortion." *Id.*[15]

Congress subsequently amended the Comstock Act four times (in 1955, 1958, 1971, and 1994) without changing the language in any respect that suggested disagreement with the well-established narrowing interpretation that the Historical and Revision Note had specifically brought to its attention. Congress made the third of these amendments in 1971—removing the Act's references to contraceptives—after being informed by the Post-

------

[15] The Note's complete discussion of the court of appeals decisions is as follows:

The attention of Congress is invited to the following decisions of the Federal courts construing this section and section 1462 of this title.

In *Youngs Rubber Corporation, Inc. v. C. I. Lee & Co., Inc.*, C.C.A. 1930, 45 F. 2d 103, it was said that the word "adapted" as used in this section and in section 1462 of this title, the latter relating to importation and transportation of obscene matter, is not to be construed literally, the more reasonable interpretation being to construe the whole phrase "designed, adapted or intended" as requiring "an intent on the part of the sender that the article mailed or shipped by common carrier be used for illegal contraception or abortion or for indecent or immoral purposes." The court pointed out that, taken literally, the language of these sections would seem to forbid the transportation by mail or common carrier of anything "adapted," in the sense of being suitable or fitted, for preventing conception or for any indecent or immoral purpose, "even though the article might also be capable of legitimate uses and the sender in good faith supposed that it would be used only legitimately. Such a construction would prevent mailing to or by a physician of any drug or mechanical device 'adapted' for contraceptive or abortifacient uses, although the physician desired to use or to prescribe it for proper medical purposes. The intention to prevent a proper medical use of drugs or other articles merely because they are capable of illegal uses is not lightly to be ascribed to Congress. Section 334 [this section] forbids also the mailing of obscene books and writings; yet it has never been thought to bar from the mails medical writings sent to or by physicians for proper purposes, though of a character which would render them highly indecent if sent broadcast to all classes of persons." In *United States v. Nicholas*, C.C.A. 1938, 97 F. 2d 510, ruling directly on this point, it was held that the importation or sending through the mails of contraceptive articles or publications is not forbidden absolutely, but only when such articles or publications are unlawfully employed. The same rule was followed in *Davis v. United States*, C.C.A. 1933, 62 F. 2d 473, quoting the obiter opinion from *Youngs Rubber Corporation v. C. I. Lee & Co.*, *supra*, and holding that the intent of the person mailing a circular conveying information for preventing conception that the article described therein should be used for condemned purposes was necessary for a conviction; also that this section must be given a reasonable construction. (See also *United States v. One Package*, C.C.A. 1936, 86 F. 2d 737.)

18 U.S.C. § 1461 (Historical and Revision Note).

13

**A-209**

46 Op. O.L.C. __ (Dec. 23, 2022)

master General that both the federal courts and USPS had adopted this narrowing interpretation. *See* H.R. Rep. No. 91-1105, at 3–4 (1970).[16] Moreover, we have found no evidence that Congress disapproved of the interpretation.[17] Indeed, in 2007 Congress legislated regarding the FDA's treatment of mifepristone in a manner consistent with the understanding that the Comstock Act does not categorically prohibit the covered modes of conveying abortion-inducing drugs.[18]

Congress's several actions "perpetuating the wording" of the Comstock Act's abortion provisions against the backdrop of a well-established, settled judicial construction that was brought to Congress's attention

---

[16] *See supra* note 11 (explaining that the courts of appeals' rationales applied equally to conveyance of items to prevent conception and to produce abortion).

[17] The House report stated at the outset of its discussion that "[e]xisting statutes completely prohibit the importation, interstate transportation, and mailing of contraceptive materials, or the mailing of advertisement or information concerning how or where such contraceptives may be obtained or how conception may be prevented." H.R. Rep. No. 91-1105, at 2. That introductory remark, however, plainly was a reference to the literal text of the provisions, as opposed to their settled meaning. The report proceeded to convey the Postmaster General's description of the settled judicial and administrative narrowing construction of the statute, noting that it was in tension with the text of the contraception provisions, and neither the report nor any evidence in the legislative record of which we are aware expresses the committee's disagreement with that construction.

[18] In approving a mifepristone product for certain abortions in 2000, the FDA imposed certain restrictions on distribution as a condition of approval, pursuant to its regulatory authority. *See* Letter for Sandra P. Arnold, Vice President, Population Council, from Ctr. for Drug Evaluation & Rsch., U.S. Food & Drug Admin., *Re: NDA 20-687* (Sept. 28, 2000). In the Food and Drug Administration Amendments Act of 2007 ("FDAAA"), Congress provided that any such restrictions, identified in the FDAAA as "elements to assure safe use," were deemed to be a "Risk Evaluation and Mitigation Strategy" that would continue to be required under the new statutory regime unless and until the FDA determined that modifications were necessary. *See* Pub. L. No. 110-85, tit. IX, § 909(b), 121 Stat. 823, 950–51 (2007). In the debate preceding this amendment, critics of the FDA's 2000 approval of mifepristone for abortion purposes acknowledged that the legislation would apply to that mifepristone approval. *See* 153 Cong. Rec. S5765 (daily ed. May 9, 2007) (statement of Sen. Coburn); 153 Cong. Rec. S5469–70 (daily ed. May 2, 2007) (statement of Sen. DeMint). Yet neither those critics nor anyone else in the congressional debate mentioned the Comstock Act, even though it would have been natural to assume that the FDA's 2000 approval had resulted in the distribution of mifepristone to certified physicians through the mail or by common carrier. Congress's decision to carry forward the FDA's regulatory conditions for mifepristone without addressing such modes of distribution suggests that Congress did not understand the Comstock Act to invariably prohibit the conveyance by mail or common carrier of drugs intended to induce abortions.

14

**A-210**

*Application of the Comstock Act to Drugs That Can Be Used for Abortions*

establishes Congress's acceptance of that narrowing construction. *Inclusive Cmtys. Project*, 576 U.S. at 536. That construction, as noted, does not prohibit the mailing of an item that is designed, adapted, or intended for producing abortion in the absence of an intent by the sender that the item will be used unlawfully.

### C.

USPS has accepted the settled judicial construction of the Comstock Act—and reported as much to Congress.

In 1951, the Solicitor of the Post Office Department, Roy C. Frank, wrote to an Arizona postmaster concerning a Planned Parenthood clinic's mailing of diaphragms and vaginal jellies to its patients "for medicinal purposes." *Contraceptive Matter—Mailings—Physicians*, 9 Op. Sol. P.O.D. 47 (1951) (No. 40). Citing "the decisions of the Federal courts," Frank opined that a "mailing of contraceptives by a physician to a patient would not be regarded as a violation" of the Comstock Act. *Id.* Similarly, in 1963, when the St. Louis Postmaster detained 490 "contraceptive devices and substances," the USPS General Counsel informed him that he should "dispatch" those items because "there is no available evidence that the items in each of these parcels were being distributed for unlawful purposes." Letter for Harriet F. Pilpel, Greenbaum, Wolff & Ernst, from Louis J. Doyle, General Counsel, Post Office Department (Oct. 24, 1963) (on file with the Smith College Libraries). In a letter to the sender Emko Company's counsel, the USPS General Counsel added that "should we obtain evidence in the future that [Emko] is distributing contraceptive devices and substances for unlawful purposes we will again look into the matter." *Id.*

Of particular importance, when Congress was considering amendments to the Comstock Act in 1970, USPS brought to Congress's attention its acceptance of the Judiciary's narrowing construction. The Postmaster General submitted a statement to Congress about his agency's understanding that "the delivery by mail of contraceptive information or materials has by court decisions, and administrative rulings based on such decisions, been considered proper in cases where a lawful and permissive purpose is present." *See* H.R. Rep. No. 91-1105, at 3–4 (1970). As a result, "[t]he lawful mailing . . . of contraceptive articles . . . is dependent on the interpretation given to the intended purpose." *Id.* at 4. The Postmaster General noted that "[w]hat is a lawful purpose within the meaning

15

**A-211**

46 Op. O.L.C. __ (Dec. 23, 2022)

of the interpretations given, though vaguely identifiable, has with the passage of time also been considerably broadened" and that "many States . . . have adopted positive legislation to authorize or encourage public family planning services." *Id*. As a result, by the time the Postmaster General wrote to Congress in 1970—after the Court's *Griswold* decision holding unconstitutional a state prohibition on the use of contraception— "it [was] quite clear that the cited law as presently written [was] unenforceable." *Id*.

The House Ways and Means Committee included the Postmaster General's statement in its report on the draft amendment and noted that "[i]n view of" that statement—along with statements supporting the draft amendment by the Departments of Labor and of Health, Education, and Welfare—the Committee on Ways and Means was "unanimous in recommending enactment of H.R. 4605." *Id.* Congress then amended the Comstock Act to repeal most of the Act's applications to contraceptives. *See* Pub. L. No. 91-662, 84 Stat. at 1973–74.[19]

\* \* \* \* \*

Thus, before the Court's recognition of a constitutional right to contraception in *Griswold* and to abortion in *Roe*, the Judiciary, Congress, and USPS itself all understood section 1461 and the related provisions of the Comstock Act not to prohibit the conveyance of articles intended for preventing conception or producing an abortion where the sender lacks the intent that those items should be used unlawfully. We further note that, shortly after Congress amended the Comstock Act in 1971 to eliminate the restrictions on contraceptives, the Supreme Court's decision in *Roe* effectively rendered unenforceable the restrictions on articles "designed, adapted, or intended for producing abortion." For the past half century, courts have not had the occasion to elaborate further on the meaning of the Comstock Act as it relates to abortion, including regarding

---

[19] Although the 1971 Congress eliminated the preexisting broad prohibitions on sending contraception-related articles and information using the mails or common carriage, it added a narrower prohibition designed to prevent the mailing of unsolicited contraceptive items and advertising to private homes. *See* 39 U.S.C. § 3001(e); *see also* 18 U.S.C. § 1461 (making it a crime to knowingly use the mails to mail anything deemed "nonmailable" in section 3001(e)). In *Bolger*, the Supreme Court held that the ban on unsolicited advertisements of contraceptives violates the First Amendment. 463 U.S. at 61.

16

**A-212**

*Application of the Comstock Act to Drugs That Can Be Used for Abortions*

the sources of law that inform whether an abortion would be "unlawful" for purposes of the established construction of the Act.

## II.

In Part I we demonstrated that, in accord with the prevailing judicial construction Congress ratified, section 1461 does not prohibit the mailing of articles that can be used to produce abortion, including mifepristone and misoprostol, where the sender lacks the intent that those items should be used unlawfully.[20] We turn now to address the many circumstances in which a sender of these drugs typically will lack an intent that they be used unlawfully.

Federal law does not prohibit the use of mifepristone and misoprostol for producing abortions. Indeed, the FDA has determined the use of mifepristone in a regimen with misoprostol to be safe and effective for the medical termination of early pregnancy. And, to the extent relevant, these drugs can serve important medical purposes and recipients in every state can use them lawfully in some circumstances. This is true even when the drugs would be delivered to an address in a jurisdiction with restrictive abortion laws, because women who receive the drugs in all fifty states may, at least in some circumstances, lawfully use mifepristone and miso-prostol to induce an abortion.

We note that those sending or delivering mifepristone and misoprostol typically will lack complete knowledge of how the recipients intend to use them and whether that use is unlawful under relevant law. Therefore, even when a sender or deliverer of mifepristone or misoprostol, including USPS, knows that a package contains such drugs—or indeed that they will be used to facilitate an abortion—such knowledge alone is not a sufficient basis for concluding that section 1461 has been violated. We also recognize that USPS may have reason to consider adopting uniform policies or practices regarding the mailing of mifepristone or misoprostol. *Cf. Smith v. United States*, 431 U.S. 291, 304 n.10 (1977) ("[T]he nation-wide character of the postal system argues in favor of a nationally uniform construction of [section] 1461.").

---

[20] *See supra* note 3 (noting that the same test would apply to section 1462 and to recipients of the drugs to the extent those persons might be amenable to prosecution).

**A-213**

46 Op. O.L.C. __ (Dec. 23, 2022)

We have not undertaken the challenging task of a detailed review of state abortion laws, but we can offer some illustrative uses for mifepristone and misoprostol that the law of a given state would not prohibit:

- First, in most states—where a majority of the U.S. population lives—abortion continues to be lawful until at least twenty weeks' gestation. It is very unlikely that someone sending validly prescribed mifepristone or misoprostol into such states will intend for them to be used unlawfully.

- Second, even some states that in recent months have enacted or begun to enforce more restrictive abortion laws continue to allow abortion for at least some number of weeks of pregnancy. Use of mifepristone and misoprostol to terminate a pregnancy that falls within that period would be lawful.

- Third, thus far, no state that has enacted or newly begun to enforce restrictions on abortion in the wake of *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), prohibits abortions that are necessary to preserve the life of the woman.[21] Many medical conditions that make pregnancy potentially life-threatening—for instance, certain heart conditions, pulmonary hypertension, or Marfan Syndrome[22]—are known in the first trimester, when women most commonly use mifepristone and misoprostol to induce an abortion. Such a use of these drugs to terminate a life-threatening pregnancy would be lawful.

- Fourth, some state abortion restrictions also include exceptions for cases of rape or incest, to protect the health of the woman, or where there are severe fetal anomalies. The use of mifepristone or miso-

---

[21] *See Dobbs*, 142 S. Ct. at 2305 n.2 (Kavanaugh, J., concurring) ("Abortion statutes traditionally and currently provide for an exception when an abortion is necessary to protect the life of the mother."); *see also Roe*, 410 U.S. at 173 (Rehnquist, J., dissenting) ("[I]f [a state] statute were to prohibit an abortion even where the mother's life is in jeopardy, I have little doubt that such a statute would lack a rational relation to a valid state objective . . . .").

[22] *See, e.g.*, Inst. of Med., Clinical Prevention Services for Women: Closing the Gaps 103–04 (2011); *see also Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 737 (2014) (Kennedy, J., concurring) (noting that "[t]here are many medical conditions for which pregnancy is contraindicated").

**A-214**

*Application of the Comstock Act to Drugs That Can Be Used for Abortions*

prostol to produce an abortion in such cases would therefore be lawful.

- Fifth, some states that regulate the conduct of certain actors involved in abortions do not make it unlawful for the woman herself to abort her pregnancy. In those contexts, section 1461 might not prohibit the mailing of mifepristone and misoprostol to a woman in a state with restrictions on abortion, even if the sender does so with the intent that the woman use the drugs to produce an abortion.

- Sixth, even if a state prohibits a pregnant person from ingesting mifepristone or misoprostol for the purpose of inducing an abortion, such an individual has a constitutional right to travel to another state that has not prohibited that activity and to ingest the drugs there.[23] Someone sending a woman these drugs is unlikely to know where she will use them, which might be in a state in which such use is lawful.

- Seventh, federal agencies provide abortion services in some circumstances without regard to contrary state law.[24] Mailings of abortion

---

[23] *See Dobbs*, 142 S. Ct. at 2309 (Kavanaugh, J., concurring) ("[M]ay a State bar a resident of that State from traveling to another State to obtain an abortion? In my view, the answer is no based on the constitutional right to interstate travel."); *id.* (referring to the question as "not especially difficult"); *see also Bigelow v. Virginia*, 421 U.S. 809, 824 (1975) (explaining that Virginia could not "prevent its residents from traveling to New York to obtain [abortion] services or . . . prosecute them for going there" (citing *United States v. Guest*, 383 U.S. 745, 757–59 (1966))).

[24] The Department of Veterans Affairs ("VA"), for example, recently has begun providing abortions to veterans and certain other VA beneficiaries without regard to state law when the life or health of the woman would be endangered if the pregnancy were carried to term or the pregnancy is the result of an act of rape or incest. *See* Reproductive Health Services, 87 Fed. Reg. 55,287, 55,288 (Sept. 9, 2022). "[S]tates may not restrict VA and its employees acting within the scope of their federal authority from providing abortion services as authorized by federal law, including VA's rule." *Intergovernmental Immunity for the Department of Veterans Affairs and Its Employees When Providing Certain Abortion Services*, 46 Op. O.L.C. __, at *10; *see also* 87 Fed. Reg. at 55,294 (noting that state and local laws, including criminal laws, that "restrict[], limit[], or otherwise impede[] a VA professional's provision of care permitted by" this new rule "would be preempted" (citing 38 C.F.R. § 17.419(b))). Also, the Department of Defense ("DoD") has for many years provided service members, dependents, and other beneficiaries of DoD health care services with abortion services when a pregnancy is the result of rape or incest or when continuing the pregnancy would endanger the woman's life, and DoD has indicated it will continue to do so without regard to contrary state laws. *See*

19

46 Op. O.L.C. __ (Dec. 23, 2022)

medications intended to be used pursuant to these federal authorities would be lawful under section 1461, because contrary state law could not constitutionally be applied.

- Finally, individuals use mifepristone and misoprostol for medical purposes other than to induce abortions and the legality of those uses would remain unaffected by state restrictions on abortion. For instance, the same dosages of mifepristone and misoprostol that are used for medication abortion can be used to treat a miscarriage,[25] and misoprostol is commonly prescribed for the prevention and treatment of gastric ulcers.[26]

Thus, no matter where the drugs are delivered, a variety of uses of mifepristone and misoprostol serve important medical purposes and are lawful under federal and state law. Accordingly, USPS could not reasonably assume that the drugs are nonmailable simply because they are being sent into a jurisdiction that significantly restricts abortion. Nor would such an assumption based solely on the recipient's address be reasonable even if it is apparent that some women in a particular state are using the drugs in question in violation of state law. *Cf. Youngs Rubber*, 45 F.2d at 110 (although the volume of the plaintiff's sales nationwide justified an inference that the drug stores to which the condoms were being delivered must have been selling at least some of them for purposes that were prohibited under state law—"and that plaintiff must know this"—that was insufficient to conclude that the company intended such illegal conduct by the recipients).

In conclusion, section 1461 does not prohibit the mailing of mifepristone or misoprostol where the sender lacks the intent that the recipient will use them unlawfully. And in light of the many lawful uses of mifepristone and misoprostol, the fact that these drugs are being mailed to a

---

Memorandum for Senior Pentagon Leadership from Gilbert R. Cisneros, Jr., Under Secretary of Defense for Personnel and Readiness, Department of Defense, *Re: Ensuring Access to Essential Women's Health Care Services for Service Members, Dependents, Beneficiaries, and Department of Defense Civilian Employees* (June 28, 2022).

[25] *See, e.g.*, Honor Macnaughton, Melissa Nothnagle & Jessica Early, *Mifepristone and Misoprostol for Early Pregnancy Loss and Medication Abortion*, 103 Am. Fam. Physician 473, 475 (Apr. 15, 2021).

[26] *See Cytotec Misoprostol Tablets*, U.S. Food & Drug Admin. 5–6 (Aug. 2016), https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/019268s051lbl.pdf (misoprostol label).

**A-216**

*Application of the Comstock Act to Drugs That Can Be Used for Abortions*

jurisdiction that significantly restricts abortion is not a sufficient basis for concluding that the mailing violates section 1461.[27]

CHRISTOPHER H. SCHROEDER
*Assistant Attorney General*
*Office of Legal Counsel*

---

[27] While this request was pending, we received a similar request from the Department of Health and Human Services ("HHS") regarding the Comstock Act in connection with the Food and Drug Administration's Risk Evaluation and Mitigation Strategy for mifepristone. We conveyed our conclusions by e-mail to HHS on December 19, 2022, and we noted there that this memorandum was forthcoming. E-mail for Samuel Bagenstos, General Counsel, HHS, from Christopher H. Schroeder, Assistant Attorney General, Office of Legal Counsel, *Re: Advice Regarding Comstock* (Dec. 19, 2022, 8:31 PM).

**A-217**

**EXHIBIT F**

F I L E D
December 2, 2022
CLERK OF THE COURT
MARION COUNTY
LB

STATE OF INDIANA      )      IN THE MARION SUPERIOR COURT
                        ) SS:
COUNTY OF MARION    )      CAUSE NO. 49D01-2211-MI-038101


CAITLIN BERNARD, M.D., on her own behalf  )
and on behalf of her patients; AMY  )
CALDWELL, M.D., on her own behalf and on  )
behalf of her patients,  )
  )
      Plaintiffs,  )
  )
v.  )
  )
TODD ROKITA, in his official capacity as  )
Attorney General of the State of Indiana;  )
SCOTT BARNHART, in his official capacity as  )
Chief Counsel and Director of the Consumer  )
Protection Division of the Office of the  )
Attorney General of the State of Indiana,  )
  )
      Defendants.  )
  )


## ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION


      This matter comes before the Court on Plaintiffs', Caitlin Bernard, M.D. ("Dr.

