No. 23-3247

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

SATANIC TEMPLE, INC.,

*Plaintiff-Appellant*,

v.

TODD ROKITA and RYAN MEARS,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
Southern District of Indiana, No. 1:22-cv-01859-JMS-MG,
The Honorable Jane Magnus-Stinson, Judge

**RESPONSE BRIEF FOR DEFENDANTS-APPELLEES**

Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-0709
James.Barta@atg.in.gov

THEODORE E. ROKITA
Attorney General of Indiana

JAMES A. BARTA
Solicitor General

KATELYN E. DOERING
Deputy Attorney General

*Counsel for Defendants-Appellees*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION ............................................................................................... 1

JURISDICTIONAL STATEMENT ......................................................................... 2

STATEMENT OF THE ISSUES ............................................................................ 3

STATEMENT OF THE CASE ............................................................................... 3

I.      Statutory Background ............................................................................. 3

      A.    General medical regulations ...................................................... 3

      B.    Indiana regulations regarding abortion .................................... 4

      C.    Federal regulations on providing abortifacients by mail ...................... 5

II.     Proceedings Below ............................................................................... 6

      A.    The original complaint and motion to dismiss ......................... 6

      B.    The amended complaint, discovery, and motion to dismiss .................. 7

      C.    The district court's dismissal of the amended complaint .................... 10

SUMMARY OF THE ARGUMENT ........................................................................ 12

STANDARD OF REVIEW .................................................................................... 14

ARGUMENT ..................................................................................................... 14

I.      The Satanic Temple Does Not Have Associational Standing ........................ 15

      A.    The Satanic Temple failed to identify a member with standing, as required by Supreme Court precedent ................................................. 16

           1.    Supreme Court precedent requires the Satanic Temple to identify a member with standing ............................................... 16

           2.    Neither a "right to privacy" or other precedent excuses an association from identifying members ........................................ 18

B.      Even if naming a member is not required, the Satanic Temple failed to establish any member has standing in her own right ...................... 22

C.      The Satanic Temple's *Daubert* argument is meritless ......................... 26

D.      Any alleged "stigmatic injury" does not confer standing ..................... 29

II.    The Satanic Temple Does Not Have Standing in Its Own Right—and Sovereign Immunity Bars the Only Claim Asserted on Its Own Behalf ........ 31

A.      The Satanic Temple lacks concrete plans to engage in prohibited conduct and would face independent barriers regardless ................... 31

B.      The Satanic Temple has not shown its alleged diversion of resources is an injury traceable to S.B. 1 or redressable ...................... 38

C.      Alleged impacts on the Satanic Temple's mission ore too abstract and generalized to support standing ...................... 40

III.   The District Court Acted Within Its Discretion When It Dismissed the Satanic Temple's Complaint Without Leave to Amend ................................ 40

CONCLUSION ................................................................................. 41

# TABLE OF AUTHORITIES

## CASES

*502 South Mich. Avenue Assocs. LTD v. Devine*,
   433 F.3d 961 (7th Cir. 2006) ................................................................ 22

*All. for Hippocratic Medicine v. U.S. Food & Drug Admin.*,
   78 F.4th 210 (5th Cir. 2023)............................................................ 22, 36

*Altria Grp., Inc. v. Good*,
   555 U.S. 70 (2008) .............................................................................. 36

*Am. Bottom Conservancy v. U.S. Army Corps of Eng'rs*,
   650 F.3d 652 (7th Cir. 2011) ............................................................... 22

*Am. Civ. Lib. Union of Ill. v. Alvarez*,
   679 F.3d 583 (7th Cir. 2012) ............................................................... 22

*Assoc. Gen. Contractors of Am. v. Cal. Dep't of Trans.*,
   713 F.3d 1187 (9th Cir. 2013) ............................................................. 21

*Baker v. Carr*,
   369 U.S. 186 (1962) ....................................................................... 14, 15

*Bazile v. Fin. Sys. of Green Bay, Inc.*,
   983 F.3d 274 (7th Cir. 2020) ............................................................... 24

*Berger v. Nat'l Collegiate Athletic Ass'n*,
   843 F.3d 285 (7th Cir. 2016) ............................................................... 14

*Bostic v. Schaefer*,
   760 F.3d 352 (4th Cir. 2014) ............................................................... 30

*Cal. Rest. Ass'n v. City of Berkeley*,
   65 F.4th 1045 (9th Cir. 2023)............................................................... 21

*California v. Texas*,
   593 U.S. 659 (2021) ............................................................. 23, 33, 37

*Carello v. Aurora Policemen Credit Union*,
   930 F.3d 830 (7th Cir. 2019) ............................................................... 40

*Cath. League for Religious & C.R. v. City & Cnty. of S.F.*,
   624 F.3d 1043 (9th Cir. 2010) ............................................................. 30

CASES [CONT'D]

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ...................................................................*passim*

*Common Cause Ind. v. Lawson,*
   937 F.3d 944 (7th Cir. 2019) ................................................ 39

*Cripe v. Henkel Corp.,*
   858 F.3d 1110 (7th Cir. 2017) .............................................. 28

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) .............................................................. 30

*Daubert v. Merrill Dow Pharm., Inc.,*
   509 U.S. 579 (1993) .............................................................. 28

*Davis v. Fed. Election Comm'n,*
   554 U.S. 724 (2008) .............................................................. 14

*De Buono v. NYSA-ILA Med. & Clinical Servs. Fund,*
   520 U.S. 806 (1997) .............................................................. 37

*Diedrich v. Ocwen Loan Servicing, LLC,*
   839 F.3d 583 (7th Cir. 2016) ................................................ 15

*Disability Rights Wis., Inc. v. Walworth Cnty. Bd. of Supervisors,*
   522 F.3d 796 (7th Cir. 2008) .......................................... 16, 25

*Do No Harm v. Pfizer Inc.,*
   96 F.4th 106 (2d Cir. 2024) ............................................ 17, 21

*Dobbs v. Jackson Women's Health Organization,*
   597 U.S. 215 (2022) ................................................................ 5

*Doe 3 v. Elmbrook Sch. Dist.,*
   658 F.3d 710 (7th Cir. 2011) ................................................ 20

*Doe v. Bolton,*
   410 U.S. 179 (1973) .............................................................. 33

*Doe v. City of Chi.,*
   360 F.3d 667 (7th Cir. 2004) ................................................ 20

*Doe v. Parson,*
   960 F.3d 1115 (8th Cir. 2020) .............................................. 20

Cases [cont'd]

*Doe v. Rokita*,
54 F.4th 518 (7th Cir. 2022) ................................................. 29

*Does I through XXIII v. Advanced Textile Corp.*,
214 F.3d 1058 (9th Cir. 2000) ............................................. 20

*Draper v. Healey*,
827 F.3d 1 (1st Cir. 2016) ................................................... 17

*Dura Auto. Sys. of Ind. Inc. v. CTS Corp.*,
285 F.3d 609 (7th Cir. 2002) ............................................... 27

*Ezell v. City of Chi.*,
651 F.3d 684 (7th Cir. 2011 ................................................ 33

*Flynn v. FCA US LLC*,
39 F.4th 946 (7th Cir. 2022) ............................................... 41

*Ga. Republican Party v. Sec. & Exch. Comm'n*,
888 F.3d 1198 (11th Cir. 2018) ........................................... 17

*GenBioPro, Inc., v. Sorsaia*,
2023 WL 5490179 (S.D.W.V. Aug. 24, 2023) ...................... 36

*Gonzales v. North Twp. of Lake Cnty.*,
4 F.3d 1412 (7th Cir. 1993) ................................................. 30

*Gopalratnam v. Hewlett Packard Co.*,
877 F.3d 771 (7th Cir. 2017) ............................................... 26

*Harmon v. Gordon*,
712 F.3d 1044 (7th Cir. 2013) ............................................. 36

*Harris v. McRae*,
448 U.S. 297 (1980) ........................................................... 31

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ...........................................................40

*Hillsborough Cnty. v. Automated Med. Labs., Inc.*,
471 U.S. 707 (1985) ........................................................... 37

*Horizon W. Condo. Homes Ass'n, Inc. v. Travelers Ins. Co.*,
2023 WL 7951194 (7th Cir. Nov. 17, 2023) ......................... 39

CASES [CONT'D]

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ................................................................ 7, 10, 15, 30

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.,*
    *UAW v. Johnson Controls Inc.*,
    674 F.2d 1195 (7th Cir. 1982) .................................................... 33

*Johnson v. U.S. Off. of Pers. Mgmt.*,
    783 F.3d 655 (7th Cir. 2015) ...................................................... 14

*Keep Chi. Livable v. City of Chi.*,
    913 F.3d 618 (7th Cir. 2019) ...................................................... 25

*Korte v. Sebelius*,
    735 F.3d 654 (7th Cir. 2013) ...................................................... 31

*Lee v. City of Chi.*,
    330 F.3d 456 (7th Cir. 2003) ...................................................... 15

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................................... *passim*

*MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*,
    935 F.3d 573 (7th Cir. 2019) .................................................. 14, 41

*Members of Med. Licensing Bd. of Ind. v. Planned Parenthood Great*
    *Nw., Haw., Alaska, Ind., Ky., Inc.*,
    211 N.E.3d 957 (Ind. 2023) ...................................................... 4, 29

*NAACP v. Ala. ex rel. Patterson*,
    357 U.S. 449 (1958) ............................................................ 16, 18

*Nat'l Council of La Raza v. Cegavske*,
    800 F.3d 1032 (9th Cir. 2015) ................................................... 21

