# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

No. 23-3247

| | |
|---|---|
| THE SATANIC TEMPLE, INC. | Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division. |
| Plaintiff-Appellant | |
| v. | |
| TODD ROKITA and RYAN MEYERS | No. 1:22-cv-01859-JMS-MG |
| | Jane Magnus-Stinson, *Judge* |
| Defendants-Appellees | |

## PLAINTIFF-APPELLANT'S REPLY BRIEF

W. James Mac Naughton, Esq.
7 Fredon Marksboro Road
Newton, NJ 07860
wjm@wjmesq.com
732-213-8180
Attorney for Plaintiff-Appellant
The Satanic Temple, Inc.

# TABLE OF CONTENTS

I.     The Clinic Has a Concrete Plan to Provide Abortions in Indiana.. . . ................................................................................. 1

II.    TST Has Standing Because it Commits a Crime if it Provides a Medical Abortion By Telemedicine to an Involuntarily Pregnant Woman in Indiana. ...................................................................... 4

III.   The Complaint Seeks to Enjoin the Enforcement of the Sections of Ind. Code § 16-34-2-1 Regulating Telehealth and Abortion-Inducing Drugs. .................................................................... 10

IV.    The Clinic Has the Ability to Deliver Medical Abortions Today By Telemedicine Using a Physician Licensed in Indiana. .......... 11

V.     The Comstock Act Does Not Bar the Clinic From Using the Telemedicine Model to Deliver Abortifacients to Indiana Residents. ... 13

VI.    TST Has Standing as a Religious Organization Because It Diverted Its Resources to Ensure All TST Members in Indiana Can Engage in the Satanic Abortion Ritual. .................................... 15

VII.   TST Does Not Have to Identify Its Members By Name to Have Standing to Represent Them. ......................................... 17

VIII.  TST Has Identified At Least One Involuntarily Pregnant Woman With Sufficient Specificity to Establish Standing as Her Representative. ................................................................. 19

IX.    TST Members Have Suffered Stigmatic Injury .................... 26

X.     The District Court Erred By Denying TST Leave to Amend the Complaint. ................................................................... 28

XI.     Conclusion. ................................................................. 30

XII.   Certificate of Compliance With Type-Volume Limit
Typeface Requirements, and Type-Style Requirements ............... 32

XIII.  Certificate of Service

# TABLE OF AUTHORITIES

## Cases

*Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021) ............... 18

*Arthur v. Dunn*, 137 S. Ct. 1521 (2017). ................................................. 18

*Bauer v. Shepard*, 620 F.3d 704 (7th Cir. 2010) .................................... 9

*Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014) .................................... 27

*Bryant v. Stein*, 1:23-CV-77 (M.D.N.C. Apr. 30, 2024) .......................... 15

*Catholic League v. City of San Francisco*, 624 F.3d 1043 (9th Cir. 2010)
................................................................................................................ 28

*Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742 (10th Cir.
2010) .................................................................................................... 12

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. ____, 142 S.
Ct. 2228 (2022) .................................................................................... 28

*Doe v. Parson*, 960 F.3d 1115 (8th Cir. 2020) ......................................... 20

*Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058 (9th Cir.
2000) .................................................................................................... 19

*Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872 (1990). 30

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2021) ................................. 9, 10

*Fl. State v. Browning*, 522 F.3d 1153 (11th Cir. 2008) ............................ 25

*Ghedi v. Mayorkas*, 16 F.4th 456 (5th Cir. 2021) .................................... 3

*Individual Members of the Med. Licensing Bd. of Ind. v. Anonymous
Plaintiff 1*, No. 22A-PL-2938 (Ind. App. Apr. 4, 2024) ........................ 29

*Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013), cert. den. __U.S.__ 134 S.Ct. 2903 (2014) ................................................................. 24

*McCormack v. Hiedeman*, 900 F. Supp. 2d 1128 (D. Idaho 2013), aff'd sub nom, *McCormack v. Herzog*, 788 F.3d 1017 (9th Cir. *2015)* ........... 2

*Mont. Shooting Sports Ass'n v. Holder*, 727 F.3d 975 (9th Cir. 2013) ...... 3

*Niam v. Ashcroft*, 354 F.3d 652 (7th Cir. 2004) ...................................... 23

*Planned Parenthood Ass'n v. Kempiners*, 700 F.2d 1115 (7th Cir. 1983) ........................................................................................................ 13

*Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908 (9th Cir. 2004) ........................................................................................................ 4

*Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908 (9th Cir. 2004) ...................................................................................................... 10

*Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786 (7th Cir. 2013) ...................................................................................................... 24

*Pollitt v. Health Care Service Corp.*, 558 F.3d 615 (7th Cir. 2009) ........ 26

*Prosser v. Becerra*, 2 F.4th 708 (7th Cir. 2021) ..................................... 21

*Roe v. Wade*, 410 U.S. 113 (1973 ........................................................... 20

*Satanic Temple v. Labrador*, __ F.3d __, 2024 WL 357045 (D. Idaho Jan. 31, 2024 ...................................................................................... 9

*Shashoua v. Quern*, 612 F.2d 282 (7th Cir. 1979) .................................. 30