Bernard"), on her own behalf and on behalf of her patients; Amy Caldwell, M.D. ("Dr.

Caldwell), on her own behalf and on behalf of her patients (collectively "Plaintiffs"),

Motion for Preliminary Injunction.

      The Motion for Preliminary Injunction was filed on November 9, 2022.

Defendants, Todd Rokita, in his official capacity as Attorney General of the State of

Indiana; Scott Barnhart, in his official capacity as Chief Counsel and Director of the

**A-219**

Consumer Protection Division of the Office of the Attorney General of the State of

Indiana (collectively, the "Division"), filed a Brief in Opposition to Motion for Preliminary

Injunction on November 17, 2022. The Court heard live testimonial evidence over the

course of two days on November 18, 2022 and November 21, 2022.

Having been fully briefed on the issues, the Court finds now as follows:

## **FINDINGS OF FACT**

### *I.      FACTS RELATED TO DR. CAITLIN BERNARD, M.D.*

**A.      Parties**

1.      Dr. Bernard is an OB/GYN physician licensed to practice medicine in the

State of Indiana.  Dr. Bernard is employed by IU Health Physicians and by the Indiana

University School of Medicine.  Declaration of Caitlin Bernard, M.D. ("Bernard Decl.") at

¶ 1.

2.      Dr. Amy Caldwell is an OB/GYN physician licensed to practice medicine in

the State of Indiana. Dr. Caldwell is employed by IU Health Physicians and by the

Indiana University School of Medicine.  Declaration of Amy Caldwell, M.D. ("Caldwell

Decl.") at ¶ 1.

3.      Defendant Todd Rokita is the Attorney General of the State of Indiana

("Attorney General").

4.      Defendant Scott Barnhart is the Chief Counsel and Director ("Director") of

the Consumer Protection Division of the Office of the Attorney General of the State of

Indiana ("CPD").

5.      The Attorney General of the State of Indiana, and "Director" (collectively,

"Defendants") are charged with investigating consumer complaints against licensed

professionals in the state of Indiana

2

**A-220**

**B.    Timeline of events for Dr. Bernard**

6.        On or around June 27, 2022, Dr. Bernard received a phone call from a child abuse doctor in Ohio concerning a 10-year old patient who became pregnant through a rape. After receiving the call from the physician in Ohio, Dr. Bernard contacted the social worker at IU Health.[1]

7.        According to Dr. Bernard's testimony prior to the treating the 10-year old patient, she immediately notified the IU Health social worker that the patient was a victim of abuse after she spoke with the Ohio physician. Furthermore, Exhibit 22 was filed and admitted by the Court under seal (pursuant to the Ind. Access to Court Records) because it was a part of the 10-year old patient's confidential medical records and addressed the details of the work completed by the IU Health social worker on behalf of the IU Health medical team.  This exhibit  confirms along with Dr. Bernard's testimony that the Ohio law enforcement and Ohio DCS had previously been notified of the abuse prior to Dr. Bernard's treatment of the patient. Dr. Bernard fully cooperated with Ohio law enforcement and the Ohio DCS. Dr. Bernard was aware the social worker addressed this reporting requirement for the medical team.

8.        On June 29, 2022, Dr. Bernard attended an event on the IU School of Medicine campus.  There she spoke with another physician about the public health emergency doctors were facing due to abortion bans in other states and the impact those bans might have for patients.  Dr. Bernard mentioned to the other physician a

---

[1] There was no transcript of the proceedings prepared as of the date of this order, so these findings contain no direct citations to the record. The Court has attempted to  make its findings sufficiently specific as to allow any reviewing court to understand this Court's decisions and the processes by which those decisions were made. *See Rose v. State*, 120 N.E.3d 262, 269 (Ind. Ct. App. 2019).

3

**A-221**

case example that she had recently heard about where a 10-year-old child from Ohio who had been raped and was pregnant.

9.      A reporter from the IndyStar who was covering the campus event overheard Dr. Bernard's conversation with the other physician, approached Dr. Bernard, and asked Dr. Bernard to confirm the information she overheard.

10.      Dr. Bernard confirmed that she received a referral from a child abuse doctor in Ohio regarding a 10-year-old patient, and it was understood that the patient was coming Indiana to receive care from Dr. Bernard's medical team.  The reporter informed Dr. Bernard that she was writing a news story about the effects of abortion bans in nearby States after *Dobbs v. Jackson Women's Health Organization*, 124 S. Ct. 2228 (2022). Dr. Bernard then confirmed with the reporter the following information: Dr. Bernard had received a phone call from a child abuse doctor from Ohio which she believed to be on Monday, June 27, 2022, regarding a potential patient who had been a victim of sexual abuse; the victim was 10 years old; the victim was an Ohio resident; the victim had been raped; Dr. Bernard agreed to terminate the child's pregnancy; and the child was six weeks pregnant. Exs. B, C.

11.      Dr. Bernard terminated the child's pregnancy on Thursday, June 30, 2022, at an Indianapolis hospital. Ex. C.

12.      6.      At 5:00 a.m. on Friday, July 1, 2022, the IndyStar published the story, titled *Patients head to Indiana for abortion services as other states restrict care*. The article reported, without quoting Dr. Bernard, on July 1, 2022 that Dr. Bernard "took a call from . . . a child abuse doctor in Ohio" who "had a 10-year-old patient in the office who was six weeks and three days pregnant."  Ex. B.  Because abortion "still is legal" in

4

**A-222**

Indiana, the article reported that "the girl soon was on her way to Indiana to Bernard's care." *Id.*

13.   On July 2, 2022, Dr. Bernard submitted to the State of Indiana Department of Health a Termination of Pregnancy Report ("TPR"). Bernard Decl. ¶ 3. This TPR contained the patient's age, the date of pregnancy termination, the estimated gestational age and post fertilization age, and that the pregnancy was the result of abuse. Bernard Decl. at Ex. A; *see also* Ind. Code 5-14-3.

14.   Also on July 2, 2022, Dr. Bernard emailed a copy of the TPR to the Indiana Department of Child Services ("Indiana DCS"), noting in the email that the TPR was "for a minor," that "[t]his case was already reported through DCS in Ohio," and she had "attached the contact info for our social worker should you need any further assistance." Ex. C.

15.   On July 6, a week after the abortion procedure in Indiana on June 30, Ohio law enforcement officers learned the identity of the child's alleged rapist after speaking to the child in her home. Ex. A at 9. After the child left Dr. Bernard's care in Indiana, the girl had returned to Ohio to live in the same home her alleged rapist. Ex. A at 9, 15–16; Ex. R. The man was later arrested and charged with two counts of rape in case number 22-CR-003226 on July 21. Ex. A at 9; Ex. R.

**C.   Consumer complaints filed against Dr. Bernard**

16.   The CPD began receiving numerous complaints about Dr. Bernard between July 8 and July 12, 2022. Ex. 6; Ex. W.

17.   The Office of the Indiana Attorney General ("Attorney General's Office") makes available a blank "Consumer Complaint" form, *see* Ex. 9, which an individual can

**A-223**

complete and file online, *see* Ex. 8, or can print out the form and mail it to the Attorney General's Office, Consumer Protection Division, *see* Ex. 9 at p. 2.

18.     Section 1 of the "Consumer Complaint" form requires personal information of the complainant, and Section 2 requires the identity of whom the complaint is against. Ex. 9 at p. 1.

19.     At the bottom of the "Consumer Complaint" form in Section 9, the complainant must "affirm, under penalties for perjury, that the foregoing representations are true." Ex. 9 at p. 2.  The complainant must also sign and date the form, as required by Indiana law.  *Id.*; Ind. Code § 25-1-7-4. The "Consumer Complaint" form also states in Section 7 that "[t]his office cannot disclose your complaint against a licensed professional to the public unless this office files a disciplinary action against the licensed professional."  *Id.*

20.     When the "Consumer Complaint" form is submitted, if it relates to a professional licensing matter it is referred to the Licensing Enforcement Division ("Division").

21.     Mary Hutchison ("Hutchison") is a Deputy Attorney General and Section Chief of Licensing Enforcement who supervises the Division. There are 34 professional boards within Hutchison's purview, including the Medical Licensing Board.

22.     On July 8, 2022, J.L., a California resident, filed a consumer complaint against Dr. Bernard. Ex. 6 at pp. 11–18.  This J.L. complaint described the first interaction between the complainant and Dr. Bernard as "[r]eported in the U.S. Media and President of the United States." *Id.* at p. 13. In Box 3–C, which asks "[w]here did the Transaction/Incident occur," J.L. checked the box marked "By Social Media."  *Id.*  In

**A-224**

Section 5 in response to "Transaction/Incident Details," J.L. complained that "Indiana is a Mandatory Reporter State.  Dr Caitlin Bernard stated she treated a 10-yr old girl from Ohio who was pregnant.  Dr Bernard refuses to confirm this was reported to law enforcement, as required by law."  *Id.* at p. 14.

23.     On July 10, 2022, P.W., a Kentucky resident, filed a consumer complaint against Dr. Bernard.  Ex. 6 at pp. 27–31.  In response to the form question 3-E, "[h]ow did you [p]ay," the complainant noted "I would presume the child's parents paid. . . ."  *Id.* at p. 29.  P.W.  provided the link to the Indianapolis Star article, and complained that Dr. Bernard had "made no mention of reporting the rape of her 10 year old patient," and that "[n]ews agencies who are researching this crime have been unable to find records of any police reports, either in the city where Dr Bernard would have examined the child and terminated her pregnancy or in Ohio."  *Id.* at p. 30.  She was "additionally concerned about whether either doctor performed a rape exam with law enforcement present" and, if "she retain[ed] the products of conception or perform[ed] DNA sampling of the blood and tissues so they could be use[d] to help prosecute the person responsible for the rape, and impregnation of the child?"  *Id.*

24.     On July 11, 2022, another California resident, D.H., submitted a consumer complaint against Dr. Bernard.  Ex. 6 at pp. 1–4.  This complaint listed Dr. Bernard's street address as "U of I" with the zip code "00000" and the phone number "555555555."  *Id.* at p. 3.  The complaint represented that the transaction was for a "Non-Profit/Church."  *Id.*  D.H. stated that "Miss Berhard [sic] kept knowledge of the rape of a 10 year old from authorities."  *Id.* at p. 4.

7

**A-225**

25.     On July 11, 2022, J.T., an Indiana resident, filed a consumer complaint against Dr. Bernard that identified Dr. Bernard's phone number simply as "317."  Ex. 6 at pp. 36–38.  The complainant represented that "By Social Media." was where the transaction/incident occurred.  *Id.* at p. 37.  As to the "Transaction/Incident Details," J.T. stated that "doctor did not report rape of 10 year brought to indy from Ohio foe abortion." *Id.* at p. 38.

26.     On July 11, 2022, R.A., an Indiana resident,  submitted a consumer complaint and asserted that she had "no personal contact" with Dr. Bernard and the transaction occurred in the "Media."  Ex. 6 at pp. 19–26.  The complaint referenced, and attached, the July 1, 2022 Indianapolis Star article.  Id. at pp. 22–26.  The complaint also alleged that Dr. Bernard "violated the confidentiality guaranteed to child survivors of rape" and that "this case is a CHINS case which means [Dr. Bernard] violated the law in releasing any information regarding the case."  *Id.*  at p. 22.  Additionally, the R.A. complaint alleged that "[t]his public announcement served no purpose . . . [i]t was purely a political and activist strategy to support Dr. Bernard's profession as an abortion provider."  *Id.*

27.     On July 12, 2022, K.H., a Missouri resident, submitted a consumer complaint against Dr. Bernard despite admitting to having had "no direct contact" with Dr. Bernard, and representing that "News Media" is where the "Transaction/Incident" occurred.  Ex. 6 at pp. 32–35.  The complainant further stated "[f]rom news stories I was made aware that apparently Dr. Bernard has failed to report sexual abuse in a child." *Id.* at p. 35.

28.     On July 12, 2022, R.T., an Ohio resident, submitted a consumer complaint against Dr. Bernard, *see* Ex. 6 at pp. 5–10, representing that the transaction with Dr. Bernard was for the complainant's "Family/Household" and occurred "By Social Media," *id.* at p. 7.  R.T. stated that "[a]s a citizen of Ohio I feel that this misinformation (aka LIE) harmed my State's image AND is a malicious act intended to harm people such as myself that hold a pro-life position. I have personally experienced hostility against me with specific mention of Dr. Bernard's interviews and her claim of a 10 year old Ohio girl being forced to have an abortion in Bernard's Indiana clinic." *Id.* at p. 8.  The complainant also attached an internet search of news articles about Dr. Bernard.  *Id.* at p. 10.

29.     Between July 12, 2022 and July 14, 2002, the Attorney General's Office sent all but one (which was sent in August) of the seven consumer complaints above to Dr. Bernard, each assigned a different file number and case number, advised her that the Attorney General's Office was investigating the complaints, and requested that she provide a written response. Ex. 6.  The D.H. and R.A. complaints, both dated July 11, were assigned separate case numbers and forwarded to Dr. Bernard the next day, on July 12.  Ex. 6 at 3-4, 21-26.

30.     At the hearing on this motion, Ms. Hutchison testified that she did not believe the R.T. complaint filed on July 12, 2022 warranted investigation and stated that "this one we are not investigating[.]" The Attorney General's Office had previously assigned a case number to the R.T. complaint dated July 12, 2022 and sent it to Dr. Bernard with a request for written response. Ex. 6 at pp. 5–10.  Indeed, the Attorney General's Office forwarded the R.T. complaint to Dr. Bernard on July 12, 2022—*the*

9

**A-227**

*very same day it had been filed*—reflecting that a file number had been opened regarding "R.T. vs. Caitlin Bernard." . *Id.* at p. 7.

31.      .On July 13, 2022, the Attorney General disclosed the investigations against Dr. Bernard on a national television network.  Bernard Decl. ¶ 8.  He stated: "And then we have this abortion activist acting as a doctor with a history of failing to report. So, we're gathering the information. We're gathering the evidence as we speak, and we're going to fight this to the end, including looking at her licensure. If she failed to report it in Indiana, it's a crime for – to not report, to intentionally not report." *Id.* (emphasis added).

32.      On July 13, 2022, the Attorney General also made public a letter he sent to Governor Holcomb that repeatedly referenced Dr. Bernard's name and the allegations he made on national television.  See Letter from Todd Rokita, Ind. Att'y Gen., to Eric Holcomb, Ind. Governor (July 13, 2022).

33.      On July 14, 2022, the Attorney General's Office issued a press release "regarding Dr. Caitlin Bernard case," stating that "we are investigating this situation and are waiting for the relevant documents to prove if the abortion and/or the abuse were reported, as Dr. Caitlin Bernard had requirements to do both under Indiana law. The failure to do so constitutes a crime in Indiana, and her behavior could also affect her licensure. Additionally, if a HIPAA violation did occur, that may affect next steps as well. I will not relent in the pursuit of truth."  Bernard Decl. ¶ 9, Ex. I.

34.      On August 19, 2022, the Attorney General's Office issued another press release in response to criticisms of his public statements in which he stated: "We must be critical consumers of information and not just believe anything we read or hear."

10

**A-228**

(Press Release, Todd Rokita, Ind. Att'y Gen., Attorney General Todd Rokita and team committed to finding the truth (Aug. 19, 2022)).

**D.      The Attorney General Launches Investigation into Dr. Bernard and Issues Subpoenas for the "Entire Medical File" of Patient.**

35.      On July 15, 2022, the Attorney General's Office issued a Civil Investigative Demand ("CID") to IU Health, Dr. Bernard's employer.  Ex. 10.

36.      On July 22, 2022, IU Health responded to the CID, which asked that the Attorney General withdraw the CID because he has "no jurisdiction to conduct the alleged investigation that serves as the CID's purported justification."  Ex. 11 at p. 1.

37.      On August 23, 2022, the Attorney General issued a subpoena *duces tecum* to IU Health University Hospital requesting:

> The entire medical file, including any and all imaging studies, authorization forms, waivers, consent forms, authorizations for disclosure of the medical records, any written communications between patient/patient's guardian and medical staff, and any notes regarding conversations between patient/patient's guardian and medical staff [for a particular patient number] for the dates June 25, 2022 to July 5, 2022."

Declaration of Kathleen A. DeLaney ("DeLaney Decl."), Ex. A at p. 2.

38.      On August 23, 2022, the Attorney General issued a subpoena to the Indiana University School of Medicine requesting:

> The entire medical file, including any and all imaging studies, authorization forms, waivers, consent forms, authorizations for disclosure of medical records, any written communications between patient/patient's guardian and medical staff, and any notes regarding conversations between patient/patient's guardian and medical staff" for a particular patient number "for the dates June 25, 2022 to July 5, 2022.

DeLaney Decl., Ex. B at p. 2.

**A-229**

### E.   The Attorney General publicly discloses investigations against Dr. Bernard.

39.   On July 13, 2022, the Attorney General appeared on one national news broadcast, referring to Dr. Bernard as "this abortion activist acting as a doctor with a history of failing to report" and asserting his office was "gathering the evidence as we speak, and we're going to fight this to the end, including looking at her licensure." Bernard Decl. ¶ 8[2]

40.   That same day, the Attorney General made public a letter he sent to the Governor, in which he repeatedly referenced Dr. Bernard by name and made clear that his office was investigating Dr. Bernard.

41.   On July 14, 2022, the Attorney General issued a press release that likewise referenced Dr. Bernard by name and expressly stated she was the subject of an investigation.

42.   In a "Facebook Live" broadcast on September 1, 2022, the Attorney General made more public comments about his investigation of Dr. Bernard.  Bernard Decl. ¶ 10, Ex. J; Ex 16.  Asked "the status of the investigation into Dr. Caitlin Bernard," the Attorney General publicly stated that "[w]e're looking into standards of practice of the professional if they were met.  If any state or federal laws, employee privacy laws, were violated.  And just as background, based on a doctor intentionally reporting her patient's circumstances to the media, my office has undertaken a review of that act in response, again to public concern.  My comments are supported by facts as are all statements from my office."  *Id.*, Ex. J at pp. 4–5; Ex. 16.

---

[2] *Available at* https://www.mediamatters.org/fox-news/after-discrediting-report-10-year-old-ohio-girl-needing-abortion-foxs-jesse-watters-now (including a video and transcript of Attorney General Rokita on Jesse Watters Primetime's July 13, 2022 program).

**A-230**

43.     On September 14, he gave an interview to a local newspaper, stating the investigation of Dr. Bernard was "ongoing" and making other comments about the investigation.[3]

44.     On September 15, 2022, the Attorney General again discussed his investigation into Dr. Bernard in a local media interview.  Kristen Eskow, *Indiana AG Rokita talks enforcement of abortion ban, lawsuits filed*, FOX59 (updated Sept. 18, 2022).[4]

45.     On September 21, 2022, IU Health filed a motion to quash the subpoena under cause number 49D12-2209-MI-032634. Ex. D. Two days later, Dr. Bernard intervened and filed her own motion to quash the subpoena to IU Health. Ex. D.

**F.      Testimony regarding determination of merit before opening investigations into consumer complaints.**

46.     Before investigating, the Licensing Division does not require that complaints be based on personal knowledge.

47.     Before investigating, the Licensing Division does not require that the complaint be based on a consumer transaction.

48.     Hutchison is only aware of two subpoenas for medical records of abortion records issued by the Licensing Division—those issued for the medical records of Dr. Bernard's patient and of Dr. Caldwell's patient.

---

[3] *Available at* https://www.indystar.com/story/news/health/2022/09/14/indiana-attorneygeneral-todd-rokita-office-declines-to-share-info-on-dr-bernard-complaints/69493958007/.
[4] *Available at* https://fox59.com/indianapolitics/indiana-ag-rokita-talks-enforcement-of-abortion-ban-lawsuits-filed/.

**A-231**

### G.   Attorney General refers complaint to Medical Licensing Board

49.   On November 30, 2022, while this motion was under advisement following two days of live testimony, the Attorney General's Office filed an administrative complaint with the Medical Licensing Board against Dr. Bernard.

### H.   Evidence and testimony related to Dr. Bernard's experiences following the initiation and public acknowledgment of the investigation against her

50.   The investigations and the public statements made by the Attorney General about these investigations have impacted Dr. Bernard's reputation.  Dr. Bernard has fears for her personal safety and that of her family as a result of the investigations into her practice of medicine.