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984) .............................................................. 7, 31

*Planned Parenthood of Southeast Pennsylvania v. Casey*,
    505 U.S. 833 (1992) ............................................................... 4

*Planned Parenthood of Wis., Inc. v. Schimel*,
    806 F.3d 908 (7th Cir. 2015) ...................................................... 33

CASES [CONT'D]

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC,*
    2 F.4th 1002 (7th Cir. 2021) ...................................................... 16, 23, 25

*Religious Sisters of Mercy v. Becerra,*
    55 F.4th 583 (8th Cir. 2022) ..................................................................... 17

*Roe v. Dettelbach,*
    59 F.4th 255 (7th Cir. 2023) ..................................................................... 20

*Roe v. Wade,*
    410 U.S. 113 (1973) ..................................................................................... 4

*S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at
    Broadlands, LLC,*
    713 F.3d 175 (4th Cir. 2013) ................................................................... 17

*Satanic Temple v. Labrador,*
    --- F. Supp. 3d ---, 2024 WL 357045 (D. Idaho, Jan. 31, 2024) ...................... *passim*

*Simic v. City of Chi.,*
    851 F.3d 734 (7th Cir. 2017) ................................................................... 38

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ................................................................................... 30

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard
    Coll.,*
    600 U.S. 181 (2023) ................................................................................... 17

*Summers v. Earth Island Institute,*
    555 U.S. 488 (2009) .............................................................................*passim*

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ................................................................................... 31

*Sweeney v. Raoul,*
    990 F.3d 555 (7th Cir. 2021) ................................................................... 32

*Target Market Publ'g, Inc. v. ADVO, Inc.*
    136 F.3d 1139 (7th Cir. 1998) ................................................................. 28

*Valley Forge Christian Coll. v. Ams. United for Separation of Church &
    State, Inc.,*
    454 U.S 464 (1982) ................................................................................... 40

Cases [cont'd]

*Vill. of Elk Grove Vill. v. Evans*,
    997 F.2d 328 (7th Cir. 1993) ................................................... 22, 24

*Wagner v. Teva Pharms. USA, Inc.*,
    840 F.3d 355 (7th Cir. 2016) ......................................................... 35

*Warth v. Seldin*,
    422 U.S. 490 (1975) ............................................................. 14, 15

Rules

Fed. R. Civ. P. 26(a)(2)(B) ............................................................. 28

Fed. R. Evid. 702 ........................................................................ 26

Fed. R. Evid. 702(c)–(d) ................................................................ 28

S.D. Ind. L.R. 10-1 ...................................................................... 19

Statutes

18 U.S.C. § 1461 ................................................................. 5, 6, 37

28 U.S.C. § 1291 .......................................................................... 3

28 U.S.C. § 1331 .......................................................................... 2

Ind. Code § 16-21-2-2.5 .................................................................. 5

Ind. Code § 16-34-1-11 ............................................................... 5, 35

Ind. Code § 16-34-2-1 ............................................................. 6, 34, 35

Ind. Code § 16-34-2-1(a) ............................................................ 5, 23

Ind. Code § 16-34-2-1(a)(1) (Aug. 2022) ............................................. 4, 35

Ind. Code § 16-34-2-1(a)(1)(B) .......................................................... 5

Ind. Code § 16-34-2-1(d) ............................................................ 5, 35

Ind. Code § 16-34-2-7(a) ........................................................ 32, 34, 35

Ind. Code § 25-1-9.5-8 .................................................................. 4

Ind. Code § 25-1-9.5-8(a)(4) ........................................................ 5, 35

STATUTES [CONT'D]

Ind. Code § 25-1-9.5-9 ................................................................................. 4

Ind. Code § 25-1-9.5-9(a) ........................................................................ 3, 34

Ind. Code § 25-1-9.5-9(b) ........................................................................ 4, 34

Ind. Code § 25-22.5-8-1 ........................................................................... 3, 34

Ind. Code § 25-23-1-19.4(c) ......................................................................... 4

Ind. Code §25-23-1-19.5 .............................................................................. 4

Ind. Code § 25-23-1-27 ............................................................................ 3, 34

OTHER AUTHORITIES

Application of the Comstock Act to the Mailing of Prescription Drugs
    That Can Be Used for Abortions, 46 Op. O.L.C. __ (Dec. 23, 2022) .................... 37

Pew Research Center, *Religious Groups' Official Positions on Abortion*
    (Jan. 16, 2013),
    https://www.pewresearch.org/religion/2013/01/16/religious-groups-
    official-positions-on-abortion/ .................................................................. 29

## INTRODUCTION

The Satanic Temple is an organization that venerates the figure Satan and whose members claim a right to destroy unborn children in a "Satanic Abortion Ritual." This case, however, is less about religion or abortion than the Satanic Temple's noncompliance with basic litigation requirements.

From the outset of this litigation, the Satanic Temple was on notice that it needed to provide factual allegations (and if they were challenged, competent evidence) sufficient to establish standing. It repeatedly refused. As the district court observed, Supreme Court precedent requires an organization asserting associational standing to establish that an "identified member" has standing in her own right by providing evidence "specific" to that member. *Summers v. Earth Island Institute*, 555 U.S. 488, 498 (2009). But the Satanic Temple declined to identify any of members or provide evidence that a specific member had suffered an injury in fact. Instead, the Satanic Temple tendered a declaration from a source with "no personal knowledge of [its] members" who merely offered statistical "speculation" about how Indiana law might impact a hypothetical member. BA14–BA15.

Nothing more supported the Satanic Temple's claim that it has standing in its own right based on an abortion clinic that it created in New Mexico. As the court below observed, the Satanic Temple's "own admissions" make "abundantly clear" that it has "no intent" to provide abortion services in Indiana using the clinic. BA25; *see* BA20. So the Satanic Temple failed to show any concrete, particularized, and imminent injury from Indiana laws regulating abortion. And even if the Satanic Temple

faced some injury, that injury would neither be caused by nor be redressable by enjoining the only Indiana provisions that the Satanic Temple challenged. "[O]ther unchallenged" laws would "independently prohibit the Satanic Temple from lawfully" shipping abortion-inducing drugs from New Mexico to Indiana by mail. BA23.

The district court properly dismissed this suit for lack of jurisdiction.

## JURISDICTIONAL STATEMENT

The Satanic Temple's amended jurisdictional statement, 7th Cir. Doc. 20, is not complete and correct. In its operative complaint, the Satanic Temple asserted claims against state officials in their official capacities related to Indiana's Senate Bill 1 (S.B. 1), which limited the legal reasons for abortions. Dkt. 21. The complaint alleged that S.B. 1 violates rights of Satanic Temple members protected by the U.S. Constitution's Takings Clause, the Thirteenth Amendment, and the Equal Protection Clause. *Id.* at 11–14 (Am. Compl. ¶¶ 69–98). The complaint also alleged that S.B. 1 violates rights afforded Satanic Temple members and the Satanic Temple itself under Indiana's Religious Freedom Restoration Act. *Id.* at 14–15 (¶¶ 99–112).

For the reasons in the district court's decision dismissing the Satanic Temple's complaint for lack of subject-matter jurisdiction and in this brief, the district court lacked jurisdiction. The Satanic Temple failed to establish Article III standing, and while its constitutional claims raise federal questions under 28 U.S.C. § 1331, sovereign immunity bars its state-law claims. *See* BA4–BA26; pp. 30–31, *infra.* The district court dismissed the Satanic Temple's claims and entered final judgment on October

25, 2023. BA1, BA26. The Satanic Temple filed a timely notice of appeal on November 22, 2023. BA2. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether the district court correctly held that the Satanic Temple lacked associational standing because it refused to identify any member allegedly injured and failed to establish that any member has standing in her own right.

2.     Whether the district court correctly held that the Satanic Temple lacked standing to bring its own claim because it failed to identify a cognizable injury traceable to the challenged statute and redressable by a favorable judgment.

3.     Whether sovereign immunity bars state-law claims that the Satanic Temple asserted against state officials in their official capacities.

4.     Whether the district court properly exercised its discretion in denying leave to amend the complaint for a second time where the Satanic Temple was on notice of its defects, failed to cure them in its first amended complaint, and did not identify amendments that would cure the defect.

## STATEMENT OF THE CASE

### I.     Statutory Background

#### A.     General medical regulations

To practice medicine in Indiana, practitioners must be licensed by the State. Ind. Code §§ 25-22.5-8-1, 25-23-1-27. Practitioners who are "physically located outside Indiana" but establish a provider-patient relationship with persons in Indiana or issue prescriptions to them are considered to be "engaged in the provision of health care services in Indiana." § 25-1-9.5-9(a). Out-of-state practitioners may not

establish a provider-patient relationship with or issue a prescription to a person in Indiana without filing a formal certification in which they submit to Indiana's jurisdiction and laws, including its licensing and practice requirements. § 25-9.5-9(b).

Maintaining a license to provide health care services in Indiana requires practitioners to comply with a variety of state health and safety regulations. As relevant here, a nurse seeking to become licensed as an "advanced practice registered nurse"—a classification that allows the nurse to prescribe certain drugs—must meet advanced training requirements and operate in collaboration with a licensed physician or under a hospital's supervision. §§ 25-23-1-19.4(c), 25-23-1-19.5. Practitioners also must abide by state regulations governing health-care services, including specific rules governing telehealth services that are designed to protect patients. *See, e.g.*, §§ 25-1-9.5-8, 25-1-9.5-9.