*Simmons v. United States*, 390 U.S. 377 (1968) ..................................... 19

*Singleton v. Wulff*, 428 U.S. 106 (1976) ........................................... 21, 22

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009)................. 18, 19

*Telescope Media Group v. Lucero*, 936 F.3d 740 (8th Cir. 2019) ............ 30

*Union Pacific Railway Co. v. Botsford*, 141 U.S. 250 (1891) .................. 29

*U.S. v. Warner*, 498 F.3d 666 (7th Cir. 2007)………………………………22

### Statutes

18 U.S.C. § 1461 (the "Comstock Act") ......................................... 11, 13, 14

Ind. Code § 16-21-2-2.5................................................................. 1

Ind. Code § 16-34-2-1................................................................. passim

Ind. Code § 16-34-2-7(a) ............................................................ passim

Ind. Code §§ § 16-34-2-1(a)(1)(E)(ii) and 16-34-2-1(d) ........................... 13

### U.S. Constitution

First Amendment ..................................................... 17, 18, 28, 29

Fifth Amendment ………………………………………………………28

Thirteenth Amendment ………………………………………………28

## I. The Clinic Has a Concrete Plan to Provide Abortions in Indiana.

The District Court dismissed this case on the grounds TST does not have a concrete plan to provide abortions in Indiana.  The District Court found the Clinic did not have concrete plan because it did not have the "abortion clinic" required by Ind. Code § 16-21-2-2.5.[1]

But that requirement was repealed before the Complaint was filed.  TST will not be opening a physical "abortion clinic" because that facility is not required to lawfully provide abortions in Indiana.[2]  The District Court's error is obvious, and the order based on its error should be reversed.

The Clinic currently has everything it needs to provide abortions in Indiana using the Telemedicine Model, including immediate access to medical personnel licensed in Indiana to prescribe mifepristone.  The Clinic could readily obtain the services of a physician licensed to

---

[1] Capitalized terms have the same meaning as in Plaintiff-Appellant's Brief dated January 29, 2024, Dkt. No. 12 (the "Brief").

[2] Defendants-Appellees concede S.B. 1 eliminated the requirement that abortions be performed in an abortion clinic.  Response at p. 5. Defendants-Appellees fail to address the District Court's erroneous requirement that TST to be licensed as an "abortion clinic" to show it had a concrete plan to provide abortions in Indiana.

practice medicine in Indiana, such as Dr. J.D., to implement its Telemedicine Model in Indiana.[3]  Or the Clinic's APRN's could become readily licensed in Indiana with the filing of the requisite paperwork and paying a nominal fee pursuant to the Nurse Licensure Compact.

The only reason these people have not been hired is because the Clinic would still be committing a crime even if it used their services. See ECF No. 44-1 at ¶¶25 and 26.  TST does not have to first comply with the laws it challenges to have standing.  *McCormack v. Hiedeman*, 900 F. Supp. 2d 1128, 1142-43 (D. Idaho 2013), <u>aff'd sub nom</u>, *McCormack v. Herzog*, 788 F.3d 1017 (9th Cir.*2015) ("McCormack"*) ("Given that [the physician] faces the threat of prosecution for performing medical abortions, it makes little sense to suggest that [he] must first comply with those laws before he has standing to challenge them.").

Article III requires an injury that is actual or imminent.  The District Court ruled in error TST's injury was not "imminent" because it had not created a physical "abortion clinic" in Indiana.  But TST's

_____

[3] Input Dr. J.D.'s name (ECF No. 46.) into https://secure.in.gov/apps/pla/search/ last visited May 19, 2024.

injury is imminent because it does not need to open an "abortion clinic.".
The Clinic intends to – and readily can – hire Indiana licensed
professionals to deliver abortions in Indiana using the Telemedicine
Model. It does not only because those professionals would go to jail.
Hiring such professionals now would be pointless. The Clinic's plans to
provide abortions in Indiana using the Telemedicine Model are
sufficiently "imminent" to give TST standing to challenge the Indiana
Abortion Ban. *Ghedi v. Mayorkas*, 16 F.4th 456, 465 n.36 (5th Cir.
2021) ("[I]mminence is an elastic concept that turns on a sufficiently
high degree of likelihood of future injury. It is not so rigid that a
plaintiff must engage in futile gestures to maintain standing." [internal
citations and quotations omitted]);

In *McCormack v. Herzog,* 788 F.3d 1017,1028 (9th Cir. 2015)
("*McCormack*") the Court held a physician had standing to challenge
abortion restrictions because he "stated his clear intention to prescribe
FDA approved medications to women in Bannock County, Idaho . . .
who seek to medically terminate their pregnancies in violation of the
restrictions contained in Idaho Code Title 18, Chapters 5 and 6 prior to
fetal viability. . . . [H]is ability to legally prescribe FDA-approved

abortion medication in Bannock County is sufficient to demonstrate an 'actual and imminent' injury—the risk of criminal prosecution for prescribing abortion pills prior to viability."). Like the physician in *McCormack*, the Clinic has the ability to prescribe FDA approved abortion medication to Indiana residents. The FDA requires the prescription be made by a "certified prescriber."[4] The "certified prescriber" is not required by REMS to be licensed in the state of the patient for whom the prescription is written.