51.   Dr. Bernard has concerns regarding her patients' privacy as a result of the Attorney General's previous issuing of broad subpoenas seeking the complete medical records and files of Dr Bernard's patient.

52.   Dr. Bernard has had to divert time and resources away from patients to address the Attorney General's and the Director's investigations.

## II.   FACTS RELATED TO DR. AMY CALDWELL, M.D.

53.   Dr. Amy Caldwell is an OB/GYN physician licensed to practice medicine in the State of Indiana. Dr. Caldwell is employed by IU Health Physicians and by the Indiana University School of Medicine.  Declaration of Amy Caldwell, M.D. ("Caldwell Decl.") at ¶ 1.

54.   On April 15, 2022, S.D., an Indiana resident, filed a consumer complaint against "PPIN- Georgetown OR (PPG1)."  *See* Caldwell Decl., Ex. A at p.1 ("Who is the Complaint Against?").  The complaint asserted that, based on information she gathered through a "public information request," that "[b]ased on IC 16-34-2 and their

14

**A-232**

website siting [sic] 13 weeks and 6 days, PPIN-Georgetown OR PPGI [wa]s in violation

of performing abortions outside that time frame according to the TPR."  *Id.* at p. 2.  For

her complaint to be resolved, S.D. requested that "a full investigation of this facility" be

conducted.  *Id.*

55.    The Division does not have statutory jurisdiction to investigate complaints

against the PPGI facility or hospitals or surgery centers. Employees of the Licensing

Division independently renamed the S.D. complaint regarding PPGI and opened an

investigation against Dr. Caldwell individually.  Caldwell Decl., Ex. A at p. 1.

56.    On May 26, 2022, the Attorney General, through the Director, sent a letter

to Dr. Caldwell attaching the April 15, 2022 complaint submitted by S.D., which the letter

now captioned as "*S.D. v. Amy Caldwell*."  *Id.* at Ex. A at pp. 1, 4–5.  The letter indicated

that the Division had opened an investigation, to which it had already assigned a file

number, and it requested that Dr. Caldwell provide a written response to the complaint.

*Id.*

57.    Dr. Caldwell provided a written response to the Division, in which she

explained "[t]hat there was a clerical error in the report[,]" specifically that the procedure

did not take place at Planned Parenthood but in fact had taken place at Eskenazi

Hospital.  Ex. Y at 18:11-18:25.

58.    After having recast the S.D. complaint to be one against Dr. Caldwell, the

Division used the complaint as a basis for issuing at least three subpoenas for the entire

medical chart of Dr. Caldwell's patient.  *See* Ex. 7.

59.    On July 22, 2022, the Attorney General, through the Director, issued a

subpoena to Dr. Caldwell, for:

**A-233**

All medical records, including, but not limited to intake information, patient charts, tests results (e.g., x-rays and MRIs), treatment recommendations, office visit logs, referrals, nursing notes, doctors notes, medication administration records, and any electronic documentation, including communications records for the patient who received a medical (surgical) procedure to terminate a pregnancy on December 10, 2021 at Eskenazi Hospital, located at 720 Eskenazi Avenue, Indianapolis, IN 46202, from December 3, 2021 to December 17, 2021.

Caldwell Decl. ¶ 4, Ex. B; *see also* Ex. 18 at p. 2.  The cover letter to Dr. Caldwell

referenced the S.D. complaint that had been re-named "S.D. v. Dr. Amy Caldwell," with

an OAG File Number.  *Id.*

60.    On October 4, 2022, the Attorney General issued a subpoena to Planned

Parenthood – Georgetown requesting:

[A]ll medical records, including, but not limited to intake information, patient charts, test results (e.g., x-rays and MRIs), treatment recommendations, office visit logs, referrals, nursing notes, doctor notes, medication administration records, and any electronic documentation, including communication records for the patient associated with TPR SFN: 008086, attached as Exhibit A, who received a medical (surgical) procedure to terminate a pregnancy on December 10, 2021."

Ex. 7, at pp. 11–15.

61.    The Division also served a subpoena duces tecum to Eskenazi Health

based on the consumer complaint caption identifying Dr. Caldwell.  S*ee generally* Ex.

19.

62.    On October 12, 2022, Planned Parenthood responded via letter that it had

no record of the patient either and indicated that Dr. Caldwell did not perform a second

trimester surgical abortion at the Planned Parenthood clinic. Exs. O, P.

63.    On November 16, 2022, seven days after Plaintiffs filed their Motion for

Preliminary Injunction, the Attorney General's Office sent Dr. Caldwell's attorney a

closing letter for the investigation, signed by Mary L. Hutchison, Section Chief,

**A-234**

Licensing Enforcement, Office of the Indiana Attorney General.  Ex. 19; Ex. Q; Ex. V at 35–36; see also Ex. Y.

64.     The closing letter stated that it "serve[d] as a Warning" to Dr. Bernard regarding the investigation, and that "we are closing this matter with a warning and directive moving forward to accurately and timely comply with Indiana law."

**A.     Evidence and testimony related to Dr. Caldwell's experiences following the initiation of the investigation against her**

65.     Dr. Caldwell has concerns that the Division improperly altered the April 15, 2022 complaint against her to gain jurisdiction and may be further harmed if nothing prevents the Defendants from repeating the conduct here, where Defendants rewrote the April 15, 2022 complaint to be against Dr. Caldwell without the consent of the actual complainant.  Ex. Y at 30:5-31:24, 32:7-32:11.

66.     Dr. Caldwell maintains that the investigation impacted her ability to practice medicine without fear of prosecution or reputational harm, and also disrupts Dr. Caldwell's practice by diverting time and resources away from patient care.  Caldwell Decl. ¶¶ 6–7.

67.     Having seen the Attorney General publicly discuss investigations and allegations against Dr. Bernard, Dr. Caldwell is now "fearful" that he will publicly mention an investigation of her.  Ex. Y at 34:14-34:17.

68.     Any findings of fact above which are more appropriately conclusions of law shall be so deemed and incorporated into the conclusions of law section.

## **CONCLUSIONS OF LAW**

**A-235**

## *I.      SPECIFIC RELIEF SOUGHT BY PLAINTIFFS*

69.      As part of their motion for preliminary injunction, Plaintiffs specifically

request that Defendants be enjoined from the following:

   a.  continuing to investigate any of the pending consumer complaints
       against Plaintiffs,

   b.  opening new investigations of Plaintiffs under Title 25 of the Indiana
       Code based on any consumer complaint as to which an initial
       determination of merit has not been made or were an allegation is
       clearly meritless based on available information,

   c.  publicly disclosing the existence, nature or status of any consumer
       complaint concerning, or any investigation of Plaintiffs under Title
       25 of the Indiana Code, except as provided in IC 25-1-7-10;

   d.  from referring any of the consumer complaints against Dr. Bernard
       to the MLB, recommending that the MLB otherwise pursue
       disciplinary action against Dr. Bernard, or prosecuting any the
       complaints against Dr. Bernard before the Medical Licensing Board
       ("MLB") pursuant to Ind. Code Ann. § 25-1-7-7 or § 25-1-7-5(b)(1)
       (West); and

   e.  putting the "warning letter" or other mention of the "warning" in Dr.
       Caldwell's file;

   f.  referring Dr. Caldwell  to the MLB for further proceedings based on
       the complaint or arising out of the events underlying that complaint;
       and
   g.  prosecuting the Administrative Complaint, Case Number 2022 MLB
       0024, filed against Dr. Bernard on November 30, 2022 before the
       Medical Licensing Board of Indiana, and Defendants must withdraw
       the Administrative Complaint, Case Number 2022 MLB 0024, filed
       against Dr. Bernard on November 30, 2022 before the Medical
       Licensing Board of Indiana.

## *III.      CHALLENGES TO PLAINTIFFS' STANDING TO SEEK INJUNCTION*

70.      Before addressing the preliminary injunction factors, the Court will first

address Defendants' arguments related to Plaintiffs' standing to bring this lawsuit and

motion for preliminary injunction.

18

**A-236**

A.      Standing arguments with respect to Dr. Caldwell

71.      With respect to Dr. Caldwell, Defendants argue Dr. Caldwell's request for

a preliminary injunction is moot because the CPD investigation into her is closed. When

a court is "unable to provide effective relief upon an issue, the issue is deemed moot."

*Larkin v. State*, 43 N.E.3d 1281, 1286 (Ind. Ct. App. 2015) (cleaned up). Because the

CPD director's investigation has been completed and closed, Ex. Q; Ex. V at 35–36;

*see also* Ex. Y, Defendants argue that Dr. Caldwell can no longer seek any declaratory

relief because there is no longer any inquiry to which such relief that could be granted to

Dr. Caldwell on her claims.

72.      In response, Plaintiffs argue that Dr. Caldwell is also  seeking prospective

relief to halt *ultra vires* conduct of the Attorney General and the Director. Plaintiffs

maintain the Attorney General and Director could still open investigations based on

meritless consumer complaints against Dr. Caldwell as they have done previously.

Plaintiffs also raise concerns about the "warning" letter the Division issued to Dr.

Caldwell being maintained in her file and potentially used against her if the Division

were to receive another complaint about Dr. Caldwell. Plaintiffs conclude, therefore, that

Dr. Caldwell's claim for injunctive and declaratory relief is not moot and she retains

standing to challenge Defendants' *ultra vires* conduct.

73.      Upon review, the Court finds that Dr. Caldwell presently lacks standing to

move forward with her claims because the evidence establishes there are no active

investigations against her and thus, she is not presently subject to the harms from

Defendants for which she seeks declaratory and injunctive relief.

74.      "[A] plaintiff must show evidence of three elements to establish standing:

the plaintiff has suffered an 'injury in fact'—an invasion of a legally protected interest

19

**A-237**

that is 'concrete and particularized' and '"actual or imminent, not 'conjectural' or

'hypothetical."' *Hulse v. Ind. State Fair Bd.*, 94 N.E.3d 726, 730-31 (Ind. Ct. App. 2018)

(*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d

351 (1992)).

75.    The undisputed facts show that Dr. Caldwell cannot seek present

injunctive relief because there is no active investigation against her that presents an

injury in fact for which the Court could enjoin Defendants from pursuing as sought in

Plaintiffs' Complaint. Any relief which Dr. Caldwell could seek now would be solely

prospective.

76.    To establish standing to seek prospective relief, a plaintiff must establish

that she is in immediate danger of sustaining a direct injury "as the result of the

challenged official conduct, and [that] the injury or threat of injury [is] both real and

immediate." *Ind. Family Inst. Inc. v. City of Carmel*, 155 N.E.3d 1209, 1219 n.5 (Ind. Ct.

App. 2020) (*citing City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S. Ct. 1660, 75

L. Ed. 2d 675 (1983) (internal quotations omitted)).

77.    Dr. Caldwell has not made any showing that  that she will imminently

suffer a concrete or particularized injury by Defendants. There is no present

investigation against her, and there was no evidence presented suggesting that Dr.

Caldwell would the subject of any future complaints. In fact, the timeline of events

shows that prospective relief is not necessary in Dr. Caldwell's case. The Defendants

opened up an investigation, and after collecting sufficient facts about the circumstances

of the alleged complaint, ultimately dismissed the investigation with no further action

being taken against Dr. Caldwell. The Court finds this is the process working as it should.

78.     As for the "warning" letter Dr Caldwell has raised concerns about, the Court finds this potential harm is too attenuated to meet the required showing that Dr. Caldwell will imminently suffer any particularized injury from Defendants to grant standing. First, Dr. Caldwell is not presently subject to any consumer complaints, so the alleged risk posed by the letter, that it would be used somehow against Dr. Caldwell in a subsequent proceeding, cannot say to be "imminent" since there is no certainty that another complaint will even be filed to prompt an investigation.

79.     Even if Defendants were to include the "warning" letter in any subsequent investigation of Dr. Caldwell for some unknown complaint field in the near or distant future, it is unclear what effect the inclusion of that letter would have. This Court notes that there is no Indiana law enacted by the Indiana General Assembly which permits the Office of the Attorney General to send a "warning" letter which can later be legally used against Dr. Caldwell. Furthermore, the warning has no legal significance because the Defendants dismissed the compliant against Dr. Caldwell finding no wrongdoing.

80.     The evidence presented by Plaintiffs does raise serious concerns about how the Division unilaterally modified the consumer complaint by changing the subject of the complaint from PPGI to Dr. Caldwell that prompted the investigation. The licensing investigations statute does not express any authority to the Division to make such alterations to the complaints it receives. In fact, the licensing investigations statute expressly forbids "employees of the attorney general's office acting in their official capacity" from filing consumer complaints. Ind. Code § 25-1-7-4.

81.     An employee of the Attorney General, CPD, and Division altering a consumer complaint to change the subject to Dr. Caldwell after receiving the complaint appears precariously close to actually filing that complaint in contravention of the licensing investigations statute.

82.     The Court need not review the events that lead to the investigation against Dr. Caldwell further since the matter has been closed and the Division has deemed there to be insufficient evidence to refer the complaint about Dr. Caldwell to the Medical Licensing Board, so the matter is closed.

83.     The Court finds that the Defendants and employees of the Attorney General handling consumer complaints are required to process them in compliance with Indiana law.

84.     For these reasons, the Court DENIES AS MOOT Dr. Caldwell's Motion for Preliminary Injunction.

**B.    Standing arguments with respect to Dr. Bernard**

85.     Defendants also raise numerous arguments to challenge Dr. Bernard's standing to bring this motion seeking to challenge the release of her patient's records by IU Health and to enjoin the CPD from engaging in any other potential future investigations or even continuing any active investigations into her.

86.     Defendants argue that Dr. Bernard does not have standing to challenge the revised subpoena issued to IU Health or the investigation in general because she does not have a legitimate privacy interest in the records. Instead, Defendants maintain her sole interest is in avoiding investigation, which would not be a legitimate interest, *S.E.C. v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 742 (1984).

22

**A-240**

87.    Defendants also argue that Dr. Bernard lacks a private right of action under the licensure investigations statute to bring suit for injunctive or declaratory relief on the basis that Defendants violated the statute. *See, e.g., Price v. Indiana Dep't of Child Servs.*, 63 N.E.3d 16, 21–22 (Ind. Ct. App. 2016), *trans. granted, vacated, summarily aff'd in relevant part*, 80 N.E.3d 170, 174 (Ind. 2017 ); *Lockett v. Planned Parenthood of Indiana, Inc.*, 42 N.E.3d 119 , 126–27 (Ind. Ct. App. 2015), *trans. denied*. Defendants argue that Indiana Code chapter 25-1-7 does not contain an express right of action and does not create any privately enforceable right for which Dr. Bernard can bring suit.

88.    Defendants further argue that Dr. Bernard's Complaint should be dismissed pursuant to Ind. Trial Rule 12(B)(8) because Dr. Bernard's suit is also duplicative of the earlier-filed subpoena litigation and thus barred.  T.R. 12(B)(8) is triggered when "the parties, subject matter, and remedies of the competing actions are precisely the same, and it also applies when they are only substantially the same." *Kindred v. Indiana Dep't of Child Servs.*, 136 N.E.3d 284, 290 (Ind. Ct. App. 2019 ), *trans. denied* (citation omitted). Defendants contend that since. Dr. Bernard is already asserting substantially the same arguments in the subpoena litigation, Ex. H, which predates this action, Ex. D, and the outcome of this suit would invariably affect the outcome of the subpoena litigation, Dr. Bernard's suit is thus barred by T.R. 12(B)(8).

89.    In response, Dr. Bernard contends that Defendants' arguments for dismissing Dr. Bernard's claims must fail.  .

90.    First. Dr. Bernard points out that Defendants have previously sought dismissal under T.R. 12(B)(8), and the Court has already rejected this argument. *See*

**A-241**

(November 15, 2022 Order on Whether or Not This Court Has Jurisdiction to Preside Over the Plaintiffs' Request for Preliminary Injunction at p. 5). In the order setting the preliminary injunction hearing, the Court rejected this argument, holding that "this matter and the lawsuit filed by IU health. . . are not substantially similar nor do they seek the same or substantially the same remedies." *Id.* at 6-7.

91.     Second, with respect to Defendants' private right of action argument under Ind. Code § 25-1-7 *et seq.*  Dr. Bernard notes she is bringing her claims under the Indiana Declaratory Judgment Act  and not the licensure investigations statute. *See* Compl. ¶¶ 91, 102, 111. Dr. Bernard maintains that under Indiana law, a declaratory judgment action is the proper procedural vehicle to contest the Defendants' conduct and to determine "the legal right, the legal status, or the legal relationship of parties having adverse interests." *Wells Fargo Bank, N.A. v. Tippecanoe Assocs.*, LLC, 923 N.E.2d 423, 428 (Ind. Ct. App. 2010).

92.     Upon review, the Court disagrees with Defendants and finds that Dr. Bernard has an adequate basis to proceed with her claims under the Uniform Declaratory Judgment Act.

93.     Starting with Defendants' T.R. 12(B)(8) argument, the Court again rejects Defendants' argument as it did in its November 15, 2022 Order. The Court finds that the relief in both cases is not substantially similar and incorporates its prior findings on that issue into this order.

94.     As for Defendants' private right of action argument, the Court agrees with Plaintiffs that whether the investigation statute has a private right of action is irrelevant since Plaintiffs are bringing their claims under the Uniform Declaratory Judgment Act.

24

**A-242**

95.    Ind. Code § 34-14-1-2, taken from the Declaratory Judgment Act, provides:

> Any person . . . whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

96.    As clarified by the Indiana Supreme Court recently, a person seeking a declaratory judgment with respect to the application of a statute must make these showings: "(1) [they are] a 'person'; (2) [their]"rights, status, or other legal relations are affected by a statute"; and (3) [they are] questioning the construction or validity of that statute. *Holcomb v. Bray*, 187 N.E.3d 1268, 1284 (Ind. 2022) (citations omitted).

97.    Here, the Court finds Dr. Bernard meets all three factors. She is a "person" as defined in the Declaratory Judgment Act. Her rights are being affected by the licensing investigations statute, and she is questioning the construction of that statute, i.e., whether Defendants' conduct has violated that statute.

98.    Dr. Bernard's interests  includes challenges to subpoenas for her patients' entire medical file. Dr. Bernard can "raise a claim on behalf of a third party if [Dr. Bernard] can demonstrate that [s]he has suffered a concrete, redressable injury, that [s]he has a close relation with the third party, and that there exists some hindrance to the third party's ability to protect [their] own interests." *Osmulski v. Becze*, 638 N.E.2d 828, 833-34 (Ind. Ct. App. 1994). The Court has already found that Dr. Bernard has suffered an injury. As for the ability of her patients to protect their interests, Indiana courts have previously found minors and victims of sexual abuse have privacy concerns that healthcare providers such as Dr. Bernard are uniquely positioned to protect. *See*

25

**A-243**

*Planned Parenthood v. Carter,* 854 N.E.2d 853, 870 (Ind. Ct. App. 2006). The Court finds that Dr. Bernard's interest in the privacy of her patients confers her standing to challenge subpoenas into their records on their behalf.

99.     The Court, therefore,  finds that Dr. Bernard has pleaded a sufficient basis for standing to bring her claims through the Declaratory Judgment Act.

## IV.    ANALYSIS OF PRELIMINARY INJUNCTION FACTORS

### A.    Standards on Injunctive Relief

100.     The Court grants preliminary injunctive relief pursuant Ind. Trial Rule 65 when the moving party demonstrates by the greater weight of the evidence that:  (1) the remedy at law is inadequate and the plaintiff will suffer irreparable harm pending resolution of the action; (2) the plaintiff is reasonably likely to prevail on the merits; (3) the threatened injury to the plaintiff if an injunction is denied outweighs the threatened harm to the adverse party if the injunction is granted; and (4) the public interest will be disserved if injunctive relief is not granted.  *See Barlow v. Sipes*, 744 N.E.2d 1, 5 (Ind. Ct. App. 2001); *City of Gary v. Mitchell*, 843 N.E.2d 929, 933 (Ind. Ct. App. 2006); *Norlund v. Faust*, 675 N.E.2d 1142, 1149 (Ind. Ct. App. 1997), *decision clarified on denial of reh'g*, 678 N.E.2d 421 (Ind. Ct. App. 1997); *see also* Ind. Code § 34-26-1-5 (statutory requirements for obtaining pre-judgment injunction).

101.     At the outset, the Court reiterates that this order has no bearing on the ultimate issues in this case. This is a preliminary order which may be revisited by the newly-selected sitting judge[5] following additional offerings of evidence and subsequent proceedings.

---

[5] Defendants filed a Motion for Change of Judge on November 10, 2022. The new judge will take this case at the conclusion of these emergency proceedings.