### B.     Indiana regulations regarding abortion

One heavily regulated service in Indiana is abortion. "For all of Indiana's history, abortion has been the subject of state lawmaking." *Members of Med. Licensing Bd. of Ind. v. Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky., Inc.*, 211 N.E.3d 957, 962 (Ind.), *reh'g denied*, 214 N.E.3d 348 (Ind. 2023). During the era of *Roe v. Wade*, 410 U.S. 113 (1973), and *Planned Parenthood of Southeast Pennsylvania v. Casey*, 505 U.S. 833 (1992), abortions before viability were generally permitted. Ind. Code § 16-34-2-1(a)(1) (Aug. 2022). For health and safety reasons, however, Indiana limited the use of abortion-inducing drugs to the first eight weeks of pregnancy, required an in-person examination by a physician, and required a

physician to dispense the drug "in person." *Id.* It explicitly prohibited the use of "[t]elehealth and telemedicine . . . to provide any abortion, including the writing or filling of a prescription for any purpose that is intended to result in an abortion." § 16-34-2-1(d) (Aug. 2022); *see* §§ 16-34-1-11, 25-1-9.5-8(a)(4) (Aug. 2022). Indiana also required clinics providing abortions to be licensed by the Indiana Department of Health. § 16-21-2-2.5 (Aug. 2022).

After the Supreme Court overruled *Roe* and *Casey* in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), Indiana amended its abortion law with Senate Bill 1 (S.B. 1). *See* BA27–70. S.B. 1 made abortion unlawful except in three circumstances: (1) where necessary to save the pregnant woman's life or to avert a serious health risk, (2) where the fetus is diagnosed with a lethal fetal anomaly, and (3) in cases of rape or incest. Ind. Code § 16-34-2-1(a). S.B. 1 also required legal abortions to be performed at hospitals and ambulatory surgical centers, eliminating the option for abortions to be performed at clinics. § 16-34-2-1(a)(1)(B). It, however, did not alter Indiana's general licensing requirements, prohibition against using telemedicine for abortions, or rules regarding abortion-inducing drugs.

## C.     Federal regulations on providing abortifacients by mail

Federal law imposes additional requirements on providers who might seek to provide abortions by telehealth. Under the Comstock Act, it is a federal crime to use the mails for any "article or thing designed, adapted, or intended for producing abortion"; for any "article, instrument, substance, drug, medicine, or thing which is

5

advertised or described in a manner calculated to lead another to use or apply it for producing abortion"; or for other similar materials. 18 U.S.C. § 1461.

## II.   Proceedings Below

### A.     The original complaint and motion to dismiss

Shortly after S.B. 1's enactment, the Satanic Temple—a putative "religious association" that simultaneously purports to "venerate[] . . . the allegorical Satan" and "adhere" to "secular humanism"—sued Indiana Attorney General Todd Rokita and Governor Eric Holcomb over S.B. 1. Dkt. 1 at 1 (Compl. ¶¶ 1, 3–4). In its original complaint, the Satanic Temple challenged Indiana's decision in "Indiana Code § 16-34-2-1" to "make[] the act of aborting an unborn child a crime except in cases of serious health risk to the mother, to protect the life of the mother, a lethal fetal anomaly or the pregnancy is the result of rape or incest." *Id.* at 3–4 (¶¶ 13–14). It did not challenge Indiana's general licensing requirements, rules for prescribing abortion-inducing drugs, or prohibition on using telehealth for abortion.

The Satanic Temple purported to challenge S.B. 1's restrictions on the legal reasons for abortion on behalf of unidentified "members residing in Indiana who are involuntarily pregnant." Dkt. 1 at 2 (Compl. ¶ 5). It defined "involuntarily pregnant" to include women who became pregnant due to the "legal inability to consent to sex (other than rape or incest)" or "failure of her Birth Control." *Id.* at 3 (¶ 7). According to the Satanic Temple, S.B. 1 violates Indiana's Religious Freedom Restoration Act by preventing involuntarily pregnant women from engaging in a "Satanic Abortion Ritual." *Id.* at 3, 13 (¶¶ 13, 89–96). It also alleged that S.B. 1 violates the U.S.

6

Constitution's Takings Clause by interfering with a woman's "property right . . . to exclude or remove" an unborn child "from her uterus," violates the Thirteenth Amendment by failing to provide "compensation" to women who "provid[e] the services necessary to sustain the life" of unborn children, and violates the Equal Protection Clause by distinguishing between women who are pregnant due to "rape or incest" and ones who are "pregnant by accident." *Id.* at 9–11 (¶¶ 59, 62, 69, 77). The Satanic Temple, however, did not allege that any members were purportedly injured by S.B. 1.

Defendants moved to dismiss, Dkt. 17, arguing that the district court lacked subject-matter jurisdiction and that the claims lacked merit, Dkt. 18. Of particular relevance here, defendants pointed out that the Satanic Temple lacked associational standing because it did not identify any member with standing to sue in her own right, as required by *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977). Dkt. 18 at 7. Defendants also observed that, under *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984), sovereign immunity barred the Satanic Temple's state-law claims against state officials. Dkt. 18 at 20–21.

## B.     The amended complaint, discovery, and motion to dismiss

The Satanic Temple amended its complaint, dropping Governor Holcomb as a defendant and adding Marion County Prosecutor Ryan Mears. Dkt. 21. As before, the Satanic Temple alleged that it brought a challenge only to S.B. 1—not to preexisting state statutes governing licensing, telehealth, or abortion-inducing drugs. *Id.* at 4 (Am. Compl. ¶ 18). The Satanic Temple alleged that S.B. 1's restriction on the legal

reasons for abortion violates the rights of "Involuntarily Pregnant Wom[e]n" secured by Indiana's Religious Freedom Restoration Act, the Takings Clause, the Thirteenth Amendment, and the Equal Protection Clause. *Id.* at 10–15 (¶¶ 69–112). Although the Satanic Temple defined the term "Involuntarily Pregnant Woman" to include members, it again did not identify any purportedly injured by S.B. 1. *Id.* at 3 (¶ 12).

The Satanic Temple also alleged that S.B. 1 violated its own state-law rights under Indiana's Religious Freedom Restoration Act by preventing it from providing abortions in Indiana "necessary for a . . . member to engage in the Satanic Abortion Ritual." Dkt. 21 at 14–15 (Am. Compl. ¶ 104). According to the amended complaint, the Satanic Temple had "spent over $75,000 to establish and maintain an abortion clinic" in "response to the bans on abortion in Indiana and other states." *Id.* at 4–5 (¶¶ 19, 21). The clinic's alleged purpose was to promote the Satanic Abortion Ritual, provide abortion-inducing drugs to members for that ritual, and counsel members on various topics. *Id.* at 4 (¶ 20). The amended complaint, however, did not specify where the Satanic Temple's clinic is located, to whom it provides abortions, under what circumstances it provides abortions, whether it is licensed to operate in Indiana, and whether any staff are licensed to practice medicine in Indiana, either in person or by telehealth.

Defendants sought discovery on matters pertinent to standing. In discovery, the Satanic Temple refused to identify any member in Indiana who it believed provided a basis for standing. A269. Instead, the Satanic Temple tendered a pseudonymous declaration from its executive director who estimated it had "approximately

5,650 female TST members residing in Indiana." A3 (Helian Decl. ¶ 11). The Satanic Temple also submitted a declaration from a physician who cited statistics regarding the 2017 fertility rate in Indiana, the 2021 abortion rate in Indiana, the percentage of women who have "used as least one form of contraception during their lifetime," and unintended pregnancies from failure of birth control. A9–A10 (J.D. Decl. ¶¶ 5–12). Although the physician did not claim to have expertise in statistical analysis, the physician opined that "these statistics" showed "ninety-four (94) TST members in Indiana are Involuntarily Pregnant Women during the course of a year." A10 (¶ 12).

Regarding its own clinic, the Satanic Temple stated that its clinic was "established in response to a decision by the U.S. Supreme Court in the *Dobbs* case." A4 (Helian Decl. ¶¶ 20–21). The clinic has no physicians and conducts no in-person appointments, but employs an "Advanced Practice Registered Nurse" who conducts appointments by video link from a location in New Mexico and prescribes abortion-inducing drugs that are shipped by mail. A5–A6 (Helian Decl. ¶ 23); *see* A265. As of June 2023, the clinic served "only . . . patients who provide[d] a New Mexico address." Dkt. A6 (Helian Decl. ¶ 25); *see* A265. It did not serve Indiana residents, had no intention to open an Indiana location, and employed no physician licensed to practice medicine in Indiana. A264–A265; *see* A4 (Helian Decl. ¶¶ 25, 26).

Defendants again moved to dismiss, reprising arguments that the Satanic Temple lacked standing and that sovereign immunity barred its state-law claims. Dkt. 36; Dkt. 37. In response to this second motion to dismiss, the Satanic Temple again refused to identify any member in Indiana allegedly injured, contending the

First Amendment excuses it from doing so. Dkt. 44 at 14–15. To buttress its own standing, the Satanic Temple twice attempted to reframe its complaint in briefing. First, it asked the court to consider the complaint as challenging not only S.B. 1's provisions restricting the legal reasons for abortion, but abortion restrictions relating to "informed consent," hospital admitting privileges, and dispensing requirements. Dkt. 44 at 5–7. Then, in a supplemental brief, the Satanic Temple sought for the complaint to be construed as attacking "any and all Indiana laws" conflicting with how it might wish to operate. Dkt. 57 at 3. The Satanic Temple also attempted to withdraw its state-law claims and sought leave to replead them as claims under the Free Exercise Clause. Dkt. 44 at 33. It offered no explanation as to why it had failed to replead the claims as proposed in its first amended complaint.