## II. TST Has Standing Because it Commits a Crime if it Provides a Medical Abortion By Telemedicine to an Involuntarily Pregnant Woman in Indiana.

Defendants-Appellees argue TST did not challenge Indiana's "rules for prescribing abortion-inducing drugs, or prohibition on using telehealth for abortion." Response Brief of Defendants-Appellees dated April 29, 2024 (the "Response") at p. 6. That is incorrect. The Complaint expressly seeks to enjoin the criminal penalties imposed for the violation *any* provision of Ind. Code § 16-34-2-1 that criminalizes an

---

[4]https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=390, last visited June 7, 2024.

abortion using the Telemedicine Model, including those pertaining to the use of abortifacients and telemedicine.

The State of Indiana has built a wall between the Clinic and Involuntarily Pregnant Women in Indiana. That wall puts Clinic personnel in jail if they provide an FDA approved medical abortion to an Involuntarily Pregnant Woman in Indiana using the Telemedicine Model, even if they are licensed in Indiana and regardless of the gestational age of the zygote. The wall has seven (7) separate, yet interlocking blocks:

- Abortions can only be performed prior to "(20) weeks of postfertilization age of the fetus [and only if] necessary to prevent any serious health risk to the pregnant woman, to save the pregnant woman's life, or the fetus is diagnosed with a lethal fetal anomaly. Ind. Code § 16-34-2-1(a)(1)(A).

- Abortions can only be performed in a hospital. Ind. Code § 16-34-2-1(a)(1)(B).

- The woman has provided her written "consent" to the abortion in the form required by Ind. Code § 16-34-2-1-1. Ind. Code § 16-34-2-1(a)(C).

- Abortifacients cannot be administered "to a pregnant woman after eight (8) weeks." Ind. Code § 16-34-2-1(a)(1)(E)(ii).

- "A physician must dispense the abortion inducing drug in person and have the pregnant woman consume the drug in the presence of the physician." Ind. Code § 16-34-2-1(a)(1)(E)(ii).

- "A physician shall examine a pregnant woman in person before prescribing or dispensing an abortion inducing drug." Ind. Code § 16-34-2-1(a)(1)(E)(ii).

- Telehealth and telemedicine may not be used to provide any abortion. Ind. Code §§ § 16-34-2-1(a)(1)(E)(ii) and 16-34-2-1(d).

A violation of any one of these requirements by an abortion provider is a Level 5 Felony. Ind. Code § 16-34-2-7(a). As alleged in the Complaint, the imposition of that criminal sanction on abortion providers such as the Clinic deprives Involuntarily Pregnant Women of the right to control the use and disposition of their bodies under the

Fifth and Thirteenth Amendments.  Dkt. No. 21 at ¶¶25, 75 to 77, 84, 85.[5]

The Complaint explicitly defines the "Indiana Abortion Ban" as Ind. Code § 16-34-2-7(a).  Dkt. No. 21 at ¶17.  That statute makes "a person who knowingly or intentionally performs an abortion prohibited by section 1 of this chapter" a felon.  "[S]ection 1 of this chapter" is Ind. Code § 16-34-2-1 *in its entirety*.[6]   That language was added to Ind. Code § 16-34-2-7(a) by Section 28 of S.B. 1.  See Br. App. 58.

Defendants-Appellees do not dispute that providers of abortion services have standing to challenge abortion restrictions.  See Brief at pp. 26 to 28.  Instead, they suggest TST has an additional burden of identifying by name an Indiana member who wants to use the Clinic's services.  See Response at pp. 37 to 38.  Defendants-Appellees cite no authority to support this argument because there is none.  Rather, they seek to conflate the standing requirements for TST as a provider of

---

[5] The restrictions on telemedicine increase the time and cost of obtaining an abortion.  See Declaration of Dr. J.D. at ¶¶17 and 18, ECF No. 44-2.  These delays and costs contribute to and exacerbate the unconstitutional conscription of women's bodies.

[6] TST made this argument to the District Court.  See Plaintiff's Opposition To Defendants' Motion To Dismiss dated June 20, 2023, ECF No. 44 at p. 6.

abortions subject to criminal sanctions with TST's standing as a religious organization representing identifiable members who are unable to practice the Satanic Abortion Ritual.

Defendants-Appellees assertion that TST "did not allege that any members were purportedly injured by S.B. 1" is not true.  See Response at p. 7.  The Complaint expressly alleges TST members cannot get a medical abortion using telemedicine from TST or anyone else because Ind. Code § 16-34-2-7(a), as amended by S.B. 1, makes it a crime.  See ECF No. 21 at ¶17.

The Complaint seeks the entry of an order permanently enjoining Defendants-Appellees from enforcing the Indiana Abortion Ban against TST for the provision of abortions in Indiana using the Telemedicine Model. ECF No. 21 at p. 15.  There is no question that if the Clinic were to dispense abortifacients in Indiana using the Telemedicine Model – with or without the services of an Indiana licensed medical professional– the Clinic commits a Level 5 felony because it violates multiple provisions of Ind. Code § 16-34-2-1, not just one or two.  The inherent threat of prosecution – standing alone – is injury for purposes of standing. *Ezell v. City of Chicago*, 651 F.3d 684, 695-696 (7th Cir.