**A-244**

## B.    Separation of Powers

102.    Before proceeding on the analysis of the preliminary injunction factors, the Court wishes to first ground its analysis within prior Indiana caselaw where private entities have previously sought to enjoin activities by government agencies.

103.    Article 3, Section 1 of the Indiana Constitution states: "The powers of the Government are divided into three separate departments; the Legislative, the Executive including the Administrative, and the Judicial: and no person, charged with official duties under one of these departments, shall exercise any of the functions of another, except as this Constitution expressly provided."

104.    "The separation of powers doctrine recognizes that each branch of the government has specific duties and powers that may not be usurped or infringed upon by the other branches of government." *Woolley v. Washington Twp. of Marion County Small Claims Court*, 804 N.E.2d 761, 765-66 (Ind. Ct. App. 2004).

105.    "Our supreme court has held repeatedly that courts should not intermeddle with the internal functions of either the Executive or Legislative branches of Government." *Planned Parenthood v. Carter*, 854 N.E.2d 853, 864 (Ind. Ct. App. 2006) (citing *Wooley*, 804 N.E.2d  at 766).

106.    In *Woolley*, the Court of Appeals determined that it did not violate the separation of powers doctrine for a trial court to enter a preliminary injunction against a division of the Indiana Attorney General's Office to enjoin the division from taking actions outside of those specifically granted to that division by the General Assembly. 854 N.E.2d at 859, 864.

107.    The *Carter* case is highly instructive to the present proceeding. The *Carter* Court noted that the trial court's role in the matter was to assist in maintaining the

27

**A-245**

appropriate balance between the branches of government. 854 N.E.2d at 864 (citing *Wilmont v. City of S. Bend*, 221 Ind. 538, 541-42, 48 N.E.2d 649, 650 (1943) ("To maintain the proper balance between the departments of government, the courts have power to confine administrative agencies to their lawful jurisdictions.")).

108.   The Court of Appeals in *Carter* further distinguished between a trial court permissibly issuing an injunction against an agency to rein it in from acting outside of its statutory bounds verses a trial court intervening in an active investigation or prosecution, which would be afforded far less deference. 854 N.E.2d at 864 (comparing the *Carter* case with the United States Supreme Court's decision in *Younger v. Harris*, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971), which overturned a federal court's injunction staying a state criminal proceeding).

109.   The Court finds this present proceeding analogous to the circumstances in *Carter*. This matter similarly involves a private person, Dr. Bernard, seeking an injunction against a division of the Indiana Attorney General's Office, the Consumer Protection Division, to prevent that division from acting outside its legislative authority. Dr. Bernard further seeks the same relief against the Attorney General and the Director of the CPD.  The Court, therefore, finds that this motion falls within the Court's acceptable oversight of state administrative agencies that aligns with the separation of powers doctrine.

### C.   Factor 1- Irreparable Harm and Inadequacy of Legal Remedy.

110.   "Irreparable harm" is considered to be "that harm which cannot be compensated for through damages upon resolution of the underlying action." *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 912 (Ind. Ct. App. 2011). This typically requires movants to establish that they could not be adequately compensated through a legal or

monetary remedy at the conclusion of the case and instead must be immediately granted extraordinary injunctive relief. *See Barlow v. Sipes*, 744 N.E.2d 1, 6 (Ind. Ct. App. 2001).

111.    When a motion seeks to enjoin an action that would violate a law or statute, however,  the act is considered to case *per se* irreparable harm. *Short on Cash.net of New Castle, Inc. v. Dep't of Fin. Insts.*, 811 N.E.2d 819, 822.  Should the Court find that the nonmovant has committed such an unlawful act, Indiana law deems the public interest in stopping the activity so great that "the injunction should issue regardless of whether the plaintiff has actually incurred irreparable harm or whether the plaintiff will suffer greater injury than the defendant. *Id*  at 823. In other words, where a Court finds that denying a preliminary injunction would permit the nonmovant to continue committing unlawful conduct, the Court need not consider the remaining preliminary injunction factors and instead must issue the relief sought by the movant.

112.    Dr. Bernard argues that Defendants have violated the licensing investigations statute, Ind. Code § 25-1-7 *et seq.*, numerous times in their investigation of the consumer complaints against Dr. Bernard, committing irreparable harm *per se.*

113.    Dr. Bernard cites two primary violations of the licensing investigations statute.

114.    First, Dr. Bernard contends that the Director failed to make a determination of whether the relevant  complaints against Dr. Bernard are meritless before starting investigations into Dr. Bernard. Under the licensing investigations statute Ind. Code § 25-1-7-5(b) (1), the Director must review each consumer complaint to determine whether they have merit before the Division may open any investigation.

**A-247**

115.    Dr. Bernard argues that the Director could not have made any determination regarding the consumer complaints against her because the complaints are patently meritless, yet the Director still moved to open investigation files on all of them. Dr. Bernard. highlights that most of the complaints come from outside Indiana, suggesting that they come from persons who were not her patients and  would not have any personal knowledge of her alleged failures to report or breaches of patient confidentiality of which they are complaining. She also notes that several of the complaints lacked necessary information asked for by the Attorney General's Complaint Form.

116.    She further notes that testimony from Ms. Hutchinson, head of the Division, indicated that at least one of the complaints which were investigated should not have been and instead should have been deemed meritless on their face.

117.    In sum, Dr. Bernard contends the Division opened investigations into her conduct without first deeming whether the consumer complaints against her had any merit as required by statute.

118.    Second, Dr. Bernard argues that Defendants have breached their statutory duty to maintain confidentiality of the investigations against her as required by the licensing investigations statute. Ind. Code § 25-1-7-10(a) requires that the Division keep the investigations into Dr. Bernard confidential until they have been referred for prosecution by the Attorney General to the Medical Licensing Board.

119.    Prior to the Attorney General's recent referral, Dr. Bernard points out that the Attorney General had discussed the investigations specifically referring to Dr. Bernard and the potential loss of her medical license in several high profile public

30

**A-248**

appearances. She contends that these appearances constitute clear violations of the licensing investigations statute's confidentiality provision.

120.    In sum, Dr. Bernard maintains that Defendants have committed a number of  "unlawful act[s]" which "constitute[] *per se* irreparable harm for purposes of the preliminary injunction analysis."  *Clay Twp. of Hamilton Cnty. ex rel. Hagan v. Clay Twp. Reg'l Waste Dist.*, 838 N.E.2d 1054, 1063 (Ind. Ct. App. 2005) (quoting *Short On Cash.Net of New Castle, Inc. v. Dep't of Fin. Insts.*, 811 N.E.2d 819, 823 (Ind. Ct. App. 2004)), and thus should be found to have committed irreparable harm *per se*  against her.

121.    As an alternative argument to the *per se* rule for irreparable harm, Dr. Bernard argues that the cumulative designations still demonstrate that she has suffered irreparable injury caused by Defendants' conduct for which there is no adequate legal remedy.

122.    Dr. Bernard argues that Defendants' investigations into her based on meritless consumer complaints have proven harmful by distracting her from serving her patients, causing her to fear whether she will be able to continue her medical practices, and to fear for the personal safety of her and her family.  She has also argued that the public statements on the investigations into Dr. Bernard have caused reputational harm and threaten her business as a healthcare provider.

123.    In response, Defendants contend that Dr. Bernard has not met her burden to establish irreparable harm.

124.    Defendants first argue that the *per se* rule cannot be applied in this case since the *per se* rule may be employed only "for clear, uncontested unlawful conduct.".

31

**A-249**

*Indiana Family & Soc. Servs. Admin. v. Walgreen Co.*, 769 N.E.2d 158, 162 (Ind. 2002).

Defendants contend that the Division's investigations do not constitute clearly unlawful

conduct that would constitute irreparable harm *per se.*

125.    Defendants dispute Dr. Bernard's claims that the Attorney General's public

comments have irreparably harmed her because she has willingly put herself in the

public spotlight, so any threats or harms to her reputation cannot be derived solely from

the Attorney General's public comments. Furthermore, Defendants argue that Dr.

Bernard made the investigations a public matter herself by filing this lawsuit in open

court.

126.    Defendants additionally argued that the Division has conducted their

investigations within the scope of their legal authority.

127.    Upon review, the Court finds that Dr. Bernard has not met her burden to

show  irreparable harm for the purposes of a preliminary injunction as to the

investigation of the consumer complaints but does find Dr. Bernard has met her burden

to show irreparable harm based on the Attorney General's public statements regarding

investigations which by Indiana law must have remained confidential until the complaint

was filed with the Medical Licensing Board.

128.    The Court further finds that the public disclosures by the Attorney General

regarding the investigations prior to the Attorney General's recent referral of the matter

to the Medical Licensing Board constituted irreparable harm *per se* and that the

Attorney General clearly violated Indiana law when discussing the confidential

investigations in the media. Because the Attorney General had not referred the matter

to the Medical Licensing Board at the time the public disclosures were initially made,

**A-250**

the Court finds that the Attorney General's public comments which were designated as part of the two-day hearing on this motion violated the licensing investigations statute's confidentiality provision.

129.   As for Dr. Bernard's arguments for irreparable harm and irreparable harm *per se* with respect to the manner in which the Division was carrying out the investigations, the Court finds that Dr. Bernard has not similarly met her burden.

130.   First, the Court finds that Plaintiffs have not satisfactory established a clear indication of unlawful conduct in the manner which the Division was carrying out its investigations to support a finding of irreparable harm *per se.*

131.   Ind. Code § 25-1-7-5 permits the Division to investigate consumer complaints and, as part of that investigation, to subpoena witnesses. Plaintiffs have taken issue with the scope of the subpoenas and the apparent lack of notice given to Dr. Bernard regarding subpoenas of their patients' records, but there is nothing in the licensing investigations statute that places any apparent limits on the scope of discovery or requires that the subjects of  complaints be alerted of any subpoenas the Division deems necessary to issue.  There are, of course, limitations that have been determined through case law, such as the Indiana Court of Appeals' ruling in the *Carter* case, which held that unlimited subpoenas for minors' medical records were not permitted by the Office of the Attorney General in a Medicaid fraud investigation. *Carter*, 854 N.E.2d 853, 883. Limitations as determined in opinions such as *Carter*, however, do not establish that the mere act of issuing an overly-broad subpoena constitutes such unlawful conduct as to show irreparable harm *per se.*

33

**A-251**

132.    As for Dr. Bernard's argument that the consumer complaints should have been rejected out of hand as meritless for a number of issues including deficient information and apparent lack of personal knowledge or relationship with Dr. Bernard, the Court too finds that this conduct is not so unlawful as to determine that Dr. Bernard has suffered irreparable harm *per se.* Dr. Bernard has have inferred from the nature of the complaints that the Division made no determination as to their merit. Defendants' designations and live testimony, however, suggests the that the Division did at least deem most of the consumer complaints against Dr. Bernard were meritorious, even if Ms. Hutchinson did subsequently testify that one of them should have been rejected immediately.

133.    Dr. Bernard has argued that the Division opening investigations on all of the complaints, even those from out of state persons, shows they could not have actually determined whether they were first meritorious, but that assumption does not mean that Defendants did not comply with applicable laws. The only express requirements for the consumer complaint stated in the  in the licensing investigations statute  are that they 1) be written and 2) signed by complainant. Ind. Code § 25-1-7-4. Any person is able to file a consumer complaint for review by the Division. *Id.* There is no personal relationship or personal knowledge of specific events required by the statute before a complaint can be filed, and any person is permitted to file a consumer complaint. *Id.*

134.    Finally, reading the subsections of Ind. Code § 25-1-7-5 in full suggests that the Division may actually make a full investigation before coming to a determination on merit. The statute provides that the Director does not need to immediately make a

34

**A-252**

determination of the merits of the complaint; the Director just needs to make an initial determination. *Id.* -5(b)(1). Once the Director has made that determination, the meritorious complaint is to be submitted to the proper licensing board. *Id.* The same statute also allows for the Director to conduct limited investigations on complaints received. *Id.* at –5(b)(4). If a complaint is deemed meritorious, then it must then be submitted to the proper licensing board. Any investigation as permitted by subsection 5(b)(4) would most likely have to occur prior to the determination of merit. If the Director were to have to immediate determine whether a complaint was meritorious, the Director would not have the opportunity to investigate because either a) the meritorious complaint would be referred to the applicable licensing board or b) the non-meritorious complaint would be rejected. Here, the Director is permitted to first engage in the investigations prior to making a determination under the statute.

135.    The Court, therefore, finds the Division's conduct falls within the permitted bounds of the licensing investigations statute in this case. While some of the consumer complaints appeared more meritorious than others on their face, the statute permits the Director and Division to investigate them all the same before coming to any conclusion. While Dr. Bernard has raised concerns about the conduct of the investigations, it is beyond the scope of the Court's irreparable harm *per se* analysis to determine whether the particular tactics employed by the Division in the investigations against Dr. Bernard should be permitted since, unlike the confidentiality issues, *see infra*, there are no express statutes specifically prohibiting the Director and Division from relying on weak consumer complaints taking months of time to complete their investigations before making a determination on merit.

136.    As for Dr. Bernard's alternative argument that the Defendants' investigations have caused Dr. Bernard irreparable harm for the purposes of justifying injunctive relief,  the Court does not find that Dr. Bernard has met her burden that she has suffered irreparable harm from the investigations into the consumer complaints by the Division. Thus, this Court finds that Dr. Bernard has not met her burden to show irreparable harm arising from Defendants' carrying out of the ongoing investigations of the consumer complaints filed against Dr. Bernard.

137.    In contrast, Dr. Bernard's concerns over the Attorney General's breaches of confidentiality requirements under the licensing investigations statute do warrant a finding of irreparable harm *per se*; however, in light of the Attorney General's recent referrals to the Medical Licensing Board, any further public comments would not constitute irreparable harm *per se*.

138.    Ind. Code Ann. § 25-1-7-10(a) provides "that all complaints and information pertaining to the complaints shall be held in strict confidence until the attorney general files notice with the board of the attorney general's intent to prosecute the licensee." The Attorney General had not referred the claims to the Medical Licensing Board  or initiated prosecution of Dr. Bernard when he made public statements on the investigations prior to November 30, 2022. Such public disclosures prior to that date then were clear violations of Indiana law.

139.    Defendants have argued that Dr. Bernard was no longer entitled to confidentiality under the statute as of July 1, 2022 since Dr. Bernard has made her own public comments about the underlying event and the subsequent investigation. The Court disagrees with Defendants on this point for two reasons.

140.     First, there is nowhere in the statute that stages the attorney general's

obligation to keep the investigation confidential is relieved when the subject of the

investigation makes it public.

141.     Second, the licensing investigations statute specifies when limited

disclosures are authorized and by whom. Ind. Code § 25-1-7-10(b) states that:

> **A person in the employ of the office of attorney general**, the Indiana
> professional licensing agency, **or any person not a party to the
> complaint** may not disclose or further a disclosure of information
> concerning the complaint unless the disclosure is:
>     (1) required under law;
>     (2) required for the advancement of an investigation; or
>     (3) made to a law enforcement agency that has jurisdiction or is
>     reasonably believed to have jurisdiction over a person or matter
>     involved in the complaint.

(Emphasis added). Ind. Code § 25-1-7-10(b) specifies that members of the Attorney

General's Office may not disclose any information about the investigation other than in

the limited circumstances set forth in the subsection, which Defendants have not

established were the reasons behind the Attorney General's public disclosures that

relate to this matter. No one from the office of the Attorney General, therefore, should

have made any public disclosures during an investigation.

142.     The provision states that it applies to anyone that is **not a party to the

complaint**. As a party to the complaint, therefore, Dr. Bernard is not required under law

to maintain confidentiality about her investigation under the statute. Rather than Dr.

Bernard's revelations about the investigation constituting any sort of waiver then, the

Court finds that the licensing investigations statute allows her to make public statements

while still obligating the office of attorney general to maintain confidentiality.  However,

the Court finds that Dr. Bernard comments to the IndyStar reporter had no bearing on

**A-255**

the issue of the Attorney General maintaining confidentially as her comments to the IndyStar reporter were made prior to the filling of any complaints with the CPD.

143.   The public statements made by the Attorney General prior to the referral of the matter to the Medical Licensing Board, therefore, are clearly unlawful breaches of the licensing investigations statute's requirement that employees of the Attorney General's Office maintain confidentiality over pending investigations until they are so referred to prosecution.

144.   Having established that the Attorney General has referred the matter to the Medical Licensing Board on November 30, 2022, however, the Court finds there is no prospective irreparable harm *per se* since making public comments about the investigation into Dr. Bernard is no longer prohibited by statute.

145.   Despite there being no showing of further irreparable harm *per se*, the Court finds that Dr. Bernard's concerns about reputational and professional harm as a result of the Attorney General's comments do constitute irreparable harm for the purposes of this preliminary injunction motion.

146.   Having found that Dr. Bernard has met her burden on the irreparable harm factor as to the breaches committed by the Attorney General as to the confidentiality of the investigation,  the Court will address the remaining preliminary injunction factors.

**D.    Factor 2- Likelihood of Success On The Merits.**

147.   The Court next addresses Dr. Bernard's likelihood of success elements of their motion for injunctive relief.

148.   In order to meet their burden to show a likelihood of success on the merits of their claim, Plaintiffs must "establish[] a prima facie case." *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 911 (Ind. Ct. App. 2011). Plaintiffs are not required to show that

**A-256**

they are entitled to relief as a matter of law in order to obtain preliminary injunctive relief.

*Abercrombie & Fitch Stores, Inc. v. Simon Prop. Grp., L.P.*, 160 N.E.3d 1103, 1109 (Ind. Ct. App. 2020).

> **1.   Whether Dr. Bernard has a prima facie case that Defendants violated  and will continue to violate statutory confidentiality requirements**

149.   The Court first addresses Dr. Bernard's motion with respect to the confidentiality provisions of the licensing investigations statute.

150.   As discussed above, the Court finds that Dr. Bernard has shown that the Attorney General did breach the confidentiality requirements through the Attorney General's public statements prior to a referral to the Medical Licensing Board.

151.   Because the Attorney General's Office has referred their investigation of Dr. Bernard to the Medial Licensing Board for prosecution, however, Defendants are no longer bound by the confidentiality statute.

152.   Because there is now no statutory basis for Dr. Bernard to compel the Attorney from making future public comments with respect to the prosecution of her, the Court finds that Dr. Bernard cannot establish the prima facie case that the Defendants remain in violation of the confidentiality provision under the licensing investigations statute. The Court, therefore, finds that Dr. Bernard has failed to meet her burden on the likelihood do success preliminary injunction element with respect to this issue.

> **2.   Whether Defendants failed to make an initial determination of merit before investigating a consumer complaint.**

153.   While the Court has found that Dr. Bernard failed to meet her burden on the irreparable harm element with respect to this issue, the Court will briefly address the arguments on the likelihood of success which were presented to the Court.

**A-257**

154.    Dr. Bernard argues that Defendants failed to make any initial determination on the merits of the complaints before opening an investigation.

155.    As stated previously, the Director of the Consumer Protection Division "shall make an initial determination as to the merit of each complaint.  A copy of a complaint having merit shall be submitted to the board having jurisdiction over the licensee's regulated occupation, that board thereby acquiring jurisdiction over the matter except as otherwise provided in this chapter." Ind. Code § 25-1-7-5(b)(1).

156.    Dr. Bernard argues that the Director must make this determination prior to opening any investigation into the consumer complaint at issue, but as discussed in the previous section, the Court does not agree with that reading of the statute.

157.    The Indiana Supreme Court has consistently confirmed that "[t]he best evidence of legislative intent is the language of the statute itself, and all words must be given their plain and ordinary meaning unless otherwise indicated by statute." *Chambliss v. State*, 746 N.E.2d 73 (Ind. 2001). Courts are required to construe statutes "together and avoid invalidating statutes or portions thereof." *Amwest Sur. Ins. Co. v. State (In re The Bond Forfeiture)*, 750 N.E.2d 865, 870 (Ind. Ct. App. 2001).

158.    A plain reading of the statute says that once the Director makes a determination on the merits of the complaint, it is to be referred to the appropriate licensing body. The same statute allows the Director to "investigate any written complaint against a licensee" and "to subpoena witnesses and to send for and compel the production of books, records, papers, and documents for the furtherance of any investigation under this chapter." Ind. Code § 25-1-7-5(b)(4-5). If the Director is to refer the consumer complaint upon finding it meritorious, a harmonious reading of the statute

40

**A-258**

requires the Court to construe the statute to allow the Director to engage in investigation prior to such a determination of merit.