### C.     The district court's dismissal of the amended complaint

The district court granted defendants' motion to dismiss, holding that the Satanic Temple failed to establish standing. BA21.

As the court explained, establishing associational standing requires an organization to establish "its members would otherwise have standing to sue in their own right." BA12 (quoting *Hunt*, 432 U.S. at 343). That requires a showing of injury "'specific' to an 'identified member.'" *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)). Despite admitting (at 46) that S.B. 1 may "affect[] only some" members, however, the Satanic Temple did not identify any member with standing. BA13. Instead, it sought to establish standing through "an unidentified doctor opining on unidentified members" identified "only through statistical probability." BA16. As the

court observed, however, the "Supreme Court has unequivocally prohibited" this kind of "speculation through statistics." BA15. And this case illustrates why: Even if the Satanic Temple's doctor were correct about "average" pregnancy and abortion rates, it would still be possible for "exactly zero Members to be pregnant," none to want an abortion, and none to be injured by S.B. 1. BA14–BA15. The district court rejected the Satanic Temple's argument that the First Amendment excuses organizations from "providing specific allegations" for standing. BA13 n.1.

The court held the Satanic Temple did not have standing in its own right either, because it failed to establish a concrete and particularized injury in fact from S.B. 1. The Satanic Temple could not claim an injury from threat of prosecution, costs of compliance, or diversion of resources because it failed to show that it "intends to engage in conduct that is unlawful under S.B. 1." BA20–BA21. The court observed that the Satanic Temple has no clinic in Indiana, employs no physicians licensed to practice in Indiana, and does not intend to establish an in-person clinic in Indiana. BA20. The court also explained that the Satanic Temple—which had challenged "only S.B. 1," BA9—could not show an injury traceable to S.B. 1 that would be redressable by a favorable judgment. BA23. Even if it succeeded in its challenge to S.B. 1, "other unchallenged federal law and Indiana laws would each independently prohibit the Satanic Temple from operating its mail-order abortion service." *Id*. And finally the Satanic Temple's allegations of a "setback to the organization's abstract social interests" were too "generalized" to support standing. BA21–BA22 (citations omitted).

The court declined to permit leave to amend for a second time. BA24. It observed that the Satanic Temple had "notice of its standing defects," was "given an opportunity to cure them," and yet "did not use its earlier opportunity to cure its standing deficiencies." BA24–BA25. The Satanic Temple instead "tried to introduce nonresponsive constructive amendments, each slipped into its briefing." BA24. And the amendments "collide[d]" with "the Satanic Temple's own admissions of fact." BA25. "Granting leave to amend would practically produce only more briefing." BA25.

## SUMMARY OF THE ARGUMENT

The Satanic Temple purports to challenge Indiana's S.B. 1. But federal courts do not have jurisdiction to decide that challenge because the Satanic Temple has not established that it has Article III standing, either as an association or in its own right.

I.    The Satanic Temple lacks associational standing on behalf of its members because it has not identified a single member that would have standing in her own right to challenge S.B. 1. The Supreme Court requires associations to identify at least one member who will be harmed by the challenged government action to assert associational standing. The Satanic Temple did not do so, but cited general statistics about pregnancy rates, abortion rates, and the like. That statistical speculation is no substitute for identifying specific members who are allegedly injured.

Even if associations may sometimes use statistical analysis in connection with establishing standing, the requirement remains that an association establish that a member would have standing to sue in her own right. The Satanic Temple fell short here. It purports to bring suit on behalf of "involuntarily pregnant" women, but it

failed to establish any member was in fact "involuntarily pregnant." Nor did the Satanic Temple establish that a single member suffered an injury traceable to S.B. 1 and redressable by a favorable judgment. It offered no evidence that any member wants an abortion or that S.B. 1 is stopping her from obtaining one.

The Satanic Temple's allegations that all members have suffered a stigmatic injury on account of S.B. 1 is too generalized and speculative for standing. And in any event, the district court did not have jurisdiction over the Satanic Temple's state-law claims based on individual religious exercises.

II.     The Satanic Temple also does not have standing in its own right to bring a claim under Indiana's Religious Freedom Restoration Act. The Satanic Temple is in no danger of injury from S.B. 1 because it has no doctors or facilities in Indiana who might perform abortions in violation of the law, nor does it have any intention of hiring or building any. Indeed, the Satanic Temple admits that it will not provide any abortions in Indiana if it wins this litigation.

Regardless, the Satanic Temple cannot show its injury is traceable to S.B. 1 and redressable by a judgment against it. S.B. 1 limits the legal reasons for abortion. But other, unchallenged laws governing licensing, telehealth, and abortion-inducing drugs would prevent the Satanic Temple from operating a mail-order service for abortion-inducing drugs. And sovereign immunity bars the only claim it brought on its own behalf, a state-law claim.

13

III.   Finally, it was well within the district court's discretion to dismiss the Satanic Temple's complaint without leave given the Satanic Temple's failure to cure known standing deficiencies and multiple attempts to shift its arguments.

## STANDARD OF REVIEW

The dismissal of a complaint for lack of subject-matter jurisdiction is reviewed de novo. *Berger v. Nat'l Collegiate Athletic Ass'n*, 843 F.3d 285, 289 (7th Cir. 2016). Any decision to dismiss a complaint without leave to amend is reviewed for abuse of discretion. *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.,* 935 F.3d 573, 582 (7th Cir. 2019).

## ARGUMENT

Article III's case-or-controversy requirement requires plaintiffs to demonstrate (1) an injury-in-fact that is "concrete and particularized," as well as "actual or imminent, not 'conjectural' or 'hypothetical,'" (2) a causal connection that renders the injury fairly traceable to the challenged action of the defendant, and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "'[A] plaintiff must demonstrate standing for each claim he seeks to press.'" *Johnson v. U.S. Off. of Pers. Mgmt.*, 783 F.3d 655, 661 (7th Cir. 2015) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). These standing requirements, which are "founded in concern about the proper—and properly limited—role of the courts in a democratic society," aim to ensure that the person bringing the lawsuit possesses "'such a personal stake in the outcome of the controversy'

14

as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

A plaintiff "bears the burden" of establishing standing "with the manner and degree of evidence required" at each "stage of the litigation." *Lujan*, 504 U.S. at 561. At the pleading stage, a plaintiff must provide plausible factual allegations sufficient to show that standing existed at the time suit was filed. *See Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 588 (7th Cir. 2016). "If standing is challenged as a factual matter," however, the plaintiff cannot rest on the complaint's allegations. *Lee v. City of Chi.*, 330 F.3d 456, 468 (7th Cir. 2003). The plaintiff "must come forward with 'competent proof'—that is a showing by a preponderance of the evidence—that standing exists." *Id.* The district court correctly held that the Satanic Temple failed to meet its burden of providing competent proof that federal jurisdiction exists.

## I.     The Satanic Temple Does Not Have Associational Standing

As the district court observed, the Satanic Temple failed to establish associational standing to raise constitutional and state-law claims on behalf of its members. Associational standing requires an organization to establish that "its members would otherwise have standing to sue in their own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). An organization must provide evidence of harm "specific" to an "identified member." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493

(2009). In this case, however, the Satanic Temple refused to identify any member and failed to demonstrate that any unidentified member has standing.

### A.    The Satanic Temple failed to identify a member with standing, as required by Supreme Court precedent

#### 1.    Supreme Court precedent requires the Satanic Temple to identify a member with standing

In *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), the Supreme Court held that associational standing requires an organization to prove harm "specific" to an "identified member." *Id.* at 498. The Supreme Court rejected the position that associations can establish standing through "statistical probability." *Id.* The "requirement of naming the affected members," the Court explained, "has never been dispensed with in light of statistical probabilities." *Id.* at 498–99. An affidavit is "insufficient" to establish standing when it "d[oes] not name the individuals who were harmed." *Id.* at 498. An exception to the requirement to name a member applies "only where *all* the members of the organization are affected by the challenged activity." *Id.* (citing *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 459 (1958)).

Prior to *Summers*, this Court stated that "the member on whose behalf the suit is filed" may "remain unnamed by the organization." *Disability Rights Wis., Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 802 (7th Cir. 2008). In *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002 (7th Cir. 2021), however, the Court conceded that statement may not "survive[] *Summers*." *Id.* at 1011. "Indeed, other courts have read *Summers* to expressly require names for associational standing on the pleadings." *Id.* And since *Prairie Rivers*, courts have increasingly

16

recognized that associations must "identify by name at least one injured member for purposes of establishing Article III standing." *Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 118 (2d Cir. 2024); *see Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 601 (8th Cir. 2022) ("an organization must identify particular members and their injuries"); *Ga. Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1204 (11th Cir. 2018); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016); *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).

Requiring plaintiffs claiming associational standing to identify individual members makes sense, at least absent a showing that all members are affected equally. Courts have "an independent obligation to assure that standing exists." *Summers*, 555 U.S. at 499. "Without individual affidavits," however, a court cannot "assure itself" that any individual member is actually harmed by the challenged action. *Id.* Nor are statistical probabilities a substitute for specifics. "Standing "is not an ingenious academic exercise in the conceivable' . . . but requires a factual showing of perceptible harm." *Id.* (cleaned up). And as the district court observed below, it may be "statistically possible" for "exactly zero" members to be injured even if there is a likelihood that an "average" member might be. BA14. Additionally, it can be "difficult[]" to "verify[]" the facts underlying statistical probabilities. *Summers*, 555 U.S. at 499. Thus, as the Supreme Court's most recent decision on associational standing makes clear, "identifiable members" are required. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023).