2021) ("*Ezell*") ("The very existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper, because a probability of future injury counts as injury for the purpose of standing." [internal citations and quotations omitted]).  See also *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010) (same).

There is no merit to the contention of Defendants-Appellees that TST must also show TST members would actually select the Clinic as their abortion provider in lieu of some other provider.[7]   Response at p. 38.  The Clinic suffers Article III injury because *potential* patients are discouraged from using its services.  *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 917 (9th Cir. 2004).  See also *June Med. Servs., L.L.C. v. Gee*, 814 F.3d 319, 322 (5th Cir. 2016) ("[Tthe physician plaintiffs have standing to assert the rights of their prospective patients.").

In *Ezell*, a builder of firearm ranges had standing to challenge a ban on firearm ranges in Chicago because it "acted as an advocate of the

---

[7] Defendants-Appellees reliance on *Satanic Temple v. Labrador*, __ F.3d __, 2024 WL 357045 (D. Idaho Jan. 31, 2024) ("*Labrador*") is misplaced. That decision relies heavily on the District Court's erroneous decision in this case and is currently on appeal to the Ninth Circuit in *Satanic Temple v. Labrador*, Case No. 24-1243.

rights of third parties who seek access to its services." 651 F.3d at 696 (internal citations and quotations omitted).  It did not need to show "any one resident of Chicago" was actually unable to use its services.

The Complaint alleges Involuntarily Pregnant Women are prospective patients of the Clinic.  See Complaint at ¶¶14 to 17.  There is no authority in the Seventh Circuit that requires a provider of services who challenges a law that criminalizes its business to identify actual existing customers - as opposed to prospective customers as a class - to have standing to challenge that law.

### III.  The Complaint Seeks to Enjoin the Enforcement of the Sections of Ind. Code § 16-34-2-1 Regulating Telehealth and Abortion-Inducing Drugs.

Defendants-Appellees argue the Complaint attacks only "S.B. 1" and "not  preexisting state statutes governing . . . telehealth, or abortion-inducing drugs." Response at pp. 7, 35 and 39.  Defendants-Appellees argue S.B. 1 "did not alter Indiana's . . . prohibition against using telemedicine for abortions, or rules regarding abortion-inducing drugs."  Response p. 5.  Thus, Defendants-Appellees argue TST "could not show an injury traceable to S.B. 1 that would be redressable by a favorable judgment."  Response at p. 11.  Defendants-Appellees further

argue that the illegal distribution of abortifacients by telemedicine would also be a violation of the Comstock Act.

The flaw in these arguments is that Section 28 of S.B. 1 made *any* violation of Indiana's "rules for prescribing abortion-inducing drugs, or prohibition on using telehealth for abortion" found in Ind. Code § 16-34-2-1 a Level 5 felony pursuant to Ind. Code § 16-34-2-7(a). TST, as a provider of abortions through the Clinic, seeks to enjoin the application of Ind. Code § 16-34-2-7(a) and Ind. Code § 16-34-2-1 *in its entirety* to the provision of abortions in Indiana using the Telemedicine Model.

Enjoining enforcement of Ind. Code § 16-34-2-7(a) will provide the redress necessary for standing because the Clinic can then dispense mifeprestone by telemedicine to Indiana residents without fear of committing a felony.

## IV. The Clinic Has the Ability to Deliver Medical Abortions Today By Telemedicine.

The Clinic's ability to provide medical abortions in Indiana is neither remote nor academic. The Clinic has the ability to deliver abortifacients to Indiana residents in accordance with FDA requirements *today* using the Telemedicine Model. The *only* barrier to

the Clinic delivering abortifacients to Indiana residents today is the threat of criminal prosecution.

The relief sought by TST, if granted, would relieve the Clinic's APRN's and other contractors from the threat of a Level 5 felony conviction if they dispensed abortifacients in Indiana using the Telemedicine Model.[8]  That redress is sufficient to support TST's standing to challenge the Indiana Abortion Ban. *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 757 (10th Cir. 2010) (Plaintiffs "need not show that a favorable decision will relieve their *every* injury. Rather, they need only show *an* injury that is likely to be redressed by a favorable decision." [emphasis in original, internal citations and quotations omitted]; *Planned Parenthood Ass'n v. Kempiners*, 700 F.2d 1115, 1120 (7th Cir. 1983) (Plaintiff "need not show that a favorable decision will relieve its *every* injury, only that a successful resolution of its claim will remove at least one substantial impediment." [emphasis in original, internal citations and quotations omitted]).

The Complaint does not seek to enjoin the levy of disciplinary sanctions on a physician who provides an abortion using the

---

[8] APRN's and physicians would be licensed in Indiana.

Telemedicine Model.  See Ind. Code § 16-34-2-2(c).  That is because enjoining enforcement of Ind. Code § 16-34-2-7(a) makes the Telemedicine Model lawful and disciplinary sanctions moot.

### V.  The Comstock Act Does Not Bar the Clinic From Using the Telemedicine Model to Deliver Abortifacients to Indiana Residents.