159.   Dr. Bernard's argument that the Defendants failed to make determinations on merits prior to launching investigations must fail because the statute expressly authorizes Defendants to conduct their investigations prior to an initial determination of the merits, otherwise the Director would be obligated to refer the complaint before having an opportunity to conduct an investigation.

160.   Because the statutes expressly permit the Defendants to investigate prior to making any determination on merits, the Court finds that Dr. Bernard has failed establish a prima facie case for declaratory relief necessary to meet her burden on the likelihood of success element with respect to this issue.

### 3.   *Whether the complaints against Dr. Bernard lack merit*

161.   Dr. Bernard argues that, even if the complaints could not be considered meritless initially, there is a prima facie case that they should now be considered meritless.

162.   Dr. Bernard notes note that Defendants' have been investigating her largely for three primary violations: (1) the requirement to file a TPR after providing abortion care; (2) the requirement to report suspected child abuse; and (3) federal and state privacy laws.

163.   She has asked for injunctive relief to suspend the investigations due to the frivolous nature of these complaints and to preclude Defendants from pursuing future complaints regarding the same subject matter over Dr. Bernard.

164.   Over the course of the hearing days, a substantial amount of evidence and testimony was presented on the merits of the claims against Dr. Bernard.

165.    Due to the recent referral of the investigations to the Medial Licensing Board by the Attorney General, however, the Court no longer has jurisdiction to make any factual findings over these ultimate questions, even for the purposes of a preliminary order.

166.    Once a complaint is deemed meritorious and has been submitted to the licensing board, that board is deemed to have jurisdiction over the matter. Ind. Code § 25-1-7-5(b)(1).

167.    Since these arguments go to validity of the consumer complaints, the Court finds any determination of such to be properly within the jurisdiction of the Medical Licensing Board at this time.

168.    Because the Court cannot assess whether Dr. Bernard has made a prima facie case that she did not violate the laws which she is accused of in the consumer complaints, the found finds that Dr. Bernard has not established a likelihood of success on this issue either.

**E.    No need to determine balance of harms or public interest considerations**

169.    Having found that Dr. Bernard failed to establish a likelihood of success on the merits, the Court need not address the remaining preliminary injunction factors.

170.    Any conclusions of law above which are more appropriately findings of fact shall be so deemed and incorporated into the findings of fact section.

### ORDER

The Court hereby DENIES the Plaintiffs' Motion for Preliminary Injunction for the reasons set forth.  However, the Court does find that the Attorney General did violate the licensing statue's confidentiality provision by discussing the statutorily confidential

**A-260**

investigation in statements to the media until the filing of a complaint with the Medical

Licensing Board against Dr. Bernard on November 30, 2022.

**SO, ORDERED, ADJUDGED AND DECREED** this 2nd day of December 2022.

*Heather A. Welch*
_____
Hon. Heather A. Welch, Judge
Marion Superior Court 1

Distribution to counsel of record.

43

**A-261**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

—————————————————————

THE SATANIC TEMPLE, INC.

       Plaintiff

                                Case No. 1:22-cv-1859-JMS-MG

       v.

TODD ROKITA, in his
capacity as the Attorney General of
Indiana and
RYAN MEARS, in his capacity as
Marion County Prosecutor

       Defendants

—————————————————————

## DECLARATION OF W. JAMES MAC NAUGHTON

      W. James Mac Naughton**,** pursuant to 28 U.S.C. §1746, declares under penalty of perjury the following statements are true and correct:

      1.     I am the attorney for Plaintiff in this case.  I make this declaration in support of Plaintiff's motion, on consent and pursuant to Local Rule 5-11(d), to maintain the sealing of the Declaration of Dr. J.D., ECF No. 46 (the "Declaration").

      2.     Plaintiff seeks to keep Declarant's identity out of the public record due to the risk of violent retribution from domestic terrorists motivated by animosity to proponents of abortion and non-Christian religious beliefs.

      3.     Plaintiff's concern for the physical safety of Declarant is not an academic matter. Plaintiff's offices in Salem MA were subjected to an arson attack last year by an individual who carried a Bible in his backpack.  Schools that have permitted Plaintiff to set up an After School

Satan Club sponsored by Plaintiff have been threatened by zealots to "come in there and shoot everybody."[1]  Plaintiff takes these threats seriously.

4.      The Declarant's identity has been disclosed to Defendants with the designation "ATTORNEYS EYES ONLY" under the terms of the Uniform Stipulated Protective Order, ECF No. 39.  Defendants have ample opportunity to investigate the *bona fides* of Declarant as an expert witness.

June 29, 2023

*W. James Mac Naughton*
W. James Mac Naughton, Esq.
7 Fredon Marksboro Road
Newton, NJ 07860
wjm@wjmesq.com
*Attorney for Plaintiff The Satanic Temple*

---

[1] https://www.mcall.com/2023/02/28/north-carolina-man-phoned-threat-to-saucon-valleyschools-in-response-to-after-school-satan-club-authorities-say, last visited June 15, 2023.

**A-263**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| THE SATANIC TEMPLE, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-01859-JMS-MG |
| | ) | |
| TODD ROKITA, in his capacity | ) | |
| as Attorney General of Indiana, | ) | |
| and RYAN MEARS, in his | ) | |
| capacity as Marion County | ) | |
| Prosecutor, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE TO
## DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSION

**REQUEST NO. 1**: The Abortion Clinic is located in New Mexico.

**RESPONSE:** Admits the Abortion Clinic lawfully prescribes abortifacients to individuals who receive the abortifacients in New Mexico. Otherwise, denies because the Abortion Clinic does not maintain an office or other physical space for the purpose of an in-person meeting with a patient.

**REQUEST NO. 2**: The Abortion Clinic has never been licensed as an abortion clinic in Indiana under 410 IAC 26-2.

**RESPONSE:** Admits.

**REQUEST NO. 3**: The Satanic Temple does not presently intend to seek an Indiana license for the Abortion Clinic under 410 IAC 26-2.

**RESPONSE:** Admits.

EXHIBIT 6A

**REQUEST NO. 4**: The Satanic Temple has not taken any steps to physically locate an abortion clinic in Indiana.

**RESPONSE:** Denies as the creation of The Abortion Clinic is a possible precursor to physically locating an abortion clinic in Indiana.

**REQUEST NO. 5**: The Satanic Temple does not presently intend to physically locate an abortion clinic in Indiana.

**RESPONSE:** Admits.

**REQUEST NO. 6**: As of the date of the responses to these requests, The Abortion Clinic does not employ any physicians who are licensed to practice medicine in Indiana.

**RESPONSE:** Admits.

**REQUEST NO. 7:** The Abortion Clinic has never provided abortion inducing drugs to a person then-residing in Indiana.

**RESPONSE:** Admits the Abortion Clinic has not, to the best of its knowledge, provided abortion inducing drugs to a person then-residing in Indiana. Can neither admit nor deny as to all patients as the Abortion Clinic relies on, but cannot vouch for, the truth of the representation of a patient as to her residency.

**REQUEST NO. 8:** The Abortion Clinic does not provide in-person services to patients at a physical clinic anywhere in the United States.

**RESPONSE:** Admits.

June 8, 2023

_W. James Mac Naughton_
W. James Mac Naughton, Esq.

2

**EXHIBIT 66**

7 Fredon Marksboro Road
Newton, NJ 07860
wjm@wjmesq.com
*Attorney for Plaintiff The Satanic Temple*

EXHIBIT 66

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| THE SATANIC TEMPLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-01859-JMS-MG |
| | ) | |
| TODD ROKITA, in his capacity | ) | |
| as Attorney General of Indiana, | ) | |
| and RYAN MEARS, in his | ) | |
| capacity as Marion County | ) | |
| Prosecutor, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S NON-CONFIDENTIAL RESPONSE TO DEFENDANTS' FIRST
SET OF INTERROGATORIES TO PLAINTIFF**

Plaintiff responds to Defendants' First Set of Interrogatories as follows:

### INTERROGATORIES

**INTERROGATORY NO. 1**: Identify each and every person who answered, or who was
consulted or provided information in answering, these interrogatories, and for each such person,
identify with specificity the information or other assistance provided in answering these
interrogatories.

**RESPONSE:** W. James Mac Naughton, who collected the information and drafted the
answers; Erin Helian who provided information regarding TST and the TST Clinic; and Malcom
Jarry who provided documents.

EXHIBIT 63

**INTERROGATORY NO. 2**: Describe in detail the nature and scope of the services provided by The Abortion Clinic.

    **RESPONSE:**  The Abortion Clinic provides the services of an Advanced Practice Registered Nurse ("APRN") for a virtual consultation with a patient to prescribe mifeprestone and misprostol (the "Abortifacients").  After reviewing the patient's record and consulting with the patient, the APRN prescribes the Abortifacients to the patient for the purpose of inducing an abortion, provided the prescription is within the risk evaluation and mitigation strategy ("REMS") guidelines established by the Food and Drug Administration ("FDA") for mifeprestone.  The APRN provides instructions and safety information to the patient regarding the use of the Abortifacients.  The prescription is delivered to a third-party vendor authorized by the FDA to distribute Abortifacients.  Delivery is by mail to a New Mexico address provided by the patient.

**INTERROGATORY NO. 3**: Identify the number of persons to whom The Abortion Clinic has provided abortion inducing drugs, the type and quantity of such drugs provided, and the location where the drugs were provided during the relevant timeframe.

    **RESPONSE:**  Plaintiff objects to this Interrogatory on the grounds it seeks information beyond the scope of Fed. R. Civ. Pro. 26(b)(1).  Subject to this objection and without waiving it, the Abortion Clinic has prescribed Abortifacients to over two dozen patients since it became operational in February 2023.

**INTERROGATORY NO. 4**: Identify each and every licensed physician employed by  or contracted by The Abortion Clinic and in which state or states each identified physician is licensed.

    **RESPONSE:** None

EXHIBIT 6B

**INTERROGATORY NO. 5**: Describe in detail the specific expenses to which the money referenced in paragraph 19 of the Complaint was applied.

**RESPONSE:** Paying contractors employed by the Abortion Clinic, including attorneys, APRN's and other support persons and the purchase of computers and telecommunications equipment and related services.

**INTERROGATORY NO. 6**: Identify each and every person from whom you intend to solicit sworn testimony for use as evidence relating to or concerning the existence, identity, status, or factual circumstances surrounding the involuntarily pregnant women referenced in paragraph 10 of the Complaint.

**RESPONSE:**  Erin Helian.  See also Plaintiff's Confidential Response to Defendants' First Set of Interrogatories.

**INTERROGATORY NO. 7**: Identify each and every involuntarily pregnant member of the Satanic Temple who resides in Indiana whom you believe provides a basis for standing in this matter.

**RESPONSE:** Plaintiff objects to this Interrogatory on the grounds it seeks information A) beyond the scope of Fed. R. Civ. Pro. 26(b)(1); B) protected from disclosure by the Health Insurance Portability and Accountability Act of 1996 ("HIPPA"); and C) protected from disclosure by the Free Exercise Clause of the First Amendment.

**INTERROGATORY NO. 8**: Describe in detail the process and requirements for becoming a member of the Satanic Temple.

EXHIBIT 69

**RESPONSE:**  See attached Exhibit A.

June 8, 2023

_W. James Mac Naughton_
W. James Mac Naughton, Esq.
7 Fredon Marksboro Road
Newton, NJ 07860
wjm@wjmesq.com
*Attorney for Plaintiff The Satanic Temple*

**Signature of Answering Party:** _____

Erin Helian, Executive Director

**EXHIBIT 73**

# EXHIBIT A

Join The Satanic Temple - Satanic temple membership - TST                    https://thesatanictemple.com/pages/join-us

Case 1:22-cv-01859-JMS-MG    Document 50-2    Filed 07/05/23    Page 6 of 7 PageID #: 577
Case: 23-3247        Document: 13        Filed: 01/29/2024        Pages: 298



Donate To TST Health    Latest News    Learn ⌄    Advocacy ⌄    Shop ⌄    Visit Salem    Join    **DONATE**    🔍    🛒 0





# JOIN THE SATANIC TEMPLE

The Benefits Of Joining Depend On What You Want To Do With Your Membership. Joining On Our Website Will Put You On Our Mailing List So You Can Stay Up-To-Date On Our Activities And Campaigns. If You Want Your Membership To Be Even More Rewarding, Consider Becoming Active In A Congregation Or Contributing To The Mission Of The Satanic Temple In Other Ways.

**Find A Congregation**

**Become A Member**



## MEMBERSHIP



✓ Membership is open to individuals dedicated, in action and/or by identity, to the tenets of The Satanic Temple.

✓ Membership is a privilege, subject to termination for failure to uphold the spirit of The Satanic Temple and its tenets.

✓ Membership does not grant authority to act as an organizational spokesperson for The Satanic Temple.

✓ Membership is free; however, official membership cards can be purchased with a non-refundable $35 fee.



## BECOME A MEMBER

Email

First Name | Last Name

United States | State/Province/Region

*If you select UK, please enter your country (ENG/SC/WLS/NIR) in the state field        *International members need to fill their State/Province/Region as well.

Phone number

EXHIBIT 72

Join The Satanic Temple - Satanic temple membership - TST     https://thesatanictemple.com/pages/join-us

Case 1:22-cv-01859-JMS-MG    Document 50-2    Filed 07/05/23    Page 7 of 7 PageID #: 578
Case: 23-3247    Document: 13    Filed: 01/29/2024    Pages: 298

If you do not see a form to submit, please disable all ad blocking software, javascript blocking software, or load the page in Chrome or Firefox. If problems still persist please SUBMIT A REQUEST HERE.

 ALREADY A MEMBER?

## Get Your Personalized Membership Card.

**CHOOSE AND PERSONALIZE CARD**

---

### SOCIAL SATAN

LEARN
ADVOCACY
SHOP
JOIN

### Information

CONTACT US
DONATE
DEVIL'S ADVOCATE SCHOLARSHIP WINNERS
LEGAL NOTICES
TERMS OF SERVICES
SHOP CUSTOMER SERVICE

### Shop Now

ALL PRODUCTS
APPAREL
CONTRIBUTE TO THE SATANIC TEMPLE
MEMBERSHIP CARDS AND CERTIFICATES

### News & Updates

Sign up to get the latest Satanic Temple Newsletters

First name

Enter your email address...

**SIGN UP**

The Satanic Temple is the only Satanic religious organization recognized as a church by the IRS and the Federal Court System.



**EXHIBIT 7B**



# W. JAMES Mac NAUGHTON, ESQ.

*Attorney at Law*
7 Fredon Marksboro Road
Newton, New Jersey 07860
Phone (732) 213-8180
Fax (732) 875-1250
wjm@wjmesq.com

August 31, 2023

**By ECF**
The Hon. Jane E. Magnus-Stinson, U.S.D.J.
United States District Court for the Southern District of Indiana

Re: *The Satanic Temple v. Rokita et al*, Case No. 1:22-cv-01859-JMS-MG

Dear Judge Magnus-Stinson:

I write to bring to your attention the recent attached decision, *GenBioPro, Inc. v. Sorsaia*, Civil Action 3:23-0058 (S.D.W.Va. Aug. 24, 2023) ("*GenBioPro*"), that bears on the pending Motion to Dismiss, ECF No. 36.  I respectfully request you accept this letter after the close of briefing in light of the complexity of the issues in this case and the recent contribution of *GenProBio* to their adjudication.

GenProBio is the only US manufacturer of generic mifepristone.  It asserted in *GenProBio* that the regulatory scheme for mifepristone adopted by the Food and Drug Administration ("FDA") pursuant to 21 U.S.C. § 355-1 pre-empts the abortion restrictions of the State of West Virginia, which are similar to the restrictions at issue in this case.

The Hon. Robert C. Chambers, U.S.D.J. previously ruled GenBioPro has standing to assert the claim, citing many of the same authorities relied on by Plaintiff in this case. *GenBioPro, Inc. v. Sorsaia*, Civil Action 3:23-0058 (S.D.W.Va. May 2, 2023). Judge Chambers then ruled that the FDA's regulatory scheme, commonly known as Risk Evaluation and Mitigation Strategy ("REMS") pre-empts state regulation of telemedicine by operation of 21 U.S.C. § 355-1(f)(3)(C).  The Court said REMS alone "dictates the manner in which mifepristone may be prescribed."  See *GenBioPro* at \*25.

Defendants in this case argue Plaintiff does not have standing because it cannot lawfully deliver mifepristone in Indiana by mail pursuant to a prescription written by an Advanced Practice Registered Nurse using telemedicine even if Indiana Code § 16-34-2-7 is struck down. ECF No. 56 at p. 4 (telemedicine ban and physician requirement are "independent legal barriers").  Defendants argue Plaintiff has not met the redress prong of standing because Plaintiff would remain subject to the Indiana bans on telemedicine and the requirement to use a physician to prescribe mifepristone even if abortions were legal at any time during the course of a pregnancy.

**A-274**

The Hon.  Jane E. Magnus-Stinson, U.S.D.J.
August 31, 2023
Page 2

 *GenBioPro* is persuasive authority that such bans are unlawful because they have been pre-empted by 21 U.S.C. § 355-1(f).  Thus, the only legal impediment to Plaintiff providing Medical Abortions in Indiana is Indiana Code § 16-34-2-7.

        Sincerely,

        W. James Mac Naughton

WJM:ndg
Encl.

CC: Defendants' Counsel w/encl by ECF

Civil Action 3:23-0058

United States District Court, Southern District of West Virginia

# GenBioPro, Inc. v. Sorsaia

Decided Aug 24, 2023

Civil Action 3:23-0058

08-24-2023

GENBIOPRO, INC., Plaintiff, v. MARK A. SORSAIA, in his official capacity as Prosecuting Attorney of Putnam County and PATRICK MORRISEY, in his official capacity as Attorney General of West Virginia, Defendants.

ROBERT C. CHAMBERS, UNITED STATES DISTRICT JUDGE

**MEMORANDUM OPINION AND ORDER**

ROBERT C. CHAMBERS, UNITED STATES DISTRICT JUDGE

Pending before the Court are Defendant Mark A. Sorsaia and Defendant Patrick Morrisey's Motions to Dismiss. ECF Nos. 17 & 19. For the following reasons, the Motions to Dismiss are **GRANTED**, in part, and **DENIED**, in part.

## I. BACKGROUND

Plaintiff GenBioPro, Inc. ("GenBioPro") is the only United States manufacturer of generic mifepristone. Pl.'s Opp'n to Def. Morrisey's Mot. to Dismiss at 1, ECF No. 35. Mifepristone is a Food and Drug Administration ("FDA") approved and regulated medication which is commonly prescribed as step one in a two-step medication abortion regimen. Compl. ¶ 2, ECF No. 1. Mifepristone and misoprostol-the other medication abortion drug-are Plaintiff's "sole source of revenue." *Id.* ¶ 23. Mifepristone has been approved for nationwide use and sale by the FDA, and GenBioPro sells the drug throughout a national market. *Id.* ¶ 77. *2

2  On June 24, 2022, the Supreme Court decided *Dobbs v. Jackson Women's Health Organization*, reversing *Roe v. Wade* [1] and "return[ing] the issue of abortion to the people and their elected representatives." 142 S.Ct. 2228, 2279 (2022). Following this grant of authority, West Virginia passed the Unborn Child Protection Act ("UCPA") in September 2022. W.Va. Code § 16-2R-1 *et seq.* The act of performing, inducing, or attempting to perform or induce an abortion is now illegal in the State, subject to a limited series of exceptions.[2] W.Va. Code § 16-2R-3. The UCPA expressly includes abortions performed or induced via "medicine" or "drug." W.Va. Code § 16-2R-2. The Act defines the prohibited "attempt to perform or induce an abortion" as "an act or the omission of an act that, under the circumstances as the person so acting or omitting to act believes them to be, constitutes a substantial step in a course of conduct intended to culminate in an abortion." *Id.* If a licensed medical professional "knowingly and willfully performs, induces, or attempts to perform or induce an abortion" with the intent to violate the UCPA, "the licensing board shall revoke medical professional's license." W.Va. Code § 16-2R-7. If a formerly licensed medical professional or any other person "knowingly and willfully performs, induces, or attempts to perform or induce an abortion," they are guilty of a felony and subject to imprisonment for "not less than three nor more than 10 years." W.Va. Code § 61-2-8(a), (b). *3

3

1  410 U.S. 113 (1973).