17

In this case, however, the Satanic Temple repeatedly refused to identify any member who allegedly has standing. It proffered an affidavit from an "Executive Director" under an assumed name, refusing to disclose the person's identity even to the court. BA13. It further tried to skirt standing requirements by asserting that, statistically, a female member of the Satanic Temple might exist. But such "speculation through statistics," BA15, does not satisfy the Supreme Court's demand that an association provide "specifics" regarding an "identified member," *Summers*, 555 U.S. at 498. The Satanic Temple's refusal to provide "statistically identified Members, [as] the Supreme Court requires," deprives it of associational standing. BA16.

### 2.    Neither a "right to privacy" or other precedent excuses an association from identifying members

Seizing primarily on *NAACP v. Alabama*, 357 U.S. 449 (1958), the Satanic Temple argues that its members have a "constitutional right to privacy" that allows them to remain anonymous. Br. 35. Read against that backdrop, the Satanic Temple contends, *Summers* does not require members to be identified by name. *Id.* at 45–46. That reads too much into *NAACP*. There, for reasons unrelated to establishing federal jurisdiction, Alabama sought to compel disclosure of the names and addresses of "*all* [the NAACP's] Alabama members and agents, without regard to their positions or functions in the association." 357 U.S. at 451 (emphasis added). The Supreme Court held that compelled disclosure would infringe on members' freedom of association. *Id.* at 468. The Supreme Court, however, did not hold that there is a general "right to privacy" so potent that it excuses organizations from providing the information needed to meet the demands of Article III of the Constitution.

The Satanic Temple itself admits that *NAACP* "did not address whether or to what extent an organization has to name some of its members individually to have standing." Br. 38. It nevertheless faults the district court for not applying "strict scrutiny" to determine whether some members must be named. *Id.* at 40. As *Summers* itself holds, however, "naming . . . affected members" is a constitutional "requirement." 555 U.S. at 498–99. *NAACP* stands for the proposition that an organization need not identify members by name "only where *all* the members of the organization are affected by the challenged activity." *Summers*, 555 U.S. at 499. It would be strange indeed if a federal court could ignore its own jurisdictional limitations out of concern for how disclosure might (or might not) affect a few members. Standing "is not an ingenious academic exercise" but a limitation on federal judicial power. *Id.* Besides, as the district court observed, courts have mechanisms to guard against potential harms. For example, it is "possible for a litigant to proceed anonymously while concurrently providing specific allegations." BA13 n.1 (citing S.D. Ind. L.R. 10-1).

The Satanic Temple argues that allowing members' identities to be disclosed to the court while remaining anonymous to the public would have been "unconstitutional." Br. 40–41. But this is not an instance of the state "impos[ing] conditions which require the relinquishment of rights guaranteed by the Federal Constitution." *Id.* at 41. The Constitution itself demands that the Satanic Temple identify to the court the facts necessary to invoke federal jurisdiction. *See Summers*, 555 U.S. at 498–99. The Satanic Temple, moreover, overlooks that individual-rights concerns cut both ways. There is a strong presumption of openness in court proceedings because of public

rights to access. *See Doe 3 v. Elmbrook Sch. Dist.*, 658 F.3d 710, 721 (7th Cir. 2011); *Doe v. City of Chi.*, 360 F.3d 667, 669 (7th Cir. 2004). And this Court recently affirmed the importance of disclosing a plaintiff's identity to the courts even where a plaintiff remains anonymous to the public. *See Roe v. Dettelbach*, 59 F.4th 255, 260 (7th Cir. 2023).

That this case arises at the intersection of religion and abortion does not change the analysis. *Contra* Br. 36. There is no longer any recognized "right to privacy" in the abortion context. *Dobbs*, 597 U.S. at 235; *see id.* at 286–87 (criticizing decisions that have "diluted" or "ignored" traditional legal rules in this context). And the Satanic Temple does not identify any cases in which courts have recognized a broad "right to anonymity" from the entire judicial process. Even in cases allowing plaintiffs to proceed anonymously, *see, e.g.*, *Does I through XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067–69 (9th Cir. 2000), the anonymous parties were identified to the courts. Indeed, the Satanic Temple itself has previously identified a specific member to the court and provided specific information about her intent to seek an abortion—even as she proceeded anonymously. *See, e.g.*, *Doe v. Parson*, 960 F.3d 1115, 1116 (8th Cir. 2020). It offers no explanation of why it could not do so here.

The Satanic Temple argues that assorted decisions have held that "identification of an association member by name is not required '[w]here it is relatively clear . . . that one or more members have been or will be adversely affected by a defendant's action and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury.'" Br. 42

(quoting *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015)). But the line the Satanic Temple lifts from the Ninth Circuit's *Cegavske* decision addressed a standing theory that primarily "rested on *[the organization's] own*" injury. *Do No Harm*, 96 F.4th at 118 n.7. Other Ninth Circuit decisions hold that, where an organization is suing on behalf of members, a complaint must "identify any affected members by name." *Assoc. Gen. Contractors of Am. v. Cal. Dep't of Trans.*, 713 F.3d 1187, 1194 (9th Cir. 2013). Reading *Cegavske* as the Satanic Temple does would bring it into conflict with *Summers*. *See Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045, 1063 (9th Cir. 2023) (Baker, J., concurring), *amended and superseded on denial of rehearing en banc*, 89 F.4th 1094, 1115 (9th Cir. 2024).

As the district court observed, moreover, this case does not involve a situation in which it is "relatively clear" that Satanic Temple members are injured and no further information is needed to understand their injury. BA14–BA15. The Satanic Temple itself guesses that only 94 of its 11,300 Indiana members might be "involuntarily pregnant" in a year. Br. 51–52. And it does not hazard any guesses as to how many of those might have been "involuntarily pregnant" at the time suit was filed or how many of those might be able to allege an injury traceable to S.B. 1. No one has shown that there are female members of the Satanic Temple in Indiana, to say nothing of whether they are pregnant, want to obtain an abortion, or are unable to do so. It is thus critical to know on whose behalf the Satanic Temple is suing to determine whether those members had plausible claims of injury at the time this suit was filed.

The Satanic Temple's other cases are equally unhelpful to its cause. *Alliance for Hippocratic Medicine v. U.S. Food & Drug Administration*, 78 F.4th 210, 235 (5th Cir. 2023), *cert. granted*, 144 S. Ct. 537 (2023), did not address the issue presented here. In that case, the plaintiff doctors had identified themselves and had identified occasions when they had been affected by the rule at issue. *Id.* at 234. Statistics were offered not to establish that a doctor with standing to challenge the rule actually existed, but rather, to establish how many more doctors might be affected. Here, the Satanic Temple has yet to establish a single member—and certainly has not identified a single member in Indiana—who has standing in her own right.

Similarly misplaced is the Satanic Temple's reliance, Br. 47, on whether an increased risk of injury to an identified plaintiff suffices for standing purposes. In each of those cases, the allegedly injured parties were clearly identified. *Vill. of Elk Grove Vill. v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993) (the village itself); *Am. Bottom Conservancy v. U.S. Army Corps of Eng'rs*, 650 F.3d 652, 657 (7th Cir. 2011) (three members who regularly visited the park); *Am. Civ. Lib. Union of Ill. v. Alvarez*, 679 F.3d 583, 588 (7th Cir. 2012) (the ACLU itself); *502 South Mich. Avenue Assocs. LTD v. Devine*, 433 F.3d 961, 962 (7th Cir. 2006) (the Congress Hotel). None held that an organization can refuse to name a member with standing. The Satanic Temple's failure to identify a single member with standing to bring suit in her own right is fatal.

## B.  Even if naming a member is not required, the Satanic Temple failed to establish any member has standing in her own right

Even if naming a member is not required to establish associational standing, the Satanic Temple failed to establish standing. As this Court held in *Prairie Rivers*,

22

whether or not an organization must name its members, "standing for at least one individual member remains an essential component of associational standing at each stage of litigation." 2 F.4th at 1011. An organization cannot rely only on "statistical probability" or speak of "its individual members only as a collective." *Id.* at 1009–10. It must provide "facts sufficient to show that at least one of its members could sue in their own right." *Id.* at 1010. The Satanic Temple did not establish that here.

As the district court ruled, the Satanic Temple proffered no facts showing that any member was injured here. BA14–15. In this case, the Satanic Temple sought to sue on behalf of "involuntarily pregnant women," defined to include any "member of TST" who "reside[s] in Indiana," who is pregnant with a non-viable child, and who became pregnant "without her consent." Dkt. 21 at 3 (Am. Compl. ¶ 12); *see id.* at 10–14 (¶¶ 69–98). So the Satanic Temple was required to prove that at least one member met all of these requirements when the complaint was filed. And that is not all it had to show. Satisfying the Satanic Temple's definition of "involuntarily pregnant" would not by itself establish that a woman has standing in her own right. To establish standing, an "involuntarily pregnant" woman would have to prove she faces an "actual" or "imminent" harm "fairly traceable" to S.B. 1. *See California v. Texas*, 593 U.S. 659, 675 (2021); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). At a minimum, that would require showing that the woman wanted an abortion that is not legal under S.B. 1. *See* Ind. Code § 16-34-2-1(a) (permitting abortions to save the pregnant woman's life, to avert a serious health risk, and for lethal fetal anomalies).