Defendants-Appellees argue "Satanic Temple's avowed intent is for mifepristone to be put to illegal purposes (namely, by dispensing it via telemedicine) [which] would run afoul of [the Comstock Act]." Response at p. 37. Defendants-Appellees do not dispute that only the U.S. Justice Department has authority to enforce the Comstock Act and the U.S. Justice Department has expressly stated the Comstock Act does not apply to a vendor of mifeprestone or misoprostol "where the sender lacks the intent that the recipient of the drugs will use them unlawfully." See Application of the Comstock Act to the Mailing of Prescription Drugs That Can Be Used for Abortions, 46 Op. O.L.C. __ (Dec. 23, 2022), slip op. at p. 2.  Rather, Defendants-Appellees argue the delivery of abortifacients by telemedicine would remain illegal even if TST prevails because TST did not challenge the validity of the bans on telemedicine in Ind. Code §§ § 16-34-2-1(a)(1)(E)(ii) and 16-34-2-1(d).

Response at pp. 33 to 34.  This argument is based on the erroneous assumption that S.B. 1 does not apply to Ind. Code § 16-34-2-1 in its entirety.

The whole point of this action is to get a judicial determination that the Indiana Abortion Ban, which criminalizes abortion by telemedicine, is unconstitutional as applied to Involuntarily Pregnant Women in Indiana.  If that relief is granted, then TST will have every reason to believe the delivery of abortifacients to Indiana residents using the Telemedicine Model is lawful and not a violation of the Comstock Act.[9]

Moreover, there is no Indiana law that makes it illegal for a pregnant woman to take an abortifacient for the purpose of inducing an abortion, regardless of how she obtained the drug.  Thus, the Comstock Act does not apply because TST would have no reason to believe "the recipient of the drugs will use them unlawfully," even if the delivery of the drug is itself unlawful.

---

[9] TST already has reason to believe many of the restrictions Indiana has put on the Telemedicine Model have been preempted by the FDA, including prohibiting prescription of mifeprestone by an APRN. See Memorandum Opinion and Order in *Bryant v. Stein*, 1:23-CV-77 (M.D.N.C. Apr. 30, 2024).

## VI. TST Has Standing as a Religious Organization Because It Diverted Its Resources to Ensure All TST Members in Indiana Can Engage in the Satanic Abortion Ritual.

The Telemedicine Model approved by the FDA is used only for women who are ten (10) weeks pregnant or less. While this covers a majority of abortions, it does not cover all of them. Guttmacher Institute March 2024 Policy Analysis; Medication Abortion Accounted for 63% of All US Abortions in 2023.[10]   If the requested relief is granted, the Clinic will be able to facilitate the Satanic Abortion Ritual in Indiana for some – but not all – TST members using the Telemedicine Model.[11]

Those TST members who cannot safely abort using abortifacients will still need to obtain a surgical abortion from a medical doctor.  If they want to engage in the Satanic Abortion Ritual while having a surgical abortion, they will need a doctor willing to accommodate that request.

---

[10] https://www.guttmacher.org/2024/03/medication-abortion-accounted-63-all-us-abortions-2023-increase-53-2020, last visited June 2, 2024.

[11] TST does not intend, as suggested by Defendants-Appellees, to abandon the delivery of abortions in Indiana using the Telemedicine Model if the requested relief is granted.  Response at p. 32

If TST is to continue promoting the Satanic Abortion Ritual to those members, the Clinic will have to either incur the expense of hiring the necessary medical doctor who will be directed to include the Satanic Abortion Ritual as part of a surgical abortion or find and make a referral to an unaffiliated medical doctor who will permit the Satanic Abortion Ritual to be included as part of a surgical abortion.

TST, as a religious organization, seeks to enjoin the application of Ind. Code § 16-34-2-7(a) to *any* provider of an abortion to Involuntarily Pregnant Women, regardless of whether it is a medical or surgical abortion.  ECF No. 21 at p. 15.[12]  Granting the requested relief for all Involuntarily Pregnant Women will enable the Clinic to choose the option of finding an unaffiliated doctor who will permit the Satanic Abortion Ritual to be included as part of a surgical abortion.[13]  TST could thus avoid the expense of hiring a doctor to provide surgical

---

[12] "Plaintiff respectfully requests [t]he entry of an order permanently enjoining Defendants from enforcing the Indiana Abortion Ban against anyone who provides an abortion to an Involuntarily Pregnant Woman."
[13] Defendants-Appellees misconstrue this option as an abandonment of Indiana members by TST and "proof" TST lacks "even someday intentions" to promote the Satanic Abortion Ritual in Indiana. Response at p. 32.

abortions using the Satanic Abortion Ritual – money that can be devoted to TST's primary mission of education.

TST has spent over $75,000 to create the Clinic, which enables TST to serve some – but not all – of its members in facilitating the Satanic Abortion Ritual using medical abortions.  This diversion of TST's resources from its educational programs is a sufficiently concrete injury to meet the injury prong of standing.

Granting the requested relief will spare the Clinic the expense of having to spend even more money to promote the Satanic Abortion Ritual to TST members who get surgical abortions.  This satisfies the redress prong of standing.  See Brief at pp. 33 and 34.