2   Under the UCPA, "[a]n abortion may not be performed or induced or be attempted to be performed or induced unless in the reasonable medical judgment of a licensed medical professional: (1) The embryo or fetus is nonviable; (2) The pregnancy is ectopic; or (3) A medical emergency exists." W.Va. Code § 16-2R-3(a). This prohibition does not apply "to an adult within the first 8 weeks of pregnancy if the pregnancy is the result of sexual assault . . . or incest" and the patient has taken steps to report the assault or incest to law enforcement. W.Va. Code § 16-2R-3(b). Likewise, the prohibition does not apply to "a minor or an incompetent or incapacitated adult within the first 14 weeks of pregnancy if the pregnancy is the result of sexual assault ... or incest" and either the patient has taken steps to report the assault or incest to law enforcement or has received medical treatment for the same. W.Va. Code § 16-2R-3(c).

Prior to the decision in *Dobbs* and the passage of the UCPA, West Virginia had provisions in place which Plaintiff asserts greatly limited the prescription and sale of mifepristone. Compl. ¶¶ 87-88. These restrictions required a waiting period and counseling before obtaining an abortion. W.Va. Code § 16-2I-2. The UCPA provides that this restriction has no effect while the UCPA is in force but would "become immediately effective" again should the UCPA "be judicially determined to be unconstitutional." W.Va. Code § 16-2R-9. Further pre-UCPA provisions continue to prohibit providers from prescribing medication abortion drugs via telemedicine. W.Va. Code §§ 30-3-13a(g)(5); 30-1-26(b)(9).

In contrast, the FDA has continually eased restrictions on access to mifepristone. The FDA is tasked with promulgating regulations concerning the approval of prescription medications for sale under the Food, Drug, and Cosmetic Act ("FDCA"). 21 U.S.C. § 393(b)(1). Under regulations known as "Subpart H," the FDA

approves drugs which treat "serious or lifethreatening illnesses and that provide meaningful therapeutic benefit to patients over existing treatments" subject to "restrictions to assure safe use." 21 C.F.R. §§ 314.500, 314.520; Compl. ¶ 36. According to the Complaint, in 2000, Danco Laboratories, LLC's Mifeprex-name-brand mifepristone-was approved under the Subpart H regulatory scheme, which imposed certain restrictions on prescription and administration of the drug to assure safe use. Compl. ¶¶ 38-39. In 2007, Congress enacted the Food and Drug Administration Amendments Act ("FDAAA"), requiring that drugs formerly approved under Subpart H be re-approved under a new regulatory scheme, entitled the Risk Evaluation and Mitigation Strategy ("REMS"). *See* 21 U.S.C. §§ 355-1(a), (g)(4)(B), (h); Compl. ¶ 41. If the FDA determines that a drug may cause an "adverse drug experience," then the agency must design and implement a REMS. § 355-1(a), (b)(1). However, any restrictions imposed under the regulatory scheme must "not be unduly *4 burdensome on patient access to the drug." § 355-1(f)(2)(C). The FDA must reassess a drug's REMS periodically. § 355-1(d).

Following the passage of the FDAAA and the implementation of the REMS schema, the manufacturer of Mifeprex proposed a REMS for its product to the FDA. Compl. ¶ 55. The FDA approved the proposed REMS in 2011. *Id.* The 2011 REMS[3] allowed Mifeprex to be prescribed by certified physicians up to 49 days of pregnancy, dispensed in certain healthcare facilities, and taken in the provider's clinic. *Id.* ¶ 56. In 2016, the FDA revised the Mifeprex REMS,[4]increasing the gestational age through which the drug is indicated, expanding those who could be certified to prescribe Mifeprex from "physicians" to "healthcare providers," and reducing the number of required patient visits to their healthcare providers. *Id.* ¶ 58. In April 2019, the FDA approved GenBioPro's generic version of mifepristone, subject to the same REMS as

Mifeprex.[5] *Id*. ¶¶ 60-61. In response to the COVID-19 pandemic two years later, the FDA announced it would stop enforcing the in-person dispensation requirement of the mifepristone REMS. *Id*. ¶ 62. On January 3, 2023,[6] the FDA promulgated a new REMS[7] for mifepristone which no longer limits dispensation of the drug to healthcare settings, thereby allowing patients to receive the *5 medication either by mail or from certified pharmacies and no longer requiring in-person visits to healthcare providers.[8] *Id*. ¶ 66.

5

---

3  U.S. Food & Drug Admin., NDA 20-687 MIFEPREX (mifepristone) Tablets, 200 mg, Risk Evaluation and Mitigation Strategy (REMS) (June 2011), https://perma.cc/3S5M-WMQ6.

4  U.S. Food & Drug Admin., NDA 020687 MIFEPREX (mifepristone) Tablets, 200 mg, Risk Evaluation and Mitigation Strategy (REMS) (Mar. 2016), https://perma.cc/KC6Z-NQUA.

5  U.S. Food & Drug Admin., Mifepristone Tablets, 200 mg, Risk Evaluation and Mitigation Strategy (REMS) Single Shared System for Mifepristone 200mg (Apr. 2019), https://perma.cc/2XSU-3HYT.

6  The Court notes that while the REMS was most recently updated in March 2023 "to add space to allow for additional contact information on the forms" and "correct a typographical error," the last significant modification was in January 2023. *See Update History*, Mifepristone, Shared System REMS, U.S. Food & Drug Admin., https://perma.cc/RE9X-NUJF (last accessed Aug. 9, 2023).

7  U.S. Food & Drug Admin., Mifepristone Tablets, 200 mg, Risk Evaluation and Mitigation Strategy (REMS) Single Shared System for Mifepristone 200mg (Mar. 2023), https://perma.cc/224Y-KFLE [hereinafter 2023 REMS].

---

8  On the eve of entry of this Opinion, the Fifth Circuit issued its decision affirming a stay of the 2016 REMS and the FDA's 2021 non-enforcement decision, later codified in the 2023 REMS. *All. for Hippocratic Med. v. FDA*, - F.4th -, 2023 WL 5266026 (5th Cir. Aug. 16, 2023). The Court has reviewed the Fifth Circuit decision and does not find its primary determinations to be persuasive. Nevertheless, the Court notes the direct effect of that decision on this case, as mifepristone is currently subject to the "conditions for use that existed in 2016" pending the litigation of *Alliance for Hippocratic Medicine*. *Id*. at *1-2. However, the Fifth Circuit noted that its "holding is subject to the prior order of the Supreme Court, which stayed the district court's order pending resolution of this appeal and disposition of any petition for writ of certiorari." *Id*. at * 4. Regardless, 2023 REMS remains law, and the Court will consider Plaintiff's claims as to those restrictions.

The FDA made these changes to the REMS in response to overwhelming evidence of the safety and efficacy of mifepristone. *Id*. ¶ 38, 58-59, 62-64. Decades of usage of the drug-both in the United States and abroad-as well as a rigorous agency and pharmaceutical industry review process have demonstrated that the FDA may promulgate REMS allowing for increased access without risking patient safety. *See, e.g.*, U.S. Food & Drug Admin., *Questions & Answers on Mifepristone for Med. Termination of Pregnancy Through Ten Weeks Gestation* (Jan. 4, 2023) (discussing safety and access determinations made by the agency), https://perma.cc/6TDS-F9FL (last accessed Aug. 9, 2023). As summarized by Food and Drug Law and Health Law Scholar *amici*, "mifepristone has been subject to more regulatory and congressional scrutiny than perhaps any other prescription drug." ECF No. 40-1, at 5. Each time the REMS were altered, the FDA "used an internal team of experts . . . to conduct medical, chemistry,

pharmacology, statistical, clinical pharmacology, and biopharmaceutics reviews of all data" in accordance with the FDCA and agency practice. *Id.* at 10. The result of this heightened scrutiny and extensive review is a REMS which unambiguously assures the safety of the drug without any additional safeguards *6 from the States. Defendants have not disputed the safety of the mifepristone REMS, nor could they.

Confronted with West Virginia's additional barriers to prescribing its product, Plaintiff filed suit in this Court on January 25, 2023, alleging that the UCPA and prior restrictions violate the Supremacy and Commerce Clauses by limiting the sale of mifepristone in West Virginia. Prosecuting Attorney of Putnam County Mark Sorsaia and Attorney General of West Virginia Patrick Morrisey were named as defendants in their official capacities. Both Defendants have filed motions to dismiss. ECF Nos. 17 & 19. Each Defendant disputes GenBioPro's standing, as well as Plaintiff's interpretation of the Supremacy and Commerce Clauses. The Court heard oral argument on the issue of standing on April 24, 2023, and subsequently issued a Memorandum Opinion and Order finding that Plaintiff had standing on behalf of itself and on behalf of third-party vendees. ECF No. 54. On May 23, 2023, the Court heard oral argument on the remainder of the Motions to Dismiss. Accordingly, the matter is now ripe for adjudication.

## II. LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain "a short and plain statement of the claim showing [the plaintiff] is entitled to relief." Fed.R.Civ.P. 8(a)(2). While the facts alleged in the complaint need not be probable, the statement must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In considering the plausibility of a plaintiff's claim, the Court accepts all well-pleaded factual allegations in the complaint as true. *7 Id.* Still, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. If the court finds from its analysis that "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'- 'that the pleader is entitled to relief.'" *Id.* (quoting, in part, Fed.R.Civ.P. 8(a)(2)). Nonetheless, a plaintiff need not show that success is probable to withstand a motion to dismiss. *Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.").

## III. DISCUSSION

### A. Major Questions Doctrine

In his Motion to Dismiss, Defendant Morrisey argues that this is a major questions case. Def. Morrisey's Mem. of Law in Supp. of Mot. to Dismiss at 8-10, ECF No. 20. The Supreme Court inaugurated the so-called "major questions doctrine" in *West Virginia v. EPA*, 142 S.Ct. 2587 (2022). "Under that doctrine's terms, administrative agencies must be able to point to clear congressional authorization when they claim the power to make decisions of vast economic and political significance." *Id.* at 2616 (Gorsuch, J., concurring) (cleaned up); *see also Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure

of skepticism." (internal quotation omitted)). Relying on a concatenation of caselaw in which agencies were found to lack the *8 authority to regulate broadly under ambiguous delegation provisions, *West Virginia* invalidated the Environmental Protection Agency's interpretation of a broad provision in the Clean Air Act as granting the agency comprehensive authority to regulate national energy systems. 142 S.Ct. at 2610-14; *see also Biden v. Nebraska*, 143 S.Ct. 2355, 2374 (2023) ("[W]hile the major questions 'label' may be relatively recent, it refers to 'an identifiable body of law that has developed over a series of significant cases' spanning decades." (quoting *West Virginia*, 142 S.Ct. at 2609)). In doing so, *West Virginia* held that courts must "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." 142 S.Ct. at 2609 (internal quotation omitted). As abortion is one such major policy decision, Defendant Morrisey argues that this Court must conclude Congress did not intend to delegate the authority to the FDA to decide access issues for mifepristone. *See* Def. Morrisey's Mem. of Law in Supp. of Mot. to Dismiss at 9.

The Court does not dispute the serious social, ethical, economic, and political issues implicated by abortion. There is no doubt that "terminating a pregnancy is an issue with 'profound moral and spiritual implications even at its earliest stage.'" Def. Morrisey's Mem. of Law in Supp. of Mot. to Dismiss at 9 (quoting *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 850 (1992)) (cleaned up). And yet, the Court disagrees that either the FDA's promulgation of the mifepristone REMS or GenBioPro's arguments concerning those REMS implicate those major questions. The seminal major questions cases all involved novel agency interpretations of long-standing ambiguous regulatory provisions as major grants of authority to reconfigure large aspects of the economy. *See West Virginia*, 142 S.Ct. at 2602-04; *Air Utility*, 573 U.S. at 323-24; *Biden v. Nebraska*, 143 S.Ct. at 2373 (involving attempted broad student loan

forgiveness under a limited grant of emergency loan waiver authority); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) *9 (involving attempted regulation of cigarettes as "drug delivery devices").

In contrast, here the FDA is acting narrowly pursuant to an explicit grant of authority as to a single prescription medication-the FDAAA's express command that the FDA promulgate a REMS for Subpart H-approved drugs (including mifepristone), subject to certain delineated principles, including ensuring accessibility. FDAAA, Section 909(b)(1); 21 U.S.C. § 355-1(f)(2)(C). That is all; the FDA is not making any novel claims to any broader authority hidden within the FDCA or the FDAAA amendments. In other words, the FDA's mifepristone REMS simply does not "effect a fundamental revision of the statute, changing it from one sort of scheme of regulation into an entirely different kind." *Biden v. Nebraska*, 143 S.Ct. at 2373 (quoting *West Virginia*, 142 S.Ct. at 2612) (cleaned up). Instead, the promulgation of the REMS was a routine regulatory action.

Nor is GenBioPro claiming that either the FDCA or the FDAAA amendments contain previously unstated broad abortion authority. GenBioPro's preemption argument can be characterized as: (1) the FDAAA commanded the FDA to consider access in promulgating a REMS for mifepristone; (2) pursuant to that authority, the REMS the FDA promulgated determined a standard of accessibility for the drug; and (3) West Virginia's abortion laws conflict with this standard. *See* Pl.'s Opp'n to Def. Morrisey's Mot. to Dismiss at 8-19. The Court will consider the cognizability of this preemption argument separately, below. But regardless of its validity, GenBioPro's argument does not allege an elephant hidden in a mousehole.

Defendant Morrisey argues that the FDCA "does not so much as mention abortion." Def. Morrisey's Mem. in Supp. of Mot. To Dismiss at 9. True-but nor does it mention any other *10 specific

A-280

GenBioPro Inc. v. Sorsaia    Civil Action 3:23-0058 (S.D.W. Va. Aug. 24, 2023)

procedure, device, cosmetic, or medication it instructs the FDA to regulate. *See, e.g.*, 21 U.S.C. § 321(h)(1) (defining "medical devices" the FDA may regulate without specifying any particular device). Defendant misunderstands the purpose and scope of the statutory grants of agency authority by demanding that Congress have listed every possible medical condition and procedure when it instructed the FDA to regulate prescription medicine generally. For example-imagine if Congress were forced to list every endangered species for the Endangered Species Act ("ESA") to grant the Fish and Wildlife Service ("FWS") authority to protect any specific at-risk organism. *See* 16 U.S.C. § 1531 *et seq*. Calling this a "major questions case" and demanding the FDA refrain from treating abortion medications on par with other medications under the FDCA would make just as much sense as demanding the FWS refrain from listing the snail darter as an endangered species under the ESA. *See Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978). If Defendant wishes to bring a delegation challenge, he will have to find standing to bring another suit.

But, significantly, Congress *did* specify that drugs previously approved under Subpart H would be deemed in effect to have a REMS in the 2007 FDAAA amendments.[9] FDAAA, Section 909(b)(1). Shortly thereafter, the FDA issued a notice indicating that mifepristone was one of these previously approved drugs. Dept. Health & Human Servs., *Identification of Drug & Biological Prods. Deemed to Have Risk Evaluation & Mitigation Strategies for Purposes of the Food & Drug Admin. Amendments Act of 2007*, 73 Fed.Reg. 16313-01, 16313 (Mar. 27, 2008). The fact that Congress did not specify that mifepristone is to be used for abortion when it incorporated the drug into the REMS scheme is of

11    no more import than its lack of specification *11 as to isotretinoin's usage as an acne medication. *See id*. Each medicine listed in the FDA's 2008 Notice was approved for an indicated use via

Subpart H, and Congress stated that those approvals were to be carried over into the new REMS schema (subject to eventual FDA reevaluation). An order to regulate an express list of prescription medicines under a second list of articulated criteria is about as granular a grant of authority as Congress ever gives an agency.

> [9] This is not a case where the regulatory agency relied upon an implied grant of authority. This list consisted of only 17 previously approved drugs and Congress undoubtedly knew that one, mifepristone, was used only for medication abortion.

Accordingly, the Court finds that this is not a major questions case, and the major questions doctrine does not bar Plaintiff's arguments as to preemption and the dormant Commerce Clause. Whether the UCPA or prior restrictions violate either the Supremacy or Commerce Clause is a different question and is considered below.

**B. Preemption**

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. It follows inexorably that "Congress has the power to preempt state law." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); *Gibbons v. Ogden*, 9 Wheat. 1, 210-211, 6 L.Ed. 23 (1824)). Accordingly, "the purpose of Congress is the ultimate touchstone in every preemption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation omitted). "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). However, there is a presumption against preemption, especially in a field traditionally occupied by the States. *Wyeth v.*

12    *Levine*, 555 U.S. 555, 565 (2009). *12

GenBioPro Inc. v. Sorsaia__ Civil Action 3:23-0058 (S.D.W.Va. Aug. 24, 2023)

Generally, there are three types of preemption: (1) express preemption, (2) conflict preemption, and (3) field preemption. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S.Ct. 1461, 1480 (2018); *Mayor & City Council of Balt. v. BP P.L.C.*, 31 F.4th 178, 198 n.2 (4th Cir. 2022). Both "conflict" and "field" are considered types of implied preemption. *Kurns v. Railroad Friction Prods. Corp.*, 565 U.S. 625, 630-31 (2012). On occasion, the Supreme Court has delineated further, treating "impossibility" and "obstacle" preemption as two separate entities within "conflict" preemption. *See Arizona*, 567 U.S. at 399-400. The Court has admitted that it "sometimes use[s] different labels" but that "these categories are not rigidly distinct." *Va. Uranium, Inc. v. Warren*, 139 S.Ct. 1894, 1901 (2019) (quoting *Crosby*, 530 U.S. at 372, n.6). This Opinion considers both whether the challenged state provisions "conflict" with or provide an "obstacle" to federal law, treating these as one form of "conflict" preemption, in accordance with *e.g.*, *Murphy*, 138 S.Ct. at 1480.

The FDCA does not include an express preemption provision. *See Wyeth*, 555 U.S. at 574 ("If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express preemption provision at some point during the FDCA's 70-year history.") The 1962 Amendments to the FDCA, however, include an express preemption saving clause. *See* Drug Amendments of 1962, § 202, 76 Stat. 793 ("Nothing in the amendments made by this Act to the Federal Food, Drug, and Cosmetic Act shall be construed as invalidating any provision of State law . . . unless there is a direct and positive conflict between such amendments and such provision of State law"). Of further import, regulation of health and safety is a field that States have traditionally occupied. *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 716 (1985). The Supreme Court has made it clear that regulating abortion is a matter of health and safety upon which States may appropriately exercise their police power. *See* *13 *Dobbs*, 142

S.Ct. at 2279. Regulation of medical professionals-which the UCPA directly accomplishes-is arguably a field in which the States have an even stronger interest and history of exercising authority. *See id.* at 2284 (emphasizing the States' interest in "the preservation of the integrity of the medical profession"); *Dent v. West Virginia*, 129 U.S. 114 (1889) (holding that West Virginia has the authority to regulate medical licensure).

Keeping these principles in mind, the Court will consider the arguments as to implied preemption.

**a. Conflict Preemption**

As an antecedent matter, the Court cannot find any evidence of Congressional intent in the FDCA or FDAAA amendments to preempt state laws of the type challenged here. Again, "the purpose of Congress is the ultimate touchstone in every preemption case." *Wyeth*, 555 U.S. at 565 (quoting *Medtronic*, 518 U.S. at 485). Congressional intent must be determined in context, as "our interpretation of [statutory] language does not occur in a contextual vacuum." *Medtronic*, 518 U.S. at 485.

In determining the purpose of the contested FDAAA "access" provisions, the Court "begin[s] by analyzing the statutory language" as "[w]e must enforce plain and unambiguous statutory language according to its terms." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010). The relevant portion of the statute reads as follows:

**(f) Providing safe access for patients to drugs with known serious risks that would otherwise be unavailable**

**(1) Allowing safe access to drugs with known serious risks**

GenBioPro Inc. v. Sorsaia    Civil Action 3:23-0058 (S.D.W. Va. Aug. 24, 2023)

The Secretary, in consultation with the offices described in subsection (c)(2), may require that the risk evaluation and mitigation strategy for a drug include such elements as are necessary to assure safe use of the drug, because of its inherent toxicity or potential harmfulness, if the Secretary determines that-

14    *14

**(A)** the drug, which has been shown to be effective, but is associated with a serious adverse drug experience, can be approved only if, or would be withdrawn unless, such elements are required as part of such strategy to mitigate a specific serious risk listed in the labeling of the drug; and

15

**(B)** for a drug initially approved without elements to assure safe use, other elements under subsections (c), (d), and (e) are not sufficient to mitigate such serious risk.