The Satanic Temple failed at every turn. It did not support with "competent proof" that a single member was "involuntarily pregnant" when this suit was filed. *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020). It did not identify, even anonymously, a member who "reside[s] in Indiana," who is pregnant with a non-viable child, and who became pregnant "without her consent." Dkt. 21 at 3 (Am. Compl. ¶ 12). Instead, using a doctor of osteopathy with "no personal knowledge of the Satanic Temple's members," the Satanic Temple sought to demonstrate "statistically" that an "involuntarily pregnant woman" might exist somewhere in Indiana. BA14. As the district court explained, however, it is "statistically possible for the average number of pregnancies to be greater than zero, and for exactly zero members to be pregnant." *Id.* And of course, simply because a woman is unintentionally pregnant does not mean that she will seek an abortion or that an abortion she does seek will be prohibited by S.B. 1. BA15. Yet the Satanic Temple did not even attempt to run a statistical analysis of how many of its hypothetical "involuntarily pregnant" members might want an abortion prohibited by S.B. 1. Only "conjecture" supports the Satanic Temple's standing theory. *Summers*, 555 U.S. at 496.

The Satanic Temple again counters that organizations may demonstrate associational standing merely by showing there is a "small probability" that some member suffered injury. Br. 47 (quoting *Vill. of Elk Grove Vill.*, 997 F.2d at 329). But if nothing else, *Summers* rejected that a "statistical probability" of harm to a member suffices. 555 U.S. at 497. In that decision, the Supreme Court rejected an organization's assertion of standing based on a claim that it was "probable" that "some" members

would have all of the factual characteristics needed to establish standing. *Id.* "While it is certainly possible—perhaps even likely—that one individual will meet all of these criteria," the Supreme Court held, "that speculation does not suffice." *Id.* at 499. That holding controls here.

This Court, moreover, has regularly rejected associational-standing claims where the association does not allege facts showing that any member will suffer harm. *See, e.g.*, *Keep Chi. Livable v. City of Chi.*, 913 F.3d 618, 625 (7th Cir. 2019) (no standing when it was "unclear whether any of the six named plaintiffs remain[ed] members of" the association); *Disability Rights Wis.*, 522 F.3d at 802 (no evidence that any of association's members would necessarily be harmed). For example, in *Prairie Rivers*, this Court held that the plaintiff organization could not establish standing by alleging that it had "more than 1000 members" who "live near, study, work, and recreate" around the affected power station. 2 F.4th at 1009. Those allegations "trend[] too closely to the statistical probability theory of associational standing rejected in *Summers*" because they failed to establish "who these members are or how exactly the alleged discharges will harm them individually." *Id.* So this Court has already rejected the notion that standing requires nothing more than a "small probability" that some member was harmed.

*Elk Grove* and the other cases the Satanic Temple cites (Br. 47–48) are not to the contrary. As discussed above, they address whether an increased risk of harm to a known individual suffices for standing. *See* p. 22, *supra*. The question here is whether any Satanic Temple member faces harm. And to the extent that those cases

suggest a "small" risk of harm suffices, they cannot be reconciled with the Supreme Court's insistence that any harm be "certainly impending" or that the plaintiff faces a "substantial risk" of harm. *Clapper*, 568 U.S. at 414 n.5. Those cases do not relieve the Satanic Temple of its obligation to demonstrate at least one member has standing.

## C. The Satanic Temple's *Daubert* argument is meritless

The Satanic Temple also accuses the district court of improperly ignoring its statistical analysis without a *Daubert* hearing. Br. 53. But the court did not hold that J.D.'s analysis could be disregarded because it failed *Daubert*'s requirements. The court held, "even if [J.D.'s] calculations were accurate," J.D.'s speculation that 94 Indiana members might be "involuntarily pregnant" over the course of a year did not prove that any single member had standing at the time suit was filed. BA14–BA15. As the court explained, "population average[s] do[] not guarantee an individual result." BA14. And a member might not want an abortion prohibited by S.B. 1 even if she were "involuntarily pregnant." BA15. The Satanic Temple simply ignores that problem in touting the opinions of its declarant. *See* Br. 51–53.

Disregarding J.D.'s analysis—on which the Satanic Temple's standing argument depends—would have been proper regardless. The Satanic Temple did not establish that its putative expert—a specialist in "obstetrics and gynecolog[y]," A8 (J.D. Decl. ¶ 1)—has superior "knowledge, skill, experience, training, or education" that would qualify the declarant to do statistical analysis, Fed. R. Evid. 702; *see Gopalratnam v. Hewlett Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017). Just because a

declarant happens to be a medical doctor does not qualify the declarant to do statistics. *See Dura Auto. Sys. of Ind. Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002).

J.D.'s analysis is unreliable as well. To start, J.D. used incorrect information. According to the Satanic Temple's anonymous director, the Satanic Temple has 11,300 members in Indiana. A3 (Helian Decl. ¶ 10). The director stated that those members are "generally between 16 and 40 years old" and "approximately 5,650 members—exactly half—are "female." A3 (Helian Decl. ¶¶ 10–11). J.D. took this to mean that there are "5,650 women of childbearing age in Indiana who are members of The Satanic Temple." A9 (J.D. Decl. ¶ 9). But J.D. had no basis for assuming that every female member is "of childbearing age" when the Satanic Temple's admitted that members "between 16 and 40 years old" only "*generally.*"

Other problems with J.D.'s analysis abound. J.D. sought to determine how many Satanic Temple members were "involuntarily pregnant" based on the 2017 Indiana fertility rate, the 2021 Indiana abortion rate, the percentage of "all women ages 15 to 44 years" who have "used at least one form of contraception during their lifetime," the percentage of all pregnancies that are unintentional, and the percentage of all unintentional pregnancies that occur due to birth control failure. A8–A9 (J.D. Decl. ¶¶ 5–6, 9–11). But J.D. offered no reason to believe that statistics regarding all women in America hold true for Satanic Temple members in Indiana specifically. J.D. offered no explanation of why it is a reliable method to mix and match statistics from different years (2017 vs. 2021) and different populations (Indiana vs. national).

In fact, what methodology J.D. used is elusive. Although experts must disclose the "basis and reasons" for their opinions, Fed. R. Civ. P. 26(a)(2)(B); *see Cripe v. Henkel Corp.*, 858 F.3d 1110, 1112 (7th Cir. 2017), and experts must demonstrate that their opinions are "the product of reliable principles and methods" "reliably applied," Fed. R. Evid. 702(c)–(d); *see Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 589–90 (1993), J.D. never explained the methodology used. J.D. simply asserted that the motley collection of statistics cited were "appl[ied]," in some undisclosed, unexplained manner. A10 (¶ 12). The district court would have been well within its discretion to disregard J.D.'s opinions without a hearing. *See Target Market Publ'g, Inc. v. ADVO, Inc.* 136 F.3d 1139, 1143 n.3 (7th Cir. 1998) ("[n]o . . . hearing is uniformly required in order to find expert testimony inadmissible," especially when the party is "unable to tell this Court exactly what missing information a hearing would have supplied to aid the district court").

Ultimately, as the court below observed, "the Satanic Temple invites a paradox of inferences." BA16. The Satanic Temple refuses to identify any members with standing, which Supreme Court precedent requires, and instead invokes "statistical probabilit[ies]," which Supreme Court precedent forbids. *Summers*, 555 U.S. at 499. To make matters worse, the Satanic Temple's statistical analysis is neither admissible nor reliable—and it does not even purport to show that a single member suffered harm traceable to S.B. 1. This is not the only time the Satanic Temple has tried to skirt Article III's requirements by offering nothing "more than speculation based

upon statistics." *Satanic Temple v. Labrador*, --- F. Supp. 3d ---, 2024 WL 357045, at *5 (D. Idaho, Jan. 31, 2024). The district court here properly dismissed the suit.

### D.     Any alleged "stigmatic injury" does not confer standing

In a last-ditch effort, the Satanic Temple argues that all of its members have suffered a "stigmatic injury" because Indiana's abortion laws cause members of the Satanic Temple to "suffer the stigma of being evil people because they do not believe a human being comes into existence at conception nor do they believe abortion is homicide." Br. 54. That theory holds no water.

First, the alleged stigma is speculative. S.B. 1 does not classify anyone as "evil" or codify a religious belief. *See Members of the Med. Licensing Bd. of Ind. v. Planned Parenthood of the Great Nw., Haw., Alaska, Ind., Ky., Inc.*, 211 N.E.3d 957, 979–80 (Ind.), *reh'g denied*, 214 N.E.3d 348 (Ind. 2023); *cf. Doe v. Rokita*, 54 F.4th 518, 520 (7th Cir. 2022) (deeming it "questionable" that a statute requiring cremation or burial of fetal remains "implies a view" about "personhood"). People of diverse religious beliefs hold abortion to be morally wrong in some or all circumstances. *See, e.g.*, Pew Research Center, *Religious Groups' Official Positions on Abortion* (Jan. 16, 2013), https://www.pewresearch.org/religion/2013/01/16/religious-groups-official-positions-on-abortion/. S.B. 1 simply reflects that Indiana "balanc[es]" competing scientific, moral, and social interests differently than the Satanic Temple. *Planned Parenthood*, 211 N.E.3d at 979–80. A single article post-dating the judgment below (Br. 56) provides no basis for concluding otherwise. *See Summers*, 555 U.S. at 500.