## VII.  TST Does Not Have to Identify Its Members By Name to Have Standing to Represent Them.

Defendants-Appellees do not dispute individual members of TST have a fundamental constitutional right of access to the courts. *Arthur v. Dunn*, 137 S. Ct. 1521, 1522 (2017).  Nor do they dispute individual members of TST have a First Amendment right to remain anonymous. *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2390 (2021) ("[T]he right to associate anonymously often operates as a vehicle to protect other First Amendment rights, such as the freedom of the

press."). Rather, they argue *Summers v. Earth Island Institute*, 555 U.S. 488 (2009) ("*Summers*") requires individual members of TST to waive their constitutional right of anonymity as a condition for getting access to the courts because that is the only way they can be identified. See Response at p. 19.

Defendants-Appellees cite no authority to support this argument because there is none. Neither *Summers* nor any of the other cases relied on by Defendants-Appellees involved the assertion of a First Amendment right to anonymity by an individual association member. See Response at p. 17.

It is well established that a party cannot be compelled to waive one constitutional right as a condition for the exercise of another. *Simmons v. United States*, 390 U.S. 377, 394 (1968) ("[W]e find it intolerable that one constitutional right should have to be surrendered in order to assert another.").[14] It is also well established that TST members cannot be compelled to surrender their First Amendment

---

[14] Defendants-Appellees rely on *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058 (9th Cir. 2000) ("*Advanced Textile*") for the proposition anonymous parties must be at least identified to the Court. Response at p. 20. *Advanced Textile* said no such thing.

right to anonymity absent a compelling government interest.  See Brief

at p. 40.  No such interest has been shown in this case.

There are numerous cases, going back before *Roe v. Wade*, 410

U.S. 113 (1973), in which individual women had standing to challenge

abortion restrictions without identifying themselves to the court or their

adversaries.[15]  To this day, Defendants-Appellees have not explained

why they or the Court need to know the identity of any TST member to

establish the constitutionality of the Indiana Abortion Ban.

## VIII.  TST Has Identified At Least One Involuntarily Pregnant Woman With Sufficient Specificity to Establish Standing as Her Representative.

The parties agree that TST needs to identify at least one member

with sufficient specificity to show that member has standing in her own

right to challenge the Indiana Abortion Ban.  However, that specificity

does not necessarily have to be established by identifying that member

by name.  Even Defendants-Appellees concede "associations may

---

[15] In *Doe v. Parson*, 960 F.3d 1115 (8th Cir. 2020), cited by Defendants-Appellees, the plaintiff was an individual member of TST who proceeded anonymously.  Her identity was never disclosed to the Court or Defendants.

sometimes use statistical analysis in connection with establishing standing."  Reponse at 12.

Standing for an individual woman challenging an abortion law requires that she either is or will certainly become pregnant at the time the complaint is filed. *Prosser v. Becerra*, 2 F.4th 708, 714 (7th Cir. 2021) ("In the absence of an actual injury, standing may still exist in the face of a threatened injury if that future injury is certainly impending—in a word, imminent."). Since lawsuits typically last longer than pregnancies, a pregnant woman retains standing to challenge an abortion restriction after she is no longer pregnant, for whatever reason. Thus, as the U.S. Supreme Court held in *Singleton v. Wulff*, 428 U.S. 106, 117 (1976) ("*Singleton*") "a class could be assembled, whose fluid membership always included some women with live claims."

It is a biological certainty that at least one Indiana women is or will become pregnant during the course of a year and want an

abortion.[16]  This is the kind of class contemplated in *Singleton* "whose fluid membership always included some women with live claims" to challenge an abortion restriction.

It is axiomatic that as the size of the class decreases, so does the probability that at least one of its members has a live claim. If TST's membership in Indiana was nominal – in the dozens – then there could be merit to the District Court's conclusion that it would be "statistically possible" for "exactly zero Members" to be pregnant. But in this case, there are 5,650 female TST members of child-bearing age in Indiana. There is *no* evidence to support the District Court's factual conclusion that it is "statistically possible" for "exactly zero Members" in that

---

[16] There were 1,328,151 Indiana women of child-bearing age in 2022. https://www.in.gov/health/vital-records/vital-statistics/terminated-pregnancy-reports/ 2022 Annual Report, last visited May 21, 2024.  The induced abortion rate in Indiana in 2021 (the last year for which statistics are available) was 6.0 induced abortions per 1,000 women. https://www.in.gov/health/vital-records/vital-statistics/terminated-pregnancy-reports/, 2021 Terminated Pregnancy Report last visited June 9, 2023.  There were over 7,000 Indiana women who, as a class, had standing to challenge Indiana's abortion laws in 2022 because it is beyond dispute at least one of them had a "live claim" during the year – they were pregnant and got an abortion.  The size of that class can be readily established using reliable government statistics.

group to be pregnant.[17]  The District Court erred by making this finding of fact without any evidence to support it. *U.S. v. Warner*, 498 F.3d 666, 680 (7th Cir. 2007) ("A district court also abuses its discretion if the record contains no evidence on which the court could have relied.").