**(2)** *Assuring access and minimizing burden Such elements to assure safe use under paragraph (1) shall-*

**(A)** be commensurate with the specific serious risk listed in the labeling of the drug;

**(B)** within 30 days of the date on which any element under paragraph (1) is imposed, be posted publicly by the Secretary with an explanation of how such elements will mitigate the observed safety risk;

**(C)** considering such risk, *not be unduly burdensome on patient access* to the drug, considering in particular-

**(i)** patients with serious or life-threatening diseases or conditions;

**(ii)** patients who have difficulty accessing health care (such as patients in rural or medically underserved areas); and

**(iii)** patients with functional limitations; and

**(D)** to the extent practicable, *so as to minimize the burden on the health care delivery system-*

**(i)** conform with elements to assure safe use for other drugs with similar, serious risks; and

**(ii)** be designed to be compatible with established distribution, procurement, and dispensing systems for drugs.

21 U.S.C. § 355-1(f) (italics added, bold in original). *15

Plaintiff argues that this language-repeatedly emphasizing ensuring access and minimizing undue burden-shows Congressional intent to designate access determinations for drugs subject to a REMS with elements to assure safe use to the FDA, thus preempting any conflicting state access determinations. Admittedly, Section 355-1(f)(2) requires the FDA to consider patient access and burden. However, this requirement is plainly a limitation on the FDA's *own restrictions* on a drug, rather than a command that the FDA assure access for all patients: "[s]uch elements to assure safe use *under paragraph (1)* shall" not be "unduly burdensome." Accordingly, Congress's purpose in directing the FDA to consider burden and access when promulgating REMS with elements to assure safe use was to ensure that the elements *themselves* would not be unduly burdensome upon patient access.

The context in which the FDAAA was passed confirms this interpretation. At the time Congress passed the FDAAA in 2007, mifepristone was approved for usage up to 49 days of pregnancy under the Subpart H regulatory scheme. Compl. ¶¶ 39, 58. In 2007, *Planned Parenthood v. Casey*'s "undue burden" or "substantial obstacle" standard was the touchstone for assessment of the constitutionality of abortion restrictions, and the Court recognized "the right of the woman to

GenBioPro Inc. v. Sorsaia   Civil Action 3:23-9058 (S.D.W.Va. Aug. 24, 2023)

choose to have an abortion before viability." 505 U.S. at 846; *see Stenberg v. Carhart*, 530 U.S. 914, 921 (2000) (providing that "a law designed to further the State's interest in fetal life which imposes an undue burden on the woman's decision before fetal viability is unconstitutional" (internal quotation marks omitted)); *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 367-69 (6th Cir. 2006) (discussing and applying *Casey*). While debate over the ethics of abortion roiled the nation, no Congressperson in 2007 could have credibly doubted that abortion was legal up to 49 days of pregnancy, long before the point of viability. In fact, in 2006, the Sixth Circuit upheld a district court's preliminary injunction on an Ohio ban of off-label *16 usage of mifepristone as unconstitutional under *Casey* and *Carhart*. *Planned Parenthood Cincinnati Region v. Taft*, 444 F.3d 502, 508-09, 518 (6th Cir. 2006). Consequently, while Congress deemed mifepristone to have in effect a REMS, and included language concerning access in the REMS scheme, it is not plausible to infer an intent from this language to preclude state abortion law by granting mifepristone access decisions to the FDA. In 2007, the issue of access to abortion up to 49 days of pregnancy was conclusively determined (so we thought) by the Supreme Court, and an appellate court had applied that standard to mifepristone. Absent express language to the contrary, the Court finds it difficult to conclude that Congress intended for the FDAAA access language to preempt state abortion restrictions which would have been unconstitutional at the time the FDAAA was passed.

Therefore, the Court finds that the UCPA and abortion restrictions do not pose an "unacceptable obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Wyeth*, 555 U.S. at 563-64 (internal quotation omitted); *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) (seminal case finding obstacle preemption). As discussed above, "conflict" preemption has been variously deconstructed into "conflict,"

"impossibility," and "obstacle" preemption. Some Supreme Court decisions have elevated obstacle preemption to sit alongside field and conflict preemption, treating the later as synonymous with "impossibility" preemption, while others conflate "obstacle" and "conflict" preemption. *Compare, e.g., Virginia Uranium*, 139 S.Ct. at 1907 (treating "conflict" and "obstacle" preemption as synonymous), *with Arizona*, 567 U.S. at 399 (delineating two types of "conflict" preemption as "impossibility" and "obstacle" preemption). Regardless of taxonomies, both parties treat "conflict" or "impossibility" preemption and "obstacle" preemption as distinct pathways to an implied preemption holding, *17 and the Court will consider those claims as they have arisen before it. *See* Def. Morrisey's Mem. of Law in Supp. of Mot. to Dismiss at 11; Pl.'s Opp'n to Def. Morrisey's Mot. to Dismiss at 14.

The Court finds that while the FDAAA requires the FDA to consider accessibility in making REMS determinations, the plain language of the statute indicates that "access" considerations are made with regards to the FDA's own limitations it imposes upon obtaining medications subject to a REMS, rather than broadly legislating geographical access to the entire population. The context in which the FDAAA was passed confirms this interpretation of the objectives of Congress. Any additional or incidental burden West Virginia has placed upon patients wishing to obtain mifepristone does not provide an unconstitutional "obstacle" to the FDAAA's unambiguous directive to the FDA.

Congruently, the Court rejects Plaintiff's assertion of "direct" or "impossibility" type conflict preemption. Conflict preemption may occur when "compliance with both federal and state regulations is a physical impossibility." *Arizona*, 567 U.S. at 399 (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143 (1963)). The Supreme Court has "long recognized that state laws that conflict with federal law are 'without effect.'" *Altria Group*, 555 U.S. at 76

(quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). Theoretically-regardless of the intent of the FDAAA-the mifepristone REMS could directly conflict with West Virginia's restrictions, thereby creating a system in which individuals regulated by both federal and state law could not comply with both mandates. *See Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 48687 (2013) (finding preemption due to direct conflict between state tort law and FDCA labelling requirements); *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 624 (2011) (same).

Yet, the Court finds that GenBioPro is not subject to a catch-22, whereby it may either comply with the UCPA or the REMS regulations. In fact, GenBioPro is not regulated by the *18 UCPA *at all.* The UCPA regulates "licensed medical professionals," defined as persons licensed under either West Virginia Code § 30-3-1 *et seq.* or § 30-14-1 *et seq.*, which govern licensure of the practice of medicine, surgery, podiatry, and osteopathic medicine or surgery for physicians and physicians' assistants. W.Va. Code §§ 16-2R-2; 16-2R-3. As discussed above, the UCPA prohibits licensed medical professionals from performing, inducing, or attempting to perform or induce an abortion by any means, subject to a limited series of exceptions. W.Va. Code § 16-2R-3. The prohibited act is further defined as "an act or the omission of an act that, under the circumstances as the person so acting or omitting to act believes them to be, constitutes a substantial step in a course of conduct intended to culminate in an abortion." W.Va. Code § 16-2R-2. Whether this definition could include GenBioPro's sale of mifepristone to doctors and pharmacies is debatable, but the Court need not decide that question today, as GenBioPro is not a "licensed medical professional" under either West Virginia Code § 30-3-1 *et seq.* or § 30-14-1 *et seq.* Accordingly, GenBioPro is not caught between obeying state and federal law in a manner which would offend the Supremacy Clause.[10]

10  As an aside, the Court rejects Defendants' argument that GenBioPro may simply choose to stop selling mifepristone in West Virginia, and thus avoid any conflict between state and federal law. *See Bartlett*, 570 U.S. at 488 (rejecting a "stop-selling rationale").

However, this Court has found that GenBioPro may assert the interests of its vendees, who are subject to the strictures of the UCPA. Mem. Op. & Order at 18-22, ECF No. 54. GenBioPro sells to doctors and pharmacies nationwide and would like to sell to those same vendees in West Virginia. Compl. ¶¶ 77-79. While the Court's previous opinion focused on the ability of GenBioPro to represent the interests of its vendees who fall outside the UCPA's definition of "licensed medical professional," there is no doubt that many of GenBioPro's vendees would be "licensed medical professionals" under the UCPA. *See* Mem. Op. & Order at 21-22; *19 Compl. ¶ 71. So, the question remains: does the UCPA conflict with the REMS such that licensed medical professionals cannot lawfully comply with both?

The REMS specify the methods by which mifepristone may be prescribed. For example, the REMS indicate which providers may prescribe the drug, whether it may be prescribed remotely or in person, and what diagnostic criteria is appropriate for prescribing mifepristone. 2023 REMS; *see also* 21 U.S.C. § 355-1(f)(3) (indicating which elements to assure safe use may be included in a REMS). The UCPA, on the other hand, instructs licensed medical professionals in the State of West Virginia to only perform abortions when certain extrinsic criteria are present-both medical and non-medical-such as an ectopic pregnancy, or reported rape or incest. W.Va. Code § 16-2R-3(a), (b). The additional state law restrictions include an active prohibition on telemedicine prescription of mifepristone and a dormant set of restrictions mostly involving informational disclosure requirements. *See* W.Va. Code §§ 16-2I-2; 16-2R-9; 30-3-13a(g)(5); 30-1-26(b)(9). A licensed

medical professional in West Virginia, therefore, must surmount several hurdles to prescribe mifepristone: first ascertaining whether a patient may obtain an abortion under the UCPA, then whether mifepristone is appropriate for that patient under the REMS, and finally, the method by which mifepristone may be prescribed to the patient in consideration of both the REMS and the West Virginia restrictions. This scheme coheres with traditional conceptions of the practice of medicine and the scope of physicians' authority as state matters. *See, e.g., Dent,* 129 U.S. at 122 (describing the "time immemorial" power of the State to regulate the practice of physicians).

Accordingly, the Court finds that the UCPA is a restriction on the incidence of abortion, rather than a state directive in direct conflict with the logistical REMS regulations. The Supreme Court has repeatedly indicated that similarly broad state regulations are not preempted by \*20 intricate federal regulatory systems. For instance, in *Virginia Uranium*, mining companies and owners of uranium-rich land sued Virginia, alleging that a state law preventing uranium mining was preempted by the federal Atomic Energy Act's regulations on the practice of uranium mining. *Virginia Uranium,* 139 S.Ct. at 1901. As the decision to disallow uranium mining is separate from the regulations on the act of mining itself- and in an area of authority traditionally left to the States-the Court found that the Atomic Energy Act did not preempt state bans on uranium mining. *Id.* at 1903, 1907-08. Similarly, the Court has found that state bans on horsemeat are not preempted by the federal regulatory scheme dictating how horses are to be slaughtered. *Nat'l Meat Ass'n v. Harris,* 565 U.S. 452, 467 (2012).[11] Here, West Virginia's UCPA has limited *when* an abortion may be performed, without touching *how* medication abortion is to be performed. The mifepristone REMS only concern themselves with the latter.[12] As the Court found States may ban uranium mining despite a federal scheme of uranium mining regulation, or horsemeat in the

face of a federal scheme of horse slaughter regulation, so this Court is compelled to find that federal regulation of medication abortion prescription does not conflict with severe state limitations on abortion. \*21

[11] While *National Meat Association v. Harris* decided that the Federal Meat Inspection Act (FMIA) preempted a California law regulating the slaughter of non-ambulatory pigs, the Court emphasized that its holding on the pigs did not imply that state laws banning horse meat would be similarly preempted by the FMIA, stating: "A ban on butchering horses for human consumption works at a remove from the sites and activities that the FMIA most directly governs. When such a ban is in effect, no horses will be delivered to, inspected at, or handled by a slaughterhouse, because no horses will be ordered for purchase in the first instance." 565 U.S. at 467. The Court has reiterated this dictum as to the legality of bans on horse slaughter in subsequent cases. *Virginia Uranium,* 139 S.Ct. at 1914 (Ginsburg, J., concurring); *see also Nat'l Pork Prod. Council v. Ross,* 143 S.Ct. 1142, 1163 (2023) (discussing state horsemeat bans).

[12] The Court is aware that the REMS do dictate "when" an abortion may be performed with mifepristone, in the sense of gestational limits and locations. But there are different kinds of "when." West Virginia creates pre-requisites to accessing abortion care, while the REMS delineate logistical safety standards once a patient has sought medication abortion.

### b. Field Preemption

Likewise, the Court rejects Plaintiff's arguments as to field preemption.

Field preemption precludes States from "regulating conduct in a field that Congress, acting within its proper authority, has determined must be

regulated by its exclusive governance." *Arizona*, 567 U.S. at 399 (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 115 (1992) (Souter, J., dissenting)). To put it another way, field preemption "occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Murphy*, 138 S.Ct. at 1480 (quoting *R.J. Reynolds Tobacco Co. v. Durham Cty.*, 479 U.S. 130, 140 (1986)). Where Congress has made this determination, States may not regulate in the same "field," even where those regulations might be "parallel to federal standards." *Arizona*, 567 U.S. at 401.

Plaintiff has argued that Congress occupied the field specifically as to drugs subject to a REMS which include "elements to assure safe use." Pl.'s Opp'n to Def. Morrisey's Mot. to Dismiss at 9.[13] A subset of REMS must contain "elements to assure safe use," if the Secretary determines that the regulated drug requires such elements "as part of [a] strategy to mitigate a specific serious risk listed in the labeling of the drug." 21 U.S.C. § 355-1(f)(1). These drugs, Plaintiff asserts, are subject to a more "pervasive framework" than other drugs regulated under the FDCA, utilizing the imperative "shall" when instructing the FDA to consider patient "access" in making REMS determinations. Pl.'s Opp'n to Def. Morrisey's Mot. to Dismiss at 9. Essentially, once the FDA concludes a REMS including such elements is necessary for a drug, the FDA is required to take a series of steps in promulgating a REMS including 22 elements to *22 assure safe use. *See* 21 U.S.C. §§ 355-1(a), (c), (f), (h). Plaintiff believes this requirement is sufficient to demonstrate that Congress has "occupied the field" when it comes to such drugs.

[13] While Plaintiff's Opposition appears to argue that Congress occupied the field as to all drugs subject to a REMS, at oral argument GenBioPro clarified that its field preemption argument is only as to drugs

subject both to a REMS and to additional elements to assure safe use. *See* Tr. of Proceedings at 34-35, ECF No. 62.

In reply, Defendant Morrisey points to the FDCA's 1962 express saving clause, demonstrating Congressional intent for state law to play a complementary role in the field. Reply in Supp. of Mot. to Dismiss at 6, ECF No. 45. Defendant Morrisey notes that "the presence of a savings provision 'is fundamentally incompatible with complete field preemption.'" *Id.* (quoting *Farina v. Nokia Inc.*, 625 F.3d 97, 121 (3d Cir. 2010); *Aldridge v. Miss. Dept. of Corr.*, 990 F.3d 868, 874-75 (5th Cir. 2021); *In re NOS Commc'ns*, 495 F.3d 1052, 1058 (9th Cir. 2007)). Included in the 1962 Amendments to the FDCA, the saving clause has been interpreted to allow for state tort law's complementary role in shaping safety standards for products regulated under the FDCA. *See Wyeth*, 555 U.S. 555. Accordingly, the Court agrees that the 1962 saving clause has foreclosed any argument for complete field preemption. However, Plaintiff has been clear in its assertion that Congress has only occupied the field as to a subsection of drugs subject to a REMS with elements to assure safe use. *See* Pl.'s Opp'n to Def. Morrisey's Mot. to Dismiss at 9.

Nevertheless, Plaintiff's argument fails for want of Congressional intent in the FDAAA amendments, as discussed in depth above. Where Congress acts in a field traditionally occupied by the States, the presumption against preemption is strongest. *Wyeth*, 555 U.S. at 565. There is no disputing that health, medicine, and medical licensure are traditional areas of state authority. *See, e.g.*, *Hillsborough*, 471 U.S. at 716. Furthermore, the Supreme Court has repeatedly held that the FDCA does not preempt state action in the field of healthcare or medicine, absent a direct conflict. *Compare Wyeth*, 555 U.S. at 581 (not finding preemption because state tort law did not directly conflict with FDCA), *with Bartlett*, 570 U.S. at 23 486-87 (finding preemption due *23 to direct conflict between state tort law and FDCA

labelling requirements). While the Supreme Court has yet to address the wrinkles of the REMS provision, Plaintiff has not advanced a convincing argument that the Court would treat that statutory subsection differently than any other portion of the FDCA.

To that end, Plaintiff cites *United States v. Locke*, 529 U.S. 89 (2000). In *Locke*, Washington State passed more stringent regulations on oil tankers than existed under the national regulatory scheme. *See id*. at 97. Washington's personnel qualifications for oil tanker employees were found to be preempted by federal requirements, given historical federal occupation of the field. *Id.* at 112-15. In reaching this conclusion, the *Locke* Court emphasized that the Coast Guard was given non-discretionary authority to ensure oil tanker personnel met the minimum federal requirements. *Id.* at 115-16. Here, Plaintiff argues that the FDA is subject to a similarly non-discretionary requirement that it ensure drugs which require both a REMS and elements to assure safe use consider access in promulgating those elements. *See* Pl.'s Opp'n to Def. Morrisey's Mot. to Dismiss at 9; 21 U.S.C. § 355-1(f)(1)-(3). Therefore, just as the *Locke* Coast Guard only must ensure oil tanker employees meet minimum qualification requirements, GenBioPro asserts that the FDA has been commanded to ensure mifepristone is available subject only to its REMS.

However, *Locke* is distinguishable for several reasons. First, the *Locke* Court repeatedly emphasized that regulating interstate navigation is historically an area of federal concern, dating back to the Constitutional Convention; here, the Court has found the opposite is true. *Id.* at 99100; *see Hillsborough*, 471 U.S. at 716; *Dobbs*, 142 S.Ct. at 2248-55 (discussing the history of abortion laws). Second, much of *Locke* circled around a preemption savings clause in the Oil Pollution Act of 1990, which indicated Congress only intended to leave room for complementary state action in a specified area of discretionary federal authority. 24   529 U.S. at 105-06. In contrast, *24 the Supreme

Court has found the 1962 FDCA saving clause to contain breadth, given the general language of the clause, the historical state police powers implicated, and the fact Congress included express preemption provisions in a different amendment to the FDCA. *Wyeth*, 555 U.S. at 567. Conversely, *Locke* found that a particular sub-field of an area of historical federal concern had been fully occupied by Congress, given the existence of a separate preemption saving clause indicating a differing sub-field would permit complementary state action. The limited language in the *Locke* opinion focusing on the Coast Guard command must be read in this broader context, which stands in stark contrast to the manner in which the Court has treated how traditional state authority over healthcare has been affected by the FDCA.

Accordingly, the Court finds that Congress has not expressed an intent to occupy the field of drugs subject to a REMS in a manner which would preempt West Virginia's abortion restrictions.

### c. Telemedicine Restriction

There is one provision which is unambiguously preempted by the 2023 REMS: the prior restriction on prescribing mifepristone via telemedicine. *See* W.Va. Code §§ 30-3-13a(g)(5); 30-1-26(b)(9). Unlike the other prior restrictions, the telemedicine provision is still in effect. *See* W.Va. Code § 16-2R-9. Accordingly, the Court's finding that the UCPA is not preempted by the REMS is irrelevant to consideration of the telemedicine restriction. The 2023 REMS reflects a determination by the FDA that when mifepristone is prescribed, it may be prescribed via telemedicine.[14] *25

---

[14] Again, the Court notes that the Fifth Circuit's recent decision in *Alliance for Hippocratic Medicine* stayed the 2023 REMS and the 2021 FDA decision to allow prescription of mifepristone via telemedicine. *See* 2023 WL 5266026, at *1-2. Therefore, this Court's decision as to the West Virginia telemedicine restriction

will not change the current Fifth Circuit injunction prohibiting telemedicine, subject to the Supreme Court's order. *See id.* at 4.

The telemedicine restriction is not "upstream" from the REMS, in the manner of the UCPA. Rather than indicating what procedures are allowed in West Virginia, the telemedicine restriction dictates the manner in which mifepristone may be prescribed. This is a determination which Congress has allocated to the FDA. 21 U.S.C. § 355-1(f)(3)(C) (stating that a REMS may include a restriction specifying that "the drug be dispensed to patients only in certain health care settings, such as hospitals."). The FDA has evaluated the criteria Congress designated and has come to the reasoned conclusion that mifepristone may be prescribed via telemedicine. 2023 REMS. This conflict between the REMS and the state statute creates the kind of impossibility preemption discussed above-a licensed medical professional prescribing mifepristone could not comply with both the access determination made by the FDA and the access determination made by West Virginia as to telehealth.