Second, the alleged stigmatic injury is not "particularized"—that is, an injury that affects members in a "personal," "individual," and "distinct" way. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (cleaned up). "Offense to moral and religious sensitivities does not constitute an injury in fact and is insufficient to confer standing." *Gonzales v. North Twp. of Lake Cnty.*, 4 F.3d 1412, 1416 (7th Cir. 1993). It is "instead a grievance" suffered by all persons who disagree with the challenged abortion law "in some indefinite way." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006) (cleaned up).

The Satanic Temple's out-of-circuit cases (Br. 55) do not help its cause. They address "specific, concrete instances of discrimination," *Bostic v. Schaefer*, 760 F.3d 352, 372 (4th Cir. 2014); *see Cath. League for Religious & C.R. v. City & Cnty. of S.F.*, 624 F.3d 1043, 1049 (9th Cir. 2010)—not a generalized grievance shared by everyone who disagrees with a law. And this Court has squarely held that "[o]ffense to moral and religious sensitivities . . . is insufficient to confer standing." *Gonzales*, 4 F.3d at 1416. Embracing the Satanic Temple's theory would gut the particularization requirement. Under its theory, every time a group disagreed with a law, the group could claim that it has suffered a stigmatic injury of being "evil."

Third, there is another problem with the Satanic Temple's standing theory as it applies to its claim under Indiana's Religious Freedom Restoration Act. Associational standing is unavailable where either "the claim asserted" or "relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. And individual participation is generally required for religious freedom claims

"to weed out sham claims." *Korte v. Sebelius*, 735 F.3d 654, 683 (7th Cir. 2013); *see Harris v. McRae*, 448 U.S. 297, 321 (1980). In all events, sovereign immunity prevents the Satanic Temple from suing "state officials on the basis of state law" in federal court. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117 (1984).

## II.     The Satanic Temple Does Not Have Standing in Its Own Right—and Sovereign Immunity Bars the Only Claim Asserted on Its Own Behalf

The district court correctly held it lacked jurisdiction over the only claim that the Satanic Temple asserted on its own behalf—a claim that S.B. 1 violates the Satanic Temple's state-law rights under Indiana's Religious Freedom Restoration Act. As the court explained, the Satanic Temple has not established Article III standing. Its asserted injuries—threat of penalties, diversion of resources, and obstacles to its mission—fail to satisfy Article III's requirements. Even if it cleared those hurdles, sovereign immunity bars the Satanic Temple's "federal suit against state officials on the basis of state law." *Pennhurst*, 465 U.S. at 117.

### A.     The Satanic Temple lacks concrete plans to engage in prohibited conduct and would face independent barriers regardless

The Satanic Temple argues that it has standing to challenge S.B. 1 "because it will commit a felony if it provides a medical abortion by telemedicine to an Indiana member." Br. 26 (capitalization altered). As the district court recognized, however, a plaintiff bringing a pre-enforcement challenge must show that an alleged injury is concrete, particularized, and "'certainly impending.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *see Clapper*, 568 U.S. at 409–10. That requires a clear, concrete "intent to engage" in unlawful conduct. *Susan B.*, 573 U.S. at 166; *see*

*Sweeney v. Raoul*, 990 F.3d 555, 560 (7th Cir. 2021). "'[S]ome day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be"—are insufficient for standing. *Lujan*, 504 U.S. at 564.

The Satanic Temple did not establish that it has any concrete plans to engage in conduct prohibited by S.B. 1. Currently, the Satanic Temple's clinic has no presence in Indiana, employs no "physicians who are licensed to practice medicine in Indiana," and provides no services to persons in Indiana. BA20 (quoting A264–65; *see* A6 (Helian Decl. ¶ 25) ("The TST Clinic currently prescribes Abortifacients only to patients who provide a New Mexico address.")). The Satanic Temple also does not have any concrete, imminent plans to provide abortifacients in Indiana. It disclaimed any intent to "locate an abortion clinic in Indiana." A265. It provided no evidence that it intends to hire practitioners licensed in Indiana or have its current employees obtain Indiana licenses. And in its brief, the Satanic Temple admits that it "will not . . . expand the Clinic into Indiana" if it wins this litigation, but instead will "return to promoting the Satanic Tenets by education and advocacy." Br. 34–35. The Satanic Temple does not even have "'some day' intentions." BA20.

The Satanic Temple argues that the "very existence of Indiana Code § 16-34-[2]-7(a)"—which makes violations of Indiana's abortion restrictions a criminal offense—confers standing. Br. 28. But the problem remains that the Satanic Temple has not established that it has any concrete plans to engage in conduct prohibited by S.B. 1. Its stated intention in bringing this litigation is to remove a legal obstacle for "*other* providers of abortions in Indiana with the requisite physicians, hospitals and

32

surgical centers" so that *it* "can return to . . . education and advocacy." *Id.* at 34–35 (emphasis added). That makes this case a far cry from others in which plaintiffs sought to engage in the proscribed conduct themselves. *See, e.g.*, *Doe v. Bolton*, 410 U.S. 179, 188 (1973) (Georgia doctors who would provide abortions themselves); *Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908, 911 (7th Cir. 2015) (Wisconsin doctors who performed abortions); *Ezell v. City of Chi.*, 651 F.3d 684, 695 (7th Cir. 2011) ("Chicago residents who own firearms and want to maintain proficiency in their use via target practice at a firing range" had standing to challenge ban on firing ranges).

The Satanic Temple faces another problem as well. For standing, a plaintiff must prove the alleged injury is "'fairly traceable to the challenged action'" and "'redressable by a favorable ruling.'" *Clapper*, 568 U.S. at 409. A party cannot satisfy these requirements if the injury stems from the "independent action of some third party not before the court," *Lujan*, 504 U.S. at 560, or if it arises from "conduct or legal provisions not before the court," BA22 (citing *California*, 593 U.S. at 678). An alleged injury from a statute is not redressable if another statute would "independently" inflict the same alleged injury. *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls Inc.*, 674 F.2d 1195, 1199 (7th Cir. 1982), *rev'd on other grounds*, 499 U.S. 187 (1991).

In this case, the Satanic Temple's alleged injury—fear of prosecution for providing abortion-inducing drugs via telemedicine to persons in Indiana—is not caused by S.B. 1 and would not be redressed by a favorable judgment. The "only"

provision of Indiana law that the Satanic Temple challenged in its operative com-
plaint is "S.B. 1." SA9. The Satanic Temple described the challenged "Indiana Abor-
tion Ban" as the Indiana Code provisions that restrict the legal reasons for abortion,
making "the act of aborting an unborn child a crime except in cases of serious health
risk to the mother, to protect the life of the mother, a lethal fetal anomaly or the
pregnancy is the result of rape or incest." Dkt. 21 at 4 (¶¶ 17–18) (citing Ind. Code
§§ 16-34-2-1, 16-34-2-7(a)). As the district court perceived, however, successfully chal-
lenging that provision of Indiana law would not allow the Satanic Temple to lawfully
operate "its mail-order abortion service." BA23. "[O]ther unchallenged" laws would
still stand in the way. *Id.*

At the state level, the Satanic Temple would face at least two barriers to
providing legal abortions even in the absence of S.B. 1. First, whether or not the
Satanic Temple must be licensed as a *clinic*, Br. 29, its *employees* lack appropriate
licenses. To practice medicine in Indiana, practitioners must be licensed by the State.
Ind. Code §§ 25-22.5-8-1, 25-23-1-27. Practitioners who are "physically located
outside Indiana" but establish a provider-patient relationship with persons in
Indiana or issue prescriptions to them are considered to be "engaged in the provision
of health care services in Indiana." § 25-1-9.5-9(a). Out-of-state practitioners may not
establish a provider-patient relationship with or issue a prescription to a person in
Indiana without filing a formal certification in which they submit to Indiana's
jurisdiction and laws, including its licensing requirements. § 25-1-9.5-9(b). The

Satanic Temple, however, employs no physician licensed in Indiana, A265, and provided no evidence that its nurse is licensed and certified, A5 (Helian Decl. ¶ 23).

Second, successfully challenging S.B. 1's restrictions on the legal reasons for abortions would not authorize the Satanic Temple to provide abortion-inducing drugs by mail. Even before S.B. 1's enactment, Indiana law limited the use of abortion-inducing drugs to the first eight weeks of pregnancy, required an in-person examination by a physician, and required a physician to dispense the drug "in person." § 16-34-2-1(a)(1) (Aug. 2022). It explicitly prohibited the use of "[t]elehealth and telemedicine . . . to provide any abortion, including the writing or filling of a prescription for any purpose that is intended to result in an abortion." § 16-34-2-1(d) (Aug. 2022); *see* §§ 16-34-1-11, 25-1-9.5-8(a)(4) (Aug. 2022). The Satanic Temple, however, does not employ a physician and does not provide in-person services. A265; A268. It seeks to provide abortion-inducing drugs by telehealth.

In the background section of its brief, the Satanic Temple tries to characterize its complaint as challenging Indiana's regulations governing abortion-inducing drugs and abortion services by telehealth. Br. 8. That ignores what the operative complaint says. It "attacks only S.B. 1," SA9, defined as the provision that makes "the act of aborting an unborn child a crime except in cases of serious health risk to the mother, to protect the life of the mother, a lethal fetal anomaly or the pregnancy is the result of rape or incest," Dkt. 21 at 4 (¶¶ 17–18) (citing Ind. Code §§ 16-34-2-1, 16-34-2-7(a)). Only in briefing did the Satanic Temple attempt to reframe its complaint as a challenge to "any and all Indiana laws" conflicting with its operating model. BA24–BA25

(quoting Dkt. 57 at 3). That reframing came "too late." *Wagner v. Teva Pharms. USA, Inc.*, 840 F.3d 355, 359 (7th Cir. 2016). Standing must be assessed based on the complaint's claims at the time of filing. *See Lujan*, 504 U.S. at 569 n.4.