There is a point at which the size of a class of women of child-bearing age is large enough that there will always be at least one "live claim," i.e. a woman who is or will certainly become pregnant due to the failure of birth control in the following twelve months and wants an abortion.  The question then becomes what is the size of that class?

Dr. J.D. opines it is 5,650.  The District Court erred by summarily rejecting Dr. J.D.'s Opinion without conducting a Daubert hearing to determine her *bona fides* as an expert and the validity of her methodology.  The District Court compounded the error by finding that it is "statistically possible for . . . exactly zero Members to be pregnant" out of a group of 5, 650 women without any evidence in the record to support its conclusion.

---

[17] The District Court failed to consider that dozens of TST members became Involuntarily Pregnant Women in the twelve-month period after the filing of the Complaint.  They faced sufficiently imminent injury as of the filing of the Complaint to have standing.

Defendants-Appellees argues Dr. J.D. relied on a "motley collection" of statistics obtained from the State of Indiana, National Institute of Health and Center for Disease Control and Prevention. Response at p. 28.  Medical professionals routinely make medical judgments about the probability of an outcome based on available statistics in their areas of expertise, particularly statistics from long established government agencies.   A Fellow in The American Congress of Obstetricians and Gynecologists who opines "to a reasonable degree of medical certainty" to facts in her area of expertise about the likelihood of pregnancy, based on statistics published by federal and state health officials, is entitled to a Daubert hearing to defend her opinion.  The District Court erred by summarily rejecting that opinion without affording Dr. J.D. the opportunity to respond to the Court's critique.  *Niam v. Ashcroft*, 354 F.3d 652, 660 (7th Cir. 2004) ("[T]he judge could not exclude [the expert] on the basis of her affidavit and curriculum vitae without voir diring her, which could have been done over the phone . . . [The expert's] affidavit was critical evidence and nothing in it or in her curriculum vitae showed that she was unqualified to give expert evidence in this case.").

It is not difficult to verify the facts underlying Dr. J.D.'s Opinion. See Response at p. 17. The Courts routinely rely on statistics generated by public health agencies and organizations to establish facts related to pregnancy and abortion. See *Korte v. Sebelius*, 735 F.3d 654, 726 (7th Cir. 2013), cert. den. __U.S.__ 134 S.Ct. 2903 (2014) ("[N]early one-half (49 percent) of all pregnancies in the United States are unintended, and roughly 40 percent of those pregnancies (22 percent of all pregnancies) end in abortion" citing Guttmacher Institute, In Brief: Facts on Induced Abortion in the United States); *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 790 (7th Cir. 2013) (Hospitalization rates in Wisconsin from colonoscopies higher than hospitalization rates from medical abortions citing Wisconsin Department of Health Services statistics).

A Daubert hearing would have shown Dr. J.D. considered "the possibility that someone who is involuntarily pregnant might voluntarily decide to bring her pregnancy to term." See Br.App. 15. That is because each of the 5,650 female members of TST in Indiana believe they should abort an unwanted "unborn child" if given the opportunity to lawfully do so. ECF No. 21 at ¶14.

24

Given the fact, to a reasonable degree of medical certainty, that at least one (1) TST Indiana member is or will became an Involuntarily Pregnant Woman while this case is pending, TST need not identify her by name. *Fl. State v. Browning*, 522 F.3d 1153, 1162-1164 (11th Cir. 2008) (Organizations need not identify particular members who would be harmed because future "probabilistic injuries" to unidentified members were sufficient if at least one member was "certain to get injured in the end.")

Defendants-Appellees are free to present their own expert testimony that the class "whose fluid membership always include[s] some women with live claims" must larger than 5,650.  But their critique of Dr. J.D.'s Opinion substitutes sophistry for facts.  Like the District Court, they are unable to point to any actual evidence to support a conclusion that it is "statistically possible" for a group of 5,650 women of child-bearing age to have "exactly zero" members who are or certainly will become Involuntarily Pregnant Women during the course of a year.  At most, this is a disputed question of fact that should have been resolved by a hearing. *Pollitt v. Health Care Service Corp.*,

558 F.3d 615, 616 (7th Cir. 2009) ("Disputes about jurisdictional facts must be resolved after a hearing under Fed.R.Civ.Pro. 12(b)(1)").

## IX. TST Members Have Suffered Stigmatic Injury.

Defendants-Appellees show their disdain for TST in the opening sentence of the Response by saying TST "members claim a right to destroy unborn children." Response at p. 1. That is the same Blood Libel zealots have thrown at non-Christians for centuries. It perfectly illustrates the division of the body politic caused by the Indiana Abortion Ban into two antagonistic camps on the basis of religious belief – those who believe a zygote is a human being from the moment of conception and those who do not. The Indiana Attorney General himself has publicly labeled those who do not believe a zygote is a human being as "satanic cultists."

TST members believe a zygote is an integral part of a woman's body and not a human being. The TST Tenets hold that the removal of that zygote is no more murder than an appendectomy. This is a perfectly legitimate religious belief shared by literally billions of people world-wide. However, if the Clinic facilitates an Indiana member acting on that belief, its staff goes to jail.