The other prior restrictions might be likewise preempted by direct conflict with the REMS, as they similarly dictate the way mifepristone may be prescribed. *See* W.Va. Code § 16-2I-2. Regardless, the Court has not found that the UCPA is unconstitutional. As none of these prior restrictions are currently in effect, this Court may not issue an advisory opinion as to the constitutionality of a law not presently operative.

Accordingly, Defendants' Motions to Dismiss Count I are **DENIED,** as to the telemedicine restriction, and **GRANTED**, as to the UCPA and other prior restrictions.

## C. Dormant Commerce Clause

The Commerce Clause grants Congress the power to regulate interstate commerce. U.S. Const. Art. I, § 8, cl. 3. The Supreme Court has long recognized that the Commerce Clause contains a corollary command, "effectively forbidding the enforcement

26   of certain state economic *26 regulations even when Congress has failed to legislate on the subject." *Nat'l Pork Prod. Council v. Ross*, 143 S.Ct. 1142, 1152 (2023) (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995)) (cleaned up). Known as the "dormant Commerce Clause," this doctrine has previously been characterized as forbidding States from enacting laws which either discriminate against interstate commerce or regulate extraterritorially. *See, e.g., Ass'n for Accessible Medicines v. Frosh*, 887 F.3d 664, 667-69 (4th Cir. 2018) (relying on *Healy v. Beer Inst.*, 491 U.S. 324, 335-36 (1989); *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 582-83 (1986); *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982) (plurality opinion); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521 (1935)). Even if a law did not discriminate or regulate extraterritorially, it could still fail the "balancing test" announced in *Pike v. Bruce Church*, 397 U.S. 137 (1970). Under this standard, if plaintiffs can demonstrate that the challenged law burdens interstate commerce, then the Court determines "whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Id.* at 142; *see Nat'l Pork*, 143 S.Ct. at 1165-66 (Sotomayor, J., concurring) (discussing the threshold burden requirement for *Pike* balancing).

On May 11, 2023, the Supreme Court issued its decision in *National Pork Producers Council v. Ross*, 143 S.Ct. 1142 (2023). *National Pork* affirmed a lower court decision to dismiss a pork industry plaintiff's challenge to a California law limiting the sale of certain kinds of pork in the State. The pork plaintiffs argued that the law violated the dormant Commerce Clause by forcing them to broadly change their business practices. *Id.* at 1151. As a preliminary matter, the Court rejected plaintiff's interpretation of *Healy*, *Brown-Forman*, *Edgar*, and *Baldwin* as engendering an "almost per se rule" against extraterritoriality.[15] *Id.*

27   at 1154-57. Accordingly, this Court finds *27 that to whatever extent the Fourth Circuit's dormant

GenBioPro, Inc. v. Sorsaia   Civil Action 3:23-0058 (S.D.W. Va. Aug. 24, 2023)

Commerce Clause jurisprudence employed a similar "principle against extraterritoriality" founded in those same cases, it has been abrogated by *National Pork. See Ass'n for Accessible Med.*, 887 F.3d at 667-69. While Justice Gorsuch's majority opinion could not come to a consensus on the application of the *Pike* balancing test to the pork industry group's claims, in three partial concurrences a minimum of six Justices[16] upheld some form of *Pike* balancing. *See id.* at 1165-72. At least a plurality held that "derivative harms" of legislation may be considered when employing the *Pike* balancing test. *Id.* at 1169 (Roberts, C.J., concurring in part); *see id.* at 1165-66 (Sotomayor, J., concurring in part) (potentially supporting usage of derivative harms as a factor in *Pike* analysis). Throughout, the opinions emphasize that an "antidiscrimination principle lies at the 'very core' of our dormant Commerce Clause jurisprudence," forbidding States from enacting statutes "driven by economic protectionism." *Id.* at 1153 (majority).

> [15] The Court appeared to limit dormant Commerce Clause extraterritoriality claims to statutes that discriminate against interstate commerce by tying in-state prices to out-of-state prices. *Id.* at 1154-55 (relying on *Healy*, 491 U.S. 324).
>
> [16] As this Court reads *National Pork*, Justices Sotomayor and Kagan upheld *Pike*'s balancing test with no further elaboration, stating only that plaintiff had failed to meet the threshold requirement for consideration under *Pike. Id.* at 1165-66. Chief Justice Roberts and Associate Justices Alito, Kavanaugh, and Jackson applied *Pike* to the facts of the case, further interpreting the balancing test. *Id.* at 1167-72. Justices Gorsuch, Barrett, and Thomas's view might be interpreted as upholding *Pike* as applying only to cases in which commensurate values could be balanced. *Id.* at 1159-61; 1166-67 (Barrett, J., concurring). Whether one considers that view to be upholding traditional *Pike*

balancing or as partially overturning *Pike* likely depends on whether one agrees with the arguments made by those Justices. Regardless, this opinion is clearly the minority and will not be applied here.

In its Opposition to Defendant Morrisey's Motion to Dismiss, Plaintiff argues that the challenged statutes "violate the Clause by imposing an undue burden on interstate commerce, by regulating extraterritorially, and by functionally banning an article of commerce." Pl.'s Opp'n to Def. Morrisey's Mot. to Dismiss at 23. However, following the decision in *National Pork*, this *28 Court ordered the parties to file supplemental briefing addressing how *National Pork*'s holding applied to the instant allegations. ECF No. 55. GenBioPro's Supplemental Brief admits that *National Pork* forecloses the Complaint's argument that West Virginia has violated the dormant Commerce Clause by regulating extraterritorially. Pl.'s Supp. Br. at 14-15, ECF No. 58. This Brief further re-categorizes GenBioPro's argument that the Clause was violated by "functionally banning an article of commerce" as a factor of consideration under the *Pike* balancing test, rather than as an independent means by which West Virginia could have violated the Clause. *Compare* Pl.'s Opp'n to Def. Morrisey's Mot. to Dismiss at 27, *with* Pl. Supp. Br. at 11-12. Therefore, the Court will only consider whether the Complaint has plausibly alleged that the challenged laws fail the *Pike* balancing test, in light of any recent refinement of *Pike* by *National Pork*.

Post-*National Pork*, Plaintiff asserts that West Virginia's laws fail that test for three reasons: "(1) they intrude on an area in which Congress requires nationally uniform regulation; (2) they functionally ban a product for its indicated use; and (3) they inflict 'derivative harms' by imperiling the health and safety of pregnant West Virginians and the national market for medications." Pl.'s Supp. Br. at 7. The Court will consider each asserted ground in turn.[17] But first,

the Court notes that *National Pork* made clear that *Pike* balancing is meant to "serve[] as an important reminder that a law's practical effects may also disclose the presence of a discriminatory purpose." 143 S.Ct. at 1157. While the Court recognized that "a small number of our cases have invalidated state laws that appear to have been genuinely nondiscriminatory," *29 they referred to ferreting out discriminatory laws as the "heartland" of the *Pike* test. *Id*. GenBioPro's claim falls far outside of this heartland, declining to assert that West Virginia was motivated by economic protectionism or that it had a discriminatory intent in passing the UCPA. As with the pork plaintiffs, this "is not an auspicious start." *Id*.

17  The Court acknowledges Defendant Morrisey's analysis of the potentially conflicting concurrences in *National Pork*, and their implications to the present dispute. *See* Def.'s Supp. Br., ECF No. 59. In fact, Defendant's Supplemental Brief contains a more prudent jurisprudential approach to applying *National Pork* to Plaintiff's Complaint. However, at the Motion to Dismiss stage, the Court takes care to draw all reasonable inferences in favor of the non-moving party and therefore employs Plaintiff's proffered post*Pork* approach in dismissing its claims. Accordingly, Defendant Morrisey's crisp application of conflicting doctrine is valued but not utilized here.

**a. Required Nationally Uniform Regulation**

Plaintiff distinguishes the holding in *National Pork*, arguing that while the pork plaintiff was merely concerned with the "cost of compliance," GenBioPro is concerned about "an area where there is a compelling need for national uniformity." Pl.'s Supp. Br. at 8 (quoting *Yamaha*, 401 F.3d at 572).

Yet again, regulation of health, medicine, and the medical profession are areas in which the States have traditionally exercised authority. *E.g.*,

*Hillsborough*, 471 U.S. at 716. Accordingly, the Supreme Court has repeatedly found that there is a complementary role for state law, even where Congress has acted to regulate health and medicine. *E.g.*, *Wyeth*, 555 U.S. at 581. If Congress had created a system mandating national uniformity, the Court would expect to see some evidence of intent to preempt historical complementary state action. As analyzed in depth above, here there is no such expressed intent to occupy the field. A "compelling need for national uniformity" could exist absent field preemption, of course, but GenBioPro has not plausibly alleged any such need.

Most importantly, it's unclear where *National Pork* or its predecessors indicate that a "compelling need for national uniformity" entails a dormant Commerce Clause violation pursuant to *Pike*. Plaintiff points to language in the Chief Justice's concurrence. *See Nat'l Pork*, 143 S.Ct. at 1170 ("The *Pike* balance may well come out differently when it comes to interstate transportation, an area presenting a strong interest in 'national uniformity.'"). However, the *30 majority opinion dispensed of this interpretation. *Id*. at 1158 n.2. ("[T]his Court has only rarely held that the Commerce Clause itself pre-empts an entire field from state regulation, and then only when a lack of national uniformity would impede *the flow* of interstate goods." (internal quotation marks omitted, emphasis in original)). There is no argument that the UCPA or other restrictions impede *the flow* of mifepristone nationally.

**b. Banning an Article of Commerce**

GenBioPro's argument that the UCPA fails the *Pike* test by functionally banning an article of commerce is misplaced. In making this argument, Plaintiff leans heavily upon an 1898 case in which the Court found that the dormant Commerce Clause forbids States from banning "oleomargarine" as an "article of commerce." Pl.'s

Supp. Br. at 11 (citing *Schollenberger v. Pennsylvania*, 171 U.S. 1 (1898)). In *Schollenberger*, the Court stated that

> The general rule to be deduced from the decisions of this court is that a lawful article of commerce cannot be wholly excluded from importation into a state from another state where it was manufactured or grown. A state has power to regulate the introduction of any article, including a food product, so as to insure [sic] purity of the article imported, but such police power does not include the total exclusion even of an article of food.

171 U.S. at 12. Be that as it may, the Court finds that *National Pork* put to rest any debate over whether States may enact product bans under their police power. Without acknowledging the existence of the oleomargine case, the various fractured opinions in *National Pork* made it clear that state bans of products as diverse as horsemeat, fireworks, and plastic bags do not offend the United States Constitution. 143 S.Ct. at 1163 (plurality); 1171 (Roberts, C.J., concurring) (responding to the plurality by arguing the broader market is affected by California's economy, rather than arguing a per se rule against banning products); 1150 (majority) ("While the Constitution addresses many weighty issues, the type of pork chops California merchants may sell is not on that list."). Circuit Courts have upheld both partial and full bans of foie gras, *31 horsemeat, and shark fins in the face of dormant Commerce Clause challenges. *See Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937 (9th Cir. 2013) (foie gras); *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551 (7th Cir. 2007) (horsemeat); *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136 (9th Cir. 2015) (shark fins). Relevant to the instant case is the fact that many of the bans upheld by the Appellate Courts and name-checked by the Supreme Court plurality were enacted under state police power to regulate the health and morality of the

community-the same authority under which the UCPA and other provisions were enacted. *See, e.g., Cavel Int'l*, 500 F.3d at 555, 557 (finding a ban on horsemeat to be within the state's power to regulate animal welfare); *Nat'l Pork*, 143 S.Ct. at 1163 (plurality; citing *Cavel Int'l*).

Plaintiff attempts to distinguish product bans which *National Pork* found acceptable from the "ban" of mifepristone,[18] arguing that "(1) the products involved are not necessities," "(2) they often cause severe harms or offer little public benefit, and (3) Congress did not subject these items to an integrated, and inherently national, system . . . much less limit 'burdens' on that system." Pl.'s Supp. Br. at 11. First, the Court finds that the determination that any given product is a "necessity" invites the Court to engage in second-guessing of state legislatures, with no limiting principle. Second, and similarly, the conclusion that any given product causes "severe harms or offer[s] little public benefit" is surely one for the legislative body enacting any given statutory ban-not for this Court. Furthermore, at oral argument in *National Pork*, the plaintiff pressed the Court to distinguish bans enacted for health and safety from bans enacted solely pursuant to a State's moral authority; the Court 32 declined. *See Nat'l Pork*, 143 S.Ct. at 1160. *32 Finally, while Plaintiff claims "[h]orsemeat and shark fins fit those three criteria," this is incorrect; both animal products are subject to an "inherently national system," demonstrating that such products may be subject to state bans. *See, e.g.,* FMIA, 21 U.S.C. § 601 *et seq.* (regulating horsemeat); Shark Conservation Act of 2010, Pub. L. 111-348; 124 Stat. 3668 (regulating shark fins).[19] More fundamentally, the Court cannot find any support in *National Pork* for the proposition that any of these criteria should be considered when considering state law limitations on the sale of consumer goods.

---

[18] Plaintiff characterizes the UCPA and other restrictions as a "functional ban" of mifepristone. Pl.'s Supp. Br. at 11-12.

GenBioPro Inc. v. Sorsaia, Civil Action 3:23-0058 (S.D.W. Va. Aug. 24, 2023)

Given the exceptions enumerated within the UCPA (and the fact mifepristone is not regulated directly by any of the challenged provisions), the Court is skeptical of this claim. *See* W.Va. Code § 16-2R-3(a) & (b).

19   The Shark Conservation Act of 2010 ("SCA") amended the High Seas Driftnet Fishing Moratorium Protection Act and the Magnuson-Stevens Fishery Conservation and Management Act ("MSA") to require all sharks caught in the United States be brought to shore with their fins naturally attached. Pub. L. 111-348; 124 Stat. 3668. The SCA is the most recent in a series of actions taken by the federal government to regulate shark finning. *See, e.g.*, The Shark Finning Prohibition Act of 2000, Pub. L. 106-557; 114 Stat. 2772. The caselaw referenced by Plaintiff found that a ban on possession of shark fins-even when those fins were obtained legally pursuant to the federal finning scheme-was neither preempted by the MSA nor in violation of the dormant Commerce Clause. *See Chinatown Neighborhood Association*, 794 F.3d 1136. As might be inferred, the parallels between *Chinatown* and the instant case are not particularly favorable to GenBioPro.

Accordingly, the Court finds that impeding the sale of an "article of commerce" is not an intrinsic violation of the dormant Commerce Clause, and that *Schollenberger* has been abrogated.[20] If West Virginia has "functionally banned" mifepristone, it was well within its rights to do so.

20   This is not the first Court to conclude that a literal interpretation of *Schollenberger* would be anomalous and out-of-step with modern dormant Commerce Clause jurisprudence. *See Association des Eleveurs*, 729 F.3d at 949-50 (implicitly interpreting *Schollenberger* to apply only where a "nationally uniform business" and national system of regulation are implicated).

### c. Derivative Harms

Next, Plaintiff argues that, under *Pike*, non-economic "derivative harms" caused by the UCPA and challenged restrictions should be weighed against the putative benefits or interests of the State in enacting the legislation. Pl.'s Supp. Br. at 12-14. *33

GenBioPro asserts derivative harms "to pregnant West Virginians by depriving them of essential medicine." Pl.'s Supp. Br. at 13. First, while this Court has granted Plaintiff third-party standing to pursue the interests of its vendees, it has not granted GenBioPro third-party standing as to "pregnant West Virginians." Nor has Plaintiff petitioned the Court to consider these interests prior to this Supplemental Brief. The Court does not doubt, however, that there are substantial derivative harms to pregnant West Virginians caused by a decrease in access to mifepristone.

Unfortunately, the Court cannot consider any such holistic derivative harms to pregnant West Virginians under *Pike* balancing. As fractured as *National Pork* is, the scant emphasis on "derivative harms" within the concurring opinion clarifies that-in the context of the dormant Commerce Clause-such harms are primarily economic in nature. *See* 143 S.Ct. at 1169 ("Our precedents have long distinguished the costs of complying with a given state regulation from *other economic harms to the interstate market*." (emphasis added)). The concurrence focused on harms to interstate commerce and interstate trade generally-such as difficulties in interstate shipping and employment-rather than harms to individuals within the challenged State. *Id.* (discussing *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520 (1959)). Again, in discussing application of *Pike*, the Chief Justice's concurrence emphasizes that these are derivative "harms to the interstate market" which are "in no sense noneconomic." *Id.* (internal quotation marks omitted). Accordingly, this Court

concludes that derivative harms to pregnant West Virginians are not the type of harm it may consider when employing the *Pike* balancing test.

Plaintiff also argues that the UCPA and restrictions "upend the national market for drugs." Pl.'s Supp. Br. at 13. A state law which spawned chaos in the national prescription drug market would likely cause the type of derivative economic and interstate harm which could be *34 considered under the *Pike* balancing test. But the Court is not convinced that Plaintiff has plausibly pled facts to support any "upending" of the national market for mifepristone caused by West Virginia's legislation. Further, as alluded to above, many States restrict abortion in a manner which likely limits the sale of mifepristone. *See, e.g.*, Miss. Code Ann. § 97-3-3(1) (banning abortion with very limited exceptions). Plaintiff has not alleged that the national prescription drug market has been upended by the incidental restriction of mifepristone in many States.

**d. *Pike* Threshold Showing**

The Court appreciates the gravity of Plaintiff's claims and has taken pains to address them at length above-but even if Plaintiff were correct that national uniformity, functionally banning an article of commerce, and the various alleged derivative harms were sufficient to swing the *Pike* balance in GenBioPro's favor, the Court remains skeptical that Plaintiff could meet the threshold burden necessary to invoke *Pike*. Admittedly, it's unclear what exactly a party would need to do to meet the threshold to be considered under the *Pike* balancing test, as muddled by *National Pork*. Justice Sotomayor's concurrence in *National Pork* averred that the pork producers had failed to meet this threshold burden, without elaboration on the facts of the case. 143 S.Ct. at 1165. This confusion is another reason the Court has considered the *Pike* claims at length above.

Regardless of whether it met the threshold burden, the pork producer plaintiff in *National Pork* plausibly alleged significant disruption to the

national pork industry. *See id*. at 1151-52. Due to the size of the California market, the national producers of pork alleged they would be compelled to alter their national production standards in order to continue to sell within California. *Id*. And yet, it appears a majority of the Justices found this insufficient to meet the threshold "burden on interstate commerce" required under *Pike*. Here, Plaintiff has undoubtedly *35 alleged less of a burden on interstate commerce than was alleged by the pork producers. None of West Virginia's laws require Plaintiff to alter its national production methods in order to access the State's market. Nor will compliance with the UCPA and other restrictions entail broad reworking of the entire pharmaceutical industry. At most, Plaintiff has plausibly alleged that one prescription medication will be prescribed less for one indicated purpose within one State.

Another comparison: in *Association for Accessible Medicine v. Frosh*, the Fourth Circuit found that a Maryland statute regulating pharmaceutical price-gouging burdened interstate commerce in prescription drugs in violation of the dormant Commerce Clause. 887 F.3d at 673. There, the Court of Appeals found that the challenged statute "set[] prescription drug prices in a way that 'interfere[s] with the natural function of the interstate market' by superseding market forces that dictate the price of a good." *Id*. (quoting *McBurney v. Young*, 569 U.S. 221, 235 (2013)). Accordingly, if many States adopted laws analogous to the Maryland act, there was the potential to create "the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude." *Id*. at 674 (quoting *Healy*, 491 U.S. at 337). There is no such potential here. The UCPA can hardly be characterized as an economic regulation, and even if every State adopted a differing regulation on when abortion is permissible-and, to be frank, *this*

GenBioPro Inc. v. Sorsaia, Civil Action 3:23-0058 (S.D.W. Va., Aug. 24, 2023)

*has already happened*-it would not entail competition on mifepristone pricing between the States.

States enact laws pursuant to their police power to regulate public health and morality. Morality-based laws often curtail the sale of goods. The vendors of curtailed goods may lose sales opportunities. Outraged, vendors can feel the laws must somehow be unconstitutional. And yet, the Supreme Court and Courts of Appeals have repeatedly affirmed that morality-based product bans do not intrinsically offend the

36                                    *36

dormant Commerce Clause. Accordingly, Defendants' Motions to Dismiss Count II are **GRANTED**.

**IV. CONCLUSION**

Defendant Mark A. Sorsaia and Defendant Patrick Morrisey's Motions to Dismiss (ECF Nos. 17 & 19) are **GRANTED,** in part, and **DENIED** in part.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

 casetext

**A-295**