In a footnote, the Satanic Temple asserts that FDA restrictions on abortion-inducing drugs preempt "any unidentified and unchallenged Indiana laws" that might prevent the Satanic Temple from operating its clinic as it desires. Br. 29 n.14. That argument is doubly forfeited. Below, it was presented only in an unauthorized filing that the district court struck, BA19 n.3 (striking Dkt. 61)—a ruling the Satanic Temple does not challenge on appeal. And the Satanic Temple does not develop its preemption argument on appeal. *See Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013) ("We have often said that a party can waive an argument by presenting it only in an undeveloped footnote"). An undeveloped assertion of preemption cannot overcome the presumption that federal law does not displace state laws governing health and safety. *See Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008).

The Satanic Temple's cite to *GenBioPro, Inc., v. Sorsaia*, 2023 WL 5490179 (S.D.W.V. Aug. 24, 2023), *appeal pending*, No. 23-2194 (4th Cir.), cannot rescue its argument. Although *GenBioPro* held that some West Virginia regulations were preempted, it "did *not* wholesale conclude that [state] statutes regarding abortifacient drugs were pre-empted by federal laws or statutes." *Labrador*, 2024 WL 357045, at *8. Additionally, the FDA regulations *GenBioPro* invoked have been deemed invalid by the Fifth Circuit. *See id.* (citing *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 223 (5th Cir. 2023), *cert. granted*, 144 S. Ct. 537 (2023)). And

36

any suggestion that the FDA's regulations preempt Indiana law cannot be squared with its traditional authority to regulate health, safety, and medicine. *See De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997); *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985).

Besides, federal law poses an independent barrier to lawfully providing abortion-inducing drugs by mail to women in Indiana. The Comstock Act prohibits using the mails for any "article or thing designed, adapted, or intended for producing abortion"; for any "article, instrument, substance, drug, medicine, or thing which is advertised or described in a manner calculated to lead another to use or apply it for producing abortion"; and for other similar materials. 18 U.S.C. § 1461. And contrary to the Satanic Temple's assertions, the U.S. Department of Justice has not refused to "enforce the Comstock Act against legal vendors of mifepristone." Br. 30. Rather, the Department of Justice has stated that "the mere mailing of such drugs to a particular jurisdiction is an insufficient basis for concluding that the sender intends them to be used unlawfully." Application of the Comstock Act to the Mailing of Prescription Drugs That Can Be Used for Abortions, 46 Op. O.L.C. __ (Dec. 23, 2022). Here, however, the Satanic Temple's avowed intent is for mifepristone to be put to illegal purposes (namely, by dispensing it via telemedicine). So the Satanic Temple's conduct would run afoul of federal and state laws that are not before this Court.

A final problem with the Satanic Temple's standing theory is that it "depends upon the decision of an independent third party." *California*, 593 U.S. at 675. The Satanic Temple will not have occasion to engage in conduct that is prohibited under

S.B. 1 unless a member becomes "involuntarily pregnant," "that member chooses to abort her child" for reasons prohibited by S.B. 1, and "that member selects the Clinic to help perform the abortion, rather than some other abortion provider." *Labrador*, 2024 WL 357045, at *7. As discussed above, however, it is entirely speculative whether these contingencies will come to pass. *See* pp. 22–26, *supra*.

### B.     The Satanic Temple has not shown its alleged diversion of resources is an injury traceable to S.B. 1 or redressable

The Satanic Temple alternatively argues that S.B. 1 caused it to divert resources to its clinic. Br. 31. There are multiple problems with this theory too. First, the Satanic Temple has not shown it intends to provide abortions prohibited by S.B. 1. BA21. In fact, its admissions establish the exact opposite. *See* pp. 31–38, *supra*. A party cannot manufacture standing by "inflicting harm on [itself] based on . . . fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416; *see Labrador*, 2024 WL 357045 at *6 ("[T]he fact that TST spent money on the Clinic *in New Mexico* does not prove an actual injury.").

Second, the Satanic Temple did not trace any alleged diversion of resources to S.B. 1. BA21. Below, the Satanic Temple averred that it created its New Mexico clinic "in response to [a] decision by the U.S. Supreme Court in the *Dobbs* case," not S.B. 1. A4 (Helian Decl. ¶ 21); *see* Dkt. 44 at 9. And any past expenditures on the clinic are "insufficient to establish standing for purposes of prospective injunctive relief." *Simic v. City of Chi.*, 851 F.3d 734, 738 (7th Cir. 2017). Even the Satanic Temple admits that the money spent on creating its clinic would have been "spent regardless of whether the Clinic could lawfully operate in Indiana." Br. 34.

The Satanic Temple, moreover, does not explain how S.B. 1 is causing it to incur any ongoing or future costs that it would not otherwise incur. Currently, it is not operating in Indiana, does not plan to open facilities in Indiana, and does not intend to seek the licenses needed to do so. A6 (Helian Decl. ¶¶ 25–26). This is not a case in which the challenged statute created "more work" for the plaintiff. *Common Cause Ind. v. Lawson*, 937 F.3d 944, 956 (7th Cir. 2019). The Satanic Temple's clinic is doing nothing at all in Indiana.

Perhaps the Satanic Temple would have to spend additional money to "expand the Clinic into Indiana." Br. 31. But the Satanic Temple has disclaimed an intention to do so: The Satanic Temple admittedly "will not . . . expand the Clinic into Indiana" if it wins this litigation. Br. 34–35. Additionally, in complaining that Indiana law would prohibit its nurse from prescribing abortion-inducing drugs by telehealth, Br. 31–32, the Satanic Temple again overlooks that the operative complaint "attacks only S.B. 1," SA9. It does not challenge other statutory provisions prohibiting its mail-order abortion service. *See* pp. 33–37, *supra*. And to the extent that the Satanic Temple suggests that it might one day "hire physicians" or open an Indiana location, Br. 31–32, it did not argue that below or establish a concrete intention to do so. *See* Dkt. 44 at 9; *Horizon W. Condo. Homes Ass'n, Inc. v. Travelers Ins. Co.*, 2023 WL 7951194 at *3 (7th Cir. Nov. 17, 2023) (unpublished) (a plaintiff "cannot change its factual allegations or press arguments for the first time on appeal").

Third, since the Satanic Temple cannot show any ongoing expenditures on account of S.B. 1, the prospective relief requested would not redress any injury. BA21.

And it appears that the Satanic Temple would continue operating its New Mexico clinic no matter how this litigation ends. According to the Satanic Temple, the clinic was "designed to make the Abortifacients used in the Satanic Abortion Ritual readily available at minimum cost throughout the country," not just Indiana. A5 (Helian Decl. ¶ 23).

### C.    Alleged impacts on the Satanic Temple's mission are too abstract and generalized to support standing

To the extent the Satanic Temple continues to assert an injury to its mission unconnected from any more tangible harm (*e.g.*, a threat of prosecution or monetary expenditure), that is not a cognizable injury. BA21–BA22. As the district court observed, a "setback to the organization's abstract social interests" is insufficient. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Although psychological distress at witnessing "conduct with which [a plaintiff] disagrees" might suit a "debating society," it is too "generalized" a "grievance" for Article III standing. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S 464, 472 (1982). The district court correctly held "mere indignation" did not confer standing. BA19 (citing *Carello v. Aurora Policemen Credit Union*, 930 F.3d 830, 834 (7th Cir. 2019)).

### III.    The District Court Acted Within Its Discretion When It Dismissed the Satanic Temple's Complaint Without Leave to Amend

Finally, the district court did not abuse its discretion in denying the Satanic Temple leave to amend its complaint a second time. The Satanic Temple does not dispute that it had "notice of its standing defects" and "an opportunity to cure them"

40

yet "failed on all fronts." BA25. Nor does it dispute that an amended pleading would not overcome the "central obstacles to standing—no identified Members, and no intent to engage in unlawful conduct." *Id.* Rather, the Satanic Temple argues that "a complaint with a jurisdictional defect should not be dismissed without leave to amend." Br. 58. But this Court has already held that, even in that context, a district court is not "required to let [a] lawsuit continue" and does "not abuse its discretion by saying 'enough is enough.'" *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.,* 935 F.3d 573, 582 (7th Cir. 2019). It was "appropriate" for the district court to "dismiss without leave to amend" based "on the plaintiffs' failure to establish Article III standing." *Flynn v. FCA US LLC*, 39 F.4th 946, 954 (7th Cir. 2022).

## CONCLUSION

This Court should affirm the dismissal without leave to amend.

Respectfully submitted,

Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-0709
James.Barta@atg.in.gov

THEODORE E. ROKITA
Attorney General of Indiana

/s/ James A. Barta
JAMES A. BARTA
Solicitor General

KATELYN E. DOERING
Deputy Attorney General

*Counsel for Defendants-Appellees*

41

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limitation of Circuit Rule 32(c) because this document contains 11,249 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.      This document complies with the typeface requirements of Circuit Rule 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 12-point font.

April 29, 2024                          /s/ James A. Barta
                                        JAMES A. BARTA
                                        Solicitor General

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ James A. Barta
JAMES A. BARTA
Solicitor General

Office of the Indiana Attorney General
Indiana Government Center South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204-2770
(317) 232-0709
James.Barta@atg.in.gov