Abortion is much more than a medical procedure. It is a profound expression of the most deeply held values a woman can have – about herself, her life and her future; the very essence of religious beliefs.

The Indiana Abortion Ban criminalizes the exercise of a legitimate religious belief that a zygote is not a human being. The Indiana Abortion Ban tells adherents to the TST Tenets, you are – in the words of Indiana's Attorney General – satanic cultists intent on murdering babies who deserve prison. This is the same kind of stigmatic discrimination that confers standing as a prohibition on same sex marriage, *Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014) or adopting a resolution telling the Catholic Church its doctrine regarding homosexuality is hateful, discriminatory and callous. *Catholic League v. City of San Francisco*, 624 F.3d 1043, 1048 (9th Cir. 2010) (Resolution *Catholic League v. City of San Francisco*, 624 F.3d 1043, 1048 (9th Cir. 2010) ("sends a clear message that [Catholics] are outsiders, not full members of the political community."). This stigma will be erased if TST members can lawfully get an abortion using the Telemedicine Model.

## X. The District Court Erred By Denying TST Leave to Amend the Complaint.

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. ____, 142 S. Ct. 2228 (2022) ("*Dobbs*") opened the door for a fulsome debate on the manner in which the body politic will resolve the "profound moral issue" of whether a human being comes into existence at conception in a manner that protects everyone's constitutional rights.  TST simply seeks the opportunity to fully participate in that debate.

The Indiana Abortion Ban is premised on the religious belief that a human being comes into existence at conception. The Indiana Court of Appeals recently held that obtaining an abortion required by one's religious beliefs is the "exercise of religion" for purposes of the Indiana Religious Freedom Restoration Act ("RFRA").  *Individual Members of the Med. Licensing Bd. of Ind. v. Anonymous Plaintiff 1*, No. 22A-PL-2938 (Ind. App. Apr. 4, 2024) (Slip. Op. at 52).

TST submits that a TST member who obtains an abortion in Indiana is exercising her First Amendment right to act in accordance with her religious beliefs set forth in the Satanic Tenets.  Criminalizing abortion infringes on the rights of an Involuntarily Pregnant Woman to protect her bodily integrity under Fifth and Thirteenth Amendments

and exercise her right under the First Amendment to act on her religious belief abortion is not murder.[18]  TST seeks leave to amend its Complaint to revise the Indiana RFRA claims stated in Counts Four and Five as First Amendment claims applying the heightened scrutiny standard.

TST recognizes there are differences between a state RFRA claim and a First Amendment claim, including the level of scrutiny.  However, those differences present fair grounds for litigation because TST is asserting a hybrid rights claim. See, *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 881 (1990) ("*Smith*") ("The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press.") and *Telescope Media Group v. Lucero*, 936 F.3d 740, 760 (8th Cir. 2019). (Plaintiff's "claims fall into "the

---

[18] The Complaint alleges Involuntarily Pregnant Women have a property interest in their own bodies irrespective of their privacy rights. The U.S. Supreme Court has long recognized that property interest. *Union Pacific Railway Co. v. Botsford*, 141 U.S. 250, 251 to 252 (1891).

class of hybrid situations in which the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech, can bar application of a neutral, generally applicable law [under *Smith*.").  The District Court abused its discretion to deny TST leave to amend to assert this claim because it cannot "be said to a certainty that the plaintiff cannot state a claim upon which relief can be granted." *Shashoua v. Quern*, 612 F.2d 282, 285 (7th Cir. 1979).

## XI.  Conclusion.

The State of Indiana decreed in 2022 that a human being comes into existence at conception. Ind. Code § 16-34-2-7(a) protects a human being *in utero* by imposing the criminal penalty for manslaughter on anyone who removes a human being from a woman's uterus by abortion.

The Complaint alleges the legislative creation of a separate human being inside the body of an Involuntarily Pregnant Woman causes a taking of her property without compensation - the use and occupancy of her uterus - and places her into involuntary servitude. Defendants-Appellees seek to shield the Indiana Abortion Ban from

judicial review for this unconstitutional conscription by arguing TST has no standing to challenge it.

For the reasons set forth above and in the Brief, TST respectfully requests the dismissal of the Complaint be reversed and the case remanded for disposition on the merits.

June 10, 2024

W. James Mac Naughton
W. James Mac Naughton, Esq.
7 Fredon Marksboro Road
Newton, NJ 07860
wjm@wjmesq.com
732-213-8180
*Attorney for Plaintiff-Appellant*
*The Satanic Temple, Inc.*

## XII.  Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1. This document complies with the word limit of Fed. R. App. P. 32 (B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 5,403 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Mac, Ver. 16.16.2. in Century 14-point font.

June 10, 2024

_W. James Mac Naughton_
W. James Mac Naughton, Esq.

## XIII.  CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the date of this pleading, I electronically filed it with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

James A. Barta
Solicitor General
Office Of Indiana Attorney General Todd Rokita
302 West Washington Street – IGCS – 5th Floor
Indianapolis, IN 46204-2770
Telephone: (317) 232-2826
Facsimile: (317) 232-7979
E-mail: James.Barta@atg.in.gov

*/s/ W. James Mac Naughton*